IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GOSPEL LIGHT MENNONITE
CHURCH MEDICAL AID PLAN,                          Case No. 1:23-cv-276
DBA LIBERTY HEALTHSHARE,
BREANNA RENTERIA,
LAURA SMITH, and
TAMMY WATERS.

                *Plaintiffs*,

                                       COMPLAINT FOR INJUNCTIVE
                                       AND DECLARATORY RELIEF

                                       JURY TRIAL DEMANDED

v.

NEW MEXICO OFFICE OF THE
SUPERINTENDENT OF INSURANCE, and
JENNIFER A. CATECHIS,
Interim Superintendent of Insurance,
in her official capacity,

                *Defendants*.

## **COMPLAINT**

      The Plaintiffs, Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare

and three of its members in New Mexico, namely, Breanna Renteria, Laura Smith, and Tammy

Waters, by counsel,  file this lawsuit against Defendants New Mexico Office of the Superintendent

of Insurance ("OSI") and Jennifer A. Catechis, Interim Superintendent of Insurance, in her official

capacity as leader of OSI, alleging that Defendants violated the United States Constitution, the

New Mexico Constitution, and New Mexico state law when Defendants prohibited Plaintiffs from

engaging in the sharing of their health care costs according to their religious beliefs and practices.

## OVERVIEW

Plaintiff Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare is a health care sharing ministry ("HCSM"). An HCSM is not insurance. It is a religious ministry grounded in Biblical teaching and is the method by which religiously like-minded members voluntarily share each other's health care costs. Indeed, Gospel Light Mennonite Church Medical Aid Plan—a recognized HCSM under federal law—merely facilitates this voluntary sharing among its members; it does not, however, indemnify any of its members against risk. And yet, Defendants—whose jurisdiction is limited by the New Mexico Constitution and state statute— have targeted Gospel Light Mennonite Church Medical Aid Plan in an effort to drive out all health care sharing ministries from New Mexico under the guise of regulating the transaction of insurance within the state.

Defendants took this recent tack despite the fact that Gospel Light Mennonite Church Medical Aid Plan has operated in New Mexico since 2014 without even the slightest hint that Defendants considered HCSMs to be unauthorized until, at earliest, March 26, 2020, when OSI, through the previous Superintendent Russell Toal, first indicated through a press release its position that an HCSM is "an unauthorized insurance product."[1] And even then, OSI did not issue its cease-and-desist order to Gospel Light Mennonite Church Medical Aid Plan until November 23, 2021.

Following a hearing—prosecuted by an OSI attorney before an OSI-employed hearing officer, depending largely on the testimony of OSI employees—the very entity that publicly and

---

[1] As a matter of fact, in a December 3, 2019, press release, then-Superintendent of Insurance John Franchini essentially took the opposite view, stating: "A few health care sharing ministries (also known as health care sharing organizations) operate in New Mexico. These organizations *do not offer insurance*, but may present plans in a way that look and feel similar to a health insurance plan. Members of these organizations 'share' health costs on a voluntary basis. Consumers should be aware that these plans have *no obligation to pay* for any medical services and have *no requirement to cover* any particular categories of health care services, such as preventive care." *See* Exhibit F at 1-2 (emphasis added).

matter-of-factly proclaimed that an HCSM is an unauthorized insurance product, not surprisingly, determined that Gospel Light Mennonite Church Medical Aid Plan was engaged in the transaction of insurance without a valid certificate. Defendants OSI and Catechis ordered that Gospel Light Mennonite Church Medical Aid Plan cease its operations in New Mexico unless and until it obtains a certificate from the Superintendent of Insurance to transact the business of insurance in New Mexico and to pay a fine in the amount of $2,510,000.

If successful, Defendants' targeted campaign to push health care sharing ministries out of New Mexico will not only deprive Gospel Light Mennonite Church Medical Aid Plan and Plaintiffs Renteria, Smith, and Waters, of their constitutional rights to free exercise of religion and to free association, but the campaign will similarly impact Gospel Light Mennonite Church Medical Aid Plan's approximately 490 New Mexico members. This all-out-attack on a 26 U.S.C. §501(c)(3) religious ministry that meets all requirements for—and has indeed been granted—a religious exemption under the federal Affordable Care Act, *see* 26 U.S.C. § 5000A(d)(2)(B), demands the strictest scrutiny, which Defendants' actions cannot survive.

## EXHIBITS

The following exhibits are offered in support of this Complaint.[2]

A. 2014-03-31 – Centers for Medicare & Medicaid Services ("CMS") Recognition Letter for Gospel Light Mennonite Church Medical Aid Plan HCSM
B. 2014-06-03 – Articles of Incorporation, Gospel Light Mennonite Church Medical Aid Plan
C. 2014-10-14 – Bylaws, Gospel Light Mennonite Church Medical Aid Plan, as signed and attached to 501(c)(3) Filing.
D. 2015-04-16 – IRS Letter of Exemption for the incorporated Gospel Light Mennonite Church Medical Aid Plan
E. 2015-05-22 – (Amended) Bylaws of Gospel Light Mennonite Church Medical Aid Plan
F. 2019-12-03 – Press Release, Office of the Superintendent of Insurance, December 3, 2019.

---

[2] Exhibits are numbered in their logical/chronological order, not the order of appearance herein.

G.  2020-03-26 – Press Release, Office of the Superintendent of Insurance, NM OFFICE OF SUPERINTENDENT OF INSURANCE CAUTIONS CONSUMERS ABOUT HEALTH CARE SHARING MINISTRIES, March 26, 2020.
H.  2020-03-26 – Email from Russell Toal Superintendent of Insurance to OSI-Employees, Subject: FYI, being released this afternoon, March 26, 2020 3:24:58.
I.   2022-09-01 – Liberty HealthShare Sharing Guidelines (Effective September 1, 2022).
J.   2023-02-22 – FINAL ORDER, Office of the Superintendent of Insurance.
K.  One Another Verse List.
L.   HCSM Tracker – Confirmed, prepared by CMS.
M.  2014-12-09 – Letter to CMS expanding new sharing limits.
N.  2021-03-00 – Consumer Advisory March 2021.
O.  NM-Trinity HealthShare Order filed November 19, 2020.

## PARTIES

### Organizational Plaintiff

1.      **Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare**

is a Christian ministry that recruits, evangelizes, and serves a distinct religious body whose members share directly in one another's spiritual, emotional, and financial needs (arising from disease and injury) via monthly solicitations and communications among the ministry and its member households. It is one of the largest HCSMs in the country. The ministry is motivated by the Scriptural Purpose stated in its Bylaws:

In Galatians 6:2 the Apostle Paul instructs believers to, "Bear one another's burdens, and so fulfill the law of Christ." II Corinthians 8:14 further explains, "At the present time your plenty will supply what they need, so that in turn their plenty will supply what you need."

**The purpose** for the formation of this Corporation is to enable followers of Christ to bear one another's burdens and:

**1.     To associate** within the community of the Christian faith for discipleship, medical-sharing, physical needs-sharing, financial stewardship, and evangelical purposes and in accordance with the Bylaws of this organization and the laws of the state or states wherein this Corporation may be doing business.

**2.     To promote** the biblical concept of mutual aid sharing, historically practiced among Christians as it relates to the socio-economic and spiritual needs of its members.

**3.     To create funds** from its activities and to maintain and invest its funds; and to disburse and apply its funds among the aged, disabled or sick among its members and among the widows and orphans or dependents of deceased members and in accordance with the laws of the state or states wherein this Corporation may be doing business.

(Ex. C, Article 2, Sections 1-3).

2.     The ministry and its members are governed by their Sharing Guidelines (Ex. I), which says the members are to "Observe Christian Standards" (Ex. I, Sharing Guidelines, Article III, Section A), and to "Maintain a Christian Lifestyle" (Ex. I, Sharing Guidelines, Article III, Section C).

3.     Stated in its most succinct form, Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare has a clear, Biblically-based function: "Our purpose is to preserve the Christian tradition of health care sharing and to enable followers of Christ to bear one another's burdens …" (Ex. C, Bylaws, Article 2, Section 2.)

4.     The corporate directors and officers of Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare are bound by the following Doctrinal Positions:

We believe the Bible alone is the inspired Word of God; therefore it is the final and only source of absolute spiritual authority.

We believe in the triune God of the Bible.  He is one God who is revealed in three distinct Persons – God, the Father; God, the Son; and God, the Holy Spirit.

We believe Jesus Christ was God in the flesh – fully God and fully man. He was born of a virgin, lived a sinless life, died on the cross to pay the penalty for our sins, was bodily resurrected on the third day, and now is seated in the heavens at the right hand of God, the Father.

We believe that all people are born with a sinful nature and can be saved from eternal death only by grace alone, through faith alone, trusting only in Christ's atoning death and resurrection to save us from our sins and give us eternal life.

We believe in the bodily resurrection of all who have put their faith in Jesus Christ.

All we believe and do is for the glory of God alone.

Ex. C, Bylaws, Article 2, Section 2(4).

5.      As the very first of those doctrines declares, "We believe the Bible alone is the inspired Word of God; therefore, it is the final and only source of absolute spiritual authority." For Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare, the Bible is the Truth, and it governs all things.

6.      The Guidelines for the members makes this declaration, "As a community of people, we try our best to live out Jesus Christ's mandates." (Ex. I, Sharing Guidelines, Article III, Section C).

7.      Thus, "[E]very member of Liberty HealthShare is expected to: Strive to live in accordance with biblical principles; Honor the biblical teaching to 'share one another's burdens' (Gal. 6:2); Participate regularly in worship or prayer." (Ex. I, Sharing Guidelines, Article III, Section A).

8.      As is the case with other groups that assemble and coordinate for their mutual benefit, such as homeowners' associations, trade associations, trade unions, and professional associations, Liberty HealthShare's members can lose membership or benefits by failing to pay

their dues or otherwise neglect their membership requirements and responsibilities. (Ex. I, Sharing Guidelines, Article III, Section I).

**Individual Plaintiffs**

9.      **Breanna Renteria** lives in Santa Teresa, New Mexico, which is just at the border with Texas. She describes herself as a "stay-at-home mom" who works on the side as an artist, illustrating children's books. She joined Gospel Light Mennonite Church Medical Aid Plan in January 2019 because it fit her fairly long checklist: it supported her growing family; it worked for her family's national and international traveling; and most importantly, it enabled her to live out her Christian faith in a real and practical way through financial sharing and prayer. She has stayed with Gospel Light Mennonite Church Medical Aid Plan while living in four different states. When Breanna joined, she signed a statement of beliefs through which she "agree[d] to share [healthcare expenses] in accordance with the . . . Statement of Christian Beliefs." She practices and lives by the principles Gospel Light Mennonite Church Medical Aid Plan requires and she attends a small church called Revolución Emanuel Ministries in El Paso, Texas.

10.      **Laura Smith** lives in Farmington, New Mexico. The faith aspect of Gospel Light Mennonite Church Medical Aid Plan is very important to her. When she joined Gospel Light Mennonite Church Medical Aid Plan in 2017, like each of the members, she signed a Statement of Beliefs that began with this statement: "I believe that my personal rights and liberties originate from God and are bestowed on me by God, and are not concessions granted to me by governments or men." She practices and lives by the principles Gospel Light Mennonite Church Medical Aid Plan requires and she attends Hills Church in Farmington.

11.     **Tammy Waters** lives in Clovis, New Mexico. As with Ms. Renteria and Ms. Smith, her faith is very dear to her and is one of the big reasons why she joined Gospel Light Mennonite Church Medical Aid Plan in 2017. She practices and lives by the principles Gospel Light Mennonite Church Medical Aid Plan requires and although she does not attend a specific church on a regular basis, she is a Christian and has attended Baptist, Methodist, and Non-Denominational churches.

### Defendants

12.     **Defendant New Mexico Office of the Superintendent of Insurance** is the state agency tasked with enforcing New Mexico law on insurance matters. It is located at 1120 Paseo de Peralta in Santa Fe, New Mexico and 6200 Uptown Boulevard NE #400 in Albuquerque, New Mexico. Defendant New Mexico Superintendent of Insurance is a "public body" as defined under the New Mexico Civil Rights Act and is being sued in that capacity. *See* NMSA 1978, § 41-4A-2. It is also a government agency according to the New Mexico Religious Freedom Restoration Act. NMSA 1978, § 28-22-2(B) (defining government agency as "the state or any of its political subdivisions, institutions, departments, agencies, commissions, committees, boards, councils, bureaus or authorities").

13.     Defendant **Jennifer A. Catechis** is the Interim Superintendent of Insurance of the State of New Mexico, having replaced former Superintendent Russell Toal on January 21, 2023.

14.     In her capacity as the Interim Superintendent of Insurance, Defendant Catechis leads the Office of Superintendent of Insurance and is the proper official to enjoin in this case.

15.     Defendant Catechis is sued here in her official capacity only.

**JURISDICTION AND VENUE**

16.     This action is brought according to 42 U.S.C. §§ 1983 and 1988 and alleges claims brought under the United States Constitution, including the First and Fourteenth Amendments, as well as other state constitutional provisions and state law.

17.     This court has subject matter jurisdiction over Plaintiffs' § 1983 and § 1988 claims according to 28 U.S.C. § 1331 because those claims present a federal question.

18.     This court has subject matter jurisdiction over Plaintiffs' remaining claims according to 28 U.S.C. § 1367(a) because those remaining claims are so related to Plaintiffs' federal claims as to form part of the same case or controversy.

19.     Venue is appropriate in the District of New Mexico according to 28 U.S.C. § 1391(b)(1) because this is the judicial district where Defendant is located, § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the District of New Mexico, and § 1391(b)(3) because there would be no personal jurisdiction over Defendant Catechis were these claims brought in any other judicial district.

**FACTUAL ALLEGATIONS**

**I.      Overview of Health Care Sharing as Ministry**

20.     The originators of health care sharing ministries, the Amish, Mennonites, and other "Anabaptists" or "Plain People," can trace their origins all the way back to Martin Luther and the Reformation in Europe in the sixteenth century.

21.     The Anabaptists' "origin story" helps to inform the reason for their consistent adherence to the literal Word of the Bible and their steadfast resistance through the centuries to governments' attempt to re-define for them their obligations to their church communities.

22.     Martin Luther began the German reformation movement in 1517 by nailing his ninety-five theses to the door of the Castle Church of Wittenberg. This Reformation challenged the hierarchies and doctrines of the official state church in that era.

23.     As the Reformation progressed and expanded, several student ministers in the Reformation began studying the Scriptures for themselves and began to develop their own religious convictions. They became dissatisfied with the Reformation movement, but they also objected to the nature and hierarchy of the official state church. They particularly denounced the state church practice of infant baptism, and they began the practice of rebaptism for Christians who wished to publicly express their faith after becoming adults. This group of Christians later became known as "Anabaptists" because of that practice of rebaptism. Mennonites derive their name from an influential leader of the Anabaptist movement in Europe during the sixteenth century. The Anabaptist leader's name was Menno Simons (1496-1561). Today, the term "Mennonite" is used interchangeably with the term "Anabaptist."

24.     The official state church viewed the Anabaptist/Mennonite movement as a theological and political threat to its existence, and it began persecuting and killing Mennonites for their faith.

25.     During persecution, Mennonites literally went "underground" and lived in catacombs beneath the earth that looked like tunnel mazes. They held church services in secret, clinging to their ethical and religious beliefs to the death. For some, it meant burning at the stake. It was in this closely-knit circle of believers that the concept of caring for one another was transfused into the lifeblood of the Mennonite faith.

26.     Those early Mennonites believed in a literal interpretation of the Bible and as they read and studied the Scriptures, they developed staunch ethical and religious convictions, embracing as one of their core beliefs that they should care for one another.

27.     Like other Mennonite churches, Gospel Light Mennonite Church declares itself to be neither Protestant nor Catholic, and it has never had a church hierarchy like the official state churches of the sixteenth century.

28.     The particular Mennonite tradition and fellowship that Gospel Light belongs to is the Beachy-Amish Mennonites.[3] It is independent of any other church leadership, and it quietly adheres to many timeless Anabaptist traditions, including sharing one other's burdens, the need for which was learned in the harsh lessons of centuries of persecution.

29.     Even after five centuries of this faith tradition, the members of Gospel Light Mennonite Church still believe in a literal interpretation of the Bible. They also still believe that caring for one another can and should include sharing health care expenses. One scriptural expression of their belief is found in Galatians 6:2, which says believers are to, "Bear one another's burdens, and so fulfil the law of Christ." When Jesus said to "Love your neighbor as yourself," members of Gospel Light Mennonite Church believe that Jesus was commanding them to care for one another in their own home church and also to the larger interdenominational Body of Christ, and the Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthCare is a practical expression of that religious belief.

---

[3] "As the Amish faced innovations of the twentieth century, they grappled with what to allow and what to forbid. The Beachy Amish-Mennonites were those Amish, a minority at the time, that were more (though not entirely) open to modern innovations like the telephone, automobile, farm tractor, and electricity, though not radio or television." *The Beachy-Amish Mennonites: General Information,* BeachyAM.org--General information, viewed March 22, 2023.

30.     The members of the Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare believe they are following the teachings of Jesus in sharing and "bearing" one another's healthcare costs. (*See* Ex. K, "One Another Verse List.") The Mennonites of long ago bore one another's burdens in the catacombs of Europe in the sixteenth century, and their spiritual descendants are still bearing one another's burdens. They have never stopped.

31.     Citing this faith tradition, *Bethel Conservative Mennonite Church v. Com'r*, 746 F.2d 388, 392 (7th Cir. 1984) upheld §501(c)(3) status for a Mennonite church, stating:

> [W]e are fully convinced that the Medical Aid Plan was simply another form of the various mutual aid plans established and used by the Mennonites in general to further their strongly held religious belief that they must "bear one another's burdens."

32.     Health care sharing ministries, based on supporting Scriptures such as Galatians 6:2 and Hebrews 13:6, are common and not unique to Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare. At least 108 of these HCSMs have been recognized by the Centers for Medicare & Medicaid Services ("CMS") as meeting the Affordable Care Act's definition of "Health Care Sharing Ministries" under Internal Revenue Code (IRC) §5000A(d)(2)(B). An obvious indication of their commonality is that forty-five of those CMS-recognized HCSMs have the term "Medical Aid Plan" as part of their name.[4] (Ex. L, HCSM Tracker – Confirmed)

---

[4] Health care ministries have been central to Christianity, and for two thousand years the Church has ministered to the faithful and their neighbors through health care. That is why many hospitals in New Mexico bear Christian names or have Christian heritages:

CHRISTUS ST. VINCENT REGIONAL MEDICAL CENTER
CHRISTUS ST. VINCENT PHYSICIANS MEDICAL CENTER
HOLY CROSS HOSPITAL
PRESBYTERIAN KASEMAN HOSPITAL
PRESBYTERIAN RUST MEDICAL CENTER
PRESBYTERIAN ESPANOLA HOSPITAL
PRESBYTERIAN HOSPITAL
REHOBOTH MCKINLEY CHRISTIAN HEALTH CARE SERVICES

33.     In 2014, the leadership of Gospel Light Mennonite Church Medical Aid Plan saw the need for the Body of Christ to have a Biblically-based medical sharing program beyond the traditional Mennonite groups. Accordingly, they sent a written notice to Benjamin L. Walker, who was at that time the Director of the Eligibility Policy and Operations Branch of CMS, advising him that:

> [T]he leadership of the Gospel Light Mennonite Church Medical Aid Plan has decided to describe the limitation for inclusion of sharing within the Gospel Light Mennonite Church Medical Aid Plan that the sharing would be for the glory of God, by those who are called by His name, and for no purpose that would advance Satan's agenda rather than God's kingdom.

(Ex. M, 2014-12-09- Letter to CMS expanding new sharing limits)

34.     Today, whether a Christian is Amish or Zion Baptist, they can come under the Scriptural mantle and health care costs support group of Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare. The members of Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare simply wish to continue the centuries-old Christian tradition of caring for one other and to "so fulfill the law of Christ."

**II.     The Reason for Plaintiff's Names: *Gospel Light* and *Liberty*.**

35.     The reason why Plaintiff has the legal and dba names it does is found "in the ring where name and image meet."[5] They were chosen for specific Biblical purposes.

36.     The explanation for the name Gospel Light begins in Matthew, Chapter 11. When questioned as to the authenticity of His identity as the Messiah, Jesus answered with His evidence list that had been observed by hundreds and thousands of eyewitnesses: "The blind see and the

---

[5] Poetically, W.H. Auden located the deepest type of love, agape-love, "Love, the interest itself," in the human heart, "in the ring where name and image meet." Kirsch, Arthur. *Auden and Christianity*. Yale University Press, 2008.

lame walk; the lepers are cleansed and the deaf hear; the dead are raised up and the poor have the **gospel** preached to them.'" Matthew 11:5 (NJKV) (bold added).[6]

37.    The word He used to describe what was preached, the "gospel," was simply the Greek word for "good news."

38.    The illuminating aspect of the good news is that "it is the God who commanded **light** to shine out of darkness, who has shone in our hearts to give the **light** of the knowledge of the glory of God in the face of Jesus Christ." 2 Corinthians 4:6 (bold added).

39.    The name Liberty HealthShare was likewise purposely sourced from Scripture (bold added):

•    Leviticus 25:10 (King James) – "proclaim **liberty** throughout all the land unto all the inhabitants thereof"[7]

•    Isaiah 61:1 (NKJV) – "The Spirit of the Lord God is upon Me, Because the Lord has anointed Me To preach good tidings to the poor; He has sent Me to heal the brokenhearted, To proclaim **liberty** to the captives, And the opening of the prison to those who are bound"

•    Luke 4:18 (NKJV) – "'The Spirit of the LORD *is* upon Me, Because He has anointed Me To preach the gospel to *the* poor; He has sent Me to heal the brokenhearted, To proclaim **liberty** to *the* captives And recovery of sight to *the* blind, *To* set at **liberty** those who are oppressed'"

•    2 Corinthians 3:17 (NKJV) – "Now the Lord is the Spirit; and where the Spirit of the Lord is, there is **liberty**."

---

[6] For more on the evidences of the divinity and historicity of Jesus Christ, see, Simon Greenleaf, *The Testimony of the Evangelists Examined by The Rules of Evidence Administered in Courts of Justice*, reprint of the 1874 edition, (Grand Rapids: Baker Book House, 1984).
[7] This verse and its citation to Leviticus 25:10 are the inscriptions on the Liberty Bell, and, of course, are the source of the bell's name.

- Galatians 5:1 (NKJV) – "Stand fast therefore in the **liberty** by which Christ has made us free, and do not be entangled again with a yoke of bondage."

40.     The choice of the word "liberty" in Liberty HealthShare's name also harkens back to the powerful text of our Declaration of Independence, which in turn references the Creator as the ultimate source of authority:

> We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, **Liberty** and the pursuit of Happiness.--That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, --That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness.

> THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) (bold added).

### III.     The Reason Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare Exists.

41.     The function, motivation, and purpose of Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare is expressed in the Vision and Mission statements published on its website[8]:

> **Our Vision**: To build a healthcare sharing community which exemplifies Jesus Christ and empowers like-minded people to manage their health care journey.

> **Our Mission:** Shepherd the Christian tradition of healthcare sharing through prayer, education, personal responsibility, and stewardship of the community's resources.

---

[8] Leading Healthcare Sharing Programs | Liberty HealthShare, https://www.libertyhealthshare.org/about-us. viewed March 22, 2023.

IV.     **The Reason the New Mexico Office of the Superintendent Insurance Exists.**

42.     The Office of Superintendent of Insurance was created by a constitutional amendment that passed on November 6, 2012, with 330,873 votes for the amendment (50.00%), and 321,055 votes against the amendment (49.00%).[9]

43.     The new constitutional amendment provided for a relatively finite range of authority: "The office of 'superintendent of insurance' is created as of July 1, 2013. The superintendent of insurance shall regulate insurance companies and others engaged in risk assumption in such manner as provided by law."[10]

44.      The legislature's follow-on codification appears to go beyond the reach of the constitutional amendment: "All powers relating to state supervision of insurance, insurance rates and rate practices, together with collection of insurance licenses, taxes or fees, and all records pertaining to such supervision are under control of the office of superintendent of insurance." NMSA 1978, § 59A-2-1(B).

45.     The function, motivation, and purpose of the Office of Superintendent of Insurance is expressed even more expansively in the statements made in its 2022 Annual Report published on its website:

> **MISSION:** The mission of the Office of Superintendent of Insurance is to provide consumers with convenient access to reliable insurance products that are underwritten by dependable and financially sound companies.[11]

> **AGENCY DESCRIPTION**: The paramount role of the OSI is to make sure the insurance industry is operating in the best interests of New Mexicans.

---

[9] Kilpatric, Moore, *Insurance Regulation in New Mexico: A New Approach*, Federation Of Regulatory Counsel Journal: Vol. 25 Edition 2 - Summer 2014, pp.3-4.
[10] NM Const art XI § 20.
[11] *2022 Annual Report, Mission*, page 2, https://a.storyblok.com/f/132761/x/f1d5ef8cdc/nm-osi-annual-report-fy22.pdf, viewed March 21, 2023.

46.     Thus, to regulate "insurance" is the only reason Defendants' offices exist and the only role Defendants Catechis and OSI serve. That is their mandate and their jurisdictional limitation under governing law.

### V.     Regulation of HCSMs

47.     Precisely to protect HCSMs, Congress created a safe-harbor "Religious Exemption[]" from the ACA's shared responsibility payment (individual mandate) for any member of a "Health Care Sharing Ministry." 26 U.S.C. §5000A(d)(2)(B). This religious exemption provision in the ACA was one of the many compromises that facilitated its passage.

48.     To enable members of HCSMs to obtain the benefits of the ACA religious exemption, CMS adopted regulations and an application process to determine which ministries met the exemption's requirements. As a result, 108 ministries were determined ACA-Compliant "Health Care Sharing Ministries" under 26 U.S.C. §5000A(d)(2)(B). *See* ACA-Certified HCSM List (Ex. L). Gospel Light Mennonite Church Medical Aid Plan is number 6 on this list.

49.     To be clear, this federal ACA religious exemption in §5000A(d)(2)(B), like comparable state safe harbors,[12] protects both HCSMs and their members *by exempting the members* from penalties for failing to have or maintain "insurance" coverage.

50.     Thirty-one states, including all four states bordering New Mexico, have gone further via safe harbors for the HCSMs themselves, making these ministries "safe" from state insurance codes and commissioners.[13]

---

[12] Such exemptions for HCSM members also exist in state law. *See* Cal. Gov't Code §100705(c)(2); D.C. Code Mun. Regs. tit. 26-A § 8901.1(f); 956 Mass. Code Regs. 5.03(3)(d); N.J. Stat. § 54A:11-2; R.I. Gen. Laws §44-30-101(a)(1); and Vt. Stat. Ann. tit. 33, § 1805(8)).

[13] *See* Ala. Code §22-6A-3; Alaska Stat. §21.03.021; Ariz. Rev. Stat. §20-122; Ark. Code §23- 60-104(a)(3)&(b)(2); Fla. Stat. §624.1265; Ga. Code §33-1-20; Idaho Code §41-121; 215 Ill. Comp. Stat. 5/4(b); Ind. Code §27-1-2.1-1; Iowa Code §505.22; Kan. Stat. §40-202(j); Ky. Rev. Stat. §304.1-120; La. Rev. Stat. Ann. §22:318-19; Me. Rev. Stat. tit. 24-A, §704(3); Md. Code Ins. §1-202(a)(4); Mich. Comp. Laws Serv. §550.1861-69; Miss. Code §83-77-1; Mo. Rev. Stat. §376.1750; Mont. Code §§33-1-102(16), 1-201(5)-(6), §50-4-111; Neb. Rev. Stat. §44-311; N.H. Rev. Stat. §126-V:1; N.C. Gen. Stat. §58-49-12; Okla. Stat. tit. 36, §110(11); 40 Pa. Stat. §23(b); S.D.

51.     New Mexico's authority to regulate "insurance" is not unlimited.

52.     One important limitation on New Mexico's authority to regulate insurance is a federal law known as the McCarran-Ferguson Act of 1945, 15 U.S.C. §§1011 et seq. ("MFA").

53.     The MFA helps reserve insurance regulation to the states by protecting such regulation from "federal preemption." *See SEC v. Variable Annuity Life Ins.*, 359 U.S. 65, 67-72 (1959).  Only regulations of "insurance" as defined by the MFA qualify for this protection.

54.     Because the MFA is a federal law, its use of the word "'insurance' [is a] federal term[]" and its "meaning [is] a federal question." *Id*. at 69. Thus, to qualify for MFA protection, states must define "insurance" consistently with federal cases.[14]

55.     The U.S. Supreme Court has been clear on several requirements of "insurance."

56.     Insurance requires assumption of "true risk." *Id*. at 70-71. "We deal with a more conventional concept of risk-bearing when we speak of insurance. For … insurance involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts. The companies that issue these annuities take the risk of failure. But they guarantee nothing[.] There is not true underwriting of risks, the one [real] earmark of insurance[.]" *Id.* at 71-73.

57.     "[If risk] is not shifted [to] others, there can be neither insurance nor indemnity. Insurance also…involves distribution of the risk, but distribution without assumption hardly can be held to be insurance. These are elemental conceptions and controlling ones."[15]

---

Code §58-1-3.3; Tex. Ins. Code §1681.001; Utah Code §31A-1-103(3); Va. Code §38.2- 6300-01; Wash. Rev. Code §48.43.009; Wis. Stat. §600.01(b)(9); Wyo. Stat. §26-1-104(a)(v).

[14] *See Air Evac EMS, Inc. v. Dodrill*, 523 F.Supp.3d 859, 871 (S.D.W.Va. 2021) (membership group analogous to Gospel Light Mennonite Church Medical Aid Plan), aff'd on other grounds, *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89 (4th Cir. 2022). The insurance commissioner's "enforcement threat against the Membership Program" was held not to "involve regulation of the business of insurance" as defined by the MFA. *Dodrill*, 523 F.Supp.3d at 872-73. "Air Evac is likely to prevail in demonstrating that its Membership Program is not insurance, and therefore that any state regulation of it is preempted[.]" *Id.* Key to the court's "no insurance" ruling was its finding of "no indemnification." *Id.*

[15] *Jordan v. Grp. Health Ass'n,* 107 F.2d 239, 245 (D.C. Cir. 1939) (citations omitted).

18

58.     Hallmarks of insurance have always included the related concepts of indemnity, promise to pay, and assumption of risk.[16]

59.     In short, a contract for insurance always requires a *legally enforceable* promise or "obligation to indemnify the insured."[17]

60.     Wherever New Mexico law defining insurance disagrees with federal law defining insurance, New Mexico law must give way and is subject to preemption or nullification.

61.     It is not unlikely that the drafters of the 2012 constitutional amendment creating OSI recognized that OSI must come within the U.S. Supreme Court's definition of insurance, and so made the assumption of risk a required aspect of those entities that would come within the purview of the new agency.[18]

62.     Further, Defendants must act circumspectly in dealing with HCSMs, because the First Amendment guarantees "special solicitude to the rights of religious organizations."[19]

**VI.     Gospel Light Mennonite Church Medical Aid Plan Sharing Model**

63.     Gospel Light Mennonite Church Medical Aid Plan has long operated in all 50 states and the District of Columbia.

64.     Gospel Light Mennonite Church Medical Aid Plan has received two relevant legal determinations from the United States government under provisions of the ACA and the Internal Revenue Code ("IRC").  Both provisions are codified in the IRC.

---

[16] *See, e.g., Kinkaid v. John Morrell & Co.*, 321 F.Supp.2d 1090, 1098 (N.D.Iowa 2004).

[17] *Jones v. Liberty Mutual*, 385 F.3d 820, 827 (4th Cir. 2004) (Md. law) ("obligation to indemnify [arises from] legal obligation to pay"); *see Travelers Indem. v. Dammann & Co.*, 594 F.3d 238, 258 (3d Cir. 2010) (same); *Stewart v. E.M.J. Corp.*, 2005 U.S. App. LEXIS 2050, at *14-15 (10th Cir. 2005) ("only [one] compelled to pay another party due to a legal obligation is eligible to seek indemnification"); *Equal Rights Ctr. v. Archstone Smith Tr.*, 603 F.Supp.2d 814, 824 (D.Md. 2009) (to "'shift [the] entire responsibility …' is exactly what indemnity means").

[18] "The superintendent of insurance shall regulate insurance companies and others *engaged in risk assumption* in such manner as provided by law." NM Const art XI § 20 (emphasis added)

[19] *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012) (unanimous) ("special solicitude to the rights of religious organizations") ("*Hosanna*").

65.     First, Gospel Light Mennonite Church Medical Aid Plan received its federal tax-exempt status under IRC §501(c)(3) effective as of June 24, 2014. *See* IRS Det. Ltr (Ex. D). Second, Gospel Light Mennonite Church Medical Aid Plan received its federal HCSM status under 26 U.S.C. §5000A on March 31, 2014. *See* CMS Det. Ltr (Ex. A) and ACA-Certified HCSM List (Ex. L).  These federal determinations are discussed further below.

66.     Gospel Light Mennonite Church Medical Aid Plan's religious burden-sharing model bears little resemblance to insurance.

67.     Gospel Light Mennonite Church Medical Aid Plan "suggests" to its members "voluntary" contributions with "no assumption of risk or promise to pay."

68.     Further, Gospel Light Mennonite Church Medical Aid Plan everywhere expressly disclaims any assumption of risk, promise to pay and other hallmarks of insurance, and all of its materials clearly state that the members remain responsible for their own medical bills.

69.     That language is abundant in Gospel Light Mennonite Church Medical Aid Plan materials starting from the "Program Overview" section of its Sharing Guidelines to the four pages of legal notices that accompany each of the Sharing Guidelines, Decision Guide, and Enrollment Application.

70.     For example, the three individual Plaintiffs in this case, together with all of Gospel Light Mennonite Church Medical Aid Plan's other New Mexico members, signed a Sharing Member Enrollment Application stating:

> PROGRAM NOT INSURANCE. I acknowledge that I am enrolling in Liberty HealthShare, a healthcare sharing ministry of Gospel Light Mennonite Church Medical Aid Plan, Inc., that is voluntary and cooperative and not insurance. I have read and understand any disclaimers to this effect and understand that there are no representations, promises or guarantees that my medical expenses will be paid. I also understand that any funds that I may receive for medical expenses do not come from an insurance plan, but are voluntary donations by the members.

71.     In short, Gospel Light Mennonite Church Medical Aid Plan expressly, consistently, and persistently disclaims any assumption of risk, promise to pay, and other customary legal incidents of insurance.

72.     Gospel Light Mennonite Church Medical Aid Plan's members share their health needs and costs among themselves, voluntarily giving their contributions, as suggested and coordinated by the ministry. No sharing is guaranteed. No member is legally obligated to contribute funds. And all members always remain legally responsible for their own medical bills.

73.     OSI exists only to regulate "insurance."  Thus, the threshold inquiry in this case is whether Gospel Light Mennonite Church Medical Aid Plan is "insurance."

74.     Gospel Light Mennonite Church Medical Aid Plan has freely operated in all 51 jurisdictions as "not insurance" until now. It has never been found in any binding legal decision to be insurance.

75.     The only reason Gospel Light Mennonite Church lacks good standing in New Mexico is that Defendants have engaged in this biased and illegal enforcement action, premised on targeting religious ministries that qualify not only for IRC §501(c)(3) status, but are also federally recognized HCSMs for purpose of a religious exemption under the ACA.

**VII.     Defendants' History with HCSMs.**

76.     New Mexico has only a recent history of questioning the "validity" of HCSMs.

77.     On March 26, 2020, the NM OSI issued a press release that "Cautions Consumers about Health Care Sharing Ministries." That same day, the NM OSI issued a Cease-and-Desist Order against the counterfeit HCSM Trinity HealthShare, Inc., claiming that it was transacting the business of insurance in New Mexico without a certificate of authority from the Superintendent.

Notably, Trinity HealthShare, Inc. did not have a valid CMS recognition letter and did not fit the ACA's definition of an HCSM nor the definition in any of the states' safe harbor laws.

78.     Trinity HealthShare, Inc. requested a hearing before the OSI.  The hearing was held on July 8, 2020. On November 17, 2020, OSI Hearing Officer R. Alfred Walker determined that Trinity HealthShare, Inc. was "transacting the business of insurance in [New Mexico]" without a "certificate of authority from the Superintendent." The Hearing Officer's decision was not based in any way on the fact that Trinity HealthShare, Inc. lacked recognition by CMS as a health care sharing ministry and did not fit any state HCSM safe-harbor laws.

79.     On January 13, 2021, less than three months after Hearing Officer Walker's decision, OSI issued a Cease-and-Desist Order against another HCSM, OneShare Health, LLC, claiming that it was transacting the business of insurance in New Mexico without a certificate of authority from the Superintendent.

80.     Rather than challenge the Superintendent's Cease and Desist Order, OneShare Health, LLC, even though it is a valid healthcare sharing ministry under the IRC with a valid CMS determination letter, decided to enter a Consent Order that rescinded the Cease-and-Desist Order. Under the Consent Order, OneShare Health, LLC, had to pay the Superintendent a $125,000.00 fine and cease offering memberships in its HCSM in New Mexico. This Consent Order was entered into on March 17, 2021.

81.     On November 23, 2021, just eight months after entering into the Consent Order with OneShare, LLC, OSI issued a Cease-and-Desist Order against Gospel Light Mennonite Church Medical Aid Plan claiming that it was transacting the business of insurance in New Mexico without a certificate of authority from the Superintendent.

82.     Gospel Light Mennonite Church Medical Aid Plan requested a hearing before the OSI. The hearing began on March 8, 2022, before Hearing Officer Richard B. Word. Upon agreement of the parties, the hearing was recessed. Hearing Officer Word set the recommencement of the Hearing for September 14, 2022. On September 9, 2022, the parties were notified that due to his upcoming retirement Hearing Officer Word had recused himself from the hearing and that Hearing Officer R. Alfred Walker would be conducting the remainder of the hearing and issuing the decision.

83.     On January 20, 2023, Hearing Officer Walker determined, as he had previously done in the Trinity HealthShare matter, that Gospel Light Mennonite Church Medical Aid Plan was "transacting the business of insurance in [New Mexico]" without a "certificate of authority from the Superintendent." He made absolutely no distinction in his two decisions that Trinity HealthShare, Inc. lacked recognition by CMS as a healthcare sharing ministry and that Gospel Light Mennonite Church Medical Aid Plan was recognized by CMS as a legitimate healthcare sharing ministry.

84.     On February 22, 2023, Defendant Catechis adopted Hearing Officer Walker's Findings of Fact, Conclusions of Law, and Recommendations as her own. Gospel Light Mennonite Church Medical Aid Plan was ordered to Cease and Desist from offering its HCSM programs in New Mexico and to pay a fine in the amount of $2,510,000.

85.     Yet, prior to March 26, 2020, it appears as if OSI did not consider HCSMs to be transacting the business of insurance. In fact, as late as December 3, 2019, then-Superintendent of Insurance John Franchini put out a press release stating that:

> [a] few health care sharing ministries (also known as health care sharing organizations) operate in New Mexico. These organizations ***do not offer insurance***, but may present plans in a way that look and feel similar to a health insurance plan. Members of these organizations 'share' health costs on a voluntary basis.

Consumers should be aware that these plans have no obligation to pay for any medical services and have no requirement to cover any particular categories of health care services, such as preventive care.  See Ex. F (emphasis added).

86.      By taking no action against HCSMs until 2020, OSI effectively staked out the position, as Superintendent Franchini stated as late as December 2019, that Gospel Light Mennonite Church Medical Aid Plan and other HCSMs were not offering "insurance" within the meaning of the Insurance Code.

87.      To be sure, prior to March 26, 2020, OSI had never challenged an HCSM as transacting the business of insurance in New Mexico without a certificate of authority from the Superintendent even though HCSMs had freely and openly been operating in New Mexico for decades prior. Then, after appropriately attacking the counterfeit HCSM, Trinity HealthShare, OSI issued Cease and Desist Orders against two valid, legitimate HCSMs in rapid succession.

88.      It defies logic that the legality of a valid HCSM should turn on the whims of the policy determinations of the Superintendent of Insurance who happens to be in power at any particular time. Interpretation of the law must be consistent in order for individuals and corporations to order their affairs. For the individuals who joined HCSMs prior to Superintendent Toal taking the reins at OSI in early 2020, they had absolutely no indication that HCSMs were "unauthorized," either in the eyes of the law or in the minds of state administrators.  Likewise, the valid, legitimate HCSMs had no reason to believe they were operating in an "unauthorized" fashion.

89.      The inaction of OSI against HCSMs prior to 2020 was consistent with the logic of the decisions of legislatures and courts nationwide during this same period.

90.     Most state governments and the federal government enacted safe harbors for HCSMs during 1995 to 2020.[20] Three state supreme courts issued published decisions on HCSMs.

91.     In *Barberton Rescue Mission v. Ins. Div.*, 586 N.W.2d 352 (Iowa 1998), Iowa's Supreme Court ruled unanimously that the HCSM was "not insurance." The Court concluded that there was no "assumption of risk," a "key element of insurance."

92.     In *Com. v. Reinhold*, 325 S.W.3d 272 (Ky. 2010), the Kentucky Supreme Court issued a divided opinion against an HCSM. The majority ruled that the HCSM was ineligible for the state's safe harbor which required direct sharing among members. The Kentucky legislature responded swiftly by repealing this direct-sharing requirement, effectively overruling the Court's majority opinion.

93.     In *Altrua HealthShare v. Deal*, 154 Idaho 390, 299 P.3d 197 (2013), which is the only post-ACA appellate court case on HCSMs, the Idaho Supreme Court ruled unanimously that the HCSM was not offering insurance. The Court stated that "[The HCSM] must assume some of the risk of paying its members' claims for its membership contract to be one undertaking to indemnify its members…[the HCSM] may have an obligation … despite its disclaimers, to pay certain member claims so long as funds are available, but there is no evidence in the record that [the HCSM] has guaranteed or assured payment of members' claims. Therefore, the Hearing Officer's conclusion that [the HCSM's] membership contract is an insurance contract because [the HCSM] assumes some risk of its members' claims is clearly erroneous." *Id*. at 395.

94.     As a concurring justice explained: "This is a prime example of an administrative agency exceeding its statutory powers in an attempt to protect citizens from themselves.  Although

---

[20] *See* FN 12 and 13, *supra*.

this [case] clearly did not involve health insurance, the Department ignored the terms of the contract[.]" *Id.* (Eismann, J.).

95.     The same is true of Defendants in this case.

96.     In addition to these state supreme courts, a few state trial courts also reviewed HCSMs before the ACA was passed:

**Christian Brotherhood Newsletter v. Office of the Insurance Commissioner, State of Washington, Superior Court of Washington, Thurston County, Case No. 92-2-03294-2 (September 22, 1993).**
There is no direct evidence in the record specifically addressing the elements of risk shifting, risk distribution or the realistic expectations in the minds of the subscribers. Instead, one must draw reasonable inferences from the undisputed evidence to arrive at those findings.
I have reviewed the evidence in this record as a whole, and from that review conclude that there is not substantial evidence to conclude that the CBN plan contains the element of risk shifting. I conclude that the element of risk distribution is supported by substantial evidence. Finally, I conclude that there is no evidence in the record at all, and certainly not substantial evidence, to support a finding of fact by inference that the CBN plan creates a realistic expectation of full performance in the minds of its subscribers.

**Commonwealth of Kentucky v. Barberton Rescue Mission, Case No. 92-CI-00640, Franklin Co. District Court (June 2, 1995).**
A necessary element of any agreement which is alleged to constitute insurance is risk-shifting. …Plaintiffs merely make the conclusory statement that "Christian Brotherhood Newsletter is a mechanism by which the risk of incurring health care expenses is transferred from individual subscribers to Christian Brotherhood Newsletter as a whole." From the documents provided by both plaintiffs and defendants, it is apparent that there has been no risk-shifting. The subscription agreement and the guidelines specifically state that there is no indemnification, the risk remains with the subscriber, and there is no promise or guarantee that payment will be forthcoming from any other subscriber to the plan. The risk of incurring medical charge under the documents, remains with the subscriber. As there is no shifting of risk, the defendants' agreement cannot be considered "insurance." Therefore, the provisions of KRS regulating the doing of an insurance business, assessment, cooperative, or otherwise, would not apply to defendants.

**Barberton Rescue Mission, Inc. dba Christian Brotherhood Newsletter v. The Insurance Division of the Iowa Department of Commerce, Case No. AA 2653, Polk Co. District Ct (November 25, 1996)**
Respondent clearly did not ask itself the determinative question in this case--would a member have a cause of action against Petitioner if that member's published "need" were to remain unsatisfied in whole or in part? If the answer to this question is "no" Petitioner could not have contractually assumed the risk of loss in return for payment and, therefore, could not have been engaged in the practice of insurance.

After reviewing the administrative record, the Court believes that the only reasonable answer to the question posed above is in fact "no."

97.     Other state officials have similarly found that these HCSMs are not insurance.  *See, e.g.*:

**Letter from Fletcher Bell, Commissioner of Insurance, Kansas Insurance Department, (March 16, 1989).** Upon review of your newsletter and the description of how your program operates, it would appear that Brother's Keeper Program is not assuming a risk and, therefore, is not transacting the business of insurance in this State.

**Letter from James J. Browder, III, Department Liaison, State of Ohio Department of Insurance, (June 21, 1989).** The Brotherhood program is not insurance. It is a mail order form of what eighty or more years ago was called a "Welfare Society."

**In the Matter of Christian Brotherhood Newsletter, Alabama Insurance Department, Case No. C-90-170EB (January 16, 1991).** After an explanation of the Christian Brotherhood Newsletter by its representatives, it appears the Christian Brotherhood Newsletter may not be insurance.

**Letter from Patrick Wood, Oregon Department of Insurance and Finance (August 1, 1991).** Thank you for your cooperation during our investigation of the Christian Brotherhood. This Division has determined that we have no jurisdiction to apply under the current Oregon insurance law towards the regulation of the newsletter in Oregon.

**Letter from Steven T. Foster, Commissioner of Insurance, Commonwealth of Virginia, (March 5, 1993)**. As a result of our review, we do not believe at this time that the Christian Brotherhood Newsletter and its related health care arrangements are subject to regulation by the Virginia State Corporation Commission Bureau of Insurance.

**Letter from Cathy J. Weatherford, Insurance Commissioner, Oklahoma, (July 29, 1993)**. The subscription form clearly states that Christian Brotherhood newsletter does not assume any risk nor does it indemnify upon determinable contingencies. After handling a plethora of written and oral communication with Oklahoma subscribers, the Department believes these consumers understand the risk they are assuming. While the Department is still concerned about Christian Brotherhood's actuarial uncertainty, it appears Christian Brotherhood Newsletter does not meet the definition of insurance found at 36 O.S. § 102. … Further, we would encourage you to lobby to the Legislature to carve out a precise exception for Christian Brotherhood Newsletter. The reason we ask your assistance in obtaining legislation is the Department's concern about "Copy Cat" operations with less honorable intentions.

**1999 La. AG LEXIS 14, \*6, La Atty. Gen. Op. No. 1998-471.** Because the necessary mutuality of obligation … between the parties is lacking, the Office of the Attorney General is of the opinion that the [HCSM] does not provide 'insurance' as that term is defined by" Louisiana law.

**VIII.   Defendants' Interpretation of New Mexico Insurance Law Considers ALL HCSMs to be a "Health Insurance Carrier"**

98.     NMSA 1978, Section 59A-16-21.2(C)(2) defines a "health insurance carrier" as "an entity subject to the insurance laws and regulations of this state … that contracts or offers to contract, or enters into agreements to provide, deliver, arrange for, pay for or reimburse any costs of health care services, or that provides, offers or administers health benefits plans in this state."

99.     Under Defendants' view, Gospel Light Mennonite Church Medical Aid Plan "is an entity that enters into agreements to provide, deliver, arrange for, pay or reimburse any costs of health care services," and therefore is, "an entity subject to the insurance laws and regulation of this state."

100.    Such an interpretation destroys any possibility of any kind of religious "sharing ministry" since any HCSM requires the mutual commitment of members to "bear one another's burdens" to "fulfill the law of Christ." *See* Galatians 6:2.

101.    That is, the goal of each HCSM is to facilitate its members' sharing of costs for health care services as a pure example of religious expression by its members. OSI's interpretation of New Mexico's Insurance Code usurps the religious doctrinal authority of Gospel Light Mennonite Church Medical Aid Plan and its members.

102.    HCSMs are founded to facilitate the mutual burden sharing as required by the Bible. That is the reason Gospel Light Mennonite Church Medical Aid Plan and other HCSMs exist and every one of its members (including the individual Plaintiffs) certify their agreement to it.

103.    OSI's interpretation of New Mexico insurance law also flatly contradicts OSI's own enforcement history that allowed HCSMs to operate freely and openly until its March 26, 2020, public warning that HCSMs are "unauthorized insurance" (and in the specific case of Gospel Light

Mennonite Church Medical Aid Plan, until the Cease-and-Desist Order was issued on November 23, 2021)

104.    Importantly, such an interpretation of New Mexico insurance law also falls outside the federal McCarran-Ferguson Act ("MFA"), the law that preserves New Mexico's authority to regulate "insurance" at all.

105.    Defendants' interpretation of Gospel Light Mennonite Church Medical Aid Plan as a "health insurance carrier" defies controlling federal precedent under the MFA defining the meaning of the "business of insurance" that Congress reserved to New Mexico in the first place.

106.    New Mexico's interpretation of "insurance" contrary to the MFA results in loss of its anti-preemption benefits, subjecting New Mexico to implied preemption by federal law when its interpretation of its insurance laws makes simultaneous compliance with both federal and state regulations impossible ("impossibility preemption"), a form of "conflict preemption."[21]

107.    New Mexico's interpretation of "insurance" contrary to the MFA results in loss of its anti-preemption benefits, subjecting New Mexico to implied preemption when its interpretation of its insurance law poses an obstacle to the accomplishment of federal goals ("obstacle preemption"), another form of "conflict preemption."[22]

108.    New Mexico's interpretation also fatally conflicts with the ACA's safe harbor—its "Religious Exemption" for "Health Care Sharing Ministries" in IRC §5000A(d)(2)(B).

---

[21] *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 707 (4th Cir. 2015) (federal law preempted a state tort duty that would obstruct a wireless carrier's ability to provide coverage and impede the FCC's authority). "Conflict preemption applies to state law 'when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id*. at 707.

[22] See *Johnson*, 781 F.3d at 707; *Columbia Venture v. Dewberry & Davis*, 604 F.3d 824 (4th Cir. 2010). "Obstacle preemption is a type of conflict preemption authorized by the Supremacy Clause. It applies 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id*. at 829-30 (citations omitted).

109.     That is, as part of the ACA in 2010, Congress enacted the HCSM religious exemption in IRC §5000A(d)(2)(B). Apparently understanding the importance of such an arrangement to people of faith, Congress exempted individuals enrolled in an HCSM from the ACA's mandate requiring individuals to maintain minimum essential insurance coverage and ensured that Americans would have access to HCSMs in every state.

110.     In 2014, CMS, which then was authorized to recognize HCSMs that met §5000A(d)(2)(B), officially recognized Gospel Light Mennonite Church Medical Aid Plan's federal HCSM status under that ACA provision, entitling all Gospel Light Mennonite Church Medical Aid Plan members nationwide to its benefits.

111.     Defendants' interpretation of New Mexico law fatally contradicts federal law in at least three ways.

112.     First, by preventing Gospel Light Mennonite Church Medical Aid Plan from serving its New Mexico members, Defendants effectively prevent Gospel Light Mennonite Church Medical Aid Plan from complying with federal law to treat all its members equally, nationally, "without regard to the State in which a member resides or its employed." §5000A(d)(2)(B)(ii)(II).

113.     This violation of the ACA's safe harbor has both an organizational component (affecting Gospel Light Mennonite Church Medical Aid Plan) and an individual component (affecting its members).

114.     By preventing Gospel Light Mennonite Church Medical Aid Plan as an organization from treating its New Mexico members equally with Gospel Light Mennonite Church Medical Aid Plan members in other states (*i.e.*, its members in any and all other states), New Mexico would obstruct Gospel Light Mennonite Church Medical Aid Plan's compliance with the ACA's religious exemption law.

115.    This interpretation of state law by Defendants would make Gospel Light Mennonite Church Medical Aid Plan's "compliance with both federal and state regulations" impossible, requiring that Defendants' view be preempted.[23]

116.    Defendants also would make Gospel Light Mennonite Church Medical Aid Plan noncompliant with the ACA by depriving members of Gospel Light Mennonite Church Medical Aid Plan (and all other HCSMs) in the other 49 states of equal treatment by preventing Gospel Light Mennonite Church Medical Aid Plan (and all HCSMs) from serving any member, like Plaintiff Renteria, who *moves* to New Mexico.

117.    Defendants' exclusion of all HCSMs—making New Mexico an HCSM-free zone—also would deprive all New Mexicans, as individual members of Gospel Light Mennonite Church Medical Aid Plan and beneficiaries of the ACA safe-harbor, of the benefits of that religious exemption to which they are entitled by federal law.

118.    Viewed in any of these ways, state law, as interpreted by Defendants, would make "compliance with both federal and state regulations" impossible, requiring preemption.[24]

119.    Second, Defendant's interpretation renders the federal religious exemption meaningless.

120.    In enacting the ACA, including §5000A, Congress necessarily defined HCSM membership as "not insurance." That is why (and the only reason why) members of HCSMs are exempt from penalties imposed by the ACA for not having insurance.[25]  If Gospel Light Mennonite Church Medical Aid Plan's programs *were* insurance, they would satisfy the ACA without any need for the §5000A safe harbor. The federal religious exemption would be meaningless.

---

[23] *See, e.g., Johnson*, 781 F.3d at 707.
[24] *Johnson*, 781 F.3d at 707.
[25] Congress "zeroed out" such penalties in 2018. But Congress can reimpose them at any time.

121.    By interpreting state law to be "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in §5000A of the ACA—including its intent to treat HCSMs as "not insurance"—Defendants assure that New Mexico law is preempted by §5000A.[26]

122.    By interpreting state law to "interfere[] with the *methods* by which [§5000A] was designed to reach [its] goal"—including its intent to make HCSMs available to Americans nationwide—Defendants assure that New Mexico law is preempted by §5000A.[27]

123.    Third, by interpreting its insurance law to create an irreconcilable conflict with §5000A, and gutting the determination of CMS that Gospel Light Mennonite Church Medical Aid Plan qualified for the federal safe harbor so that all of its members in New Mexico qualified for the religious exemption's benefits, Defendants have acted to "impede the [CMS's] authority, and thus New Mexico's interpretation is preempted.[28]

124.    Specifically, the IRS ruled in 2014 that Gospel Light Mennonite Church Medical Aid Plan qualifies for federal tax-exempt status under IRC §501(c)(3) even though IRC §501(m)(1) strictly prohibits such status for any entity that even "substantially" provides any kind of "commercial insurance."

125.    Federal law is clear that IRC §501(c)(3) status is forbidden to any sort of insurer.

---

[26] *Columbia*, 604 F.3d at 829-30 ("Obstacle preemption … applies 'where state law stands as an obstacle [to] accomplishment and execution of the full purposes and objectives of Congress.'")

[27] *Id*. ("Obstacle preemption … occurs where state law 'interferes with the methods by which the federal statute was designed to reach [its] goal.'") (citations omitted; emphasis in original).

[28] *Johnson*, 781 F.3d at 706.

126.    The IRS may recognize the IRC §501(c)(3) status of an entity "*only if no substantial part* of its activities consists of providing *commercial-type insurance*." IRC §501(m)(1) (emphasis added).  "Congress intended a broad definition of the term 'commercial-type insurance.'"[29]

127.    This federal definition was intended to capture anything even like insurance. Gospel Light Mennonite Church Medical Aid Plan clearly is not "insurance" within the meaning of this definition, as the IRS has recognized Gospel Light Mennonite Church Medical Aid Plan's §501(c)(3) status continually since first formally recognizing it in 2014.

128.    In this way, Defendant's interpretation of New Mexico insurance law is preempted by §501(m)(1) and the IRS determination of Gospel Light Mennonite Church Medical Aid Plan's tax-exempt status for all the same reasons that it is preempted by IRC §5000A and the CMS determination of Gospel Light Mennonite Church Medical Aid Plan's HCSM status.

129.    Thus, Defendants' unlawful interpretation of its insurance law ruptures the otherwise reasonably uniform national regulatory environment—led by the ACA religious exemption for qualifying HCSMs—that allows Gospel Light Mennonite Church Medical Aid Plan to operate freely as "not insurance" nationwide. It renders New Mexico the lone, hostile outlier, a sharp departure from its own regulatory policy prior to March 26, 2020.

130.    Finally, Defendants are insisting on the impossible. Even if Gospel Light Mennonite Church Medical Aid Plan were willing to be licensed as an insurer in New Mexico, Gospel Light Mennonite Church Medical Aid Plan is prohibited by law in several ways.

---

[29] *Paratransit Insurance Corp. v. Tax Com'r*, 102 T.C. 745, 752 (1994). Because it "provides commercial-type insurance under the meaning of 26 U.S.C. §501(m)(1)," the IRS "appropriately determined that FICURMA is not eligible for exemption." *FICURMA v. U.S.*, 850 F.Supp.2d 125, 132 (D.D.C. 2012) (relying on *Paratransit*).

131.    First, as explained above, Gospel Light Mennonite Church Medical Aid Plan's §501(c)(3) status precludes it from being or acting, even "substantially," as a commercial insurer, "broadly" defined.

132.    Second, Gospel Light Mennonite Church Medical Aid Plan's exclusively religious membership precludes compliance with antidiscrimination law, as detailed below.

133.    Third, attempted compliance with NM OSI's antidiscrimination requirements would preclude compliance with the "common … religious beliefs" requirements of §5000A.

134.    For example, the federal religious exemption requires HCSMs to "share medical expenses among members in accordance with [their common] beliefs." §5000A(d)(2)(B)(ii)(II). This cannot be done if Gospel Light Mennonite Church Medical Aid Plan members are forced to support heath care treatments that violate their Biblical beliefs on issues such as life, marriage, and sexuality.

135.    Nor could Gospel Light Mennonite Church Medical Aid Plan comply with §5000A(d)(2)(B)(ii)(II)'s requirement of national uniformity in the treatment of its members ("without regard to the State in which a member resides") if it must sacrifice the deeply held beliefs of its New Mexico members.

136.    Nor could it do so without relinquishing its own rights, and sacrificing the rights of its members, that are guaranteed by the Federal and New Mexico Constitutions.

**IX.    Defendants' Campaign Against HCSMs is Biased and Prejudged.**

137.    Defendant's aggressive pursuit of Gospel Light Mennonite Church Medical Aid Plan—a religious ministry that is insulated by the laws throughout the United States, has freely and openly operated in all jurisdictions, including New Mexico, for decades and looks nothing like insurance—provides strong evidence of prejudgment and bias.

138.    As mentioned, Superintendent Toal first announced that OSI considered HCSMs "an unauthorized insurance product" in a press release issued on March 26, 2020, and then over the next 18 months, issued Cease and Desist Orders to two valid HCSMs.

139.    Defendants inflexibly pursued this enforcement action against the HCSMs from the beginning knowing full well their prejudged outcome.

140.    Further, after the Superintendent issued Gospel Light Mennonite Church Medical Aid Plan a Cease-and-Desist Order, it requested a fair and impartial hearing. Plaintiff began its hearing under Hearing Officer Richard Word before he granted a recess in the hearing. Just three business days prior to the recommencement of Gospel Light Mennonite Church Medical Aid Plan's hearing, Plaintiff was informed that Hearing Officer Word would not conclude the hearing and render a decision, rather R. Alfred Walker, the Hearing Officer who rendered the decision determining that the counterfeit HCSM Trinity HealthShare, Inc. was an unauthorized insurer, would be concluding Gospel Light Mennonite Church Medical Aid Plan's hearing and rendering the decision.

141.    Gospel Light Mennonite Church Medical Aid Plan attempted to call Superintendent Toal to testify at its Hearing to show evidence of his bias against HCSMs, but his subordinate employee, Hearing Officer Walker, ruled against allowing this testimony to be taken. Then in his decision against Plaintiff, Hearing Officer Walker concluded that Plaintiff had not presented sufficient evidence of Superintendent Toal's bias.

142.    Upon information and belief, Defendants had already adopted an interpretation of New Mexico insurance law which would doom all HCSMs, including Gospel Light Mennonite Church Medical Aid Plan, and the hearing afforded to Gospel Light Mennonite Church Medical Aid Plan was just a formality. Regardless of facts, testimony, documentation, and all honest

inquiry, Defendants had made their decision before the hearing ever began. This was a predetermined outcome.

143.    Notably, Defendants ignored the statutory source of their authority, the constitutional limits on their authority, and the evidence presented by Plaintiffs.

144.    Defendants did all of this presumably to respond to a *de minimis* number of consumer complaints (which had already been resolved prior to the Cease and Desist) and to protect the interests of the state's insurance industry and the policymakers who disdain any perceived competition to plans offered on BeWellNM.  *See, e.g.,* Ex. N (Consumer Advisory in which then-Superintendent of Insurance Russell Toal warns against HCSMs as scams and encourages New Mexicans to use the New Mexico insurance exchange, beWellnm); Ex. O (Final Order issued against Trinity HealthShare in which then-Superintendent Toal ordered Trinity HealthShare to inform each of its members of all possible options for obtaining major medical coverage, "specifically including enrollment through beWellnm.com").

145.    Even without a fair hearing, Gospel Light Mennonite Church Medical Aid Plan was able to present substantial evidence of Defendants' crusade to shut down the HCSM community in New Mexico.

**X.    Defendants' Campaign Against HCSMs is Unconstitutional.**

146.    Such an application of New Mexico insurance law violates fundamental rights guaranteed by the United States Constitution. These include the rights of free religious exercise, expressive association, equal protection of the law and due process of law.

147.    "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'"[30] "This applies to *administrative agencies which adjudicate as well as to courts*. Not

---

[30] *Caperton v. A.T. Massey Coal*, 556 U.S. 868, 876 (2009); accord *William Jefferson & Co. v. Bd. of Ass'mt*, 695 F.3d 960, 963-64 (9th Cir. 2012) (applying *Caperton* to local agency process).

only is a biased decisionmaker constitutionally unacceptable but 'our system of laws has always endeavored to prevent *even the probability of unfairness*.'"[31]

148.    The process for "agency adjudication" should be "characterized by the same degree of procedural integrity and independence as the judicial process."[32] Thus, an agency tribunal's "overlap" "between prosecutorial and adjudicative functions … potentially raises a greater concern about bias."[33] "Even the most minimal of procedural due process require that the decision be issued by 'a neutral and detached hearing body[.]'"[34]

149.    In short, Plaintiffs in any governmental tribunal must have a "fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."[35]

150.    Due process requires judicial-like process, especially in a case like this where Gospel Light Mennonite Church Medical Aid Plan faces a $2,510,000.00 fine and expulsion from the state.

151.    OSI and its Hearing Officer cannot be viewed as a "neutral and detached" tribunal here. Defendants effectively serve as prosecutor, judge, jury, and executioner all at once and the "overlap between prosecutorial and adjudicative functions" "raises a greater concern about bias." That combination of powers, together with the evidence of prejudgment and protectionism discussed above demonstrate clearly and convincingly the appearance or probability of unfairness.

152.    HCSMs like Gospel Light Mennonite Church Medical Aid Plan simply cannot survive Defendants' regulation.

---

[31] *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (citations omitted; emphasis added); *accord Cox v. Com'r,* 514 F.3d 1119, 1126 (10th Cir. 2008); *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014).
[32] *Harline v. DEA*, 148 F.3d 1199, 1205 (10th Cir. 1998).
[33] *William Jefferson & Co*., 695 F.3d at 965.
[34] *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (citation omitted) (parole board hearing).
[35] *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004); accord *Hicks v. Comm'r of Soc. Sec*., 909 F.3d 786, 799 (6th Cir. 2018) (applying *Hamdi* to administrative agency adjudication).

153.    Even if Plaintiff could survive the financial, reputational, and other burdens of regulatory compliance, the attendant religious antidiscrimination and other state-imposed legal requirements would compel such fundamental changes in its membership policies and internal values and cultures that it—as it defines itself—would cease to exist.

154.    Gospel Light Mennonite Church Medical Aid Plan would face two intolerable choices: (1) enroll everyone who applies and facilitate payment for all medical and therapeutic treatments, or (2) close down.

155.    As discussed above, Gospel Light Mennonite Church Medical Aid Plan is a Christian ministry like many others and its members' shared faith is based on applicable Scripture from the Holy Bible.

156.    Gospel Light Mennonite Church Medical Aid Plan members do not simply share their medical expenses. They do so as an expression of love and obedience to God and each other, to and through God's Word (Jesus Christ) and the Body of Christ (all Christians), including specific Scriptural commands, such as to love "neighbor" as self (Matt. 22:39; Luke 10:27), to do good "especially to those who belong to the family of believers" (Gal. 6:10), and to "bear" one another's "burdens" (Gal 6:2).

157.    Such ministries date from the 16th Century Protestant Reformation and its modern practice has occurred continually for at least the last 100 years. *See Bethel Mennonite*, 746 F.2d at 392. It is Gospel Light Mennonite Church Medical Aid Plan's sole Mission and the way it executes its only reason to exist.

158.    This kind of Christian ministry is not new. It is done out of a profound sense of Christian commitment and love, and it has profound benefits for member wellbeing— physically, mentally, and spiritually.

38

159.    The ministry of Gospel Light Mennonite Church Medical Aid Plan is of immense importance to its members, including those in New Mexico, and including the three named individual Plaintiffs.

160.    By attempting to halt Gospel Light Mennonite Church Medical Aid Plan's operations in New Mexico, Defendant threatens to punish every current Gospel Light Mennonite Church Medical Aid Plan member (and prevent every future member) in New Mexico.

161.    For some of these members, such an action is equivalent to barring them from attending Sunday worship service or Bible studies.

162.    Thus, subjection to New Mexico regulations would not just infringe the First and Fourteenth Amendment rights of Gospel Light Mennonite Church Medical Aid Plan and its members; it would terminate the ministry (at least as it now exists) in New Mexico and might deal it a death sentence nationwide.

163.    Such a prejudged outcome defies the law and is contrary to the notions of Freedom of Religion and Freedom of Association that this country was founded upon.

**XI.    Applicable Constitutional Standards: Strict Scrutiny and Absolute Protection.**

164.    *Strict Scrutiny (Balancing Test)*. The default test to protect most individual rights under the First and Fourteenth Amendments is strict scrutiny. In its most common formulation, it requires the state to prove that its challenged action was the "least restrictive means of achieving some compelling state interest."[36] Under this test, "only those interests of the highest order [can] overbalance legitimate claims to the free exercise of religion."[37] This two-part balancing test "is

---

[36] *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981).
[37] *Id*. (quoting *Wisc. v. Yoder*, 406 U.S. 205, 215 (1972)).

the most demanding test known to constitutional law."[38] Defendants must prove that they satisfy this test.

165.   *Absolute Protection (Categorical Approach: No Balancing)*. Some constitutional rights may not be infringed at all. Certain state actions are categorically barred as intolerable and never justifiable, no matter what the state's interests or means may be. For example, the state must never punish belief.[39] It must never discriminate among religions under the Establishment Clause.[40] Two other examples are critical here. First, the state must never act out of invidious intent (animus) against religion.[41] Second, the state must never "interfere" with the "autonomy" of religious groups "to define their own *doctrine*, *membership*, organization, and *internal requirements*."[42] Defendants cannot do either as both kinds of state action are flatly barred.

166.   Defendants have violated the Free Speech and Assembly Clauses of the First Amendment, and the rights of Plaintiffs guaranteed thereunder, by violating neutrality principles enshrined therein.

167.   Defendants' enforcement policy and action here amount to non-neutral content and viewpoint restrictions of Plaintiffs' Free Speech rights.[43]

---

[38] *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

[39] "The First Amendment obviously excludes all 'governmental regulation of religious beliefs as such.'" *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990). *Smith* lists many other examples.

[40] It is "usually flatly forbidden without reference to" strict scrutiny. *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2008) (McConnell, J.) (citing cases, including *Larson v. Valente*, 456 U.S. 228 (1982)) ("Colo. Christian").

[41] "To be sure, where [states] discriminate out of 'animus' against particular religions, such decisions are plainly unconstitutional." *Jesus Christ is the Answer Ministries v. Baltimore Cty.*, 915 F.3d 256, 262 n.3 (4th Cir. 2019) ("*Jesus Christ is the Answer*"). "Religious animus is not a permissible government interest, much less a compelling one." *Id.*

[42] *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 975 (7th Cir. 2021) (*en banc*) (citation to McConnell omitted; emphasis added) ("*Demkovich*").

[43] See *Shurtleff v. City of Boston*, 142 S.Ct. 1583 (2022); *Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).

40

168.     Defendants also destroy the "associational" and "expressive association" rights of Plaintiffs guaranteed by the First Amendment.[44]

169.     This freedom to associate prohibits "intrusion into the internal structure or affairs of an association,"[45] and "plainly presupposes a freedom not to associate."[46]

170.     This freedom "applies with special force [to] religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals."[47]

171.     "[T]here is [no] doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity [such as] the right 'to engage in association for the advancement of beliefs and ideas.'"[48] That is precisely the sort of "orderly group activity" and "association for the advancement of beliefs and ideas" in which Gospel Light Mennonite Church Medical Aid Plan and its members engage.

172.     Such activity by Gospel Light Mennonite Church Medical Aid Plan represents precisely the "modes of expression and association protected by the [U.S. Constitution] which [New Mexico] may not prohibit, under its power to regulate the [insurance] profession, as improper solicitation of [insurance] business."[49]

173.     To be sure, "a State may not, under the guise of prohibiting professional misconduct, ignore Constitutional rights."[50]

---

[44] "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others.'" *Americans for Prosperity v. Bonta*, 141 S.Ct. 2373, 2382 (2021) (quoting Roberts v. U.S. Jaycees, 468 U.S. 609 (1984)); see also *Boy Scouts v. Dale*, 530 U.S. 640 (2000); *Hurley v. Irish-American Gay, Lesbian, & Bisexual,* 515 U.S. 557 (1995).

[45] *Roberts*, 468 U.S. at 623.

[46] *Roberts*, 468 U.S. at 623. Courts defer to a group's explanation of the "nature of its expression [and its] view of what would impair its expression." *Dale*, 530 U.S. at 653.

[47] *Hosanna*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring) ("Alito/Kagan").

[48] *NAACP v. Button*, 371 U.S. 415, 430 (1963) (citation omitted).

[49] 371 U.S. at 428-29 ("We hold that the activities of the NAACP, its affiliates and legal staff shown on this record are modes of expression and association protected by the First and Fourteenth Amendments which Virginia may not prohibit, under its power to regulate the legal profession, as improper solicitation of legal business[.]").

[50] *Id*. at 439 (citations omitted).

174.   Nor may a State "foreclose the exercise of constitutional rights by mere labels."[51]

175.   Fundamentally, that is exactly what Defendants have done to Gospel Light Mennonite Church Medical Aid Plan: they have mislabeled Gospel Light Mennonite Church Medical Aid Plan's sharing programs as "insurance."

176.   Nor may a State infringe on First Amendment rights of charitable organizations, especially religious ministries, to engage in solicitation of financial and spiritual contributions.[52]

177.   It is well established since at least 1980 that the First Amendment protects [the] right to solicit charitable contributions."[53]

178.   Defendants would take over Gospel Light Mennonite Church Medical Aid Plan's management of its own membership rolls by dictating who could be admitted, excluded, and expelled. They would also subject Gospel Light Mennonite Church Medical Aid Plan and its members to antidiscrimination requirements and prevailing social policy anathema to Gospel Light Mennonite Church Medical Aid Plan and its members forcing Gospel Light Mennonite Church Medical Aid Plan into one of two equally unacceptable alternatives: (1) to secularize or (2) to shut down.[54]

179.   All such rights of free speech, assembly, and expressive association are protected by strict or heightened scrutiny. And any invidious discrimination is categorically barred.

180.   To protect against such meddling or even hijacking of a religious group's internal affairs, the First Amendment offers extra protection. Plaintiffs are entitled not just to "special

---

[51] *Id*. at 429.
[52] *Amers. for Prosperity v. Bonta*, 141 S.Ct. 2373 (2021) (analyzing cases before invalidating state regulations that limited certain rights of charitable entities soliciting funds in California).
[53] *Id*. at 2389 (quoting *Vill. of Schaumburg v. Cits. for Better Env't*, 444 U.S. 620, 633 (1980)).
[54] The First Amendment outlaws regulations that might (a) "affect the way an organization carried out what it understood to be its religious mission," *Amos*, 483 U.S. at 336; (b) prevent it from "defin[ing] itself" by limiting its staff to "those committed to [its] mission," *Id*. at 342 (Brennan, J., concurring); or (c) cause it "as it currently identifies itself to cease to exist." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006); *FCA*, 46 F.4th at 1099 (without relief, the club "may continue to dwindle" until it "cease[s] to exist").

solicitude,"[55] but to "double" First Amendment protection, since its core activity is expressive association and "religious observance doubly protected by the Free Exercise and Free Speech Clauses."[56] As with other non-neutral treatment under either of these Clauses, Defendants' interference with the internal must survive the strictest possible scrutiny, a rare feat.

181.    As noted above, the state must never "interfere" with the "autonomy" of religious groups "to define their own *doctrine*, *membership*, organization, and *internal requirements*."[57] "[T]he Religion Clauses protect religious institutions [in] matters 'of faith and doctrine' [and "internal management decisions" against] government intrusion. State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute [an] establishment of religion. The First Amendment outlaws such intrusion."[58] All such state action is categorically barred.[59]

182.    Defendants have interfered with the autonomy of Gospel Light Mennonite Church Medical Aid Plan and its members to define their own *doctrine*, *membership*, and *internal requirements*. Defendants have done so by imposing the cost on Gospel Light Mennonite Church Medical Aid Plan of defending against the Cease-and-Desist Order. They have also levied a fine of $2,510,000.00 against Gospel Light Mennonite Church Medical Aid Plan.

183.    All such OSI actions interfere with Gospel Light Mennonite Church Medical Aid Plan's internal requirements, all of which originate in the Biblical doctrine held by Gospel Light Mennonite Church Medical Aid Plan and its members as they understand and define it. This includes the mutual Biblical responsibility, obedience, and love of members and the supernatural

---

[55] *Hosanna*, 565 U.S. at 189.
[56] *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2433 (2022).
[57] *Demkovich*, 3 F.4th at 975 (en banc) (citation to McConnell omitted; emphasis added).
[58] *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020) ("OLG").
[59] The Supreme Court always bars, never balances, such action. *See, e.g., OLG* and *Hosanna.*

power of Christ, the Divine Healer, that it unleashes. The Defendants' enforcement action, including the eventual subjection of Gospel Light Mennonite Church Medical Aid Plan to anti-discrimination and other state social policies—such as coalescing around the "landmark" reforms of the ACA—is accelerating, irreparable, and categorically barred.

184.    For separate but similar reasons, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment, and the rights of Gospel Light Mennonite Church Medical Aid Plan and its members guaranteed thereunder, by violating antidiscrimination principles enshrined therein. The same "intent to treat differently" that violates the Free Exercise Clause violates the Equal Protection Clause, because it either harms a "suspect class" or burdens a "fundamental right." Defendants have done both. "Unquestionably, the free exercise of religion is a fundamental constitutional right."[60]

185.    Additionally, "Religion is a suspect class."[61] So, differential treatment due to "religious beliefs and practices would result in classifying them based on membership in a suspect class and would violate the Equal Protection Clause unless the classification satisfies strict scrutiny."[62] Defendants may attempt to satisfy strict scrutiny (a very tall order) only if their actions were free from animus. But if motivated by animus, they are flagrantly unconstitutional and flatly prohibited.

186.    For reasons explained above, Defendants have violated the Due Process Clause of the Fourteenth Amendment, and the rights of Gospel Light Mennonite Church Medical Aid Plan and its members guaranteed thereunder. The OSI Hearing procedures failed to provide Plaintiffs with a fair and impartial forum where their case could be heard and ultimately resulted in a biased

---

[60] *Jesus Christ is the Answer*, 915 F.3d at 265 (4th Cir.) (quoting Supreme Court precedent).
[61] *Saud v. Days*, 50 F.4th 705, 710 (9th Cir. 2022).
[62] *Saud v. Days*, 50 F.4th at 710.

and prejudged proceeding that ended with a $2,510,000 fine and expulsion from the state. Together, Defendants have acted as the police, prosecutor, judge, and executioner in an action that resulted in what is tantamount to a death sentence for Gospel Light Mennonite Church Medical Aid Plan's ministry in New Mexico. Such an action by Defendants could possibly have spillover effects nationwide; the adverse publicity from a Cease-and-Desist Order is likely to result in loss of members, insurance agency actions in other states, and detrimental rulings in private lawsuits. All of these ills have accompanied similar enforcement actions against HCSMs.[63] As a tribunal, OSI is neither adequate (particularly to adjudicate complex Constitutional rights) nor fair (particularly in view of evidence of prejudgment and protectionism). OSI has demonstrated hostility to the HCSM community which OSI clearly intends to shut down. There is nothing fair or neutral about Defendants' hearing process.

187.    Plaintiffs are entitled not just to "special solicitude,"[64] but to "double" First Amendment protection, since its core activity is "religious observance doubly protected by the Free Exercise and Free Speech Clauses."[65] Defendants' action injures the religious freedom of both ministry and members. Each day it continues, it harms and threatens their "doubly protected" "First Amendment freedoms," whose loss, "for even minimal periods of time, unquestionably constitutes irreparable injury."[66] Defendants' Cease and Desist Order should be enjoined by this Court.

188.    The loss of these doubly protected First Amendment rights will extend beyond the Cease-and-Desist Order enforcement. If Defendants are allowed to exercise authority over

---

[63] See *OneShare v. Com'r Kreidler*, Case 3:20-cv-06207 (W.D.Wash., filed Dec. 15, 2020) (docket filings). Such follow-on results can even be intended by a commissioner. See *id*.

[64] *Hosanna*, 565 U.S. at 189.

[65] *Kennedy*, 142 S.Ct. 2407, 2433 (2022).

[66] *RCD*, 141 S.Ct. at 67.

Plaintiffs, the ministry will be compelled to comply with antidiscrimination and other regulations that will violate their sincere, shared religious beliefs. Such regulations might, for example, compel Gospel Light Mennonite Church Medical Aid Plan to conform to prevailing social policies on issues such as life, marriage, and sexuality.[67]

189.     The evidence thus far suggests the need for closer scrutiny of Defendants' motives. It appears they sought to achieve social policy—whether securing ACA reforms, protecting domestic insurance providers, stabilizing the domestic insurance market, or expanding the reach of antidiscrimination policy to conscientious objectors like Gospel Light Mennonite Church Medical Aid Plan, or all of these—at the expense of individual rights enshrined in the Federal and New Mexico Constitutions and under state law. This they had no authority to do.

190.     This lawsuit seeks a permanent injunction against the Defendants' enforcement action, as well as a declaratory judgment that Defendants' actions violate the United States Constitution, the New Mexico Constitution, and New Mexico state law.

### CLAIM 1
### Violation of the Free Exercise Clause According to 42 U.S.C. § 1983
### Non-Neutral Treatment

191.     Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

192.     State action must be "neutral toward religion," *see Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018), as required by three separate clauses of the United States Constitution: The Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause. The analysis under these three clauses is interrelated, but the commands of each are independent and distinct.

---

[67] "As an initial matter, it is plain that [Defendants'] actions [will] have burdened [Gospel Light Mennonite Church Medical Aid Plan's] religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs." *Fulton*, 141 S.Ct. at 1876.

193.    Under the non-neutrality aspect of the Free Exercise Clause, this Court must determine "whether the burden [OSI] has placed on the religious exercise of [Plaintiffs] is constitutionally permissible." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021).

194.    "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorable than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original).

195.    OSI's actions toward the Gospel Light Mennonite Church Medical Aid Plan and other HCSMs have not been accidental, incidental, or merely negligent toward religion or its exercise. These actions have been intentional and aimed expressly at religious health care sharing ministries.

196.    For purposes of the federal safe-harbor law, an HCSM must not just claim a particular religious status but must meet a specific religious definition. This HCSM sector targeted by OSI was and remains an expressly and exclusively religious sector. Thus, OSI's conduct has not been neutral toward religion.

197.    Defendant Catechis directly, and in concert with other state officials, targeted these ministries for OSI's collective enforcement actions and related public warning campaign.

198.    Defendant Catechis relied upon the religious safe harbor law—designed to accommodate religious exercise by exempting these ministries from their enforcement power—to support and justify their enforcement power over these religious ministries.

199.    Defendant Catechis failed to understand the sharing model of the Gospel Light Mennonite Church Medical Aid Plan, or to properly analyze and determine the threshold insurance inquiry necessary to proceed against the Gospel Light Mennonite Church Medical Aid Plan.

200.    Defendant Catechis applied the New Mexico Insurance Code to create a new source of power arming her to issue more than $2 million in fines and to order the expulsion of the Gospel Light Mennonite Church Medical Aid Plan from New Mexico.

201.    Each of these intentional acts were directed exclusively at a thoroughly religious ministry, composed of a thoroughly religious membership, which qualified for a facially religious exemption under federal law. Accordingly, none of these acts were neutral toward religion.

202.    Defendant Catechis, and her predecessors, have repeatedly shown actual hostility toward HCSMs, the least acceptable form of state action under the neutrality doctrine.

203.    Any form of official "hostility [i]s inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *Masterpiece Cakeshop*, 138 S. Ct. at 1732.

204.    OSI and Defendant Catechis have applied disparaging and demeaning descriptions to health care sharing ministries in general. *See* Ex. N (Consumer Advisory from then-Superintendent of Insurance Russell Toal effectively calling HCSMs a "scam[]," "low quality," and "bad plans"; *see also* Ex. G (Press Release in which then-Superintendent of Insurance Toal warns against HCSMs, in part, because members of HCSMs "may also be subject to religious or moral restrictions from the sharing ministry, which may leave members responsible for the full costs of health care that result from an activity the ministry does not agree with."). Such actions are not neutral toward religion, and demonstrate animus toward the religious nature of HCSMs.

205.    OSI and Defendant Catechis' actions to exclude the Gospel Light Mennonite Church Medical Aid Plan from New Mexico are not neutral toward religion.

206.    OSI's public campaign against HCSMs and OSI's present enforcement campaign against HCSMs are not neutral towards religion.

48

207.    After years of nonenforcement against HCSMs, Defendant Catechis, and her predecessors, suddenly began to interpret and apply New Mexico insurance law to determine that Plaintiff Gospel Light Mennonite Church's religious health care sharing ministry constitute insurance. This sudden change is not neutral toward religion.

208.    To accomplish their goal of expelling HCSMs, Defendant Catechis, and her predecessors, alongside OSI, have had to manipulate the law and its own enforcement policies and practices, resulting in a vicious cycle of nonsensical contradictions between state and federal law.

209.    This chaotic approach has resulted from OSI's predetermined goal to target a specific religious sector. That predetermined goal and result are not neutral toward religion.

210.    Defendant Catechis's actions are also not neutral toward religion because kicking the Gospel Light Mennonite Church Medical Aid Plan out of New Mexico permanently deprives its entire New Mexico membership of their chosen religious ministry.

211.    Defendant Catechis cannot prove that her actions, and the actions of OSI, are the least restrictive means of achieving some compelling state interest.

212.    Defendant Catechis's, her predecessors', and OSI's asserted state interests are not sufficient to satisfy strict scrutiny.

213.    Defendant Catechis's and OSI's actions are not the least restrictive means to achieve their interests in regulating the Gospel Light Mennonite Church Medical Aid Plan and its members.

214.    Defendant Catechis does not even have a rational basis for her actions in this case and thus cannot survive any form or sort of judicial scrutiny.

215.    Defendant' actions, undertaken under color of state law, constitute a violation of Plaintiffs' civil rights according to 42 U.S.C. § 1983.

216.     Absent injunctive and declaratory relief against Defendant Catechis, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

217.     As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

218.     As a result, Plaintiffs seek injunctive and declaratory relief against Defendants to stop their unlawful actions that violate the United States Constitution's guarantee of the free exercise of religion.

**Claim 2**
**Violation of the Free Exercise Clause According to 42 U.S.C. § 1983**
**Non-Generally Applicable Treatment**

219.     Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

220.     "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original) (citation omitted).

221.     Unlike the neutrality standard, general applicability does not focus on religion or intent; instead, it focuses on mechanisms and process.

222.     While a law may appear to be generally applicable on its face, it may not be in practice where it includes a mechanism that invites or results in an uneven application of the law in a way that burdens or has a disparate impact on religion.

223.     The evidence in this case demonstrates that Defendants do not apply the New Mexico Insurance Code generally to similarly situated persons, but rather operates in a manner that results in an uneven application of the law that burdens or has a disparate impact on religion.

224.     Notably, Defendants allow nonreligious organizations that actually provide insurance or insurance-like products, such as labor and fraternal organizations, to operate in New Mexico completely free from regulation by OSI. *See, e.g.* NMSA 1978, § 59A-1-15(A); NMSA 1978, § 59A-1-16(A); NMSA 1978, § 59A-44-23; NMSA 1978, § 59A-44-40(A)(1)-(2); NMSA 1978, § 59A-44-40(F);

225.     Moreover, Defendants have the sole ability to determine whether a HCSM is "insurance" according to the New Mexico Insurance Code. Defendants could have easily determined that the Gospel Light Mennonite Church Medical Aid Plan, which makes clear to all members that it is not insurance and does not indemnify or guarantee payment, is not insurance according to the New Mexico Insurance Code.[68] Nevertheless, Defendants have interpreted the New Mexico Insurance Code to disallow HCSMs, including the Gospel Light Mennonite Church Medical Aid Plan, from operating in New Mexico.

226.     Defendants' interpretation of New Mexico's insurance code, including but not limited to their interpretation of "insurance," are intentionally inconsistent, incoherently overlapping, and mutually contradictory, resulting in anything but generally applicable law enforcement regarding similarly situated parties.

227.     Strict scrutiny of these state actions is required here by the general applicability doctrine under the Free Exercise Clause.

228.     Defendants cannot satisfy this test because, as discussed in this complaint, Defendants' actions are not based upon a compelling governmental interest, there is no compelling

---

[68] *See Cordova v. Wolfel*, 1995-NMSC-061, ¶ 8, 120 N.M. 557, 903 P.2d 1390 ("Insurance is a contract whereby for consideration one party agrees to indemnify or guarantee another party against specified risks."); *cf. id.* ("We note that self-insurance and insurance serve similar purposes and that insurance principles may sometimes apply to self-insurance by way of analogy. Nonetheless, we reject as inaccurate Cordova's theory that self-insurance is a sub-set of insurance." (emphasis added)).

governmental interest, and Defendants did not use the least restrictive means to achieve their interests.

229.     Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm as the Gospel Light Mennonite Church Medical Aid Plan would be prohibited from operating in New Mexico and because the Individual Plaintiff Members would no longer be able to carry out their religious beliefs by participating in the Gospel Light Mennonite Church Medical Aid Plan.

230.     This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' civil rights according to 42 U.S.C. § 1983.

231.     As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

232.     As a result, Plaintiffs seek injunctive and declaratory relief against Defendants to stop their unlawful actions that violate the United States Constitution's guarantee of the free exercise of religion.

### Claim 3
### Violation of the Establishment Clause According to 42 U.S.C. § 1983
### Discrimination Against and Among Religions

233.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

234.     The Establishment Clause, the other Religion Clause of the First Amendment, demands the strictest neutrality toward and among religions such that it categorically bars discrimination against or among religions of particular faiths or exercise.[69]

---

[69] *See, e.g., Larson v. Valente*, 456 U.S. 228, 244, (1982) ("Larson"); *Trump v. Hawaii*, 138 S.Ct. 2392, 2418 (2018); *Colo. Christian*, 534 F.3d at 1266.

235.    "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."[70]

236.    For the same reasons Defendants' actions violate the Free Exercise Clause above, they also independently violate this strictest of antidiscrimination principles embodied in the Establishment Clause.

237.    As alleged herein, Defendants have discriminated against Plaintiffs based upon Plaintiffs' shared religious faith and sharing commitments in favor of similarly situated entities and individuals that embrace and pursue different religious faiths or no religious faith.[71]

238.    All such discrimination under the Establishment Clause is "usually flatly forbidden without reference to" strict scrutiny or any other balancing test.[72]

239.    In any event, Defendants' actions are not the least restrictive of religious exercise to further any governmental interest, much less a compelling one.

240.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

241.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

242.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

243.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

---

[70] *Lund v. Rowan Cty.*, 863 F.3d 268, 280 (4th Cir. 2017) (en banc) (quoting *Larson*, 456 U.S. at 244)).

[71] *Larson*, 456 U.S. at 244; *Colo. Christian*, 534 F.3d at 1266. Protections for religious exercise to fulfill the Free Exercise Clause (e.g., religious safe harbors) obviously do not constitute discrimination in violation of the Establishment Clause. *See, e.g., Liberty Univ. v. Lew*, 733 F.3d 72, 100 (4th Cir.), cert. denied, 571 U.S. 1071 (2013) (rejecting Establishment Clause and Equal Protection Clause challenges to the ACA safe harbor in IRC §5000A(d)(2)(B)).

[72] *Colo. Christian*, 534 F.3d at 1266 (collecting Supreme Court cases).

**Claim 4**
**Violation of The Free Speech Clause According to 42 U.S.C. § 1983**
**Content Discrimination**

244.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

245.    Defendants have violated the Free Speech Clause of the First Amendment, and the rights of Plaintiffs guaranteed thereunder, by violating neutrality principles enshrined therein.

246.    Plaintiffs are engaging in shared religious and communicative exercise, including but not limited to the sharing of health care needs, practices, expenses, and other burdens.

247.    Plaintiffs and its members organize and worship around Biblical Christian faith and principles that apply to everyday life, including, but not limited to, physical health needs.

248.    Plaintiffs express their shared faith by congregating and communicating through cards and notes, their monthly newsletter and spiritually through prayer.

249.    The actions of Defendants described herein have infringed these rights of Plaintiffs to freely express themselves based upon the content of their speech.

250.    The same expressive rights Defendants have honored for similarly situated groups Defendants now threaten to deny forever to Gospel Light Mennonite Church Medical Aid Plan and its 490 members in New Mexico.

251.    For the same reasons described in the Causes of Action above, Defendants' enforcement policy and action against Gospel Light Mennonite Church Medical Aid Plan and its members amount to non-neutral content restrictions of their Free Speech rights.

54

252.    Content-based restrictions of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[73]

253.    The entire class of content-based restrictions on speech—whether or not they also discriminate according to viewpoint—must undergo strict scrutiny.[74]

254.    Even facially content-neutral laws constitute content-based regulations of speech if a law cannot be "justified without reference to the content of speech" or was adopted "because of disagreement with the message [the speech] conveys."[75]

255.    Defendants do not have a rational, let alone compelling, reason for their actions.

256.    Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

257.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

258.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

259.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

260.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

---

[73] *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted) ("*Reed*").
[74] "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995) ("*Rosenberger*").
[75] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

**Claim 5**
**Violation of The Free Speech and Assembly Clauses According to 42 U.S.C. § 1983**
**Expressive Association**

261.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

262.    Defendants have violated the Free Speech and Assembly Clauses of the First Amendment, and the rights of Plaintiffs guaranteed thereunder, by violating their rights to "expressive association" guaranteed by the First Amendment.[76]

263.    This freedom to associate prohibits "intrusion into the internal structure or affairs of an association" and "plainly presupposes a freedom not to associate."[77]

264.    Courts defer to a group's explanation of the "nature of its expression [and its] view of what would impair its expression."[78]

265.    The First Amendment's protection of expressive association and speech "applies with special force [to] religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals."[79]

266.    The First Amendment prohibits regulations that might (a) "affect the way an organization carried out what it understood to be its religious mission,"[80] (b) prevent it from "defin[ing] itself" by limiting its staff to "those committed to [its] mission,"[81] or (c) cause it "as it currently identifies itself to cease to exist."[82]

---

[76] *See Hurley v. Irish-American GLB*, 515 U.S. 557 (1995) ("*Hurley*"); *Boy Scouts v. Dale*, 530 U.S. 640 (2000) ("Dale"); *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ("*Roberts*").
[77] *Roberts*, 468 U.S. at 623.
[78] *Dale*, 530 U.S. at 653.
[79] *Hosanna*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring).
[80] *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 336 (1987) ("Amos").
[81] *Amos*, 483 U.S. at 342 (Brennan, J., concurring).
[82] *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006); *FCA*, 46 F.4th at 1099 (without relief, the club "may continue to dwindle" until it "cease[s] to exist").

267.    Gospel Light Mennonite Church Medical Aid Plan and its members are entitled not just to "special solicitude,"[83] but to "double" First Amendment protection, since their core activity expressive association and religious observance are "doubly protected by the Free Exercise and Free Speech Clauses."[84]

268.    Defendants would effectively take over Gospel Light Mennonite Church Medical Aid Plan's management of its own membership rolls by dictating who could be admitted, excluded, and expelled.

269.    The same associational rights Defendants have honored for similarly situated groups Defendants now threaten to deny forever to Gospel Light Mennonite Church Medical Aid Plan and its 490 members in New Mexico.

270.    At the same time, Defendants also would subject Gospel Light Mennonite Church Medical Aid Plan and its members to antidiscrimination requirements and prevailing social policy contrary to the religious faith that Gospel Light Mennonite Church Medical Aid Plan and its members all share and that is the basis for their sharing of their health care burdens, forcing Gospel Light Mennonite Church Medical Aid Plan to secularize or close its doors.

271.    Such constitutional rights of free speech, assembly, and expressive association are protected by strict scrutiny.

272.    Plaintiff Gospel Light Mennonite Church Medical Aid Plan and its past, current, and prospective members (including the three individual Plaintiff members) constitute an expressive association that desires to associate for the purpose of engaging in shared religious and communicative exercise, including but not limited to the voluntary sharing of health care needs, practices, expenses, and other burdens.

---

[83] *Hosanna*, 565 U.S. at 189.
[84] *Kennedy*, 142 S.Ct. at 2433.

273. These deeply held shared beliefs include Biblical teaching on such religious and social policies of life, marriage, and sexuality.

274. Defendants' actions as described herein have infringed these rights of Plaintiffs and other New Mexico members to freely express themselves and associate together for all the deeply held religious purposes described herein.

275. Defendants do not have a rational, let alone compelling, reason for their actions.

276. Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

277. Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

278. This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

279. As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

280. Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

**Claim 6**
**Violation of The Equal Protection Clause According to 42 U.S.C. § 1983**
**Discrimination Involving a Fundamental Right**

281. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

282. The Equal Protection Clause of the Fourteenth Amendment requires that any government action that interferes with a "fundamental right" be subject to strict scrutiny.[85]

---

[85] *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).

283.   "Unquestionably, the free exercise of religion is a fundamental constitutional right."[86]

284.   Defendants' actions described herein interfere with Plaintiffs' free exercise of religion and thereby independently violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution, for all the reasons alleged above.

285.   The same "intent to treat differently"[87] that violates the Free Exercise Clause violates the Equal Protection Clause because it burdens a "fundamental right."

286.   If motivated by animus, Defendants' actions are flagrantly unconstitutional, as "[r]eligious animus is not a permissible government interest, much less a compelling one."[88]

287.   Upon information and belief, Defendants' differential treatment of Plaintiffs, Defendants' interpretation and application of New Mexico insurance laws to Plaintiffs, and Defendants' other actions toward Plaintiffs described herein are motivated by animus.

288.   Such actions patently violate the Fourteenth Amendment.

289.   Even if not motivated by animus, the actions of Defendants hereunder are subject to strict scrutiny because they infringe the fundamental right of free exercise of religion.

290.   Defendants do not have a rational, let alone compelling, reason for their actions.

291.   Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

292.   Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

---

[86] *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974); *accord Jesus Christ is the Answer Ministries, Inc. v. Balt. Cty.*, 915 F.3d 256, 265 (4th Cir. 2019) (quoting *Johnson*).
[87] *Colo. Christian*, 534 F.3d at 1260 (McConnell, J.).
[88] *Jesus Christ is the Answer*, 915 F.3d at 262 n.3.

293.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

294.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

295.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

**Claim 7**
**Violation of The Equal Protection Clause According to 42 U.S.C. § 1983**
**Discrimination Involving Suspect Class**

296.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

297.    The Equal Protection Clause of the Fourteenth Amendment requires that any government action that discriminates against a "suspect class" be subject to strict scrutiny.[89]

298.    "Religion is a suspect class."[90]

299.    The differential treatment of Gospel Light Mennonite Church Medical Aid Plan and its members due to their "religious beliefs and practices would result in classifying them based on membership in a suspect class and would violate the Equal Protection Clause unless the classification satisfies strict scrutiny."[91]

300.    For all the reasons stated in the previous Cause of Action, the actions of Defendants discriminate against Plaintiffs in violation of the Fourteenth Amendment.

301.    Even if not motivated by animus, the actions of Defendants hereunder are subject to strict scrutiny because they infringe the fundamental right of free exercise of religion.

---

[89] *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).
[90] *Saud v. Days*, 50 F.4th 705, 710 (9th Cir. 2022) (citing *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).
[91] *Saud v. Days*, 50 F.4th at 710.

302.    To the extent Defendants were motivated by animus against the religion or religious exercise or beliefs of Gospel Light Mennonite Church Medical Aid Plan or its members, those actions patently violate the Fourteenth Amendment and are flatly barred.

303.    Otherwise, such actions of Defendants are subject to strict scrutiny.

304.    Defendants do not have a rational, let alone compelling, reason for their actions.

305.    Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

306.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

307.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

308.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

309.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

**Claim 8**
**Violation of The Due Process Clause According to 42 U.S.C. § 1983**
**Denial of Fair Hearing Process**

310.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

311.    As alleged herein, Defendants have violated the Due Process Clause of the Fourteenth Amendment, and the rights of Gospel Light Mennonite Church Medical Aid Plan and its members guaranteed thereunder, by failing to provide Gospel Light Mennonite Church Medical Aid Plan with the full protections that due process requires.

312.    "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of the due process.'"[92]  "This applies to *administrative agencies which adjudicate as well as to courts*. Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'"[93]

313.    The process for "agency adjudication" should be "characterized by the same degree of procedural integrity and independence as the judicial process."[94] Thus, an agency tribunal's "overlap" "between prosecutorial and adjudicative functions … potentially raises a greater concern about bias."[95]  "Even the most minimal guarantees of procedural due process require that the decision be issued by a 'neutral and detached hearing body[.]'"[96]

314.    The blending of powers within OSI, including the "overlap between prosecutorial and adjudicative functions," "raises a greater concern about bias."  That combination of powers, together with the evidence of prejudgment and protectionism discussed above, make it impossible for OSI to avoid the appearance or "probability of unfairness."[97]

315.    Under the Fourteenth Amendment, the bare minimum that "due process requires is notice and opportunity to be heard by a 'disinterested decisionmaker.'"[98]

316.    Defendants and the OSI administrative process deny this bare minimum of the due process to Plaintiffs.

---

[92] *Caperton v. A.T. Massey Coal*, 556 U.S. 868, 876 (2009); *accord William Jefferson & Co. v. Bd. of Ass'mt*, 695 F.3d 960, 963-64 (9th Cir. 2012) (applying *Caperton* to local agency process).

[93] *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (citations omitted; emphasis added); *accord Cox v. Com'r*, 514 F.3d 1119, 1126 (10th Cir. 2008); *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014).

[94] *Harline v. DEA*, 148 F.3d 1199, 1205 (10th Cir. 1998).

[95] *William Jefferson & Co.*, 695 F.3d at 965.

[96] *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (citation omitted) (parole board hearing).

[97] Agency adjudication that blurs separation of powers has long been allowed. But Gospel Light Mennonite Church Medical Aid Plan reserves its right to challenge the role of agencies acting in multiple capacities, especially if the Supreme Court alters longstanding precedent.

[98] *Clearone, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1352 (Fed. Cir. 2022).

317.    Defendant Catechis has rendered the final decision in Plaintiff Gospel Light Mennonite Church Medical Aid Plan's appeal.

318.    Defendant Catechis is not a disinterested, neutral, and impartial decisionmaker in this matter and with regard to Plaintffs.

319.    Among other things, Catechis, as successor to Superintendent Toal, made the determination prior to Gospel Light Mennonite Church Medical Aid Plan's hearing that HCSMs were offering "unauthorized insurance."

320.    Among other things, Catechis, as successor to Superintendent Toal, made the determination that OSI would contradict and reverse its long-standing position that HCSMs operating openly and freely in the State of New Mexico would be challenged as offering "unauthorized insurance."

321.    Among other things, Defendants have prejudged this case with demonstrated hostility to religious healthcare sharing ministries and a stated intention to shut down their operations in the State of New Mexico.

322.    Among other things, Defendants have used this enforcement action to institutionalize favoritism and protectionism to insulate and protect New Mexico's own producers and providers in its own ACA-governed insurance market.

323.    Among other things, Defendants and the OSI administrative hearing process that they controlled denied Plaintiff Gospel Light Mennonite Church Medical Aid Plan the opportunity to question the Superintendent of Insurance under oath for evidence of inconsistency, illegality, motive, or other irregularities necessary to pursue and develop evidence of animus by Defendants against Plaintiff Gospel Light Mennonite Medical Aid Plan and other HCSMs and their members.

324.    Defendants and the OSI administrative hearing process that they control have forced Plaintiff Gospel Light Mennonite Church Medical Aid Plan to face extended litigation, a $2.5 million fine and expulsion of Plaintiff and all its operations from the State of New Mexico and deprive Gospel Light Mennonite Church Medical Aid Plan's members of any opportunity to participate in an HCSM as their religious beliefs and right to free exercise direct.

325.    The OSI administrative forum the Defendants control is inadequate, particularly to adjudicate complex constitutional questions necessary to protect the Plaintiffs' constitutional rights, as demonstrated by Hearing Officer Walker's decision and Defendant Catechis' adoption of that opinion as her own.

326.    Defendants' actions cannot withstand any form of judicial scrutiny.

327.    Defendants do not have a rational, let alone compelling, reason for their actions.

328.    Defendants' actions also are not a rational or even minimally acceptable means to further any governmental interest, much less a compelling one.

329.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

330.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

331.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

332.    Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

## Claim 9
## Federal Preemption

333.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

334.    Defendants' interpretation and application of New Mexico insurance laws conflict with the interpretation and application of governing federal laws in a manner that requires preemption under the Supremacy Clause of the United States Constitution.

335.    The McCarran-Ferguson Act ("MFA") helps reserve "insurance regulation" to the states by protecting such regulation from "federal preemption."

336.    Only regulations of "insurance," as defined by the MFA, qualify for this protection.[99] Federal cases control the meaning of "insurance" for purposes of preemption.[100] To qualify for MFA protection, OSI must define "insurance" consistently with federal cases.[101]

337.    Insurance requires assumption of "true risk," under the "conventional concept of risk-bearing[, which] involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts," and a "true underwriting of risks, the one [real] earmark of insurance[.]"[102] "[If risk] is not shifted [to] others, there can be neither insurance nor indemnity. Insurance also … involves distribution of the risk, but distribution without assumption hardly can be held to be insurance. These are elemental conceptions and controlling ones."[103]

---

[99] *See SEC v. Variable Annuity Life Ins*., 359 U.S. 65, 67-72 (1959).
[100] *Variable Annuity*, 359 U.S. at 69.
[101] In *McVey*, the district court ruled that the West Virginia insurance commissioner's "enforcement threat against the Membership Program" did not "involve regulation of the business of insurance" as defined by the MFA. 523 F.Supp.3d at 872-73. "Air Evac is likely to prevail in demonstrating that its Membership Program is not insurance, and therefore that any state regulation of it is preempted[.]" *Id*. One key was a finding of "no indemnification." *Id*.
[102] *Variable Annuity*, 359 U.S. at 70-73.
[103] *Jordan v. Grp. Health Ass'n*, 107 F.2d 239, 245 (D.C. Cir. 1939) (citations omitted).

338.    Hallmarks of insurance have always included the related concepts of indemnity, promise to pay, and assumption of risk.[104] In short, a contract for insurance always requires a legally enforceable promise or "obligation to indemnify the insured."[105]

339.    To the extent New Mexico law, as interpreted or as applied by Defendants, disagrees, New Mexico law is preempted.

340.    As described above, Gospel Light Mennonite Church Medical Aid Plan's programs meet the federal definition of "not insurance" and therefore, New Mexico's contrary law—or Defendants' contrary interpretation of it—is preempted.

341.    Defendants' interpretation of insurance contrary to the MFA nullifies New Mexico's anti-preemption protection, subjecting it to implied preemption by federal law when interpretation of its insurance laws makes simultaneous compliance with both federal and state regulations impossible ("impossibility preemption"), a form of "conflict preemption."[106]

342.    Defendants' interpretation of insurance contrary to the MFA also nullifies anti-preemption protection when their state-law interpretation poses an obstacle to the accomplishment of federal goals ("obstacle preemption"), another form of "conflict preemption."[107]

---

[104] *See, e.g., Kinkaid v. John Morrell & Co.*, 321 F.Supp.2d 1090, 1098 (N.D.Iowa 2004).

[105] *Jones v. Liberty Mutual*, 385 F.3d 820, 827 (4th Cir. 2004) ("obligation to indemnify [arises from] legal obligation to pay"); *see Travelers Indem. v. Dammann & Co.*, 594 F.3d 238, 258 (3d Cir. 2010) (same); *Stewart v. E.M.J. Corp.*, 2005 U.S. App. LEXIS 2050, at *14-15 (10th Cir. 2005) ("only [one] compelled to pay another party due to a legal obligation is eligible to seek indemnification"); *Equal Rights Ctr. v. Archstone Smith Tr.*, 603 F.Supp.2d 814, 824 (D.Md. 2009) (to "'shift [the] entire responsibility …' is exactly what indemnity means").

[106] *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 707 (4th Cir. 2015) (federal law preempted a state tort duty that would obstruct a wireless carrier's ability to provide coverage and impede the FCC's authority). "Conflict preemption applies to state law 'when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 707.

[107] *See Johnson*, 781 F.3d at 707; *see also Columbia Venture v. Dewberry & Davis*, 604 F.3d 824 (4th Cir. 2010). "Obstacle preemption is a type of conflict preemption authorized by the Supremacy Clause. It applies 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 829-30 (citations omitted).

343.    Defendants' interpretation also fatally conflicts with the ACA's safe harbor—its "Religious Exemption" for "Health Care Sharing Ministries" in IRC §5000A(d)(2)(B).

344.    As part of the ACA in 2010, Congress enacted the HCSM religious exemption in IRC §5000A(d)(2)(B) to ensure that Americans would have access to HCSMs in every state.

345.    In 2014, CMS officially recognized Gospel Light Mennonite Church Medical Aid Plan's federal HCSM status under that ACA provision, entitling all Gospel Light Mennonite Church Medical Aid Plan members nationwide to its benefits.

346.    By preventing Gospel Light Mennonite Church Medical Aid Plan from serving its New Mexico members, Defendants would prevent Gospel Light Mennonite Church Medical Aid Plan from complying with federal law to treat all its members equally nationwide "without regard to the State in which a member resides or is employed."[108]

347.    This violation of the ACA's religious exemption has both an organizational component (affecting Gospel Light Mennonite Church Medical Aid Plan) and an individual component (affecting its members).

348.    By preventing Gospel Light Mennonite Church Medical Aid Plan as an organization from treating its New Mexico members equally with Gospel Light Mennonite Church Medical Aid Plan members in other states (*i.e.*, its members in any and all other states), Defendants would obstruct Gospel Light Mennonite Church Medical Aid Plan's compliance with the ACA religious exemption.

349.    Defendants' interpretation of state law would make Gospel Light Mennonite Church Medical Aid Plan's "compliance with both federal and state regulations" impossible, requiring that this interpretation be preempted.[109] Defendants also would make Gospel Light

---

[108] IRC §5000A(d)(2)(B)(ii)(II).
[109] *See, e.g., Johnson*, 781 F.3d at 707.

Mennonite Church Medical Aid Plan noncompliant with the ACA by depriving members of Gospel Light Mennonite Church Medical Aid Plan (and all HCSMs) in the other 49 states of equal treatment by preventing Gospel Light Mennonite Church Medical Aid Plan (and all HCSMs) from serving any member who moves to New Mexico.

350.    Defendants' exclusion of all HCSMs also would deprive *all New Mexicans*, as individual members of Gospel Light Mennonite Church Medical Aid Plan and beneficiaries of the ACA religious exemption, of the benefits of that safe harbor to which they are entitled by federal law.

351.    Viewed in any of these ways, state law, as interpreted by Defendants, would make "compliance with both federal and state regulations" impossible, requiring preemption.[110]

352.    Further, Defendants' interpretation will render the federal safe harbor meaningless.

353.    In enacting the ACA, including IRC §5000A(d)(2), Congress necessarily defined HCSM membership as "not insurance." That is why members of HCSMs are exempt from penalties imposed by the ACA for not having insurance.[111] If Gospel Light Mennonite Church Medical Aid Plan's programs were insurance, they would satisfy the ACA without any need for the IRC §5000A religious exemption.  The federal religious exemption would be meaningless.

354.    In this way, Defendants have interpreted state law so as to be "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the ACA— including its intent to treat HCSMs as "not insurance"—requiring preemption by IRC §5000A.[112]

---

[110] *See, e.g., Johnson*, 781 F.3d at 707.
[111] Congress "zeroed out" such penalties in 2018. But Congress can reimpose them at any time.
[112] *Columbia*, 604 F.3d at 829-30 ("Obstacle preemption … applies 'where state law stands as an obstacle [to] accomplishment and execution of the full purposes and objectives of Congress.'").

355.    By interpreting state law to "interfere[] with the methods by which [IRC §5000A] was designed to reach [its] goal"—including its intent to make HCSMs available to Americans nationwide—Defendants' interpretation must be preempted by IRC §5000A.[113]

356.    By interpreting state insurance law to create an irreconcilable conflict with IRC §5000A, and gutting the determination of CMS that Gospel Light Mennonite Church Medical Aid Plan qualified for the federal religious exemption's benefits, Defendants have acted to "impede the [CMS's] authority, again ensuring preemption.[114]

357.    In addition to negating IRC §5000A and the CMS's specific determination for Gospel Light Mennonite Church Medical Aid Plan and its members thereunder, Defendants' interpretation negated IRC §501(c)(3) and IRC §501(m)(1) and the IRS's specific determination for Gospel Light Mennonite Church Medical Aid Plan and its members thereunder.

358.    Specifically, the IRS ruled that effective June 24, 2014, that Gospel Light Mennonite Church Medical Aid Plan qualified for federal tax-exempt status under IRC §501(c)(3) even though IRC §501(m)(1) strictly prohibits such status for any entity that even "substantially" provides any kind of "commercial insurance."

359.    Federal law is clear that IRC §501(c)(3) status is forbidden to any sort of insurer.

360.    The IRS may recognize the IRC §501(c)(3) status of an entity "*only if no substantial part* of its activities consists of providing *commercial type insurance*.'" IRC §501(m)(1) (emphasis added). "Congress intended a broad definition of the term 'commercial-type insurance.'"[115]

---

[113] *Id*. ("Obstacle preemption … occurs where state law 'interferes with the methods by which the federal statute was designed to reach [its] goal.'") (citations omitted; emphasis in original).

[114] *Johnson*, 781 F.3d at 706.

[115] *Paratransit Insurance Corp. v. Tax Com'r*, 102 T.C. 745, 752 (1994). Because it "provides commercial-type insurance under the meaning of 26 U.S.C. §501(m)(1)," the IRS "appropriately determined that FICURMA is not eligible for exemption." *FICURMA v. U.S.*, 850 F.Supp.2d 125, 132 (D.D.C. 2012) (relying on *Paratransit*).

361.    This federal definition was intended to capture anything even like insurance. Gospel Light Mennonite Church Medical Aid Plan clearly is not "insurance" within the meaning of this definition, as the IRS has recognized Gospel Light Mennonite Church Medical Aid Plan's IRC §501(c)(3) status continually since first formally recognizing it in 2014.

362.    In this way, Defendants' interpretation of state insurance law is preempted by IRC §501(m)(1) and the IRS determination of Gospel Light Mennonite Church Medical Aid Plan's tax-exempt status for all the same reasons that it is preempted by IRC §5000A and the CMS determination of Gospel Light Mennonite Church Medical Aid Plan's HCSM status.

363.    Thus, Defendants' unlawful interpretation of New Mexico insurance law ruptures the otherwise reasonably uniform national regulatory environment—led by the ACA religious exemption—that allows Gospel Light Mennonite Church Medical Aid Plan to operate freely as "not insurance" nationwide. It renders New Mexico the lone hostile outlier, a sharp departure from its own regulatory policy prior to March 26, 2020.

364.    For all the above reasons, Defendants' interpretation of New Mexico insurance law, contrary to federal law, that results in Gospel Light Mennonite Church Medical Aid Plan being labeled "insurance" is preempted by federal law under the Supremacy Clause of the United States Constitution.

365.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have suffered and will continue to suffer imminent and irreparable harm.

366.    This conduct, undertaken under color of state law, constitutes a violation of Plaintiffs civil rights according to 42 U.S.C. § 1983.

367.    As a proximate result of Defendants' actions, Plaintiffs were damaged and continue to be damaged.

368.     Plaintiffs are entitled to an injunction prohibiting Defendants from violating their constitutional and civil rights.

## Claim 10
## Declaratory Judgment Under 28 U.S.C. § 2201

369.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

370.     As alleged above, Plaintiff Gospel Light Mennonite Church Medical Aid Plan qualifies as not engaged in "insurance" or the "business of insurance" as those terms are defined by the federal ACA and IRC and does not engage in the "transaction of insurance" under New Mexico law.

371.     As alleged above, Plaintiff Gospel Light Mennonite Church Medical Aid Plan also qualifies as a "Health Care Sharing Ministry" under IRC §5000A(d)(2).

372.     As alleged above, Plaintiff Gospel Light Mennonite Church Medical Aid Plan qualifies for and is entitled to the religious exemption under IRC §5000A(d)(2)(B).

373.     As alleged above, Defendants have determined that Gospel Light Mennonite Church Medical Aid Plan's ministry is "insurance" under the New Mexico Insurance Code and have subjected Gospel Light Mennonite Church Medical Aid Plan to expulsion from the state and a $2,510,000 fine.

374.     Federal courts may grant declaratory relief under 28 U.S.C. §2201, and here there is a real and actual controversy between Plaintiffs and Defendants regarding whether Defendants may undertake to act as described herein.

375.     Plaintiff Gospel Light Mennonite Church Medical Aid Plan's request for a declaration that its ministry does not constitute "insurance" within the meaning of the ACA and

New Mexico insurance laws and that its ministry is an HCSM under IRC §5000A(d)(2)(B) and thus entitled to the religious exemption thereunder "arises under" federal law.  28 U.S.C §1331.

376.    This issue is substantial: Proper interpretation of these questions impacts not just Gospel Light Mennonite Church Medical Aid Plan and its approximately 490 New Mexico members (including the three individual Plaintiffs), but also whether thousands of other New Mexicans can engage in constitutionally protected religious exercise by participating in HCSMs.

377.    Deciding this narrow statutory issue will not generate a federalism conflict. Rather, New Mexico's regulatory power over HCSMs should be confined by New Mexico's insurance laws in a manner consistent with federal law, including but not limited to the U.S. Constitution, the MFA, the ACA, the definition of "insurance," the definition of "health care sharing ministry," and the religious exemption for HCSMs contained therein.

378.    Plaintiffs are entitled to a declaration under 28 U.S.C. §2201 that Gospel Light Mennonite Church Medical Aid Plan's ministry does not constitute "insurance" within the meaning of the ACA and New Mexico insurance laws and that its ministry is an HCSM under IRC §5000A(d)(2)(B) and thus entitled to the religious exemption thereunder.

**Claim 11**
**Violation of N.M. Const. Art. II, § 11**
**Against Defendant OSI**

379.    Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

380.    Article II, Section 11 of the Bill of Rights of the New Mexico Constitution, makes this clear and unequivocal declaration: "Every man shall be free to worship God according to the dictates of his own conscience, and no person shall ever be molested or denied any civil or political right or privilege on account of his religious opinions or mode of religious worship."

381.     Defendant New Mexico Office of the Superintendent of Insurance is a public body that may be sued according to the New Mexico Civil Rights Act. *See* NMSA 1978, § 41-4A-2.

382.     The New Mexico Civil Rights Act states that "[a] public body or person acting on behalf of, under color of or within the course and scope of the authority of a public body shall not be subject or cause to be subjected any resident of New Mexico or person within the state to deprivation of any rights, privileges or immunities secured pursuant to the bill of rights of the constitution of New Mexico." NMSA 1978, § 41-4A-3(A).

383.     The New Mexico Civil Rights Act allows for any "person who claims to have suffered a deprivation of any rights, privileges or immunities pursuant to the bill of rights of the constitution of New Mexico due to acts or omissions of a public body or person acting on behalf of, under color of or within the course and scope of the authority of a public body" to bring a claim against the public body. NMSA 1978, § 41-4A-3(B).

384.     While the New Mexico Civil Rights Act does not define "person," person is generally defined to include both individuals and organizations such as nonstock corporations.

385.     Defendant Catechis was acting on behalf of, under color of, or within the course and scope of the authority of the Office of the Superintendent of Insurance when she issued her order prohibiting the Gospel Light Mennonite Church Medical Aid Plan from operating in New Mexico and issuing a fine for doing so.

386.     Because Defendant Catechis was acting on behalf of, under color of, or within the course and scope of the authority of the Superintendent of Insurance, Plaintiffs may bring this action against the Office of the Superintendent of Insurance. NMSA 1978, § 41-4A-3(C).

387.     The actions of Defendants violate Article II, Section 11 of the Bill of Rights of the New Mexico Constitution:

a.      By not allowing Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare members to be free to worship God according to the dictates of their own consciences;

b.      By molesting Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare members on account of their religious opinions or mode of religious worship; and

c.      By denying the civil rights and privileges to Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare's members on account of their religious opinions or mode of religious worship.

388.    In practical terms, the Defendants' punitive actions told Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare members that although they believe sharing one another's medical expenses is a Biblical directive (a dictate of their own consciences), the members will nevertheless be punished (and their HCSM will be fined $2,510,000 dollars) if they do in fact worship God by living out the Biblical command to, "not forget to do good and to share, for with such sacrifices God is well pleased." Hebrews 13:16.

389.    Additionally, the Defendants' punitive actions have shown Gospel Light Mennonite Church Medical Aid Plan dba Liberty HealthShare members that not only will they be denied the right to share the funds they have been privileged to earn, but the Defendants also deem their religious opinions and modes of religious worship to be of no account.

390.    Sharing with other Christians is a "sacrifice," the Bible says.[116]

391.    By definition, a sacrifice is an act of worship:

NEW WEBSTER'S DICTIONARY (1993): "sacrifice. An offering, e.g. of animal life, food or incense, made to a deity etc. as propitiation, thanksgiving etc.; the act or practice of making such an offering; (*theol.*) Christ's offering of himself in the Crucifixion."

---

[116] The New Testament book of *Hebrews* was not first written in English, it was written in Greek. The word we translate in *Hebrews* 13:16 as "sacrifice" was originally the Greek word θυσία (*thisia*). Whether read in an English translation or in the original Greek, sacrifice means a act of religious worship.

THE AMERICAN HERITAGE DICTIONARY (1976): "sacrifice. The act of offering something to a deity in propitiation or homage."

WEBSTER'S ENCYCLOPEDIC DICTIONARY (1957): "sacrifice. The act of offering something to God in atonement, as an act of worship; what is thus offered."

FUNK & WAGNALLS, VOL TWO (1949): "sacrifice. The act of making an offering to a deity, in worship or atonement."

392.     Because Article II, § 11 of the New Mexico Constitution addresses a fundamental constitutional right, claims that a public body have violated that right should be considered through the application of strict scrutiny.

393.     Defendants' actions fail strict scrutiny because there is no compelling governmental interest in preventing the Gospel Light Mennonite Church Medical Aid Plan and its members from sharing each other's health care costs in New Mexico.

394.     All members of the Gospel Light Mennonite Church Medical Aid Plan that live in New Mexico have access to health insurance programs should they wish to enroll in an insurance plan that pays for all health care expenses. In fact, the Gospel Light Mennonite Church Medical Aid Plan makes it abundantly clear that it is a ministry and not an insurance plan.

395.     Even if there is a compelling governmental interest in prohibiting the Gospel Light Mennonite Church Medical Aid Plan and its members from sharing each other's health care costs in New Mexico, Defendants' actions still fail strict scrutiny because they are not using the least restrictive means to further that governmental interest because the Office of Superintendent of Insurance has taken action to stop the Gospel Light Mennonite Church Medical Aid Plan from operating in New Mexico at all.

396.     As a result, Plaintiffs seek injunctive and declaratory relief against Defendants Office of the Superintendent of Insurance to stop its unlawful actions that violate Article II, § 11 of the New Mexico Bill of Rights.

**Claim 12**
**Violation of the New Mexico Religious Freedom Restoration Act**
**Against Defendant OSI**

397.     Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

398.     Defendant New Mexico Office of the Superintendent of Insurance is a government agency that may be sued according to the New Mexico Religious Freedom Restoration Act. *See* NMSA 1978, § 28-22-2(B).

399.     The New Mexico Religious Freedom Restoration Act prohibits government agencies from restricting a person's free exercise of religion.

400.     The Office of Superintendent of Insurance, by ordering the Gospel Light Mennonite Church Medical Aid Plan to cease and desist from operating in New Mexico, is depriving the Gospel Light Mennonite Church Medical Aid Plan and its New Mexico members from engaging in the free exercise of religion, including but not limited to their beliefs that they must care for one another, which is carried out, in part, through sharing each other's health care costs.

401.     No exception to the New Mexico Religious Freedom Restoration Act applies in this case because there is no compelling governmental interest in preventing the Gospel Light Mennonite Church Medical Aid Plan and its members from sharing each other's health care costs in New Mexico.

402.     All members of the Gospel Light Mennonite Church Medical Aid Plan who live in New Mexico have access to health insurance programs should they wish to enroll in an insurance plan that pays for all health care expenses. In fact, the Gospel Light Mennonite Church Medical Aid Plan makes clear that it is a ministry and not an insurance plan.

403.     Even if there is a compelling governmental interest in prohibiting the Gospel Light Mennonite Church Medical Aid Plan and its members from sharing each other's health care costs

in New Mexico, no exception to the New Mexico Religious Freedom Restoration Act applies in this case because the Office of the Superintendent of Insurance is not using the least restrictive means to further that governmental interest because the Office of Superintendent of Insurance has taken action to stop the Gospel Light Mennonite Church Medical Aid Plan from operating in New Mexico at all.

404.    As a result of this, Plaintiffs seek injunctive and declaratory relief against Defendant Office of the Superintendent of Insurance to stop its unlawful actions that violate the New Mexico Religious Freedom Restoration Act.

**Prayer for Relief**

Plaintiffs respectfully request the following relief:

A.      A declaratory judgment, according to 28 U.S.C. § 2201, that the actions of Defendant Catechis taken according to the New Mexico Insurance Code are invalid because they violate the United States Constitution and are unenforceable;

B.      A declaratory judgment, according to NMSA 1978, § 41-4A-3(B), that the actions of Defendant Office of the Superintendent of Insurance taken according to the New Mexico Insurance Code are invalid because they violate the New Mexico Constitution and are unenforceable;

C.      A declaratory judgment, according to NMSA 1978, § 28-22-4(A)(1), that the actions of Defendant Office of the Superintendent of Insurance taken according to the New Mexico Insurance Code are invalid because they violate the New Mexico Religious Freedom Restoration Act;

D.      A declaratory judgment, according to 28 U.S.C. § 2201, that Gospel Light Mennonite Church Medical Aid Plan's ministry does not constitute "insurance" within the

meaning of the ACA and the New Mexico Insurance Code, and that Gospel Light Mennonite Church Medical Aid Plan's ministry is an HCSM under §5000A(d)(2)(B) and thus entitled to the religious exemption thereunder;

E.    A permanent injunction enjoining Defendants from enforcing the New Mexico Insurance Code against the Gospel Light Mennonite Church Medical Aid Plan and other HCSMs;

F.    An order awarding Plaintiffs their costs and attorneys' fees according to 42 U.S.C. § 1988, NMSA 1978, § 41-4A-5, and NMSA 1978, § 28-22-4(A)(2); and

G.    Such other and further relief as the Court deems just and proper.

Dated March 31, 2023

Respectfully submitted,

*/s/ Nicholas T. Hart*

Carter B. Harrison IV
Nicholas T. Hart
Daniel J. Gallegos
**HARRISON & HART, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 295-3261
carter@harrisonhartlaw.com
nick@harrisonhartlaw.com
daniel@harrisonhartlaw.com

and

J. Michael Sharman
Commonwealth Law Offices, P.C.
246 E. Davis Street, Suite 200
Culpeper, VA 22701
Tel: (540) 727-1007
Email: mikesharman@verizon.net
*Pro Hoc Vice (forthcoming)*

*Attorneys for Plaintiffs*