**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

_____

GOSPEL LIGHT MENNONITE
CHURCH MEDICAL AID PLAN
d/b/a LIBERTY HEALTHSHARE,
BREANNA RENTERIA,
LAURA SMITH, and
TAMMY WATERS,

        Plaintiffs,

v.                                       Case No. 1:23-cv-00276-MLG-KK

NEW MEXICO OFFICE OF THE
SUPERINTENDENT OF INSURANCE, and
JENNIFER A. CATECHIS,
Interim Superintendent of Insurance,
in her official capacity,

        Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART MOTION TO**
**DISMISS AND DENYING MOTION FOR PRELIMINARY INJUNCTION**

      This matter comes before the Court on Defendants' Motion to Dismiss in Lieu of Answer,

filed April 25, 2023 (Doc. 8) and Plaintiffs' Motion for Preliminary Injunction, filed March 31,

2023 (Doc. 3). Having reviewed the parties' submissions and the applicable law, and having held

a hearing on June 2, 2023, the Court grants the motion to dismiss in part and denies the motion for

preliminary injunction.

**BACKGROUND**

A.     **Gospel Light's cost-sharing arrangement**

      Plaintiff Gospel Light Mennonite Church Medical Aid Plan d/b/a Liberty HealthShare

("Gospel Light") is a foreign corporation that incorporated in Virginia on June 24, 2014. Doc. 1-

3. Gospel Light functions as a healthcare sharing ministry ("HCSM"), which it defines as "a

religious ministry grounded in Biblical teaching . . . by which religiously like-minded members voluntarily share each other's health care costs."[1] Doc. 1 at 2. The purpose of the organization is "to coordinate voluntary contributions for the sharing of qualifying health care costs between members based on shared ethical and religious beliefs." Doc. 3 at 4. To effectuate this goal, Gospel Light "Sharing Members" contribute a "monthly share amount" to be used for the medical needs of others. Doc. 1-10 at 35. How much money should be contributed as part of a member's "monthly share amount" is "determined by majority vote of the Board of Directors" who look to various factors including the "amount of bills," "the amount needed to administer the [p]rogram," and "the number of participating members." *Id*. at 9. Gospel Light also collects membership enrollment dues, annual dues, and administrative fees from its members to "defray administrative costs" and address overhead. *Id*. at 11. The collected monies are then shared among members in a manner "suggested and coordinated" by Gospel Light administrators. *Id*. at 21. Certain exceptions exist to this cost-sharing (e.g., certain job-related injuries), and members are expected "to pursue payment from any other responsible payer" including private insurance, Medicare, Medicaid, and worker's compensation. *Id*. at 13.

Gospel Light's cost-sharing arrangement is not without risk to program participants. Gospel Light bears no responsibility or obligation to pay for any healthcare bill. As the legal disclaimer incorporated into Gospel Light's informational materials explains:

> This program is not an insurance company nor is it offered through an insurance company. The program does not guarantee or promise that your medical bills will be paid or assigned to others for payment. Whether anyone chooses to pay your medical bills will be totally voluntary. As such,

---

[1] This definition generally conforms to the statutory definition of a HCSM. *See* 26 U.S.C. § 5000A (defining HCSM as an organization whose "members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed").

> this program should never be considered as a substitute for an insurance
> policy. Whether you receive any payments for medical expenses and
> whether or not this program continues to operate, you are always liable for
> any unpaid bills.

Doc. 1-10 at 36. *See also* Doc. 1 at 21 ("[Gospel Light] expressly, consistently, and persistently disclaims any assumption of risk, promise to pay, and other customary legal incidents of insurance."); *id.* ("No sharing is guaranteed.").

**B.      OSI takes administrative enforcement action against Gospel Light**

Gospel Light began offering cost-sharing in New Mexico in 2014, Doc. 3 at 2, and its operations have previously gone unfettered by regulation from the New Mexico Office of the Superintendent of Insurance ("OSI"). That changed when two people lodged consumer complaints against the corporation. Doc. 8 at 2. Following these reports, the superintendent of insurance ("Superintendent") initiated an "administrative enforcement action" culminating in an Order to Cease and Desist and Order to Show Cause ("Order to Show Cause"). Doc. 3-3. That order found that Gospel Light fell within the state definition of a "health insurance carrier" and was operating without the requisite certificate of authority. Doc. 3-3 at 4-5, 7. Gospel Light requested a hearing on the matter, which occurred and proceeded under the authority of an OSI hearing officer. Doc. 3-4 at 2. For reasons hewing closely to those articulated in the Order to Show Cause, the hearing officer found that Gospel Light was a health benefits plan under New Mexico law and that the Superintendent therefore possessed the authority to

> require [Gospel Light] to cease and desist from soliciting, offering to sell, selling,
> collecting membership fees or monthly share amounts, or servicing, HCSMs in
> New Mexico, unless and until [Gospel Light] obtains a certificate of authority to
> operate as a health insurer in this state, and its plans are approved by the
> Superintendent for sale in this state.

*Id.* at 2, 96-97. The hearing officer recommended that the Superintendent levy a $10,000 fine for each of the 502 unauthorized membership plans Gospel Light issued in New Mexico—a total

recommended fine of over $10,000,000. The Superintendent ultimately adopted all the hearing officer's factual findings and legal conclusions. Doc. 1-11 at 7. Gospel Light was ordered to cease operating as an HCSM in New Mexico and to pay a (reduced but nonetheless substantial) fine of $2,510,000.00. *Id.* at 23; Doc. 13-2.

Gospel Light appealed the Superintendent's final order to state district court. *See* NMSA 1978, § 59A-4-20(A) (2011) (providing for appeal of Superintendent decision to the state district court). It requested that OSI stay any administrative action pending the state court proceedings. OSI did not concur with this request. Instead, the Superintendent required Gospel Light to execute a bond of twice the value of the fine ($5,020,000.00) and cease operating in New Mexico except to process medical expenses submitted on or before April 24, 2023. Doc. 13-3 at 4. Gospel Light subsequently sought the state district court's review of that decision. Both the substantive appeal and the request for stay are currently pending; the matter is set for hearing in state court later this summer.

## C.    Federal proceedings

Gospel Light filed the present action alleging a variety of federal and New Mexico constitutional violations, federal preemption, and violations of the New Mexico Religious Freedom Restoration Act. *See generally* Doc. 1 (complaint). Gospel Light also filed a motion for preliminary injunction, and OSI has filed a motion to dismiss the case on a variety of jurisdictional grounds. Docs. 3, 8. The Court held a hearing on these motions after they were fully briefed. Doc. 23 (clerk's minutes). Gospel Light and OSI filed closing briefs shortly thereafter. Docs. 27, 28. With leave of the Court, the Alliance of Health Care Sharing Ministries submitted a brief as amicus curiae. Doc. 29 (granting leave); Doc. 25-1 (amicus brief). Finally, Gospel Light filed a notice of supplemental authority. Doc. 36. Having reviewed this substantial briefing record, the Court rules

on the issues as described below.

**ANALYSIS**

**I.      OSI's Motion to Dismiss**

OSI's motion to dismiss raises three jurisdictional arguments and also invokes abstention pursuant to *Younger v. Harris*, 401 U.S. 37 (1971).[2] Jurisdictional matters present a threshold question, so the Court addresses those issues first. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." (internal brackets, quotations, and citations omitted)). The Court then considers the application of *Younger* to these proceedings and parties.

**A.  Standing of individual Plaintiffs**

Under Article III of the United States Constitution, a plaintiff must have standing to bring their claims. *McCombs v. Delta Grp. Elecs., Inc.*, Case No. 1:22-cv-00662, 2023 WL 3934666, at *2 (D.N.M. June 9, 2023). To demonstrate Article III standing, a plaintiff must establish three elements.

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant,

---

[2] The Tenth Circuit has clarified that *Younger* is an abstention doctrine and not a jurisdictional matter. *D.A. Osguthorpe Family P'ship v. ASC Utah, Inc.*, 705 F.3d 1223, 1230 n.8 (10th Cir. 2013) ("In denying Osguthorpe's motion, the federal district court suggested that the *Younger* doctrine is jurisdictional. This is not precisely correct. *Younger* is a doctrine of abstention. An abstention doctrine is one 'under which a District Court may decline to exercise or postpone the exercise of its jurisdiction.' This differs from a case in which the district court is barred at the outset from exercising its jurisdiction.") (citations omitted). However, the Tenth Circuit also acknowledged that "once a court has properly determined that *Younger* abstention applies, 'there is no discretion to grant injunctive relief.'" *Id.* (citation omitted).

and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The plaintiff "bears the burden of establishing these elements," which at the pleading stage means the plaintiff must "allege facts demonstrating each element." *Id.* at 3 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted)).

OSI argues that there is no injury in fact, and therefore no standing, because the individual Plaintiffs have not alleged a specific religious belief that mandates them to participate in a healthcare sharing plan. Doc. 8 at 14. While true, the individual Plaintiffs do allege that sharing healthcare costs through an HCSM is a means through which they practice their faith. *See* Doc. 37 at 85-87. They further assert that the inability to share healthcare costs would prevent them from engaging in their sincerely held religious beliefs.[3] Doc. 1 at 52. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (The "exercise of religion involves not only belief and profession but the performance of (or abstention from) physical acts that are engaged in for religious reasons." (internal quotation marks and citations omitted)).

These claimed restrictions are sufficient to confer standing. At the pleading stage, the Plaintiffs need only make some plausible "show[ing] that [their] good-faith religious beliefs are hampered[.]" *Am. Legion v. Am. Humanist Assoc.*, 139 S. Ct. 2067, 2100 (2019) (Gorsuch, J., concurring in the judgment) (quoting *Braunfeld v. Brown*, 366 U.S. 599, 615 (1961) (Brennan, J., concurring and dissenting)). Whether those asserted harms give rise to a constitutional violation is a merits issue to be determined after the claims and attendant facts have been fleshed out. *See*

---

[3] The Alliance of Health Care Sharing Ministries' amicus brief further discusses the role of spiritual support and prayer in HCSMs. Doc. 25-1 at 3-4.

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) ("For purposes of the standing inquiry, the question is not whether the alleged injury rises to the level of a constitutional violation. That is the issue on the merits. For standing purposes, the court asks only if there was an injury in fact, caused by the challenged action and redressable in court.") (free speech context). For now, the Plaintiffs have sufficiently pleaded an injury in fact, caused by OSI, and redressable by this Court.

The preceding analysis also disposes of OSI's claim that the individual Plaintiffs lack prudential standing. Doc. 8 at 14-15. Prudential standing examines whether a plaintiff is asserting "its own rights, rather than those belonging to third parties" and forbids assertions of "generalized grievance[s] shared in substantially equal measure by all or a large class of citizens." *Citizens' Committee to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1026 (10th Cir. 2002)*; see also Wilderness Soc'y v. Kane Cty.*, 632 F.3d 1162, 1174 (10th Cir. 2011) ("[P]rudential standing moves beyond injury in fact and addresses whether a plaintiff is asserting its own legal rights rather than resting on the rights or interests of third parties."). As explained above, the individual Plaintiffs are participants in Gospel Light's healthcare sharing plan who aver that their personal religious practices are impeded by OSI's administrative actions. They are not merely asserting rights on behalf of other HCSM members or on behalf of Gospel Light. Because the individual Plaintiffs have a stake in the litigation in the form of their own religious exercise, the Court is satisfied that they meet the requirements of prudential standing.

## B.  Eleventh Amendment immunity

OSI argues the Court should dismiss Gospel Light's claims for violation of the New Mexico Civil Rights Act ("NMCRA"), NMSA 1978, § 41-4A-1 *et seq.*, and the New Mexico Religious Freedom Restoration Act ("NM RFRA"), NMSA 1978, § 28-22-1 *et seq.*, because New

Mexico has not waived Eleventh Amendment immunity to allow for federal court proceedings. Doc. 8 at 7-8; Doc. 18 at 6, 8-10; Doc. 27 at 3. To assess this claim, the Court looks first to the NMCRA's text.

The statute's venue provision, codified at NMSA 1978, Section 41-4A-3(B) (2021), does not specifically address whether the waiver of immunity extends to suits brought in federal court. It states only that a person deprived of a right contained in the New Mexico Constitution's bill of rights "may maintain an action to establish liability and recover actual damages and equitable or injunctive relief in any New Mexico district court." *Id*. Gospel Light equates silence with consent. It reasons that because the waiver of sovereign immunity does not explicitly limit itself to state court, it must necessarily extend to federal courts also. Doc. 28 at 16.

That New Mexico has waived immunity to be sued in its own courts does not mean, ipso facto, that it has consented to suit in federal court. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999). "A State does not waive its Eleventh Amendment immunity by consenting to suit only in its own courts, and thus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court*." (emphasis in original) (internal citations, quotation marks, and brackets omitted)). That is not the case here. The NMCRA contains no express waiver to suit in a federal forum, and for this reason the Court agrees with OSI that sovereign immunity bars adjudication of that claim.[4]

The same reasoning and conclusion apply to Gospel Light's NM RFRA claims. NMSA 1978, § 28-22-4 (2000) of that legislation grants a waiver of immunity for injunctive and

---

[4] Because it finds that New Mexico has not waived sovereign immunity, the Court does not reach the issue OSI raises regarding the NMCRA's coverage of "persons" as applied to organizational plaintiffs. *See* Doc. 18 at 7.

declaratory relief, but it contains no provision consenting to suit in federal court.[5] Again, the statute is silent on the matter, and again, this omission is dispositive. *See Port Auth. Trans-Hudson Corp.*, 495 U.S. at 306.[6] Because the state has not expressly consented to be sued in federal court for claimed NM RFRA violations, Gospel Light cannot pursue its claims for relief in this litigation. *See Sossamon*, 563 U.S. at 284 (explaining that a waiver of sovereign immunity "will be strictly construed, in terms of its scope, in favor of the sovereign") (internal quotation marks and citations omitted).

### C. Timeliness

OSI next claims that that Gospel Light failed to timely appeal the hearing officer's findings. Doc. 8 at 4. Rule 1-074(E) NMRA and NMSA 1978, § 39-3-1.1(C) (1999) provide for appeals from agency decisions to the district court but require that a notice of appeal be submitted "within thirty days of the date of filing of the final decision." Whatever relevance these rules might have to the state court proceedings, they are of little import to this federal court litigation. Gospel Light is not required to exhaust the administrative appeal process before filing Section 1983 claims in this Court. *See Carrete v. N.M. Racing Comm'n*, No. 21-cv-0678, 2021 WL 6072581, at *9 (D.N.M. Dec. 23, 2021) (citing *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 519 (10th Cir. 1998) (stating that a plaintiff's "failure to seek judicial review in state court [did not] preclude[]

---

[5] Plaintiffs' NM RFRA claims are limited to injunctive and declaratory relief. Doc. 1 at 77 ¶ 404.

[6] Gospel Light points to the decision in *Ross v. The Board of Regents of the University of New Mexico*, 599 F.3d 1114 (10th Cir. 2010), claiming that it serves as "a guidepost for this Court's analysis of whether the [NMCRA] and [NM RFRA] waivers of sovereign immunity apply in the federal courts." Doc. 28 at 18. However, Gospel Light's brief omits a key fact; in *Ross*, the state defendants removed the matter to federal court. "Removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter (here of state law) in a federal forum." *Trant v. Okla.*, 754 F.3d 1158, 1172 (10th Cir. 2014) (quoting *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 624 (2002)).

his procedural due process claim" and that "[i]t is beyond dispute that a plaintiff need not exhaust state administrative remedies before filing suit in federal court under § 1983")); *McNulty v. Sandoval Cty.*, No. CIV 05-221, 2005 WL 8163566, at *3 n.3 (D.N.M. Aug. 15, 2005) (stating that exhaustion of state law remedies did not bar the plaintiff's Section 1983 post-termination due process claim). And the state mechanisms providing for appeal—along with the concomitant deadlines included in those procedural rules—of an administrative agency to state district courts do not preclude Gospel Light from seeking separate relief pursuant to federal law in a federal court.[7] Accordingly, any state appeals deadlines are inapplicable to this federal case.[8]

**D.    *Younger* abstention generally**

Finally, the Court looks to *Younger* abstention—the thorniest issue raised in the motion to dismiss. *Younger* abstention requires a federal court to refrain "from deciding a case otherwise within the scope of its jurisdiction in certain instances in which the prospect of undue interference

---

[7] OSI's suggestion that the *Carrete* decision requires a different result misconstrues the nature of the claims at issue in that case. Doc. 8 at 5 (citing *Carrete*, 2021 WL 6072581). In *Carrete*, the plaintiff was disqualified from horse racing because his horse had illegal substances in its system, and the plaintiff (untimely) appealed the administrative decision to the state district court, bringing several Section 1983 due process claims and a New Mexico Declaratory Judgment Act ("NMDJA") claim. *Id.* at *1-2. The New Mexico Racing Commission removed the case to federal court, then moved to dismiss arguing, inter alia, that the administrative appeal was untimely under Rule 1-075 NMRA. The court dismissed the Section 1983 claims for separate reasons. *Id.* at *4. As for the timeliness issue, the court clarified that the Section 1983 claims would not have been subject to the thirty-day appeal period in Rule 1-075. *Id.* However, the NMDJA claim was subject to Rule 1-075 specifically because the plaintiff had initiated the administrative review process and was now, in effect, stuck with its deadlines. *Id.* at *5-6. Therefore, because the plaintiff had not filed the declaratory judgment claim within the administrative appeal period, the court dismissed the NMDJA claim without prejudice. Here, the federal case is not an appeal from a state administrative action; in fact, the appeal from the state administrative action is currently, separately, pending in state court.

[8] Additionally, the Court notes that the individual Plaintiffs were not parties to the state administrative proceeding, and therefore, the deadlines associated with that proceeding cannot apply to their claims.

with state proceedings counsels against federal relief." *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 522 (10th Cir. 2023). The legal precept underlying the doctrine comports with notions of federalism and comity, *Younger*, 401 U.S. at 44, and precludes federal court interference "with state court proceedings by granting equitable relief—such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings—when such relief could adequately be sought before the state court." *Schwab v. Kansas*, 691 F. App'x 511, 514 (10th Cir. 2017).

> To that end, a federal court must abstain from exercising jurisdiction when: (1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the state proceedings involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies.

*Id.* (brackets omitted) (quoting *Amanatullah v. Colo. Bd. of Med. Exam'rs*, 187 F.3d 1160, 1163 (10th Cir. 1999); *see also McDonald v. Eagle Cnty.*, 807 F. App'x 786, 790 (10th Cir. 2020) (same). Though the doctrine is to be sparingly applied, and only on the showing of exceptional circumstances, once the relevant factors have been met, the doctrine is "non-discretionary" and "the district court must abstain" from hearing the matter. *Courthouse News Serv. v. N.M. Admin. Off. Cts.*, 53 F.4th 1245, 1256 (10th Cir. 2022).

### 1. *Younger* abstention applies to Gospel Light's claims for relief

The Court begins by considering *Younger* abstention as applied to Gospel Light's claims for relief. Gospel Light does not dispute that there is an ongoing state judicial proceeding or that ongoing litigation in state court falls outside the types of actions to which *Younger* applies.[9] Doc.

---

[9] The underlying civil enforcement proceeding, which OSI initiated to investigate and ultimately discipline Gospel Light, fits cleanly within the definition of a civil enforcement proceeding in the *Younger* context. *See Sprint Comm'ns, Inc. v. Jacobs*, 571 U.S. 69, 79 (2013) (clarifying that civil enforcement proceedings are "akin to a criminal prosecution in important respects" because they

15 at 6. Rather, Gospel Light questions whether the state court provides an adequate forum to address the claims it raises here (the second element necessary for *Younger* abstention) and denies the presence of an important state interest (the third element necessary for *Younger* abstention). Gospel Light also invokes two limited exceptions to abstention asserting that (1) OSI acted in bad faith and (2) Gospel Light will suffer irreparable injury if its claims are not addressed in this forum. The Court addresses these issues in turn.

Gospel Light concedes that the state court has jurisdiction to decide the pending constitutional issues but argues that the central questions are federal in nature and should therefore be heard by a federal court. *See* Doc. 15 at 7 ("That a New Mexico state court could decide the federal issues here is not enough to declare those courts an adequate forum."). But the mere fact that many of Gospel Light's claims require interpretation of the Federal Constitution is insufficient reason for this Court to intervene in the ongoing state court proceedings. The state court may address those matters, and the proposition that state courts are unfit for adjudication of federal civil rights claims is a postulate that the Supreme Court has "repeatedly and emphatically rejected." *Moore v. Sims*, 442 U.S. 415, 430 (1979); *see also Morkel v. Davis*, 513 F. App'x 724, 728 (10th Cir. 2013) ("State courts are generally equally capable of enforcing federal constitutional rights as federal courts."); *Fisher v. Civil Serv. Comm'n*, 484 F.2d 1099, 1100 (10th Cir. 1973) ("[S]tate courts of general jurisdiction are competent to rule on federal constitutional claims."). Indeed, Supreme Court precedent directly addressing religious liberty claims attests to the adequacy of the state forum. *See Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 629 (1986) ("[I]t is sufficient under [existing precedent] that constitutional claims may be raised in

---

are "characteristically initiated to sanction the federal plaintiff," typically involve a state actor that initiated the action, and often include an investigation that ultimately results in "the filing of a formal complaint or charges" (internal citations and quotation marks omitted)).

state-court judicial review of the administrative proceeding."). Gospel Light can raise, and has raised,[10] its constitutional concerns in the state proceedings. The state district court is well-equipped to address those legal questions.

Having determined that the state court provides an adequate forum for resolution of Gospel Light's claims, the Court turns to the question of whether an important state interest is at play. There is little doubt that the regulation of insurance meets this test. Both federal and state courts have repeatedly held so. *See Hunter v. Hirsig*, 660 F. App'x 711, 717 (10th Cir. 2016) (finding that the *Younger* state interest prong was met because "the regulation and licensure of insurance producers" constituted an important state interest); *N.M. Life Ins. Guar. Ass'n v. Quinn & Co.*, 1991-NMSC-036, ¶ 33, 111 N.M. 750, 809 P.2d 1278 ("We have little trouble recognizing the substantial nature of this interest. The state long has regulated the business of insurance pursuant to its police powers. Indeed, it is beyond peradventure that protection of consumers from unsafe and unsound insurance companies is a substantial state interest."). Nevertheless, Gospel Light suggests that the state's regulatory authority is not controlling because "there is not an important state interest when there is a 'facially conclusive' claim of federal preemption." Doc. 15 at 8 (citations omitted). Although Gospel Light's legal take is correct, *see New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367 (1989), no facially conclusive claim of federal preemption exists here.[11]

---

[10] The Court may take judicial notice of filings in other courts that relate to the matter at issue. *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

[11] Preemption occurs when Congress forbids state regulation either expressly or impliedly. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015). One form of implied preemption is conflict preemption, in which "compliance with both state and federal law is impossible." *Id*. at 377. The Court interprets Gospel Light's argument that "Defendants' interpretation of the New Mexico Insurance Code results in an irreconcilable conflict with federal law and is preempted" to refer to conflict preemption. *See* Doc. 15 at 8.

The Affordable Care Act ("ACA") permits individuals who are members of HCSMs that meet a particular set of requirements to avoid the penalty for failure to maintain minimum essential coverage. *See* Doc. 3 at 19 (citing 26 U.S.C. § 5000A(d)(2)(B)). That is, members of suitable HCSMs are exempt from the individual mandate and related penalties for noncompliance with that directive. But this fact, standing alone, does suggest that Congress intended to supersede a traditional state police power.[12] *Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007) ("Whatever its form, pre-emption analysis starts with the assumption that the historic police powers of the States are not to be superseded by [federal law] unless that is the clear and manifest purpose of Congress."). To the contrary, Gospel Light's expert, Kevin McCarty, a former Florida Insurance Commissioner, testified at the hearing on this matter that "states are free to regulate [HCSMs] as they choose."[13] Doc. 37 at 198. McCarty's opinion is consistent with the relevant federal and state laws at issue; the ACA defines and exempts HCSMs from the federally imposed individual mandate, while state statutes regulate HCSMs in various ways unrelated to the ACA's requirements. Simply put, states are free to regulate HCSMs, and the ACA did not cabin state

---

[12] Gospel Light claims that federal law trumps OSI's declaration that Gospel Light is engaging in the business of insurance. Specifically, it argues that the ACA requires HCSMs to be nonprofits, and the Internal Revenue Code does not allow nonprofits to engage in the business of insurance. Doc. 15 at 9. Therefore, it contends, federal law defines Gospel Light's actions as definitively *not* the business of insurance. This is not necessarily true: while the Court does not take a position on the matter because of its conclusion that abstention is required, it notes that an HCSM could, for example, improperly engage in the business of insurance in violation of the requirements of its nonprofit status.

[13] During the hearing on this matter, Gospel Light provided testimony from Kevin McCarty. McCarty spent about 27 years working for the Florida Department of Insurance and served as the Insurance Commissioner from 2003 through 2016. Doc. 37 at 159. He has a juris doctorate from the University of Florida, has served as an expert witness in state court, and has testified in administrative hearings and before Congress. *Id.* at 160-61. McCarty was offered, and accepted, as an expert in the "regulation of healthcare sharing ministries under the Affordable Care Act." *Id.* at 165-66.

oversight of HCSM operations. *Id.* at 203-05.

This observation is borne out through other states' experiences. Some have created "safe harbor" statutes that exempt HCSMs from regulatory oversight but require compliance with the minimum criteria necessary to satisfy the relevant ACA provisions; some have exempted HCSMs but imposed conditions more onerous than the minimum imposed by the ACA; and some, like New Mexico, have not enacted any legislation that shields HSCMs from regulatory oversight. *See* Doc. 37 at 204-05; *see, e.g.*, Wash. Rev. Code § 48.43.009 (2011) (safe harbor provision requiring compliance with ACA provisions); N.H. Rev. Stat. Ann. § 126-V:1 (2012) (exempting HCSMs but imposing additional conditions, including disclaimer, annual audit, and distribution of monthly written statement to members accounting for money requested by members and money actually shared). As these varied approaches suggest, regulation of HCSMs is possible without defying federal law.

Gospel Light's second argument—that federal interests counsel against *Younger* abstention—is similarly unavailing. As discussed previously, the state court provides a sound forum for resolution of Gospel Light's legal claims, and those issues can be addressed in the pending legal proceedings. A different result is not required because many, but not all, of Gospel Light's claims address federal constitutional questions. The mere presence of a "substantial constitutional challenge to state action" is insufficient to avoid abstention. As the Supreme Court explained in *New Orleans Public Service, Inc.*:

> There is no greater federal interest in enforcing the supremacy of federal statutes than in enforcing the supremacy of explicit constitutional guarantees, and constitutional challenges to state action, no less than pre-emption-based challenges, call into question the legitimacy of the State's interest in its proceedings reviewing or enforcing that action. Yet it is clear that the mere assertion of a substantial constitutional challenge to state action will not alone compel the exercise of federal jurisdiction. *See Younger*, 401 U.S., at 53, 91 S.Ct., at 755. That is so because when we inquire into the substantiality of the State's interest in its proceedings we do not

look narrowly to its interest in the outcome of the particular case—which could arguably be offset by a substantial federal interest in the opposite outcome. Rather, what we look to is the importance of the generic proceedings to the State. In *Younger*, for example, we did not consult California's interest in prohibiting John Harris from distributing handbills, but rather its interest in "carrying out the important and necessary task" of enforcing its criminal laws. *Id.*, at 51–52, 91 S.Ct., at 754. Similarly, in *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), we looked not to Ohio's specific concern with Dayton Christian Schools' firing of Linda Hoskinson, but to its more general interest in preventing employers from engaging in sex discrimination. *Id.*, at 628, 106 S.Ct., at 2723. Because pre-emption-based challenges merit a similar focus, the appropriate question here is not whether Louisiana has a substantial, legitimate interest in reducing [New Orleans Public Service, Inc.'s] retail rate below that necessary to recover its wholesale costs, but whether it has a substantial, legitimate interest in regulating intrastate retail rates. It clearly does. "[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Arkansas Electric Cooperative Corp. v. Arkansas Public Serv. Comm'n*, 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983).

491 U.S. at 365. The implication of important federal interests, such as constitutional claims under the First and Fourteenth Amendments, does not permit the federal court system to keep a case that also implicates important state interests, such as the regulation of insurance.

   2. **The record does not support Gospel Light's claims that OSI has acted in bad faith**

Gospel Light also claims that *Younger* does not apply because OSI's actions were taken in bad faith based on animus toward Gospel Light's religious beliefs.[14] Doc. 15 at 10. In support of this argument, Gospel Light holds up OSI's briefing as demonstrating animus because the agency suggested that cost sharing could be effectuated through private donations, charitable giving, or through GoFundMe pages. *Id*. However, the Court does not read the relevant briefing as "mocking Plaintiffs' religious practices"—OSI was simply raising the possibility that Gospel Light members

---

[14] In support of this argument, Gospel Light applies the holding in *Perez v. Ledesma*, 401 U.S. 82, 85 (1971). There, the Supreme Court ruled, "Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate." *Id*.

could practice their religious obligation to bear each other's burdens in other ways that complied with the law. *See* Doc. 8 at 14.

Gospel Light further asserts that OSI described HCSMs as "scams," "low quality," and "bad plans." Doc. 15 at 10-11. That is not quite accurate. OSI did not make the blanket statements that Gospel Light attributes to it regarding the quality of HCSMs; it warned consumers about the possibility of scam health insurance programs, which could include HCSMs or other types of programs. *See* Doc. 1-15 at 1. HCSMs, just like secular healthcare payment structures, are not immune to abuse by bad actors. Such an observation does not demonstrate animus against religion.

Gospel Light also alleges disparate treatment by OSI because, it claims, secular organizations were permitted to offer noncompliant insurance products, while Gospel Light was not. This allegation, which is unsupported except by citation to Gospel Light's complaint, is not so extreme as to demonstrate that the entire state action was "undertaken by state officials in bad faith and without hope of obtaining a valid conviction," or in this case, a valid administrative penalty against Gospel Light. *See Perez*, 401 U.S. at 85. Further, the labor and fraternal organizations to which Gospel Light points are meaningfully different in character from HCSMs.

For example, NMSA 1978, § 59A-1-16(A) (2001), states that the insurance code shall not apply to "a labor organization that, incidental only to operations as a labor organization, issues benefit certificates to members or maintains funds to assist members and their families in times of illness, injury or need, and is not for profit[.]" As the statutory text indicates, this provision exempts a labor organization that, as an *incidental* part of its overall operations, maintains a pool of money to support members in need. *Id*. By contrast, one of an HCSM's core activities is to facilitate members' sharing of each other's healthcare burdens through financial support. *See* Doc. 1-4 (Gospel Light's articles of incorporation stating that "[t]he purpose for the formation of this

Corporation is to enable followers of Christ to bear each other's burdens and . . . to associate within the community of the Christian faith for discipleship, *medical-sharing, physical needs-sharing, financial stewardship*, and evangelical purposes. . . .") (emphasis added). That the insurance code applies different standards to labor organizations, which only incidentally shares some limited funds, peripheral to its main reason for existing, and an organization whose primary purpose is to share the burdens of healthcare costs, is not indicative of animus.

Similarly, the provisions of the New Mexico insurance code exempting fraternal benefit societies do not support Gospel Light's argument that religious and non-religious organizations are treated differently. NMSA 1978, § 59A-44-5 (1989) requires fraternal benefit societies to "operate for the benefit of members and their beneficiaries by . . . lawfully operating for one or more social, intellectual, educational, charitable, benevolent, moral, fraternal, patriotic *or religious purposes* for the benefit of its members, which may also be extended to member dependents." (emphasis added). Fraternal benefit societies can be religious in nature, such as the Knights of Columbus (a Catholic organization), or they can be secular, such as the Croatian Fraternal Union of America (an organization supporting Croatian heritage). The diversity of these organizations—including religious groups—undermine Gospel Light's claim that the OSI or state statutes exhibit an animus toward religion or impermissible and disparate treatment.

### 3. No irreparable injury

Gospel Light also argues that *Younger* abstention is inapplicable because abstention would result in irreparable injury, which it identifies as the impairment of its members to exercise their constitutional rights and the corresponding chilling effect resulting from OSI's enforcement actions. Doc. 15 at 11-12. But Gospel Light has not offered any evidence that members have left because of these proceedings. *See Citizen Ctr. v. Gessler*, 770 F.3d 900, 913 (10th Cir. 2014)

18

("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.") (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). It provides no temporal connection between OSI's enforcement actions and any members who opted out of Gospel Light's cost-sharing plan. As far as the Court can discern, there were 502 members when OSI initiated enforcement proceedings, and there are 490 members currently. *See* Doc. 1-11 (referring to 502 "violations of the New Mexico Insurance Code," i.e., 502 New Mexican Gospel Light members); Doc. 1 at 72 ¶ 376 (identifying approximately 490 New Mexican Gospel Light members, including the individual Plaintiffs, at the time the complaint was filed). Even assuming all twelve of these people left as a direct result of OSI's actions, those departures would be insufficient to establish the kind of injury warranting interference in ongoing state court litigation.

Moreover, *Younger* held that "in view of the fundamental policy against federal interference with state criminal prosecutions, even irreparable injury is insufficient unless it is both great and immediate." 401 U.S. at 46. (Of course, *Younger* was later extended to include certain types of civil proceedings as well.) "Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." *Id.* *Younger* also found the presence of a chilling effect, on its own, insufficient—"even in the area of First Amendment rights." *Id.* at 51. Testimony at the hearing on June 2, 2023, indicated that New Mexicans make up only a small fraction of Gospel Light's overall membership. *See* Doc. 37 at 155-56 (out of total 131,117 members nationwide, 490 are New Mexican). Therefore, the loss of these members—while it is an irreparable injury—is not sufficiently "great and immediate" to avoid *Younger*'s mandate to abstain.

Finally, Gospel Light adds for the first time in its post-hearing brief that because this case

"seeks to remedy extraordinary circumstances that present a threat of immediate and irreparable injury to a constitutional right," abstention is improper. Doc. 28 at 8. Gospel Light relies heavily on *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 100 (4th Cir. 2022), but that case is inapposite. *McVey* involved a state proceeding against an organization, Air Evac, alleged to be selling insurance without a license. *Id.* at 94. A federal court contending with a preemption claim found that although *Younger* would normally apply, certain emails between the insurance commissioner and Air Evac's main in-state competitor indicated that the state had "prejudged the outcome of the state administrative proceeding" because of "favoritism" towards the competitor. *Id.* at 101. Additionally, the only record of any complaint against Air Evac was from the in-state competitor. *Id.* at 102. Because of these concerns of bias, the federal district court found that abstention was inappropriate, and the Fourth Circuit did not find an abuse of discretion. *Id.*

Gospel Light argues that OSI has similarly shown a bias here, asserting that OSI changed course to target HCSMs after previously acknowledging that HCSMs were not subject to insurance regulation, and complaining that the administrative hearing was conducted by an attorney from the OSI general counsel's office and presided over by another attorney from the same office. Doc. 28 at 9-10. However, these allegations do not mirror the evidence of bias from the *McVey* proceeding. OSI states that its investigation was in response to consumer complaints, Doc. 37 at 32, and at this stage, Gospel Light has not alleged that those complaints were issued by competitors or otherwise suspect. Nor is there evidence of communication between OSI and any of Gospel Light's competitor organizations that would indicate that OSI was engaging in favoritism. *McVey* is therefore inapposite.

For all of the above reasons, the Court must abstain from hearing Gospel Light's federal case. All claims by Gospel Light, the corporate entity, are therefore dismissed without prejudice.

*See Goings v. Sumner Cnty. Dist. Attorney's Office*, 571 F. App'x 634, 639 (10th Cir. 2014) (dismissals under *Younger* should be without prejudice).

### 4. *Younger* abstention does not apply to the individual Plaintiffs' claims for relief

The case does not end with Gospel Light; the corporate entity is not the only plaintiff. Three individuals—Breanna Renteria, Laura Smith, and Tammy Waters—have lodged claims for relief in the current action. OSI concedes that *Younger* abstention is inapplicable to the claims of the individual plaintiffs, who are not parties to the underlying state action and who bring their own claims of constitutional injury. Doc. 37 at 16 (counsel for OSI states, "I acknowledge that the Younger abstention policy doesn't apply to the three individual Plaintiffs."). Therefore, the individual Plaintiffs' claims remain viable and their request for a preliminary injunction must be considered.

## II.    Preliminary injunction

"Under the traditional four-prong test for a preliminary injunction, the party moving for an injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013). Irreparable harm is the "single most important prerequisite." *N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017). This element is satisfied when a movant demonstrates "a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (citation and italics omitted). A preliminary injunction is only appropriate if this harm is likely to occur before a trial on the merits can take place. *Id.* at 1260.

Here, the individual Plaintiffs argue that the administrative order, "if enforced, will cause irreparable harm" because it will deprive them of their First Amendment right to practice their religion by sharing each other's burdens. Doc. 3 at 16. But according to counsel for Gospel Light, Liberty HealthShare is still operational in New Mexico and "[t]here has been no refusal to share or to pay those requests to share because of . . . the order of OSI." Doc. 37 at 64.

Conceding that they have not suffered any present injury, the individual Plaintiffs speculate about the future. They argue that *if enforced*, the order will cause irreparable harm, and Gospel Light characterizes that outcome as almost inevitable. *See* Doc. 28 at 54 ("And the day is coming when the order will be effective."). But this fatalistic interpretation is far from certain. It is entirely possible that the state court will invalidate the hearing officer's order and resolve the question in Gospel Light's favor.[15] Regardless, the mere specter of injury, which is conditional on the outcome of a separate legal proceeding, is insufficient grounds to grant the relief sought.[16] The Tenth Circuit has held that "to satisfy the irreparable harm factor, the [movant] must establish both that harm

---

[15] Gospel Light and the individual Plaintiffs express concerns that the underlying state court proceedings could take years to resolve. Doc. 37 at 48 ("And waiting for the state court to hear an appeal which, unfortunately Your Honor, I'm not as optimistic as the Office of Superintendent of Insurance of how quickly that's going to move, being that there are months before the [state] Court will even hear our Motion to stay and even after that, there are potentially all types of appeals that will take -- could potentially take years."). This assessment underscores the uncertainty of the claimed harm. Gospel Light could be banned from operating, or it could not; a lengthy appeals process could ensue, or it could not; the request for a stay of the administrative order at the state level could be granted, or it could not.

[16] Gospel Light cites to *Greater Yellowstone Coalition*, 321 F.3d at 1258 for the proposition that "a plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative." Doc. 28 at 54. *Greater Yellowstone Coalition* involved a significant risk of harm to a bald eagle population, but the timing and extent of that harm was unclear because the bald eagles' behavior could not be predicted with certainty. 321 F.3d at 1259-60. The Court finds that the uncertainty inherent in environmental harms and animal behavior is not equivalent to the uncertainty in the present case, which involves an intervening event in any potential causal chain: a concurrent state legal proceeding that might resolve the entire dispute without any irreparable harm ever coming to pass.

will occur, and that, when it does, such harm will be irreparable." *N.M. Dep't of Game & Fish*, 854 F.3d at 1251 (internal quotation marks omitted). Accordingly, because the alleged irreparable harm is too speculative, the individual Plaintiffs fail to satisfy the requirements for a preliminary injunction, and the Court need not reach the remaining factors. *See DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018). The Court therefore denies the motion. Doc. 3.

## CONCLUSION

As outlined above, the Court grants OSI's motion to dismiss (Doc. 8) as it pertains to (1) all claims by Gospel Light, the organizational plaintiff, pursuant to the requirements of *Younger* abstention; (2) the NMCRA and NM RFRA claims by the individual Plaintiffs. In all other respects, OSI's motion to dismiss is denied.

As for the motion for preliminary injunction, the Court finds that the individual Plaintiffs have failed to show a likelihood of irreparable harm. The Court therefore denies the motion for preliminary injunction. Doc. 3.

It is so ordered.

_____
MATTHEW L. GARCIA
UNITED STATES DISTRICT JUDGE