**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

GOSPEL LIGHT MENNONITE
CHURCH MEDICAL AID PLAN,
d/b/a LIBERTY HEALTHSHARE,
BRENNA RENTERIA, and
LAURA SMITH,

        *Plaintiffs,*

    v.                           No. 1:23-cv-00276-MLG-KK

NEW MEXICO OFFICE OF THE
SUPERINTENDENT OF INSURANCE,
and ALICE KANE,
Superintendent of Insurance,
in her official capacity,

        *Defendants.*

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

      Plaintiffs Breanna Renteria and Laura Smith (together, "Plaintiffs"), through their below-signed attorneys of record, and pursuant to Fed. R. Civ. P. 56, hereby move this Court to enter summary judgment in favor of Plaintiffs on Counts I through X, all remaining counts, of the Complaint against the New Mexico Office of the Superintendent of Insurance ("OSI") and Alice T. Kane, Superintendent of Insurance, in her official capacity (together, "Defendants").

**TABLE OF CONTENTS**

**INTRODUCTION** ...................................................................................................................4

**STATEMENT OF FACTS** .......................................................................................................6

    A.    According to the Affordable Care Act ("ACA") and other authority, Gospel Light is a qualified HCSM and not an insurance provider. ...................................................................................6

    B.    Through their membership with Gospel Light, Plaintiffs and other Gospel Light members are exercising their sincerely held religious beliefs, including religious speech and religious association. ................................................................................................................26

    C.    OSI targets religious HCSMs and their members in an organized campaign against HCSMs that is not neutral toward religion and demonstrates OSI agents' animus toward HCSM members' religious beliefs, including the beliefs of Plaintiffs. .............................................32

i. In early 2020, OSI begins an organized campaign against HCSMs, contradicting its prior, longtime stance that it had no oversight authority over HCSMs. ....................................32

ii. Throughout OSI's actions against Gospel Light, OSI knew that Gospel Light was one of the legitimate, ACA-qualified HCSMs and that its members were generally very happy with their membership.................................................................................................37

iii. Despite having knowledge of Gospel Light's legitimacy and value to New Mexicans, OSI aggressively antagonizes Gospel Light members, along with HCSMs generally, and attempts to prevent New Mexicans from associating with the Gospel Light membership and other HCSMs. ...................................................................................................40

iv. In addition to the OSI's campaign against HCSMs, OSI's animus toward HCSM members' religious beliefs is further underscored by the prejudice displayed by key OSI personnel. ...................................................................................................... 47

D. OSI's administrative adjudication of Gospel Light failed to provide due process protections to Gospel Light and its members, particularly due to OSI's bias against Gospel Light and its members. ...................................................................................................59

E. OSI agents' actions were, and are, undertaken under color of state law. ..............................74

F. OSI's definition of insurance is inconsistent, contradictory, and has a disparate impact on religion, treating comparable secular activities more favorably than the religious activities of HCSM members...................................................................................................74

G. OSI's interpretation of insurance conflicts with federal law, making HCSMs' simultaneous compliance with both federal and state regulations impossible and posing obstacles to the accomplishment of federal goals.................................................................................85

H. OSI has no rational basis or compelling state interest in dismantling Gospel Light and other HCSMs in New Mexico. .................................................................................................87

I. The state has less restrictive means of accomplishing its interest in protecting New Mexicans from malfeasance by HCSMs and fraudulent HCSMs. ..............................................88

J. OSI's actions against members of HCSMs, including Plaintiffs, have harmed, and will continue to harm, HCSM members, including by affecting the ways that HCSM members engage in religious expression, associate, define themselves, and carry out their mission. ..92

**LEGAL STANDARD** ...................................................................................................**102**

**ARGUMENT** ...................................................................................................**105**

I. **DEFENDANTS VIOLATED PLAINTIFFS' RELIGIOUS LIBERTY RIGHTS UNDER THE BOTH THE FREE EXERCISE AND ESTABLISHMENT CLAUSES OF THE UNITED STATES CONSTITUTION**.........................................................**108**

A. Legal background.................................................................................................108

1. The (Mostly Recent) Case Law.................................................................108

2. The Law of the (This) Case .................................................................116

B.  Analysis: The New Mexico Insurance Code is neither neutral nor generally applicable, and its application to HCSMs is animated by demonstrable animus. .........................118

1.  The Code's "slew of exceptions" for comparable secular conduct necessitates an analogous exception for comparable religious activity. ...........................................120

2.  The OSI's plenary discretion to choose who to leave alone and who to literally expel from the state constitutes an individualized exception.............................................124

3.  The OSI exercised its enforcement discretion with unvarnished animus toward the religious practices of HCSMs. ...............................................................................126

**II.  PLAINTIFFS' EQUAL PROTECTION RIGHTS HAVE BEEN VIOLATED THROUGH DEFENDANTS' DISCRIMINATION OF THEIR FUNDAMENTAL RIGHT TO FREE EXERCISE OF RELIGION AND DISCRIMINATION BASED ON PLAINTIFFS' RELIGION, A SUSPECT CLASS. .......................................................130**

A.  Defendants violated Plaintiffs' equal protection rights by purposefully depriving them of their fundamental right to free exercise of religion. .............................................132

B.  Separately, Defendants violated Plaintiffs' equal protection rights by intentionally discriminating against Plaintiffs' religion, a suspect class. .........................................135

C.  In depriving Plaintiffs of their fundamental right to free exercise of religion and subjecting them to religious-based discrimination, Defendants' actions were not narrowly tailored to achieve a compelling state interest and cannot survive strict scrutiny. 140

D.  Regardless of any alleged state interest, Defendants' discriminatory acts against Plaintiffs are *per se* violations of the Equal Protection Clause, as these actions were motivated by religious animus, which is not a permissible governmental interest under the Equal Protection Clause. ...................................................................................143

E.  Plaintiffs suffered adverse effects due to Defendants' equal protection violations.....145

**III.  DEFENDANTS VIOLATED FEDERAL PREEMPTION LAWS BY APPLYING THE NEW MEXICO INSURANCE CODE TO GOSPEL LIGHT AND ITS MEMBERS, INCLUDING PLAINTIFFS.....................................................................................148**

A.  Conflict preemption prevents the application of the New Mexico Insurance Code to HCSMs.......................................................................................................................148

B.  The Superintendent's arguments against preemption are untenable. ..........................152

C.  HCSMs do not offer insurance, so the McCarran Ferguson Act does not apply.........153

**IV.  THE OSI'S PROHIBITION ON THE PLAINTIFFS' ASSOCIATION WITH EACH OTHER AND WITH OTHER GOSPEL LIGHT MEMBERS—AND ITS ONGOING AND IN-EFFECT BAN ON ADMITTING NEW MEMBERS, IN PARTICULAR— VIOLATES THE FIRST AMENDMENT RIGHT TO FREE SPEECH AND ASSOCIATION. .............................................................................................................155**

**V.   DEFENDANTS VIOLATED PLAINTIFFS' DUE PROCESS RIGHTS THROUGH THE OSI'S UNCONSTITUTIONALLY INADEQUATE ADJUDICATORY PROCESS.** ....................................................................................................165

**VI.  PLAINTIFFS ARE ENTITLED TO DECLARATORY JUDGMENT THAT DEFENDANTS' ACTIONS VIOLATED THE U.S. CONSTITUTION AND THAT GOSPEL LIGHT IS AN HCSM UNDER FEDERAL LAW, WHICH CANNOT BE CONSIDERED AN "INSURANCE PROVIDER" IN NEW MEXICO.** ....................171

**CONCLUSION** ........................................................................................................................173

## INTRODUCTION

The OSI initiated its crusade against HCSMs—turning what started as an appropriate, reactive enforcement action against one notoriously bad actor into a categorical and prospective view that all HCSMs are illegal in New Mexico—based in part (and this is the part that the OSI will acknowledge) on a set of reasons that apply 100% equally to healthcare-sharing plans offered by labor unions and fraternal benefit societies: generalized consumer protection-type concerns about HCSM members not understanding the non-insurance nature of the ministry (these concerns have been so completely refuted by the evidence in this case that the OSI no longer appears to even be arguing that *Gospel Light's* members might have been confused); and equally generalized concerns about HCSMs siphoning off healthier members of the state risk pool and thus undermining actual insurance products in the state (these concerns have at least not been disproven in this litigation, although it should be noted that the OSI has developed no evidence suggesting that Gospel Light members specifically, or even HCSM members generally, would be positive-value additions to the risk pool).[1] When asked the reason for the disparate treatment of religious HCSMs and labor and fraternal organizations, OSI

---

[1] Additionally, whatever impact Gospel Light might have on the risk pool would be negligible, as Gospel Light only has 490 members in New Mexico (Ex. 28 at 2), but there were 67,799 enrollees in beWell New Mexico, *see* *https://acasignups.net/25/01/14/new-mexico-bewell-enrolls-678k-qhps-27-yy-so-far-you-still-have-until-jan-15thgetcovered#:~:text=New%20Mexico%3A%20BeWell%20enrolls%2067.8K%20OHPs%2C%20up%2027%25,exchange%2C%20has%20an%20Open%20Enrollment%20Dashboard%20updated%20weekly%3A.*

officials did not even attempt to come up with one that could pass First Amendment muster, instead simply saying that "[y]ou['d] have to ask the legislators"—an answer that may shift the ultimate 'blame' for the discrimination, but one that is in no way a defense here, as legislatures (as well as the coordinated efforts of legislative and executive action) can violate the First Amendment just as surely as unilateral executive action can.

But in addition to not having a constitutionally relevant explanation for its disparate treatment, the discovery in this case has revealed something else that permeated the OSI's anti-HCSM campaign: a level of anti-religious sentiment that, thankfully, is rarely seen in the modern religious-liberty case law—an open-ended *suspicion*, both stated outright and alluded to through emailed jokes and barbs among OSI principals, that religious ministries, specifically, are *scams*. This type of animus or distrust is an unacceptable basis for government action in the United States, where "[t]he Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices," the Court must intervene. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993).

Here, Plaintiffs bring 10 remaining claims against Defendants for violations of the U.S. Constitution and federal preemption laws: Claims 1 and 2, for violations of the Free Exercise Clause (Argument, Section I); Claim 3, for violations of the Establishment Clause (Argument, Section II); Claims 4 and 5, for violations of the Free Speech and Assembly Clauses (Argument, Section IV); Claims 6 and 7, for violations of the Equal Protection Clause (Argument, Section II); Claim 8, for violations of the Due Process Clause (Argument, Section V); Claim 9, for violations of federal preemption laws (Argument, Section III); and Claim 10, seeking declaratory judgment for the above-referenced legal violations (Argument, Section IV). As detailed below, the Court should grant summary judgment to Plaintiffs on each of these claims, as no reasonable fact-finder could deny the

constitutional violations and violations of federal preemption laws suffered by Plaintiffs due to Defendants' unlawful conduct.

## STATEMENT OF FACTS

Plaintiffs outline the following indisputable material facts ("SOF").

**A. According to the Affordable Care Act ("ACA") and other authority, Gospel Light is a qualified HCSM and not an insurance provider.**

1.      At the hearing concerning the OSI's cease-and-desist order against Gospel Light, Gospel Light member Valentine E. Miller, Jr. testified that he has been a member of Gospel Light Mennonite Church since its beginning, on January 1, 1995, and that the Church has always had a health care sharing program, which has expanded and is referred to as Gospel Light Mennonite Church Medical Aid Plan and uses the tradename "Liberty Healthshare," while remaining the same program as the one that existed in 1995. (Ex. 19 at 187:25-188:16, 190:17-191:24.)

2.      During the hearing, Mr. Miller testified that, it is a tradition of Anabaptist churches, like Gospel Light, that they also have medical aid plans as part of the churches, and that essentially all Amish Beachy fellowships would operate a HCSM. (*Id.* at 190:5-16.)

3.      At the hearing, Mr. Miller testified that all of the Anabaptist congregations listed in the "Red Book" Amish Mennonite Directory are considered to be within the same fellowship. (*Id.* at 197:15-198:15.)

4.      During the hearing, the affidavit of Mr. Miller was admitted into evidence. (*Id.* at 187:25-188:2, 193:21-25.)

5.      In Mr. Miller's affidavit, he explained that his family was an original founder of Gospel Light Mennonite Church, which was organized and began convening in January 1995, and that its members adhered to the Anabaptist tradition, dating back many centuries, to share one other's burdens, including sharing one another's health care expenses, in accordance with a number of biblical scriptures. (Ex. 21 at 1-2.)

6.    In his affidavit, Mr. Miller affirmed that "[t]he medical expenses of the members of the Gospel Light Mennonite Church Medical Aid Plan have been shared continuously and without interruption since January 1995, initially as an unincorporated association of Gospel Light Mennonite Church but subsequently as a Virginia nonstock corporation, after its incorporation in 2014, through the present date." (*Id.* at 2.)

7.    In his affidavit, Mr. Miller also avowed: "I can personally attest that the sharing has been continuous and without interruption since January 1995, because I have been a member of the Gospel Light Mennonite Church Medical Aid Plan throughout its entire history: first, when it was an unincorporated association, then after its incorporation in 2014, and I am still a member at the present time." (*Id.* at 2-3.)

8.    Gospel Light Mennonite Church Medical Aid Plan, d/b/a Liberty Healthshare, was lawfully incorporated in the Commonwealth of Virginia on June 24, 2014. (Ex. 1.)

9.    Gospel Light adopted its initial bylaws on October 14, 2014. (Ex. 2 at 6.)

10.    Gospel Light's initial bylaws state that its purpose "is to enable followers of Christ to bear one another's burdens" as the Apostle Paul instructs, in Galatians 6:2 of the Bible, to "[b]ear one another's burdens, and so fulfill the law of Christ." (*Id.* at 1.)

11.    Gospel Light's initial bylaws also state that it was formed so that followers of Christ can "associate within the community of the Christian faith for discipleship, medical-sharing, physical needs-sharing, financial stewardship, and evangelical purposes." (*Id.*)

12.    Gospel Light's initial bylaws state that another of its purposes is to "promote the biblical concept of mutual aid sharing, historically practiced among Christians as it relates to the socio-economic and spiritual needs of its members." (*Id.*)

13.    Another of Gospel Light's purposes, as stated in its initial bylaws, is to "remain faithful to this Statement of Faith: We believe the Bible alone is the inspired Word of God; therefore it is the

final and only source of absolute spiritual authority. We believe in the triune God of the Bible. He is one God who is revealed in three distinct Persons – God, the Father; God, the Son; and God, the Holy Spirit. We believe Jesus Christ was God in the flesh – fully God and fully man. He was born of a virgin, lived a sinless life, died on the cross to pay the penalty for our sins, was bodily resurrected on the third day, and now is seated in the heavens at the right hand of God, the Father. We believe that all people are born with a sinful nature and can be saved from eternal death only by grace alone, through faith alone, trusting only in Christ's atoning death and resurrection to save us from our sins and give us eternal life. We believe in the bodily resurrection of all who have put their faith in Jesus Christ. All we believe and do is for the glory of God alone." (*Id.* at 1-2.)

14.    Gospel Light "[m]embership is limited to the members of Gospel Light Mennonite Church and those who prescribe to the Statement of Faith." (*Id.* at 2.)

15.    In its initial bylaws, Gospel Light clarified that it "is organized exclusively for charitable and religious purposes under section 501(c)(3) on the Internal Revenue Code, or corresponding section of any future federal tax code." (*Id.* at 5.)

16.    On May 22, 2015, Gospel Light amended its bylaws. (Ex. 3 at 23.)

17.    Gospel Light's amended bylaws described its "scriptural purpose" as following "the biblical and Christian purpose . . . as contained in the Holy Scriptures: In Galatians 6:2 the Apostle Paul instructs believers to, 'Bear ye one another's burdens, and so fulfill the law of Christ.' Galatians 6:10 further instructs, 'As we have therefore opportunity, let us do good unto all men, especially unto them who are of the household of faith.' II Corinthians 8:14 further explains, 'At the present time your plenty will supply what they need, so that in turn their plenty will supply what you need.' Jesus taught in Luke 10:27 to 'love your neighbor as yourself.' He further explained through the parable of the Good Samaritan (Luke 10:30-37) that our neighbor is anyone in need.'" (*Id.* at 1.)

18.     Gospel Light's amended bylaws state that it also serves "to preserve the Christian tradition of health care sharing and to enable followers to bear one another's burdens." (*Id.*)

19.     Gospel Light's amended bylaws further state that its purpose is to enable Christians to "associate within the community of the Christian faith for discipleship, medical-sharing, physical needs-sharing, financial stewardship, and evangelical purposes." (*Id.* at 2.)

20.     Per Gospel Light's amended bylaws, one of its purposes is to enable Christians to "promote the Christian tradition of healthcare cost sharing as historically practiced among Christians as it relates to the socio-economic and spiritual needs of its members to all who share [its members'] core beliefs." (*Id.*)

21.     Another of Gospel Light's purposes is to "create funds from its activities and to maintain and invest its funds; and to disburse and apply its funds among the aged, disabled or sick among its members and among the widows and orphans or dependents of deceased members and in accordance with the laws of the state or states wherein [it] may be doing business." (*Id.*)

22.     Gospel Light's amended bylaws include the same Statement of Faith to which its corporate directors, and officers must remain faithful. (*Id.*)

23.     Gospel Light's amended bylaws also state an evangelistic purpose, which is "to include in [its] sharing ministry those who at the time of inclusion may not adhere to [its] corporate Statement of Faith, but who share beliefs that glorify God, that fulfill the purpose of Christ, and do not advance in any way the kingdom of Satan but instead advance God's kingdom. [Gospel Light does] this to evangelize, influence and persuade onlookers to join [its] community of believers in Christ." (*Id.*)

24.     Gospel Light's amended bylaws make clear that its activities must be limited to those permitted "by a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code." (*Id.* at 12.)

25.    Gospel Light's amended bylaws require members to pay annual dues; "[c]omplete, sign and submit an enrollment or renewal application containing acceptance of [its] membership Shared Beliefs;" "[c]omply with godly lifestyle requirements as may from time to time be required by the Sharing Guidelines;" and "[g]ive a requested gift amount each month to another person's medical need." (*Id.* at 19.)

26.    According to its amended bylaws, Gospel Light members are able to annually vote "for the purpose of advising the Board of Directors on amending the organization's Sharing Guidelines." (*Id.* at 21.)

27.    On March 31, 2014, the Director of the Center for Consumer Information & Insurance Oversight at the U.S. Department of Health and Human Services confirmed in a letter to Gospel Light that "the Centers for Medicare & Medicaid Services (CMS) has determined that [Gospel Light] has submitted sufficient information to substantiate its compliance with the standards specified in section 5000A(d)(2)(B)(ii) of the Code and will be considered a health care sharing ministry for purposes of subpart G of 45 CFR part 155" of the Affordable Care Act. (Ex. 5 at 1-2.)[2]

28.    On December 9, 2014, Gospel Light sent CMS a letter noting that it had "decided to describe the limitation for inclusion of sharing within [Gospel Light] that the sharing would be for the glory of God, by those who are called by His name, and for no purpose that would advance Satan's agenda rather than God's kingdom." (Ex. 6.)

---

[2] 26 U.S.C. § 5000A(d)(2)(b)(ii) defines "health care sharing ministry" to mean: "an organization (I) which is described in section 501(c)(3) and is exempt from taxation under section 501(a), (II) members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed, (III) members of which retain membership even after they develop a medical condition, (IV) which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999, and (V) which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request."

29. On April 16, 2015, the Director of Exempt Organizations for the U.S. Internal Revenue Service confirmed in a letter to Gospel Light that it is "exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code," as it is a "public charity." (Ex. 4.)

30. During the OSI's cease-and-desist hearing against Gospel Light, the OSI stipulated that "[t]he Virginia nonstock corporation known as Gospel Light Mennonite Church Medical Aid Plan, is recognized by the Internal Revenue Service as a public charity under 16 U.S.C. §501(c)(3) and exempt from taxation under 26 U.S.C. §501(a)." (Ex. 22 at 2.)

31. At the cease-and-desist hearing, the OSI stipulated: "On March 31, 2024, Gary Cohen, Director, Center for Consumer Information & Insurance Oversight, sent to the Respondent his determination of compliance letter for the Respondent's health care sharing ministry, which stated at page 2: 'Having completed the review of the materials you submitted dated January 29, 2014 and March 17, 2014, the Centers for Medicare & Medicaid Services (CMS) has determined that Gospel Light Mennonite Church Medical Aid Plan has submitted sufficient information to substantiate its compliance with the standards specified in § 5000A(d)(2)(B)(ii) of the Code." (*Id.* at 2-3.)

32. The OSI further stipulated: "The question of whether [Gospel Light] meets the criteria set forth in federal law to qualify as a legitimate health care sharing ministry within the meaning of the federal Patient Protection and Affordable Care Act ("ACA") is no longer contested by the Office of the Superintendent of Insurance." (*Id.* at 3.)

33. In her deposition testimony related to this litigation, OSI attorney Rebecca Branch acknowledged that, when determining whether to pursue an enforcement action against an HCSM, the OSI would have to take into consideration whether or not the HCSM met the criteria and definition of HCSMs as outlined in the ACA. (Ex. 34 at 120:10-23.)

34. On January 13, 2022, Gospel Light's Chief Executive Officer Dorsey W. Morrow signed an affidavit affirming that Gospel Light "is not, and does not operate as, an insurance company

. . . is a health care sharing ministry authorized pursuant to 26 U.S.C. §5000A(d)(2)(B) . . . [and] conducts business as a non-profit 501(c)(3) entity." (Ex. 7 at 1-2.)

35.    In his affidavit, Mr. Morrow further affirmed that Gospel Light "is recognized and certified as a health care sharing ministry by the Centers for Medicare and Medicaid Services, a division of the U.S. Department of Health and Human Services (CMS), for purposes of the Affordable Care Act," and that it "facilitates the sharing of medical needs among its members, who are in fact self-pay patients for health care purposes." (*Id.*)

36.    Mr. Morrow's affidavit also explained that "[d]isclaimers are conspicuously provided with remarkable redundancy in multiple places in [Gospel Light] literature and documents, such as the Decision Guide, Sharing Guidelines, membership card, [Gospel Light] website and membership application documents, making it abundantly clear that [Gospel Light] is a health care sharing ministry and not an insurance company and that it does not guarantee payment of medical costs." (*Id.* at 3.)

37.    In Mr. Morrow's affidavit, he confirmed that Gospel Light's "role is to enable self-pay patients to help fellow members through voluntary financial gifts." (*Id.*)

38.    As described in Mr. Morrow's affidavit, Gospel Light members are required to sign "various acknowledgements on [their] enrollment application[s], including the following: PROGRAM NOT INSURANCE. I acknowledge that I am applying for membership in Gospel Light HealthShare, a healthcare sharing ministry of Gospel Light Mennonite Church Medical Aid Plan, Inc., that is voluntary and cooperative and not insurance. I have read and understand any disclaimers to this effect and understand that there are no representations, promises or guarantees that my medical expenses will be paid. I also understand that any funds that I may receive for medical expenses do not come from an insurance plan, but are voluntary donations by the members." (*Id.* at 4.)

39.     Mr. Morrow's affidavit also stated that, "[u]nder the Legal Notices section of the [Gospel Light] Sharing Guidelines, the following legal notice is provided: GENERAL LEGAL NOTICE. This program is not an insurance company nor is it offered through an insurance company. This program does not guarantee or promise that your medical bills will be paid or assigned to others for payment. Whether anyone chooses to pay your medical bills will be totally voluntary. As such, this program should never be considered as a substitute for an insurance policy. Whether you receive any payments for medical expenses and whether or not this program continues to operate, you are always liable for any unpaid bills." (*Id.* at 4-5.)

40.     In his deposition, Superintendent Toal acknowledged that, if HCSMs are "explicit about non-coverages, then that would not be misleading." (Ex. 38 at 253:16-18.) Superintendent Toal further affirmed that, if OSI's investigation found that an HCSM had documents very clearly stating that the HCSM does not guarantee covering medical expenses, then based on that, the OSI would not take enforcement action so long as the explanations were "readily apparent and easily understood by a prospective purchaser of the plan" and without being buried in a footnote or on page 31—it had to be "prominent." (*Id.* at 257:16-258:12, 259:3-9.)

41.     Likewise, Superintendent Toal said that, if an HCSM took six months to pay a claim, they needed to disclose that prominently in their materials to avoid being in violation of the law in that regard. (*Id.* at 272:5-21.)

42.     Similarly, Superintendent Catechis testified in her deposition that Christians who wish to share each other's monetary burdens should be allowed to do so in New Mexico through donations, or "a kindness giving" where there is "no expectation of something in return." (Ex. 39 at 89:6-15, 90:10-18.)

43.    Superintendent Catechis testified that, in her mind, what changes the donation model into an insurance model, in the healthcare sharing context, is when there's "an expectation of anything." (*Id.* at 91:15-92:1.)

44.    Additionally, Superintendent Catechis affirmed that, from her perspective, if six friends wanted to casually pool their money and have it available if someone got sick, provided there were funds still available in the pool, that might constitute insurance subject to OSI oversight if any of the friends had any expectation that they could use those funds. (*Id.* at 92:8-93:17.) In contrast, if these friends knew that there was no guarantee to access any of the money in the pool, then it would be a mere understanding and not an expectation; and it would not be insurance, it would be akin to a shared savings account. (*Id.* at 94:5-95:9.) Finally, if these friends signed any type of agreement, Superintendent Catechis suggested they reach out to the OSI to ask the OSI if the OSI believes that the friends have signed "a contract that creates an expectation of healthcare." (*Id.* 96:13-97:17.)

45.    Gospel Light's Sharing Guidelines program overview, provided to prospective and current members, states that the Gospel Light healthshare program is a program "of Gospel Light Mennonite Church Medical Aid Plan, Inc., which is the non-profit ministry that facilitates voluntary contributions for the sharing of qualifying healthcare costs between members. The program is based on shared ethical and religious beliefs, a religious tradition of mutual aid, neighborly assistance and financial sharing. The program does not share expenses resulting from behaviors and lifestyles destructive to personal health but is specially tailored for individuals who maintain a Christian lifestyle and make responsible choices in regard to health and believe in helping others. Members share one another's medical expenses, and [Gospel Light] serves only to facilitate this mutual sharing, directing member's gifts to those who have eligible expenses. Each member is obligated to be price conscious concerning his/her medical decision making. It is the obligation of each adult member to

14

read and understand these Sharing Guidelines. Our sharing is voluntary and requires the active participation by our members in all respects." (Ex. 8 at 3.)

46.    Gospel Light's Sharing Guidelines further describe participation as voluntary, stating: "Monthly contributions are voluntary gifts and are not refundable. Each member is a self-pay patient who sends monthly contributions to assist another member who has medical expenses. Whether anyone chooses to share in another member's medical expenses is voluntary. Giving a monetary gift to assist another member in the program does not create a legally enforceable right to receive funds for healthcare expenses." (*Id.* at 4.)

47.    Gospel Light's Sharing Guidelines emphasize in bold and blue highlighting: "Whether or not any member receives assistance from other members for medical expenses, members are always liable for their own medical decisions and the expenses that may accrue as a result of their decisions and remain ultimately responsible to pay their bill. As a voluntary sharing ministry, we are always constrained by finite resources no matter how many members we may have. We are acutely aware that we cannot always be all things to all people and may therefore decline participation to those who present pre-existing medical needs since such expenses may strain our giving beyond our current capacity. [Gospel Light] reserves the right to sever the voluntary relationship with members who are not aligned with the sharing mentality or who are unwilling to cooperate with stewardship efforts to avoid exorbitant medical prices." (*Id.*)

48.    Gospel Light's Sharing Guidelines further require all Sharing Members to "[s]trive to live in accordance with biblical principles, [h]onor the biblical teaching to 'share one another's burdens' (Gal. 6:2), [and p]articipate regularly in worship or prayer." (*Id.* at 5.)

49.    Additionally, Gospel Light's Sharing Guidelines require that all members accept its shared beliefs, which state: "[Gospel Light] members come together to share medical bills because we hold to beliefs of conscience – based on moral, ethical and religious values – that affect the way

we live and compel us to support, care and help each other. We share each other's medical expenses not as matter of convenience or cost savings, but because we are compelled by God and conscience to do so. Sharing such burdens is part of our religious, ethical and moral code. It is our biblical obligation to help our fellow man when in need. We are our brother's keeper! It is our spiritual duty to God and our ethical responsibility to ourselves and the other members of our cost-sharing ministry to care for our bodies and maintain our health. It is also our ethical responsibility to be good stewards of the resources of our community. Finally, it is our fundamental right and responsibility to make decisions about our healthcare and not to relinquish that right to others. These beliefs form the religious and ethical basis for our interaction and relationship as a community." (*Id.*)

50.    Gospel Light's Sharing Guidelines also require members to subscribe to Gospel Light's Statement of Shared Beliefs, which states: "We believe that our personal rights and liberties originate from God and are bestowed on us by God and are not concessions granted to us by governments or men. We believe every individual has a fundamental religious right to worship the God of the Bible in his or her own way. We believe it is our biblical and ethical obligation to assist our fellow man when they are in need according to our available resources and opportunity. We believe it is our spiritual duty to God and our ethical duty to others to maintain a healthy lifestyle and avoid foods, behaviors or habits that produce sickness or disease to others or ourselves. We believe it is our fundamental right of conscience to direct our own healthcare, in consultation with physicians, family or other valued advisors, free from government dictates, restraints and oversight." (*Id.*)

51.    According to Gospel Light's Sharing Guidelines, members must also "comply with any lifestyle requirements contained in these Guidelines and must submit a detailed account of their medical history," including requirements that members: "1. Refrain from tobacco use in any form (including smokeless tobacco and vaping devices). 2. Follow scriptural teachings on the use or abuse of alcohol. 3. Avoid abuse of prescription drugs, which means consuming prescription medications

16

in a manner not intended by the prescriber that would likely result in bodily harm or dependency. 4. Abstain from the abuse of legal drugs or use of illegal drugs including, any hallucinogenic substance, barbiturates, amphetamines, cocaine, heroin or other opiates, marijuana, illegal intravenous drugs or narcotics. 5. Exercise regularly and eat healthy foods that do not harm the body." (*Id.* at 6.)

52.    In keeping with the amended bylaws' requirement that Gospel Light's activities may "not advance in any way the kingdom of Satan" (Ex. 3 at 2.), Gospel Light's Sharing Guidelines prohibit the sharing of medical expenses related to abortion, contraceptives, and sex changes. (Ex. 8 at 15.)

53.    On Gospel Light's Sharing Member Enrollment Application, on the "Acknowledgements" page, in all capital letters and highlighted in purple, the form emphasizes: "PROGRAM IS NOT INSURANCE: I acknowledge that I am applying for membership in [Gospel Light], a healthcare sharing ministry of Gospel Light Mennonite Church Medical Aid Plan, Inc., that is voluntary and cooperative and not insurance. I have read and understand any disclaimers to this effect and understand that there are no representations, promises or guarantees that my medical expenses will be paid. I also understand that any funds that I may receive for medical expenses do not come from an insurance plan, but are voluntary donations by the members." (Ex. 18 at OSI-6, pages 1-2 of 10.)

54.    Gospel Light's Sharing Member Enrollment Application requires that members sign an agreement "to share in accordance with the . . . Statement of Shared Christian Beliefs," stating: "I believe that my personal rights and liberties originate from God and are bestowed on me by God and are not concessions granted to me by governments or men. I believe every individual has a fundamental religious right to worship the God of the Bible in his or her own way. I believe it is my biblical and ethical obligation to assist my fellow man when they are in need according to my available resources and opportunity. I believe it is my spiritual duty to God and my ethical duty to

others to maintain a healthy lifestyle and avoid foods, behaviors or habits that produce sickness or disease to myself or others. I believe it is my fundamental right of conscience to direct my own healthcare consultation with physicians, family or other valued advisors, free from government dictates, restraints and oversight." (*Id.* at OSI-6, page 3 of 10.)

55.     Robert Joaquin Glassman, a Gospel Light member who submitted a consumer complaint to the OSI against Gospel Light, admitted that he "understood that [Gospel Light] wasn't an insurance policy, that it was a medical sharing program." (*Id.* at OSI-8, pages 9-10 of 20.)

56.     During the OSI's cease-and-desist hearing against Gospel Light, Gospel Light member Ginger Knollenberg testified that, when she became a Gospel Light member, she read and signed an acknowledgement that Gospel Light was not offering insurance and that her monthly share amounts were voluntary donations that she was under no obligation to pay. (Ex. 19 at 40:19-42:22.)

57.     During the hearing, Ms. Knollenberg confirmed that her concern with Gospel Light was "not that it is insurance, but that just simply it didn't live up to the expectations that [she] had of it." (*Id.* at 42:23-43:3.)

58.     Ms. Knollenberg's written testimony was entered into evidence at the hearing. (*Id.* at 40:3-5.)

59.     Despite baldly insisting that Gospel Light provides insurance (*id.* at 69:6-8), witness Julie Weinberg, the OSI director of life and health (*id.* at 46:20-25), admitted that she had no knowledge of any insurance company that possessed the following traits of Gospel Light:

(1) refraining from using health insurance agents (*id.* at 57:1-18);

(2) requiring individuals to sign a statement of beliefs and affirm their agreement with those beliefs before signing a contract for participation (*id.* at 57:16-24, 59:11-18);

(3) requiring individuals to sign an acknowledgement that says they are enrolling in a voluntary HCSM that is not insurance (*id.* at 60:4-12);

(4) requiring individuals to sign an acknowledgment that says there are no representations, promises or guarantees that their medical expenses will be paid (*id.* at 60:18-61:4, 66:3-12);

(5) requiring individuals to sign an acknowledgement that states the funds they may receive for medical expenses do not come from an insurance plan and are instead voluntary donations by members (*id.* at 61:5-13);

(6) including a written statement saying that the entity is a voluntary association of like-minded people who come to together to assist each other by sharing medical expenses, which does not lend itself to the mentality of legal and forcible rights (*id.* at 73:11-21);

(7) enacting a policy where three randomly chosen individual participants, or members, review disputes concerning medical payment denials to internally resolve the disputes (*id.* at 74:23-75:10); and

(8) providing a policy whereby Christian Conciliation, a division of Christian Conciliation Peacemaker Ministries, has authority to provide legal and binding arbitration concerning medical payment denial disputes (*id.* at 75:11-21).

60.    In her hearing testimony, Ms. Weinberg also admitted that she was not aware of any Gospel Light written materials that stated that Gospel Light assumed the risk of loss regarding any health benefit plans. (*Id.* at 61:21-62:3.)

61.    Ms. Weinberg's written testimony was entered into evidence at the hearing. (*Id.* at 56:4-13.)

62.    Gospel Light member Doctor Phyllis Panzeter also testified at the cease-and-desist hearing (*id.* at 120:3-25), where she explained that she joined Gospel Light because she "really like[s] the idea of sharing [her] health costs with other like-minded people" through "a more spiritual organization where [she] honor[s her] body, [her] mind, and [her] spirit and having all that impact [her] health and [her] health costs and having other people that share that ideal of living," including

"[a] simple life, clean living, [and] prayer," which she feels "leads to a more healthy lifestyle" (*Id.* at 121:23-124:16).

63.    At the cease-and-desist hearing, Dr. Panzeter testified that she understood that she does not have a contract with Gospel Light or Gospel Light members and that she bears the risk concerning any of her medical expense needs—a risk she also felt was a burden with insurance companies because of her high deductible. (*Id.* at 123:22-125:10.)

64.    During the hearing, Dr. Panzeter distinguished between insurance and Gospel Light membership by explaining that, with health insurance companies, "there is a contract with a corporation," whereas, with Gospel Light, they're "a membership"—"a bunch of people pitching into a pot and, you know, whoever needs the money for serious health issues that occur, even though they, you know, try to lead a healthy life, they need the money and they take it out of the pot." (*Id.* at 126:6-25.) Dr. Panzeter further explained how she understood that "sometimes there may not be enough in the pot for [her]," but she understood and was okay with that arrangement. (*Id.* at 127:1-4.)

65.    Dr. Panzeter testified that, prior to signing a membership document, she read in Gospel Light's materials that there were no promises or guarantees that Gospel Light would pay her medical expenses. (*Id.* at 127:13-19.)

66.    At the hearing, Dr. Panzeter testified that Gospel Light arranged sharing for costs associated with her broken toe and that Gospel Light did so "really quickly with no problem." (*Id.* at 130:1-2.)

67.    Dr. Panzeter testified: "[T]he mission of [Gospel Light] and its members is more important to me right now than paying for a health insurance company and making sure I get every penny back for every single little thing that I need medical help with." (*Id.* at 131:20-25.)

68.    During Dr. Panzeter's testimony, she explained that she likes how Gospel Light will state the first name and dollar amount that Gospel Light has shared with another member on her online

membership dashboard and that the dashboard also includes prayer requests from other members, which are "nice little perks that [she thinks] are special about [Gospel Light.]" (*Id.* at 138:5-19.)

69.    Plaintiff Laura Smith is a Gospel Light member who currently resides in Farmington, New Mexico, and who resided in New Mexico throughout the OSI's enforcement actions against Gospel Light and its members. (Ex. 10 at 1; Ex. 19 at 149:6-10.)

70.    During the cease-and-desist hearing, Gospel Light member Plaintiff Laura Smith testified that she and her husband became Gospel Light members in 2017, joining their daughter, and they've "liked it ever since." (Ex. 19 at 145:8-24.)

71.    At the hearing, Mrs. Smith testified that she and her husband have always understood that Gospel Light is not insurance or an insurance company and that the risk of loss concerning medical expenses remains on her and her husband. (*Id.* at 146:6-16, 155:4-10.)

72.    During the hearing, Mrs. Smith testified that she and her husband save $800-$1,000 monthly with their Gospel Light membership compared to using an insurance company, so based on those savings, she feels like the risk that Gospel Light is unable to facilitate sharing for some of their medical expenses is "a chance [she is] willing to take." (*Id.* at 146:17-147:9.)

73.    Plaintiff Breanna Renteria is a Gospel Light member who currently resides in Santa Teresa, New Mexico, and who resided in New Mexico during the OSI's enforcement actions against Gospel Light and its members. (Ex. 9 at 1; Ex. 27 at 81:19-21.)

74.    During the cease-and-desist hearing, Mrs. Renteria testified that, when she and her family became Gospel Light members, she understood that Gospel Light was not insurance, that she was not getting any insurance policy, and that the risk of loss for her family's medical expenses stayed on her and her family. (Ex. 19 at 161:9-19, 164:17-24.)

75.    During the cease-and-desist hearing, Gospel Light member Tammy Waters testified that she researched various health insurance companies and HCSMs before deciding to become a

Gospel Light member, fully understanding that Gospel Light was not health insurance and that she retained the risk of loss concerning her medical expenses. (*Id.* at 176:24-177:9, 177:24-178:8, 179:18-22, 181:13-22, 183:11-24, 185:6-17.)

76.     During the hearing, Ms. Waters testified that she intentionally chose to refrain from purchasing health insurance and instead chose membership with a health care sharing ministry because, in part, she does not feel that health insurance companies focus on keeping people healthy, and instead exist simply to take care of people after they become sick, whereas Gospel Light has "done some wonderful things with [her] specifically" in providing her with a nutritionist, who called her once a month with diet and exercise suggestions at no additional cost. (*Id.* at 178:4-25.)

77.     At the hearing, Ms. Waters testified that the faith aspects of Gospel Light are very important to her, because she likes what Gospel Light stands for and the things that they oppose, which align with her own beliefs. (*Id.* at 179:8-17.)

78.     During the hearing, Ms. Waters testified that she is "very comfortable" with Gospel Light and believes they are "a wonderful program and they are not scammers" and that "they do what they say they will do." (*Id.* at 179:25-180:8.)

79.     At the hearing, Ms. Waters testified that Gospel Light has facilitated sharing for her medical costs for her annual checkups and a minor surgery, and that she pays other medical expenses without asking Gospel Light members to share those costs, because she "save[s] so much monthly on what [she] pay[s] into the sharing," and her "sharing amount is so much less than what it would be with the health insurance," so she is able to pay many of her own medical bills because she is still ahead financially due to all the money she saves by being a Gospel Light member rather than purchasing health insurance. (*Id.* at 180:9-23, 183:11-24.)

80.     At the cease-and-desist hearing, Kevin McCarty—a former Florida insurance commissioner of 12 years and the 2012 president, and longtime member, of the National Association

of Insurance Commissioners—testified that Gospel Light "is very explicit that this is not [] considered insurance" and that "there is no sharing of the risk" as would exist with an insurance company. (Ex. 19 at 203:3-24, 205:20-206:12, 214:10-215:9, 215:19-216:21, 217:7-14.)

81.     During the hearing, Mr. McCarty testified that there is an "important distinction" between entities claiming to be HCSMs that have not received CMS recognition and those that are HCSMs that have received CMS recognition, because CMS provides guidance to the states regarding entities CMS considers to have met the standards of an HCSM—including that these entities were formed before 1999, have memberships with shared religious beliefs, and are not considered insurance, because there is no guarantee or transfer of risk concerning members' medical expenses. (*Id.* at 213:17-214:9.)

82.     At the hearing, Mr. McCarty testified that Gospel Light is "compliant with the standards relevant to [it] being considered as a Health Care Sharing Ministry," which requires that it was established pre-1999, is an inherently religious organization where members share the same or a similar faith, and involves members sharing medical expenses in accordance with their religion as part of how they carrying out their religious activities. (*Id.* at 224:16-225:6.)

83.     During the cease-and-desist hearing, Morris J. Chavez—New Mexico Superintendent of Insurance from 2006 to 2010 and insurance attorney and expert witness thereafter—testified that Gospel Light's written materials and the hearing testimony of Gospel Light members demonstrate that Gospel Light lacks the characteristics of insurance, because there is no transfer of risk for members' medical expenses, there is no premium charged, there is no claims process, and the Gospel Light member witnesses "understood the risk of loss stayed on them." (*Id.* at 226:14-227:4, 228:16-229:9, 237:12-239:17.)

84.     At the hearing, Mr. Chavez testified that, in his decades of experience working in the insurance industry as the New Mexico Superintendent of Insurance, an insurance litigator, within the

insurance legislation and regulation sectors, as an insurance lobbyist, as an advisor recommending insurance plans, and as an expert witness concerning insurance—the topic of HCSMs never arose in any insurance industry setting. (*Id.* at 226:14-227:4, 228:16-229:9, 231:9-232:9.)

85.     During the cease-and-desist hearing, Keith Price, Gospel Light's senior manager of marketing and communications, testified that Gospel Light does not have a network, members may use any provider of their choice globally, and Gospel Light does not use health insurance agents. (*Id.* at 253:9-25, 257:9-258:24.)

86.     During a hearing related to Gospel Light's federal civil rights lawsuit against the OSI, Wendy Kuhl, Gospel Light's project manager (Ex. 27 at 139:22-140:2), testified that Gospel Light is not similar to insurance because: (1) Gospel Light does not have a clinical network, so members can go to any medical facility (*id.* at 141:7-13); and (2) Gospel Light does not maintain a capital surplus because it is a nonprofit HCSM and "what [they] get in every month is shared out" to members (*id.* at 141:14-23).

87.     At the same federal hearing, Ms. Kuhl disclosed Gospel Light's total sharing contributions and what was shared back out to providers (*id.* at 142:6-19, 155:17-22), calculating that 86% of the contributions are shared with members (*id.* at 144:13-18).

88.     As a part of this hearing, Ms. Kuhl's affidavit was entered into evidence, which specified that Gospel Light had facilitated sharing of nearly $12.5 million to members in New Mexico to fulfill over 19,000 requests for sharing. (Ex. 28 at 2.) At the time that her affidavit was filed, Gospel Light had 490 members in the State of New Mexico. (*Id.*)

89.     During the hearing, Ms. Kuhl noted that Gospel Light encourages its members to reach out to them when members know they are going to have large procedures so that Gospel Light can assist them in finding cost-effective medical providers. (Ex. 27 at 147:18-22.) Similarly, Gospel Light

provides members with a Healthcare Bluebook, where members can enter a procedure code and their zip code to find a list of providers available for a cost-effective price. (*Id.* at 148:23-149:10.)

90.    At the federal hearing, expert witness Kevin McCarty explained how the Affordable Care Act definitions distinguish authentic HCSMs from insurance and insurance fraudsters stealing money, and he noted that HCSMs are not insurance "[f]rom the very beginning," because HCSMs do not involve contracts transferring or assuming risk, and individuals still retain liability for covering their medical costs. (*Id.* at 178:23-179:19.)

91.    During the hearing, Mr. McCarty explained that he investigated Gospel Light when he was the Florida Insurance Commissioner, but he never issued a cease-and-desist against Gospel Light because it was "not in the business of insurance" and "[t]here was no assuming of the risk." (*Id.* at 180:18-181:7.)

92.    At the hearing, Mr. McCarty contrasted the fact that approximately 85% of Gospel Light members' monetary contributions are used to pay members' medical expenses with some insurance companies where about 85% of the fees paid by insured individuals go "right out to Mercedes-Benz and to the pockets of people who collected the money who were there just scamming people." (*Id.* at 182:8-13.)

93.    During the hearing, Mr. McCarty provided expert testimony that the Affordable Care Act provides a required loss ratio of at least 85% for insurance companies [that fall into the "large group" health insurance market], thereby "attempt[ing] to direct more dollars to pay for medical services to fight fraud and to bend the cost curve" than any state had implemented previous to that. (*Id.* at 191:4-14.)

94.    After reviewing Gospel Light's materials, Mr. McCarty found that Gospel Light negotiated medical bills down "quite well" for its members and had a significant incentive to do so. (*Id.* 193:11-25.)

95.    Before taking enforcement action against Gospel Light, OSI staff acknowledged that "there is a safe harbor in NM law that allows these [HCSM] entities to exist without oversight—so long as they are truly run as religious organizations." (Ex. 30 at 8.) OSI staff distinguished between the truly religious HCSMs that may operate without oversight from the fraudulent HCSMs that "have moved beyond their mission to operate as an insurance company or business for profit." (*Id.*)

96.    Before taking action against Gospel Light, OSI staff explained: "[T]here are two camps of health care sharing ministries. Those that consider themselves bona fide in that they claim to meet the ACA's requirement of having been formed prior to 1997 [sic] and those that do not." (*Id.* at 10.)

97.    In her deposition related to this litigation, Plaintiff Smith explained that she knew that Gospel Light was simply a vehicle whereby the monthly share payment of members "goes into the pot to help share with other people's bills." (Ex. 32 at 11:18-21.)

98.    The OSI has never presented any evidence or testimony that any Gospel Light member has believed any of Gospel Light's sharing programs to be an insurance policy or that Gospel Light itself is an insurance company. (Ex. 18-21, 27; Ex. 40 at 6.) All of the Gospel Light members who have provided testimony understand that Gospel Light is a healthcare sharing ministry and that, ultimately, each member retains the risk of loss associated with their own medical care expenses. (Ex. 18-21, 27; Ex. 40 at 6.)

**B. Through their membership with Gospel Light, Plaintiffs and other Gospel Light members are exercising their sincerely held religious beliefs, including religious speech and religious association.**

99.    Unquestionably, the OSI admitted that Gospel Light is a religious ministry whose members share their medical expenses as an exercise of their sincerely held religious beliefs, stipulating that: "The question of whether [Gospel Light] meets the criteria set forth in federal law to qualify as a legitimate health care sharing ministry within the meaning of the federal Patient

Protection and Affordable Care Act ("ACA") is no longer contested by the Office of the Superintendent of Insurance." (Ex. 22 at 3.)

100.    At the cease-and-desist hearing, Plaintiff Laura Smith testified that "the faith aspects" of Gospel Light were "very, very important" to her. (Ex. 19 at 146:3-5.)

101.    During the hearing, Mrs. Smith testified that one of the aspects of Gospel Light that is most important to her, and that she would miss if Gospel Light was taken from her family, are Gospel Light's values, including that "they will only cover healthy people and healthy lifestyles," but that they will also work through health issues with members because "they care about [members] as human beings and want to help [members] be healthy and not actually need the financial help." (*Id.* at 148:1-13.)

102.    At the hearing, Mrs. Smith testified that she is happy that Gospel Light does not facilitate sharing for costs for contraceptives or abortions, because she does not support these things and feels that, if someone chooses these options, they should pay for the costs on their own. (*Id.* at 148:14-22.)

103.    During the cease-and-desist hearing, Plaintiff Breanna Renteria testified that she became a Gospel Light member in 2019 because it "went along with" the religious beliefs of her family. (*Id.* at 159:6-9, 160:12-17.)

104.    At the hearing, Mrs. Renteria testified that her ability to share other members' medical expense burdens through Gospel Light is a very important part of her faith, stating: "I think in the community that we're in, it's very important to be able to support other believers and to be able to share burdens, if we were going to use the terms in religious terms, financial burdens with others, even if we're not physically close by. I think that's just what we're called to do as fellow believers. So in my belief, in my religious beliefs, that is what I would like to follow, and I didn't even know [HCSMs] existed years ago, but now learning about it has really established, okay, this is how we

should be living. So I definitely agree with sharing and I think it's an important part of my belief and to help others in our community as far as like a religious community." (*Id.* at 166:1-23.)

106. During the hearing, Mrs. Renteria affirmed that sharing medical expense burdens with other Gospel Light members definitely fits with her understanding of the biblical model specifying that each family is supposed to carry their own load or burden, but the part of their burden that a family cannot carry is supposed to be shared by the larger community. (*Id.* at 166:24-167:7.)

106. At the hearing, Mrs. Renteria testified: "The Bible talks a lot about stewardship, and we should be good stewards and definitely do our part and then if others are able to help when it gets too hard. I mean, that's what I believe the Bible said that Jesus did for us. So definitely would be something that we should be doing." (*Id.* at 167:8-14.)

107. During the hearing, Mrs. Renteria affirmed that sharing other members' medical costs is something that she looks forward to, as it helps boost her faith and affirms the existence of a community of generous people in her religious community that have pulled through for her and her family. (*Id.* at 172:9-23.)

108. At the cease-and-desist hearing, Valentine E. Miller, one of Gospel Light's members since 1995, testified that, as part of his and his fellow church members' religious beliefs, they experience joy in sharing one another's burdens. (*Id.* at 189:21-24.)

109. During a hearing related to Gospel Light's federal civil rights claims against the OSI, Judge Matthew L. Garcia acknowledged that the OSI conceded that Gospel Light and its members were engaging in their sincerely-held religious beliefs through participation in Gospel Light's HCSM, stating: "I'll tell both sides, nobody has argued that this is not a sincerely-held religious belief, so I think that part is conceded and given, so that part is not the issue for me." (Ex. 27 at 63:7-11.)

110.    At this federal hearing, Mrs. Renteria testified that she was attracted to HCSMs because of "the family orientation . . . religious aspects . . . common beliefs and the sharing amongst other believers." (*Id.* at 84:1-7.)

111.    At the hearing, Mrs. Renteria further testified: "I don't want to be involved in financially supporting abortion, or other surgeries. I am a firm believer that God made people the way they're supposed to be and that we shouldn't be changing young children. And so those were my main objections to the traditional insurance companies and all of that goes with it." (*Id.* at 85:10-20.) Mrs. Renteria testified that Gospel Light will not facilitate sharing into these things, because it goes against members' religious beliefs, which is something that she supports. (*Id.* at 102:21-23.)

112.    During the hearing, Pastor Wesley Humble, Gospel Light's Executive Director of Ministry, Community Relations, and Events (*id.* at 115:1-116:6), testified that Gospel Light provides a vehicle for members to associate religiously other than through sharing their medical expenses, including: (1) weekly devotionals written and sent by a pastor to Gospel Light employees (*id.* at 116:7-18); (2) twice weekly religious messages and reminders written and sent by a pastor to Gospel Light employees (*id.* at 116:17-22, 121:23-122:1); (3) wooden prayer boxes at Gospel Light's offices for employees to place written prayer requests to have a pastor follow up with them (*id.* at 116:23-117:9); (4) quarterly in-house newsletters written and sent by a pastor to Gospel Light's employees (*id.* at 117:20-23); (5) scripturally based videos recorded and sent by a pastor to Gospel Light employees and members containing religious messages and hymns (*id.* at 117:25-119:14, 121:10-18); (6) an online prayer box for members to share prayer requests with other members and receive messages of encouragement in return (*id.* at 119:15-120:6); (7) the support of a pastoral care team that assist Gospel Light's pastor in praying for those who have submitted prayer requests (*id.* at 119:22-120:2); pastoral support concerning grief for a member's family when they die and support through sudden and unexpected bad news (*id.* at 120:12-121:6); (8) monthly newsletters containing a

devotion thought (*id.* at 121:21-23, 136:22-137:5); (9) volunteer initiatives for Gospel Light employees to engage in acts of service and fundraising together (*id.* at 129:9-130:1); and (10) spiritual care for members in their final moments of life through phone calls with Gospel Light's pastor (*id.* at 135:14-19).

113.    At the hearing, Pastor Humble affirmed that it is "absolutely" his "understanding that healthcare sharing is grounded in Biblical teaching" and that, "it has always been clear to [him] that we have a responsibility as Christians to not only take care of the poor, to take care of the needy, but to take care of one another." (*Id.* at 122:12-14, 123:1-6.)

114.    During the hearing, Pastor Humble explained: "[W]e were told over and over and over to share and share with one another, bit it—bear one another's burdens. So for anybody that would be what I would call an authentic follower of Christ, following classic historic Christianity, which means the whole Bible, and taking seriously the teachings of Christ and the apostles and those who wrote in the New Testament, you can't get away from that principle and command to love one another and take care of one another. Does it always, you know, does it always—do we always have the opportunity to live that out, not necessarily. In maybe small ways for me, healthsharing—and I'm a member personally, I've had to walk through that—feels like a real answer to what I consider to be Biblical commands." (*Id.* at 124:1-16.)

115.    In his hearing testimony, Pastor Humble described Gospel Light members' healthcare sharing as "an act of faith," further expounding: "When it comes to healthsharing, you're caring for one another, even people you don't know. You are doing it with a Christian faith and basis. You're having faith that the sharing is, you know, that they believe the same as you believe, that we're going to help one another and take care of one another's needs." (*Id.* at 124:20-125:11.) Pastor Humble further explained that he was not certain that his medical expenses would be shared through members' donations to Gospel Light but, "[y]ou just trust and you have faith." (*Id.* at 138:21-25.)

116.    During the hearing, Pastor Humble also explained that, although Gospel Light members' individual religious beliefs may differ somewhat, "there is one thing [members] have in common, and that is [they] believe in caring for one other's burdens, in this case medical situations," and that the "people who sign off on [Gospel Light's] statement of shared beliefs . . . "help[] build up the body of Christ." (*Id.* at 128:6-19.)

117.    At the hearing, Pastor Humble stated that, through his role with Gospel Light, he spreads Gospel Light's teachings and methods of religious association by traveling to various association meetings and pastors' conferences to inform participants of Gospel Light's HCSM model. (*Id.* at 130:19-131:16.)

118.    During her deposition for this litigation, Plaintiff Renteria affirmed her particular interest in HCSM membership because it "went along with [her family's] beliefs," HCSMs were "supportive of family" and provided "the right maternity coverage" that worked with her lifestyle. (Ex. 31 at 10:12-24.)

119.    Mrs. Renteria further explained her difficulty in finding insurance "providers that will work outside of the borders of New Mexico" but that HCSMs enabled her family to get help no matter where they were located. (*Id.* at 50:3-25.)

120.    During this deposition, Mrs. Renteria further testified that she "really, really enjoyed" her membership with HCSMs and had participated in multiple HCSM memberships throughout her life, enjoying "how everything operated" within these ministries. (*Id.* at 10:21-24.)

121.    Mrs. Renteria further testified that Gospel Light members have a minimum monthly suggested donation amount but that members can give above and beyond that amount if they choose. (*Id.* at 17:6-10.)

122.    In her deposition, Mrs. Renteria reaffirmed that she does not want to support abortion or certain surgeries performed on children, which violate her religious beliefs, and she feels "like

contributing to other insurance agencies or programs that are doing those things, [she feels] like part of [her] money is going to support that, and it . . . does not feel right to [her]." (*Id.* at 50:3-51:10.)

123.    Mrs. Renteria explained that she feels that some of her money would be allocated to advertising for, and the practice of, certain medical procedures that violate her religious beliefs, and she specifically remembers receiving a pamphlet from one of her prior medical insurance providers advertising abortion, which she did not want her money going toward and which upset her to receive. (*Id.* at 51:11-52:2.)

124.    During her deposition for this litigation, Plaintiff Smith testified that she joined Gospel Light because she "liked the idea of it being a Christian ministry, and [she] liked the idea of them investing in things [she] believed in. (Ex. 32 at 11:9-14.)

**C. OSI targets religious HCSMs and their members in an organized campaign against HCSMs that is not neutral toward religion and demonstrates OSI agents' animus toward HCSM members' religious beliefs, including the beliefs of Plaintiffs.**

> ***i.   In early 2020, OSI begins an organized campaign against HCSMs, contradicting its prior, longtime stance that it had no oversight authority over HCSMs.***

125.    Gospel Light's Project Manager for Negotiations and Key Accounts/Contracts, Wendy Kuhl, submitted an affidavit in this matter verifying that Gospel Light had been operating in New Mexico, without incident, since 2014. (Ex. 28 at 1.)

126.    As early as 2016, OSI staff, including Paige Duhamel, were aware of, and acknowledged, the federal definition of HCSMs and that Gospel Light satisfied those requirements, admitting: "[Gospel Light] . . . has now established themselves under Gospel Light Mennonite Church Medical Aid Plan, Inc. which now makes them an eligible sharing ministry under the ACA." (Ex. 30 at 34-35.)

127.    In 2016, then-Superintendent of Insurance John Franchini acknowledged that the federal government allows HCSMs, and specifically Gospel Light, to operate. (*Id.* at 35-36.)

128.    In the OSI's December 3, 2019 press release, then OSI Superintendent of Insurance John Franchini "urge[d] consumers to proceed with caution when purchasing health coverage options outside of Affordable Care Act compliant plans." (Ex. 11 at 1; Ex. 35 at 99:5-9.) He stated that: "Consumers' best bet for individual and family health plan coverage options is still to shop with BeWellNM.com." (Ex. 11 at 1.)

129.    In its December 3, 2019 press release, the OSI also confirmed: "A few health care sharing ministries (also known as health care sharing organizations) operate in New Mexico. These organizations **do not offer insurance**, but may present plans in a way that look and feel similar to a health insurance plan. Members of these organizations 'share' health costs on a voluntary basis. Consumers should be aware that these plans have no obligation to pay for any medical services and have no requirement to cover any particular categories of health care services, such as preventive care" (emphasis added). (*Id.* at 1-2.)

130.    In her deposition testimony, OSI attorney Rebecca Branch admitted that the OSI had issued the December 3, 2019 press release, warning consumers about HCSMs, without first having done "a lot of in-depth investigations at that point." (Ex. 34 at 79:17-80:2.)

131.    OSI health insurance policy analyst Paige Duhamel echoed these sentiments in her deposition, stating: "I don't know that that first, how much thought went into that first press release since it seemed to be a copy and paste of a New Hampshire press release. So I don't know that the first press release was necessarily a, you know, truly well thought out position on healthcare sharing ministries." (Ex. 35 at 103:4-25.)

132.    In its March 26, 2020 press release, the OSI contradicted its description of HCSMs from its December 3, 2019 press release, stating: "a HCSM plan is an unauthorized insurance product that likely will not provide the protections of an authorized, regulated, and ACA compliant major medical plan." (Ex. 12 at 1.)

133.    In its March 26, 2020 press release, the OSI accused all HCSM plans of not complying with the ACA, "even if their materials say they do." (*Id.*)

134.    In the OSI's March 26, 2020 press release, then OSI Superintendent of Insurance Russell Toal urged New Mexican consumers to refrain from HCSM membership, "urg[ing] consumers not to purchase health insurance other than an ACA compliant plan." (*Id.*)

135.    In the March 26, 2020 press release, Superintendent Toal stated that consumers required "protect[ion]" from HCSMs and implied that HCSMs have "deliberately misled" consumers, making no effort whatsoever to differentiate legitimate HCSMs from any illegitimate ones. (*Id.* at 2.)

136.    Despite being presented with the March 26, 2020 press release in his deposition (Ex. 37 at 175:4-8), Superintendent Toal erroneously denied ever issuing "any such statement" labeling "HCSMs as unauthorized insurance products" on two separate occasions before finally admitting that the OSI "say[s] in the second paragraph it's an unauthorized plan" (*id.* at 132:11-14; Ex. 38 at 304:17-305:25).

137.    In his deposition, Superintendent Toal admitted that, if the OSI had indeed called all HCSMs "unauthorized insurance products in a press release," that phrasing would be problematic and an inaccurate reflection of the OSI's investigations. (Ex. 38 at 294:17-295:9.)

138.    Similarly, Superintendent Toal incorrectly denied "formally discourag[ing] New Mexicans from signing up for health care sharing ministries." (*Id.* at 284:20-21.) Notably, he confirmed that it would be "improper to discourage New Mexicans from doing things like signing up for HCSMs" because that is not the OSI's role. (*Id.* at 284:20-285:11.)

139.    For a third time, Superintendent Toal erroneously denied the message relayed by the OSI's March 2020 press release, testifying that the press releases did not indicate that insurance companies were a better choice than HCSMs. (*Id.* at 302:8-11.)

140.    Superintendent Toal also stated that he could not reconcile the conflicting understandings of HCSMs between the December 2019 and March 2020 OSI press releases, indicating that he never would have issued the December 2019 press release. (Ex. 37 at 175:4-8.) He further confirmed that the two press releases were "mutually exclusive" and "cannot both be right." (*Id.* at 174:14-17.)

141.    During his deposition, Superintendent Toal admitted that he was never made aware of the existence or content of Superintendent Franchini's December 3, 2019 press release, and he never looked into the prior superintendent's position on HCSMs to ensure consistency in the OSI's stance regarding the legality of HCSMs. (*Id.* at 81:8-22, 174:21-22.)

142.    When asked for the reason behind the OSI's rapid change in its understandings of HCSMs, Superintendent Toal attributed these changes to him being a "new and more informed superintendent and one who was focused on enforcing the law." (*Id.* at 175:9-18.) He did not perceive the December 2019 press release as attempting to focus on enforcing the law. (*Id.*)

143.    In her deposition testimony, OSI attorney Rebecca Branch admitted that the March 26, 2020 press release, including the OSI's opinions of HCSMs, was based only on the evidence presented to the OSI through its investigations into Trinity, one purported illegitimate, bad actor HCSM, and the content of the March 26, 2020 press release was based on the OSI's understanding of how deceptive Trinity was. (Ex. 34 at 88:10-90:19, 97:12-98:2.)

144.    In her testimony, Attorney Branch confirmed that the OSI's description of all HCSMs as unauthorized insurance products was only based on an OSI investigation into one HCSM in particular—the illegitimate, bad actor Trinity/Aliera HCSM. (*Id.* at 90:7-19.)

145.    Attorney Branch also affirmed that she knows of no legal basis to make the assumption that all HCSMs, categorically, produce misleading materials, and she would not make that assumption herself. (*Id.* at 152:13-19.)

146.     In her deposition concerning this case, OSI health insurance policy analyst Paige Duhamel attributed the change in OSI's position on HCSMs to the fact that they were issued by "two different superintendents." (Ex. 35 at 103:4-19.)

147.     When asked about the OSI's definition of HCSMs, as used for the December 2019 and March 2020 press releases, Ms. Duhamel admitted in her deposition that the OSI had no uniform understanding of what an HCSM was, but that the OSI could still make allegations against HCSMs in these press releases, because "you're not going to get into a legal argument in a press release." (*Id.* at 126:9-23.)

148.     In its "March Insurance Tip of the Month," the OSI issued a consumer advisory calling *all* HCSMs "scammers trying to lure people into purchasing low-quality health insurance or health insurance-like products," which are "low-quality products," "bad plans" that "can leave consumers stuck with huge medical bills from doctors and hospitals," "non-ACA plans," and "red flags." (Ex. 13.)

149.     In an August 10, 2020 letter to then U.S. Department of the Treasury Secretary Steven Mnuchin, the New Mexico Attorney General, along with other states' Attorneys General, warned that "incentivizing payments to [HCSMs] will only accelerate medical debt and poor health outcomes." (Ex. 14 at 1.)

150.     In the August 10, 2020 letter to Steven Mnuchin, the New Mexico Attorney General also associated *all* HCSMs with "fraudulent marketing practices" that "continue to elude enforcement by the States." (*Id.* at 2.)

151.     The August 10, 2020 letter to Steven Mnuchin further stated that HCSMs "often employ deceptive marketing tactics" and blamed HCSMs for "ripple effects from damaged credit," associating all HCSMs with "long-term economic deprivation, bankruptcy, housing instability, and even homelessness." (*Id.* at 4.)

152.    In the August 10, 2020 letter to Steven Mnuchin, the New Mexico Attorney General further accused *all* HCSMs generally of having "fraudulent practices targeting consumers" and creating "risks of consumer confusion," "fraud," and "the risk of market segmentation and erosion of existing health insurance marketplaces." (*Id.* at 4-5, 8.)

153.    One day after the Attorneys General sent this letter to Steven Mnuchin—on August 11, 2020—the OSI opened an investigation into Gospel Light. (Ex. 33 at 73:10-14.)

> ii.  **Throughout OSI's actions against Gospel Light, OSI knew that Gospel Light was one of the legitimate, ACA-qualified HCSMs and that its members were generally very happy with their membership.**

154.    By January 2020, OSI employees, including Superintendent Toal, had been informed of the distinction between legitimate, ACA-compliant HCSMs and bad actors falsely claiming to be HCSMs. (Ex. 30 at 72-73.)

155.    In May 2021 correspondence between the OSI and Gospel Light, Gospel Light informed the OSI that Gospel Light "is not, and does not operate as, an insurance company, does not collect premiums or issue insurance policies, is not an HMO, and does not constitute an ERISA plan. [Gospel Light] is a health care sharing ministry authorized pursuant to 26 U.S.C. §5000A(d)(2)(B), conducting business as a non-profit 501(c)(3) entity, and is recognized and certified by the Centers for Medicare and Medicaid Services, a division of the U.S. Department of Health and Human Services (CMS), for purposes of the Affordable Care Act. [Gospel Light] facilitates the sharing of medical needs among its members, who are in fact self-pay patients for health care purposes." (Ex. 15 at 1.)

156.    On September 28, 2021, Gospel Light sent a letter to the New Mexico Office of the Attorney General informing the office that "[Gospel Light] is not, and does not operate as, an insurance company, does not collect premiums or issue insurance policies, is not an HMO, and does not constitute an ERISA plan. [Gospel Light] is a health care sharing ministry authorized pursuant to 26 U.S.C. §5000A(d)(2)(B), conducting business as a non-profit 501(c)(3) entity, and is recognized

and certified by the Centers for Medicare and Medicaid Services, a division of the U.S. Department of Health and Human Services (CMS), for purposes of the Affordable Care Act. [Gospel Light] facilitates the sharing of medical needs among its members, who are in fact self-pay patients for health care purposes." (Ex. 16 at 1.)

157.    In Gospel Light's September 28, 2021 letter to the New Mexico Office of the Attorney General, it further explained: "[Gospel Light] is a health care sharing ministry and does [not] [sic] collect premiums or pay claims and does not sell any insurance services or products. Disclaimers are conspicuously provided with remarkable redundancy in multiple places in [Gospel Light] literature and documents, such as the Decision Guide, Sharing Guidelines, membership card, [Gospel Light] website and membership application documents, making it abundantly clear that [Gospel Light] is a health care sharing ministry and not an insurance company and that it does not guarantee payment of medical costs. Our role is to enable self-pay patients to help fellow members through voluntary financial gifts." (*Id.* at 2.)

158.    Gospel Light's May 2021 correspondence to the OSI and September 28, 2021 letter to the New Mexico Attorney General also described in detail how it had worked with former member Ginger Knollenberg, who had filed a complaint against Gospel Light, to fully resolve her concerns about her medical expenses. (Ex. 15 at 2-3; Ex. 16 at 2-3.)

159.    Before OSI elevated the Glassman complaint against Gospel Light for enforcement, Superintendent Toal knew that Mr. Glassman was happy with Gospel Light, had received sharing payments for his medical bills, was going to continue his Gospel Light membership, and did not want to pursue additional enforcement action. (Ex. 36 at 92:2-93:2, 97:18-98:7, 100:10-17.) Mr. Glassman informed OSI investigator Phyllis Christy that "pretty much his whole family" were Gospel Light members and that Gospel Light had been recommended to him by his church. (*Id.* at 93:3-12, 100:3-9.)

160. At the cease-and-desist hearing, Gospel Light member Dr. Panzeter testified that she intentionally switched from insurance to Gospel Light membership and has "been really happy with it." while also understanding that she does not have a contract with Gospel Light or Gospel Light members and that she bears the risk concerning any of her medical expense needs—a risk she also felt was a burden with insurance companies because of her high deductible. (Ex. 19 at 124:20-23.)

161. At the hearing, Gospel Light member Mrs. Smith testified that Gospel Light members have shared most of her medical costs and that the amounts not shared were "usually pretty minimal and [she was] happy to pay it." (*Id.* at 147:10-18.)

162. During the hearing, Gospel Light member Ms. Waters testified that she has been very happy with Gospel Light and that, of all the options available to her, Gospel Light fit her and her husband's needs. (*Id.* at 177:16-23.)

163. At the hearing, Gospel Light member Mrs. Renteria testified that some of her medical needs have been shared through Gospel Light, including costs associated with maternity, labor, and delivery, while other medical costs were not fully shared; but regardless, she has not ever felt defrauded by Gospel Light, and she feels that Gospel Light and its members have definitely done their best to keep medical costs low to protect her. (*Id.* at 162:10-18, 163:23-164:11, 165:5-16.)

164. At a federal hearing related to Gospel Light's civil rights lawsuit against the OSI, Mrs. Renteria testified about why she is drawn to HCSMs, stating: "They're also very accepting and encouraging of families and maternity and they are just so helpful with labor and delivery, maternity needs, things like that. And that was very important for us and kind of difficult to find anywhere else, and so we were, we were encouraged with that and I personally was just thrilled of how easy everything was to work with." (Ex. 27 at 84:4-15.)

165. At this hearing, Mrs. Renteria also testified about aspects of her Gospel Light membership that she especially enjoys, explaining: "I like the community. I like, like I just stated,

how easy it is to work with everyone. I get a real person on the phone who is always very friendly and willing to help. The e-mails are responded to quickly. I get the updated e-mails of actual ministry encouragement edification, not just advertisements, and you can see, some people chose to share anonymously, but you can also see people's names that choose to share above and beyond even their monthly sharing that they contribute. And it's really special to see members jumping in and prayer requests being answered and you can see all of that through the portal and it's very real and the people are, they just feel close even though we're a national span here, they feel very close and I appreciate that." (*Id.* at 84:16-85:9.)

166.    During the hearing, Mrs. Renteria further explained that Gospel Light was helpful in walking her through things she was missing and needed to submit related to the birth of her child, educating her on how to get a good financial deal with different medical providers, and treating her with kindness so that she felt like she had a personal advisor with Gospel Light. (*Id.* at 85:25-86:15.)

167.    At the hearing, Mrs. Renteria testified that she believes Gospel Light is "very transparent in reporting numbers, to the degree that they can, with the members" concerning what Gospel Light does with members' financial contributions, including providing a forum for members to see the names of other members who have provided donations above their standard monthly contribution amount. (*Id.* at 106:14-107:20.)

168.    During her deposition for this litigation, Plaintiff Smith affirmed that she is "happy with" Gospel Light and has no desire to switch to a different HCSM. (Ex. 32 at 20:9-11.)

> ### *iii.    Despite having knowledge of Gospel Light's legitimacy and value to New Mexicans, OSI aggressively antagonizes Gospel Light members, along with HCSMs generally, and attempts to prevent New Mexicans from associating with the Gospel Light membership and other HCSMs.*

169.    During her deposition, OSI attorney Rebecca Branch testified that, if an HCSM was legitimate under the ACA, and proved that it was legitimate, she assumed that the OSI would choose not to pursue enforcement action against that HCSM. (Ex. 34 at 139:18-140:8.)

170.     Attorney Branch further testified that she assumes there are good actors, in addition to the bad actors, within the HCSM sector. (*Id.* at 152:20-153:1.)

171.     Despite the OSI's prior knowledge that Gospel Light had already facilitated sharing for complainant Ginger Knollenberg's medical expenses (Ex. 15-16) and despite the OSI's prior knowledge that Gospel Light was not an insurance provider subject to OSI oversight (*id.*), the OSI issued a cease-and-desist order against Gospel Light on November 23, 2021. (Ex. 17.)

172.     The OSI's November 23, 2021 cease-and-desist order against Gospel Light wrongly claimed that the OSI Superintendent had "probable cause to believe that [Gospel Light's] actions or inactions . . . constitute violations of the Insurance Code or other applicable laws that are subject to enforcement by the Superintendent." (Ex. 17 at 1, 7; Ex. 24 at 6-8, 13-14.)

173.     The OSI's cease-and-desist order against Gospel Light wrongly stated that the OSI's preliminary findings in the order were "made after due inquiry and upon reasonable belief." (Ex. 17 at 1; Ex. 24 at 4-6.)

174.     The OSI's cease-and-desist order against Gospel Light wrongly claimed that the OSI Superintendent had "good cause to believe [Gospel Light is] not exempt from the insurance laws of the State of New Mexico" and that Gospel Light "should be made to cease and desist from any and all offerings, marketing, sales, and business related to its activities within the State until [Gospel Light has] made a satisfactory showing of good cause why [its] activities in this state are lawful and are not prohibited by the New Mexico Insurance Code and other applicable law." (Ex. 17 at 2; Ex. 24 at 4-8, 13-14.)

175.     In its cease-and-desist order against Gospel Light, the OSI falsely claimed that Gospel Light was "not a legitimate health care sharing ministry within the meaning of the federal Patient Protection and Affordable Care Act ("ACA") because [Gospel Light] fail[ed] to meet the criteria set forth in federal law." (Ex. 17 at 2; Ex. 22 at 2-3.)

176.    The cease-and-desist order against Gospel Light wrongly stated that the "functional elements of [Gospel Light's] health benefits are identical to those of a 'mainstream' health insurance plan." (Ex. 17 at 3; Ex. 24 at 4-8, 13-14.)

177.    The OSI's cease-and-desist order against Gospel Light also incorrectly alleged that Gospel Light's "member guides and promotional materials deceptively assert that its plans are not insurance despite having the traditional characteristics of health insurance." (Ex. 17 at 4; Ex. 24 at 4-8, 13-14.)

178.    The cease-and-desist order against Gospel Light falsely claimed that, "[b]y selling health care sharing membership plans in New Mexico, Gospel Light has transacted the business of insurance in this state." (Ex. 17 at 7; Ex. 24 at 4-8, 13-14.)

179.    The cease-and-desist order against Gospel Light erroneously stated that Gospel Light "is a health insurance carrier that sells health benefit plans in New Mexico without a valid certificate of authority." (Ex. 17 at 7; Ex. 24 at 6-8, 13-14.)

180.    The cease-and-desist order against Gospel Light wrongly asserted that the OSI "Superintendent has jurisdiction over [Gospel Light.]" (Ex. 17 at 7; Ex. 24 at 11-12.)

181.    The cease-and-desist order against Gospel Light incorrectly alleged that Gospel Light "has falsely claimed to be exempt from the ACA" and that Gospel Light's "claims to be exempt from the ACA and that its plans are not insurance are both deceptive." (Ex. 17 at 7-8; Ex. 22 at 2-3.)

182.    The cease-and-desist order against Gospel Light improperly ordered Gospel Light to cease and desist from: (a) representing that Gospel Light is not insurance and soliciting New Mexico residence regarding Health Care Sharing Ministry memberships. (Ex. 17 at 8; Ex. 24 at 14-22, 29.)

183.    The cease-and-desist order against Gospel Light wrongfully presented Gospel Light with the choice of either paying a fine or cancelling all New Mexico membership plans, refunding all

contributions received by the New Mexico members, and informing all New Mexico members of options for obtaining major medical coverage. (Ex. 17 at 9; Ex. 24 at 29-36.)

184.    Prior to Gospel Light and Plaintiffs filing this civil rights lawsuit against the OSI, the OSI was aware that, Robert Glassman, one of their witnesses who submitted a complaint against Gospel Light, "was satisfied" with Gospel Light, because they had facilitated sharing into his medical expenses; he planned on remaining a Gospel Light member; and he did not want to pursue any adverse action against Gospel Light. (Ex. 36 at 22:13-24:15.)

185.    During a hearing related to Gospel Light's civil rights lawsuit against the OSI in the Federal District Court of New Mexico, Judge Matthew L. Garcia commented that the OSI's actions against Gospel Light were "unnecessarily aggressive," because the OSI sought to force Gospel Light to immediately cease operating in New Mexico despite the fact that it had been operating for years without issue, and despite the fact that the underlying legal issues had not been conclusively resolved, stating: "I think saying, well, you know, we have an administrative decision, so now, you know, you've been in operation for years, but now we're coming for you. It seems, you know, it seems unnecessarily aggressive until the underlying legal issues are conclusively resolved." (Ex. 27 at 32:1-7.)

186.    During the same hearing, the OSI admitted that it would take enforcement action against just five people pooling money to pay for each other's medical bills. (*Id.* at 33:22-34:14.)

187.    In an internal email, OSI employee Jill Medina asked: "Can't we just outlaw health ministries in the next session?" (Ex. 30 at 59.) In response, an OSI policy analyst Paige Duhamel wrote: "New Mexico has laws protecting with 'freedom of religion' that would probably interfere. There'd be so many lawsuits. There's ways to weed out the worst of actors, though. We're working on it." (*Id.*)

188.    In her deposition testimony, Ms. Duhamel stated that the laws protecting freedom of religion to which she was referring were the Religious Freedom Restoration Act laws. (Ex. 35 at 225:16-25.)

189.    OSI staff internally circulated a list of HCSMs to target for enforcement actions, including to Superintendent Toal, and Gospel Light was on that list. (Ex. 30 at 69-70.)

190.    OSI staff aggressively searched for consumer complaints of purported HCSMs from 2017 through January 2020 and admitted that they could not find any. (*Id.* at 72.)

191.    On February 3, 2021, an OSI staff attorney emailed the New Mexico Attorney General's office asking whether their office had received "any complaints about [Gospel Light] or OneShare Health." (Ex. 30 at 84.) In response, a staff member at the Attorney General's office provided the OSI with one complaint for Gospel Light. (*Id.* at 85.)

192.    During his deposition, Superintendent Toal explained that, if anyone from the OSI reached out to the Attorney General's Office to inquire about complaints against HCSMs, that "would have been inappropriate for them to do so," "[b]ecause contact between constitutional officers happens at that level, not lower level." (Ex. 38 at 246:14-25.)

193.    OSI staff interpret certain HCSMs' actions to defend their existence as malignant toward the OSI, stating that one purported HCSM "had endless resources to mess with [the OSI]" and providing "condolences" to other state employees pursuing actions against the entity. (Ex. 30 at 4.)

194.    OSI staff refer to *all* HCSMs as "red flag[s]" (*id.* at 8), a "form of garbage" (*id.* at 20), "Ponzi scheme[s] rather than insurance" (*id.* at 36, 76), swindlers (*id.* at 39), and "Frankenstein plans" (*id.* at 47.)

195.    OSI staff compared *all* HCSMs to fraudsters. (*Id.* at 15.)

196.    While the OSI was pursuing enforcement action against Gospel Light, the OSI staff knew that Gospel Light was one of several HCSMs claiming legitimacy and that it was part of the Alliance of Health Care Sharing Ministries. (*Id.* at 28.)

197.    Superintendent Toal encouraged OSI staff to contact insurance agents and brokers to find out if anyone was selling HCSM plans in New Mexico rather than basing potential enforcement actions on actual complaints by New Mexico consumers. (*Id.* at 48.)

198.    OSI staff admittedly "were actively looking at different avenues to stop the potential solicitation and sale of [HCSMs]." (*Id.* at 48.)

199.    OSI staff, including Ms. Duhamel, proactively held meetings to plan enforcement strategies against certain purported HCSMs even though OSI staff confirmed never having received any complaints about these entities. (*Id.* at 49.)

200.    During her deposition, Ms. Duhamel—OSI's former expert witness on health insurance policy (Ex. 35 at 71:10-15)—listed the following "green flags" as indicative of a higher likelihood that a purported HCSM is charitable, legitimate, and excluded from OSI oversight (*id.* at 192:8-23, 221:25-222:7): (1) devoting 80-85% of members' cost-sharing donations toward paying members' medical expenses (*id.* at 171:1-17, 172:8-15); (2) operating for purposes other than providing medical cost coverage so that covering medical costs is simply one of the HCSM's purposes (*id.* at 175:2-17); (3) minimal involvement of third-party administrators (*id.* at 202:13-21); (4) possessing profit margins that are in line with, and no higher than, those of a typical health insurance company (*id.* at 205:6-22); and (5) using straightforward and basic language to disclaim the HCSM's obligation to pay members' medical costs (*id.* at 220:3-221:24).

201.    During her deposition, Ms. Duhamel listed the following "red flags" as indicative of a higher likelihood that a purported HCSM is non-charitable, illegitimate and subject to OSI enforcement action (Ex. 35 at 192:8-23, 221:25-222:7): (1) failing to have a "cohesive series of

beliefs" and lacking a general unifying principle (*id.* at 165:2-16); (2) spending only 30-40% of members' cost-sharing donations on paying members' medical expenses (*id.* at 168:1-11, 171:1-17); (3) advertising the HCSM through pop-ups on social media, other websites, and on the radio (*id.* 176:2-14); (4) opening up HCSM membership to everyone (*id.* at 176:21-25); (5) using a third-party administrator to validate the medical necessity of members' claims (*id.* at 178:6-179:1); (6) paying the third-party administrator an unusually high salary, which can indicate the funneling of money from the third-party administrator to an entity's executives (*id.* at 194:1-21); (7) requiring that all claims go through a third-party administrator and requiring all HCSM funds to be handled by the third-party administrator (*id.* at 199:10-200:2); (8) describing medical-sharing options using names like bronze, silver, and gold plans (*id.* 181:5-9); (9) using deceptive advertising materials with phrases likening membership to insurance, such as "healthcare coverage," "healthcare plan," "get your medical expenses paid," and "alternative to health insurance coverage" (*id.* at 203:2-19); (10) purchasing stop loss coverage for the HCSM (*id.* at 204:1-22); and (11) using agents and brokers to sell HCSM memberships (*id.* at 256:16-257:3).

202.    In her deposition testimony, Ms. Duhamel mentioned "looking for the green flags and the red flags" as a way to "weed out the worst of actors" within the entities claiming to be HCSMs exempt from OSI oversight. (Ex. 35 at 226:1-10.)

203.    Despite the fact that Gospel Light possesses all of these five "green flags," the OSI continues to pursue enforcement action against it. (Ex. 40 at 2-8.)

204.    Additionally, despite the fact that Gospel Light possesses only one of these 11 "red flags," the OSI continues to pursue enforcement action against it. (*Id.*)

205.    Of the alleged "red flag" features, the one possessed by Gospel Light—advertising on social media platforms—is not indicative of its inauthenticity, because Gospel Light "looks for online Christian personas and specifically, Christians who are looking for healthcare alternatives." (*Id.* at 5.)

"Gospel Light's advertising emphasizes that it is a Christian ministry," and it "does not use its advertising to deceive consumers into believing they are purchasing health insurance." (*Id.*)

206. Gospel Light has the hallmarks of a legitimate HCSM so that, according to the OSI's own expert, it should therefore not be subject to OSI oversight, including the following: (1) approximately 86% of Gospel Light members' contributions went to sharing of members' eligible medical expenses between 2021 and 2024 (*id.* at 2); (2) Gospel Light has never purchased any "stop loss coverage" (*id.*); (3) Gospel Light had no third-party administrators when the OSI's cease-and-desist order was issued, as it administers most of its programs in-house, and it has never required that sharing be facilitated by a third-party administrator (*id.*); (4) Gospel Light generally does not use insurance agents or brokers, as new member development is handled in-house (*id.* at 3); (5) Gospel Light has an extensive array of benefits and activities other than healthcare sharing, including pastoral, prayer, and devotional support and charitable outreach programs (*id.* at 3-5); (6) Gospel Light never uses phrases likening membership to insurance, clearly emphasizing that it is not insurance (*id.* at 5-7); and (7) Gospel Light members unite around a cohesive and biblically grounded set of specific Christian values (*id.* at 7-8).

### iv. In addition to the OSI's campaign against HCSMs, OSI's animus toward HCSM members' religious beliefs is further underscored by the prejudice displayed by key OSI personnel.

207. During a deposition, Superintendent Toal confirmed that, when he came on as OSI superintendent, "there was a stark difference in the priorities between [his] office and the prior superintendent's office." (Ex. 37 at 37:25-38:3.)

208. In her deposition for this litigation, Paige Duhamel, longtime OSI employee and healthcare policy analyst, confirmed that the OSI's priorities concerning which investigations to conduct and enforcements to pursue "would change based on whoever was superintendent at the time." (Ex. 35 at 24:3-25:1, 67:12-68:11.)

209.    At her deposition, Ms. Duhamel testified that "both superintendent [Franchini] and superintendent Toal were very concerned about these healthcare sharing ministries . . . because . . . their impact on the stability of the marketplace and the potential for economic harms to consumers." (*Id.* at 104:8-25.)

210.    Ms. Duhamel also testified that she would regularly meet with Superintendent Toal to discuss various insurance issues, and Superintendent Toal was personally interested in HCSM enforcement, because, according to Ms. Duhamel: "He was in general concerned about their operation, the state and potential for misleading consumers about what they were buying into." (*Id.* at 94:15-96:7.)

211.    In her testimony, Ms. Duhamel confirmed that the Superintendent of Insurance was the one who "ultimately made decisions for the agency," so she "had to follow what, you know, he decided to do." (*Id.* at 95:22-96:1.)

212.    Likewise, OSI investigator Phyllis Christy testified in her deposition that "every superintendent has their own agenda" and that "Mr. Toal was more interested in stopping the Healthshare Sharing Ministries," but after he left, "it wasn't such a focus" and at least two other investigations into other purported HCSMs were never addressed and cease and desist letters were never sent to them as originally intended." (Ex. 36 at 51:12-52:19.)

213.    In her deposition, Ms. Christy further explained how Superintendent Toal's pet "project appeared to be the Healthshare Sharing Ministries." (*Id.* at 55:15-20.) Ms. Christy learned this fact through meetings that Superintendent Toal would arrange with staff, where he would bring up HCSMs, and discussions between her and her supervisor, Mark Marquez, where he relayed that Superintendent Toal had been asking for updates on HCSM investigations and why the investigators could not get the complainants to cooperate. (*Id.* at 56:9-20.)

214.    Ms. Christy confirmed, during her deposition, that she "felt like there was some pressure coming from him, from the top, to really dig in to these Complaints against HCSMs and get a Complaint finalized who wanted to pursue action." (*Id.* at 56:21-25.) She felt this much more urgently with Superintendent Toal than she did with other superintendents. (*Id.* at 57:1-3.)

215.    In his deposition, Superintendent Toal echoed these general sentiments, stating: "I think it's appropriate to say that I put pressure on them to come to a conclusion on almost any investigation. That's why we did the tracking sheet to ensure that things were moving forward." (Ex. 38 at 314:14-20.) He also admitted that there "were attorneys in that [OSI] office who certainly objected to [his] insistence about things moving forward" regarding enforcement against HCSMs and other entities. (*Id.* at 317:10-12.)

216.    Additionally, Ms. Christy testified that she knew that Mr. Toal wanted to move along the investigations against HCSMs despite the fact that there was no evidence that the complainants wanted to move them along. (Ex. 36 at 57:9-22.) She found out this information through emails that she was copied on and through conversations with her supervisor, Mark Marquez. (*Id.*)

217.    Superintendent Toal confirmed this in his deposition, declaring that it "wouldn't be material to whether [OSI] did an enforcement action," because "[t]he enforcement action would have been driven by the results of the investigation [r]egardless of what the consumer wanted." (Ex. 38 at 316:7-15.)

218.    Notably, Ms. Christy testified that Mark Marquez did not have much respect for Superintendent Toal, and he would refer to him as an "F'ing idiot" because the OSI investigators were trying to address all of these other cases against agents involving the defrauding of 55+ New Mexicans, but these investigations and evidence were not progressing to enforcement action because "the focus was all on the Healthcare Sharing Ministries." (Ex. 36 at 58:10-59:13.)

219.    Ms. Christy testified that Mr. Marquez would call Superintendent Toal an idiot in the context of his frustrations over not being able to address all of the other issues the OSI should be taking care of, because the only thing that Superintendent Toal wants the attorneys to work on is the Healthcare Sharing Ministry." (*Id.* at 59:14-60:1.)

220.    According to Ms. Christy's deposition testimony, Mr. Marquez would also relay his frustrations that, "as investigators, [they] deal with facts" rather than opinions or "what if's" and so, if Mr. Marquez could not give Superintendent Toal enough facts through his investigation to support enforcement action, he was not going to elevate the investigation for enforcement. (*Id.* at 60:1-5, 60:22-61:1.)

221.    Ms. Christy testified that, based on her experience at OSI, she feels like "members of the New Mexico community suffer in large because of the focus on HCSMs over bigger threats out there." (*Id.* at 61:2-23.) Ms. Christy provided an example of this regarding 55 New Mexicans who were defrauded by "the Florida Four"—four Florida based insurance agents—which was ignored, despite the abundance of evidence collected by Ms. Christy and Mr. Marquez, because of Superintendent Toal's focus on HCSMs. (*Id.* at 61:2-62:6, 63:3-20.) Mr. Marquez revealed these same frustrations to Ms. Christy, which they both shared. (*Id.* at 61:2-62:6.)

222.    During her deposition, Ms. Christy explained that the OSI attorneys told her that they were searching for evidence that people in the community had been damaged by HCSMs, but she did not have that evidence. (*Id.* at 76:14-19.) She said that "sometimes the attorneys want things that we just can't get," because if the OSI does not have a "consumer complaint, it's hard to prove that someone's being harmed." (*Id.* at 75:6-16.)

223.    When corresponding about an entity that identified as an HCSM, Superintendent Toal presumed, before any OSI investigation, that OSI should take enforcement action against the entity, telling his staff at OSI: "We need to investigate and probably take action." (Ex. 30 at 2.)

224.    Likewise, certain OSI staff approach investigations of all purported HCSMs with the foregone conclusion that these entities have violated the insurance code and that the OSI will file enforcement actions against them, as demonstrated when OSI General Counsel Bryan Brock emailed OSI attorney Rebecca Branch asking for the projected timeline for filing an enforcement action against one purported HCSM, and Attorney Branch responded that the OSI had not even evaluated the entity "to determine, what, if any, violations there are." (*Id.* at 55-56; Ex. 33 at 79:13-17; Ex. 34 at 16:8-20.)

225.    In his deposition testimony, Superintendent Toal admitted that he never came across a health care sharing ministry that was bona fide that he also found to be compliant with New Mexico law. (Ex. 38 at 251:7-12.)

226.    While being deposed for this litigation, Margaret Peña—Division Director for OSI's Consumer Services Division (Ex. 33 at 6:3-16, 64:18-19)—testified that she personally oversaw the OSI's investigation of Gospel Light, and her testimony revealed that she presumed enforcement action against Gospel Light was inevitable regardless of what the investigation revealed, as she described the investigative role as follows: "My specific involvement is to work with the investigator with any of the cases, including this one, to ensure that we have documentation to send forth to our legal department to—so they can do what they need to do to change it to an enforcement action." (*Id.* at 62:1-14, 66:5-7, 79:7-9.) Unsurprisingly then, the OSI elevated its investigation of Gospel Light for enforcement action after only about a month of investigative work and without interviewing any Gospel Light representative about the complaint. (*Id.* at 112:1-5, 122:20-123:5.)

227.    Once a consumer complaint reaches the enforcement stage, non-neutral OSI attorneys review the related entity's materials searching for violations of law, as confirmed by OSI attorney Rebecca Branch during her deposition related to this litigation. (Ex. 34 at 16:8-20, 29:11-17.)

228.    Despite his awareness that certain purported HCSMs disclaim that they are insurance, Superintendent Toal overstepped his authority in claiming that the OSI has "an obligation to determine whether [the purported HCSM] should be regulated" as insurance, simply because he personally felt that "their products should be subject to regulation" in some form. (Ex. 30 at 11.)

229.    In email correspondence, Superintendent Toal revealed his distrust of the NAIC and the religious sincerity of HCSMs, writing sarcastically that the NAIC "[g]ives one real faith that their alliance is of truly legitimate health care sharing ministries." (*Id.* at 27; Ex. 35 at 256:16-257:3.)

230.    During her deposition related to this case, Phyllis Christy, the OSI investigator with the Central Investigations Bureau who investigated Gospel Light, verified over the phone with Robert Glassman, a man who submitted a consumer complaint against Gospel Light, that: Gospel Light had facilitated sharing into Mr. Glassman's medical expenses, he was happy with Gospel Light and intended to remain a member, and he did not want to pursue any adverse action against Gospel Light. (Ex. 36 at 22:13-23:8, 42:14-16.)

231.    Ms. Christy informed OSI employee Mark Marquez—her immediate supervisor who assigned her the Glassman complaint (*id.* at 47:21-48:2)—and OSI enforcement lawyers that the Glassman complaint against Gospel Light had been resolved, but she still received pressure to elevate the investigation for enforcement (*id.* at 91:22-92:1, 98:17-99:7.)

232.    When Ms. Christy spoke with Mr. Marquez about not wanting to elevate the Glassman complaint against Gospel Light for enforcement, Mr. Marquez informed her that he was being told to elevate it by Superintendent Toal, and they had to do what the superintendent wanted." (*Id.* at 92:2-9.)

233.    In her deposition testimony, Ms. Christy admitted that she elevated her investigation materials of Gospel Light for enforcement action because she was instructed to elevate them even

though she did not agree that her investigation of the Glassman complaint against Gospel Light should have been elevated. (*Id.* at 89:6-90:23, 132:15-22, 133:16-134:8.)

234.    Certain OSI staff attribute OSI's final order against one purported HCSM to OSI employee Paige Duhamel, thanking her for "scouting out the issue in the first place." (Ex. 30 at 6.)

235.    OSI employee Paige Duhamel's enforcement efforts against Gospel Light are due, in part, to her personal stake in issues involving Gospel Light, as her friend and personal hairdresser was a Gospel Light member and complained to Ms. Duhamel about concerns related to Gospel Light. (*Id.* at 23, 38.)

236.    During her deposition in this matter, when asked when the investigation into Gospel Light first began, Ms. Duhamel admitted: "I think it might have been triggered by me telling somebody that I knew [Gospel Light] was operating in New Mexico because my hairdresser had had difficulties with [Gospel Light]. So, I think that was a part of the start of this investigation." (Ex. 35 at 72:24-73:5.)

237.    Superintendent Toal vehemently disclaimed this fact in his deposition, stating that Ms. Duhamel's personal connections with her hairdresser, a disappointed Gospel Light member, was "absolutely not" the reason for OSI's investigation into Gospel Light. (Ex. 38 at 312:15-22.)

238.    In her deposition, Ms. Duhamel explained that, while she was getting her hair cut, her stylist mentioned fighting with her health insurance company about paying medical expenses, and Ms. Duhamel asked the stylist for the company name, informed her stylist that she worked for the OSI, and suggested that her stylist file a complaint with OSI, an action which Ms. Duhamel cannot confirm actually occurred. (Ex. 35 at 74:4-75:23.)

239.    Ms. Duhamel further testified that she followed up with OSI staff to make sure they were on the lookout for any complaints against Gospel Light from her hair stylist, because Ms. Duhamel did not want her stylist's complaint "to get lost in the shuffle." (*Id.* at 75:10-23.)

240.    During her deposition, Ms. Duhamel stated that she followed up with her hairdresser during a subsequent hair appointment because she "was concerned that OSI didn't follow-up with her" stylist, and she did not want to "have [her] agency look bad." (*Id.* at 87:9-88:3.)

241.    At least in part due to her personal stake in issues involving Gospel Light, Ms. Duhamel reached out to OSI employees, including Superintendent Toal, to forward negative news articles about Gospel Light and urge OSI staff to search "older investigations cases" for complaints against Gospel Light so that the OSI could investigate Gospel Light without Ms. Duhamel needing to bother her friend to submit a complaint against Gospel Light, as her friend did not wish to complain about Gospel Light formally to the OSI. (Ex. 30 at 38-39.)

242.    In a separate email, Ms. Duhamel verified that she had spoken with her personal hairdresser about filing a complaint against Gospel Light even though her hairdresser had informed her that Gospel Light had not even refused to facilitate sharing for any of her family's healthcare expenses at the time. (*Id.* at 74.)

243.    As soon as Ms. Duhamel received notice that a consumer had submitted a complaint about Gospel Light to the New Mexico Attorney General's Office, she fast-tracked the complaint for OSI enforcement, replying to the notification email within three minutes and instructing OSI staff: "Right now let's send it to Becki and Todd." (*Id.* at 77-83.)

244.    During her deposition for this litigation, OSI investigator Phyllis Christy confirmed Ms. Duhamel's testimony that Gospel Light was initially investigated because "a friend of Paige's" became involved in Gospel Light, and "Paige found out that they weren't licensed and so Paige is the one that initiated the original, and that's where the original hearing came from" rather than originating from any investigation (Ex. 36 at  64:18-65:6.)

245.    Additionally, Ms. Christy noted that the Gospel Light cease-and-desist hearing occurred before Mr. Glassman's complaint had been investigated by her, and when she was sitting in

on the hearing, she did not "know why there was a hearing," because "there really wasn't an investigation done prior to that original hearing." (*Id.* at 50:4-15.) She explained: "[W]hen I sat through the hearing, I couldn't understand why they had initiated a hearing at that time without having done an investigation." (*Id.* at 65:18-21.)

246.   In her testimony, Ms. Christy stated that she didn't understand why the OSI was pursuing enforcement against Gospel Light, and she "felt like they rushed and jumped the gun. Because—there was no investigation at that time." (*Id.* at 51:2-6.) Based on Ms. Christy's assessment, the only thing that the OSI looked for before pursuing enforcement against Gospel Light was that "they weren't a licensed insurance carrier in New Mexico." (*Id.* at 51:7-11.)

247.   During her deposition, Ms. Christy confirmed that she has never heard of any investigators being asked to investigate an entity after, rather than before, a cease-and-desist order is issued, declaring: "It's the only one that I'm aware of that was in a cease and desist order before it was sent to the Investigations Bureau." (*Id.* at 80:16-81:2.)

248.   Ms. Christy confirmed that, out of hundreds of entities that were investigated throughout her time at the OSI, Gospel Light stands out as the only entity she can recall where a cease-and-desist order was issued before any investigation had been done through the OSI. (*Id.* at 81:3-24.)

249.   During his deposition, Superintendent Toal said that he "would not have issued a cease-and-desist order against [Gospel Light] if it had not been fully investigated," and to do so would be in violation of the proper process for pursuing enforcement with the OSI. (Ex. 38 at 210:24-211:22, 309:11-17.)

250.   In his testimony, Superintendent Toal explained how he was raised with a Christian background, attending the Evangelical and Reformed Church of America, and that his mother was

the church organist. (Ex. 37 at 55:7-56:4.) However, when he was 24 or 25 years old, Superintendent Toal stopped identifying as Christian, because he converted to Judaism. (*Id.* at 60:9-61:3.)

251.    When discussing his conversion from Christianity to Judaism, Superintendent Toal stated that the "problem" with Christianity where he lived was that "there were lots of southerners, including members of the church, who were full of disdain, if not outright hatred, for people who were different than them, and [he] found that intolerance not acceptable." (*Id.* at 61:4-15.)

252.    During his deposition, Superintendent Toal said that part of his motivation to convert from Christianity to Judaism was due to "some of the same things that [he] had seen before" regarding the "bias" of Christians, usually demonstrated through "comments from people in the workforce and outside." (*Id.* at 61:24-62:9.)

253.    In his testimony, Superintendent Toal confirmed that he was "turned off by some of the racist and sexist remarks of people in [his] prior religious communities," who were Christian. (*Id.* at 67:6-10.)

254.    Notably, when asked what made him conclude that the sexist and racist Christians "sincerely held" their Christian beliefs, Superintendent Toal stated that their comments or actions revealing "instances of intolerance" contributed to his understanding that they were "sincerely" Christian—thereby revealing his association with sincere Christians as being intolerant individuals. (*Id.* at 67:11-24.) Superintendent Toal further testified about the southern Baptists he knew "who were die-hard racists, but they certainly felt strongly in their faith." (*Id.* at 68:12-15.)

255.    During his deposition, Superintendent Toal indicated that he felt it was acceptable, and not unjust, to give certain Christians the limited choice of either: (1) buying products that promote or facilitate medical procedures that violate their religious beliefs or (2) foregoing any assistance program providing support in paying their medical costs. (Ex. 37 at 71:15-24, 75:5-76:6; Ex. 38 at 301:5-16.) However, Superintendent Toal simultaneously acknowledged that it would be an

"injustice" to be denied the opportunity to purchase medical insurance, because assistance in paying one's medical costs is "an extremely important protection to be able to have." (*Id.* at 74:4-21.)

256.    Likewise, Superintendent Catechis testified that, if Christians are against contraception and those types of coverages for religious reasons, so they do not want to purchase medical insurance, they should not have the option of selecting a different health care sharing model other than the self-funded model where they would cover costs themselves. (Ex. 39 at 86:11-87:2.)

257.    While Gospel Light was being investigated by the OSI, Superintendent Toal and Ms. Duhamel mocked HCSMs by comparing them to pet insurance, criticizing the medical care exempted from HCSMs' medical sharing for religious reasons, and joking that, like some HCSMs, pet insurance wrongly did not cover behavioral health. (Ex. 30 at 29.)

258.    When reviewing this correspondence during his deposition, Superintendent Toal affirmed that he found nothing wrong with "comparing a crazy pet health care sharing [plan] to a religious health care sharing ministry." (Ex. 38 at 279:2-10.)

259.    Through email correspondence between Superintendent Toal and Ms. Duhamel, the Superintendent admitted that the OSI was biased in favor of requiring HCSMs to comply with New Mexico's Insurance Code. (Ex. 30 at 32-33.)

260.    During these correspondences, as Ms. Duhamel testified in her deposition, she was concerned that OSI would appear biased against HCSMs in opposing a proposed rule allowing certain reimbursements to HCSM members for their medical expenses, because the OSI was "opposing them getting money" and opposing "employers giving people money to buy unlicensed products." (Ex. 35 at 245:2-246:1.)

261.    OSI staff treat purported HCSMs that they are investigating as if these entities have already been found guilty of wrongdoing and "skirt[ing] Federal rules," as OSI staff circulated the names of these entities to the NAIC to be part of a "list of companies/producers selling unauthorized

or bundled limited benefit plans" even though the entities were still under investigation and only suspected of wrongdoing by the OSI. (Ex. 30 at 47.)

262.    During her deposition related to this lawsuit, Ms. Duhamel categorized Gospel Light members engaged in their religious practice of medical cost burden-sharing as "heart-breaking," wrongly assuming that Gospel Light's value to members was limited to medical cost reimbursement and stating: "I mean some of the other issues that were always so heart-breaking that I saw is that people would sign up for these alternatives. Again, healthcare sharing ministry only one of many. You know, they would sign people up who are eligible for Medicaid and that was absolutely free coverage with no financial requirements." (Ex. 35 at 37:9-15.)

263.    In his deposition testimony, Superintendent Toal refused to acknowledge any "religious component" in the way that any HCSMs "function." (Ex. 37 at 9:5-7.)

264.    During a hearing related to Gospel Light's civil rights lawsuit against the OSI, while cross-examining Gospel Light member Mrs. Renteria, OSI attorney Tatiana Perez Valero wrongfully implied that the OSI could outlaw Mrs. Renteria's membership with Gospel Light because there are "other way of helping [her] friends, members, Christian friends or members of the [Gospel Light] HealthShare . . . other than within the platform of [Gospel Light] Healthshare." (Ex. 27 at 108:18-22.)

265.    At the hearing, OSI attorney Ms. Valero improperly implied that the OSI could outlaw Mrs. Renteria's membership with Gospel Light because there were a few local medical providers in, or near, Santa Teresa, New Mexico that Mrs. Renteria could use. (*Id.* at 112:25-113:16.)

266.    During the hearing, Attorney Valero also improperly implied that the OSI could outlaw Gospel Light in New Mexico because nowhere in the scripture does it say "something about, along the lines that, thou shall be a member of a healthcare sharing ministry" and that there are "other

ways to help one another with the medical bills within the church" other than through Gospel Light. (*Id.* at 133:13-134:6.)

267.    During her closing remarks at the hearing, Attorney Valero belittled Gospel Light members' religious practices when she compared Gospel Light members being prevented from associating with their chosen religious community to nude dancers being forced to wear G-string thongs when they dance. (*Id.* at 246:7-16.)

268.    In her closing remarks, Attorney Valero belittled Gospel Light members' religious practices again by saying: "Yes, there may be an irreparable harm that they [Gospel Light members] may not do the cost-sharing through [Gospel Light], but that harm is not substantial and it is not— it's very speculative." (*Id.* at 247:10-14.)

269.    In Defendants' April 25, 2023 motion to dismiss, Defendants recommended that Gospel Light members substitute their religious ministry with Gospel Light by, instead, "donating to GoFundMe pages." 4/25/23 Motion to Dismiss, ECF No. 8, at 14.

270.    In a legal briefing filed in the U.S. Court of Appeals for the Tenth Circuit, the OSI's Office of Legal Counsel offensively compared Gospel Light members' religious healthcare sharing community to gay conversion therapy tactics and a physician who committed fraud by falsely advertising that he cured vascular disease through God's hands. (Ex. 29 at 25-26.)

**D. OSI's administrative adjudication of Gospel Light failed to provide due process protections to Gospel Light and its members, particularly due to OSI's bias against Gospel Light and its members.**

271.    During his deposition testimony, Superintendent Toal stated that he was initially attracted to the position of Superintendent of Insurance because, in that role, he could really be his "own person," and he would not have to clear things with another supervisor above him—he would be the "top dog." (Ex. 37 at 26:19-27:9.)

272.    Superintendent Toal admitted to doing "some kind of edit to virtually everything that came to [him]" when he was OSI superintendent. (*Id.* at 134:15-20.)

273.    Additionally, Superintendent Toal testified that he had the "final say in determining whether a consumer complaint was elevated for further enforcement action after the initial investigation" (Ex. 38 at 292:17-21); he had "final say in whether or not the cease and desist order was sent to an HCSM" (*id.* at 292:22-25); he "gave the final edits to the hearing officer's recommended decision regarding HCSMs" (*id.* at 293:1-3); and he "gave the final edits to the final orders against HCSMs" (*id.* at 293:4-13).

274.    However, when asked whether he found it problematic that he "had the final say and final edits in each action throughout the entire step of the investigation, enforcement, recommended decision, and final order," Superintendent Toal responded: "Not at all." (*Id.* at 295:14-297:8.) On the contrary, Superintendent Toal testified that the state law "require[d him] to be the final person and to be involved in that," and that he "consider[ed] it part of [his] responsibility . . . to be the final arbiter in all these things." (*Id.* at 295:14-297:8.)

275.    Superintendent Toal contrasted himself with his predecessor, Superintendent Franchini, testifying that Superintendent Toal did not believe that Superintendent Franchini similarly "involved himself on day-to-day investigation matters or kept himself informed of them or provided guidance about what should be done when a problem was found." (*Id.* at 298:20-299:4.)

276.    However, Superintendent Catechis found it problematic for superintendents to be "intimately involved in the details" of a matter "until probably the end where . . . [their] name's going on something" so that they can avoid being improperly influenced by something that occurs within the process that creates a "bias early on" which can cause someone to "prematurely make some sort of subconscious opinion of something." (Ex. 39 at 104:6-105:18.) From Superintendent Catechis's perspective, becoming too involved in the details of an investigation "interferes with a full

development of a case," and "you may not see everything," like the opposing perspective—and this bias can potentially affect superintendents' final decisions if they "don't have the full picture." (*Id.* at 105:19-106:6.)

277.    Unlike Superintendent Toal, Superintendent Catechis never took "a proactive step [to] get involved in the process of determining whether or not an investigated complaint should be elevated for enforcement, because it was not her role to so do as superintendent. (*Id.* at 111:6-17.) Similarly, Superintendent Catechis affirmed that she had "no input into the final recommendation from the hearing officer." (*Id.* at 115:1-2.)

278.    Superintendent Toal verified that, if he felt that one of his investigators had not done a sufficiently thorough investigation, he would tell them to "go back" and keep investigating. (Ex. 37 at 99:4-6.) Likewise, he confirmed that, when the OSI was deciding whether or not to elevate a complaint from the investigation stage to the enforcement stage, his role would be to "ultimately decide whether an investigation was elevated for an enforcement action," even where OSI investigators disagreed with his decision. (Ex. 37 at 101:10-103:1.)

279.    Similarly, Superintendent Toal acknowledged that he would complete final edits to the cease-and-desists issued by the OSI. (*Id.* 117:21-118:2, 134:15-20.) He also confirmed that he "had the final say on whether to issue a cease and desist," and he remembers instances where he would override a group decision within the OSI about a recommendation concerning whether to issue a cease-and-desist order. (*Id.* at 137:6-18.)

280.    In his deposition, Superintendent Toal explained that he edited Hearing Officer Walker's recommended decision against Trinity before it was finalized to include the provision that, in lieu of paying the fine, Trinity could cancel all of its New Mexico membership. (*Id.* at 145:1-13.) Superintendent Toal affirmed that, if Hearing Officer Walker had not wanted to add that provision to his recommended decision against Trinity, Superintendent Toal could have forced him to add it. (*Id.*)

281.    Additionally, Superintendent Toal testified that he did not draft final orders, and that the hearing officers and general counsel would coordinate to create a draft proposed final order, and then they would send it to Superintendent Toal for his review. (*Id.* at 147:24-148:14.)

282.    When asked about whether Superintendent Toal would propose edits to the draft final orders, he responded: "Yeah, but to be honest with you, you know, once the hearing decision has been made, there isn't too much to discuss," because "you got a hearing decisions that I have reviewed and essentially signed off on, and the next step is a order, [s]o it's kind of—[o]ne follows from the other." (*Id.* at 148:15-149:1.) Superintendent Toal admitted that his final orders were "pro forma" and that any edits to the final orders would not have included "any substantive edits at all," so he would spend very little time discussing with the hearing officers any edits to the draft final orders (*Id.* at 149:2-22.)

283.    However, when testifying about his review of the recommended decision against Gospel Light, Superintendent Toal admitted: "I certainly don't remember reading 100 pages, no." (Ex. 38 at 213:13-214:5.)

284.    Similarly, Superintendent Toal also testified that he may or may not have given feedback to the hearing officers regarding their recommended decisions, and that he only provided feedback sometimes. (*Id.* at 215:4-21.)

285.    Notably, in regard to the final order against Gospel Light, Superintendent Toal could not recall ever having a discussion with Hearing Officer Walker about what should be included in the final order that the hearing officer drafted for Superintendent Toal to sign. (*Id.* at 217:14-21.) Instead, Superintendent Toal explained that the final order would merely "follow from the hearing officer's decision." (*Id.*)

286.    During her deposition, OSI investigator Phyllis Christy testified that, after Superintendent Toal took over, he discouraged investigators from continuing their NAIC training and

perpetuated a system in which the investigators' department does not have any standard operating procedures on how they are supposed to conduct their investigations—deprioritizing the education and internal organization of OSI investigators (Ex. 36 at 102:14-25, 104:5-14.)

287.    Rather than review the OSI attorneys' investigative documents and draft their own, independent cease and desist orders, OSI Superintendents merely review and approve cease and desist orders that have been drafted by the same OSI attorneys who conducted the related investigations. (Ex. 30 at 51; Ex. 37 at 117:18-118:2.)

288.    In response to the OSI's cease-and-desist order against Gospel Light (Ex. 17), a hearing was conducted (Ex. 18-19).

289.    The first part of a hearing was conducted in response to the OSI's cease-and-desist order against Gospel Light before OSI hearing officer Richard B. Word, and on March 8, 2022, after direct and cross examination of the witnesses, the written testimony and associated exhibits of OSI witnesses Phyllis Christy and Jessica Baker were admitted into evidence for purposes of the hearing. (Ex. 18 at 1, 9-10, 15-16.)

290.    In Jessica Baker's written hearing testimony, she admitted that, before the OSI issued the cease-and-desist order against Gospel Light, the OSI knew that Gospel Light had resolved the consumer complaint lodged with the OSI against Gospel Light by Gospel Light member Ginger Knollenberg and that Gospel Light had facilitated sharing for over $20,000 of her medical costs. (*Id.* at OSI-19, page 2-3 of 4.)

291.    In Phyllis Christy's written hearing testimony, she admitted that, before the OSI issued the cease-and-desist order against Gospel Light, the OSI's legal department never attempted to work with Gospel Light to resolve Gospel Light member Robert Joaquin Glassman's consumer complaint that he had lodged with the OSI against Gospel Light. (*Id.* at OSI-18, page 4 of 6.)

292.    On September 14, 2022, the second part of the hearing was conducted in response to the OSI's cease-and-desist order against Gospel Light before OSI hearing officer R. Alfred Walker. (Ex. 19 at 1, 6.)

293.    Due to the change in hearing officer, Gospel Light moved for a mistrial, because the newly assigned hearing officer, R. Alfred Walker, was not able to hear all of the evidence, including the live testimony and cross-examination of the OSI witnesses who testified on March 8, 2022, and he was only provided with 1.5 days to become acquainted with the record—an insufficient period of time given the length of the March 8, 2022 record. (*Id.* at 9:18-12:19.)

294.    During the September 14, 2022 hearing, Gospel Light also noted that it had received approximately 4,000 pages of discovery from the OSI, and Gospel Light had not had sufficient time to review the documents to ensure that the new hearing officer, assigned 1.5 days prior, was free of bias and had no potential conflict of interest in overseeing the hearing. (*Id.* at 13:25-16:5.)

295.    OSI hearing officer R. Alfred Walker denied Gospel Light's motion for a mistrial despite the fact that he only had access to a transcript, rather than audio and/or video, of the portion of the hearing that occurred on September 14, 2022. (*Id.* at 19:22-20:6, 23:15-16.)

296.    OSI hearing officer R. Alfred Walker denied Gospel Light's motion for a continuance despite the fact that Gospel Light had not had sufficient time to review discovery and conduct additional research to ensure that R. Alfred Walker was sufficiently without relevant bias and free from conflicts of interest concerning the hearing. (*Id.* at 13:25-16:5, 24:15-24.)

297.    During the hearing, the OSI stipulated that Gospel Light was not incorporated in New Mexico, domiciled in New Mexico, has no office or other physical presence in New Mexico, has no employees in New Mexico, and has no agents in New Mexico. (Ex. 22 at 3.)

298.    After the OSI's cease-and-desist hearing against Gospel Light, hearing officer R. Alfred Walker erroneously found that Gospel Light fell "within the New Mexico definition of

insurance" and that Gospel Light provides "health benefits plans as defined by Section 59A-16-21.1." (Ex. 23 at 1-2.)

299.    Hearing Officer Walker wrongly recommended that Gospel Light "be ordered to cease and desist from soliciting, offering to sell, selling, collecting membership fees or monthly share amounts, or servicing HCSMs in New Mexico until [Gospel Light] complies with the requirements of the Insurance Code." (*Id.* at 2.)

300.    Hearing Officer Walker also incorrectly recommended that Gospel Light "be ordered to pay an appropriate fine of ten million forty thousand dollars ($10,040,000) for its violations of the New Mexico Insurance Code." (*Id.* at 2.)

301.    In response to Hearing Officer Walker's recommended decision and order, Gospel Light submitted exceptions to the hearing officer's recommended decision (the "Exceptions"). (Ex. 24.)

302.    In its Exceptions, Gospel Light explained how Mr. Walker ignored, and failed to address, the concept of burden of proof, and that the law placed the burden of proof on the OSI, not Gospel Light. (Ex. 23; Ex. 24 at 1.)

303.    The Exceptions disclosed how Mr. Walker improperly shifted the legal burden, placing the burden on Gospel Light to prove a series of negatives—*i.e.*, that Gospel Light is not insurance and does not provide health care benefits—rather than expecting the OSI to meet its legal burdens. (Ex. 23 at 38; Ex. 24 at 2.)

304.    In its Exceptions, Gospel Light also explained how Mr. Walker ignored, and failed to address, the standard of proof, and that the law required the OSI "to establish the prerequisites which would entitle [it] to the relief it requested *by a preponderance of the evidence*" in accordance with 13.1.5.17(A) NMAC." (Ex. 23; Ex. 24 at 2.)

305.    The Exceptions showed how Mr. Walker improperly implied that Gospel Light "somehow converted itself from a ministry to an insurance company because it requires its members to live up to their membership responsibilities." (Ex. 23 at 40-42; Ex. 24 at 2-3.)

306.    Gospel Light's Exceptions contested Mr. Walker's reliance on the irrelevant fact that all of Gospel Light's members in New Mexico who testified "received or were promised reimbursement for at least a portion of medical expenses they submitted" to Gospel Light. (Ex. 23 at 43-44; Ex. 24 at 3.)

307.    Notably, Gospel Light's Exceptions explained how Mr. Walker unlawfully relied on parole evidence outside the scope of Gospel Light's membership contract without making any conclusion of law that the contract between Gospel Light and its members was ambiguous. (Ex. 23 at 43-44; Ex. 24 at 3-4.)

308.    The Exceptions detailed how Mr. Walker improperly added his own term to the agreement between Gospel Light and its members when he concluded that Gospel Light promised "at least partial reimbursement of medical expenses," which was not supported by any evidence, as there was no evidence presented that Gospel Light or its members intended or understood that Gospel Light would undertake to indemnify its members or to assume any risk of loss concerning members' medical expenses. (Ex. 23 at 44-46; Ex. 24 at 4-6.)

309.    In the Exceptions, Gospel Light also described how Mr. Walker erroneously found that Gospel Light's HCSM "is a policy or agreement entered into, offered, or issued . . . to provide, deliver, arrange for, pay for, or reimburse any of the costs of health care services," because the relevant statute did not list HCSMs in any class of "health insurance carrier," and HCSMs are not "any other entity" akin to the specific class listed in the definition. (Ex. 23 at 49-51; Ex. 24 at 6-8, 13-14.)

310.    Gospel Light's Exceptions further detailed how Mr. Walker improperly concluded that Gospel Light "provides coverage in [New Mexico] for health benefits," because the term coverage is inextricably linked to the concept of insurance, which Gospel Light is not. (Ex. 23 at 51-53, 70-75; Ex. 24 at 6-10, 12.)

311.    The Exceptions explained how Mr. Walker baselessly concluded that Gospel Light "undertakes to pay or indemnify its members as to loss from certain specified contingencies or perils, or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies," which is contradicted by Gospel Light's materials disclaiming any obligation to reimburse members for medical expenses and is unsupported by the OSI's own evidence. (Ex. 23 at 53-54; Ex. 24 at 10-11.)

312.    In the Exceptions, Gospel Light challenged Mr. Walker's erroneous conclusion that the OSI has jurisdiction over Gospel Light, noting that Gospel Light does not provide insurance coverage and that the OSI admitted that Gospel Light is not incorporated or domiciled in New Mexico, has no physical presence or agents employed in New Mexico, and does not advertise in New Mexico. (Ex. 23 at 58-66; Ex. 24 at 11-12.)

313.    Gospel Light's Exceptions also challenge Mr. Walker's unsupported conclusions that Gospel Light offers a health benefits plan, because this term must be offered or issued by a health insurance carrier, which Gospel Light is not. (Ex. 23 at 74-75, 85-86; Ex. 24 at 6-8, 12-13, 22-23.)

314.    The Exceptions noted Mr. Walker's improper circular reasoning in concluding that Gospel Light "offers health benefits because it is a health insurance carrier and is a health insurance carrier because it offers a health benefits plan." (Ex. 23 at 74-76; Ex. 24 at 13-14.)

315.    In the Exceptions, Gospel Light showed how Mr. Walker wrongly concluded that Gospel Light is insurance subject to regulation under the New Mexico insurance code, because (1) he never made the necessary finding that the agreement between Gospel Light and its members was a

contract of insurance, (2) the conclusion contradicts the unambiguous language written into the agreement, and (3) there was no evidence presented that Gospel Light assumed the risk of loss of any members' medical expenses. (Ex. 23 at 76-85; Ex. 24 at 14-22.)

316.    Gospel Light's Exceptions detailed Mr. Walker's erroneous conclusion that there was no constitutional impediment to the OSI's exercise of jurisdiction or its enforcement powers against Gospel Light, explaining (1) how exemptions from the insurance code for labor and fraternal organizations but not religious organizations is not neutral or generally applicable and (2) how the OSI lacks any compelling reason to prohibit Gospel Light from operating its religious HCSM while allowing secular organizations to share members' healthcare expenses outside of OSI's oversight (Ex. 23 at 86-90; Ex. 24 at 23-26; 25.)

317.    Gospel Light's Exceptions incorporate the following arguments made within its written closing argument and post-hearing brief: the OSI violated the First Amendment to the U.S. Constitution, Articles XXI, § 1 and II, § 11 of the New Mexico Constitution, and the New Mexico Religious Freedom Restoration Act because (1) its targeting of Gospel Light treats comparable secular activities of fraternal and labor organizations more favorably than Gospel Light members' HCSM religious exercise and (2) the OSI offered no compelling reason as to why it has a particular interest in prohibiting Gospel Light from operating a religious HCSM while making exceptions to similar functions within secular organizations.  (Ex. 24 at 23-26; Ex. 25 at 17-20.)

318.    The Exceptions also challenge Mr. Walker's conclusion that the OSI's public statements against HCSMs do not evince religious animus or prejudgment of the facts of the OSI's proceeding against Gospel Light, detailing how the OSI cautioned consumers against HCSMs while emphasizing their associated religious restrictions and indicated that consumers needed protection from HCSMs. (Ex. 23 at 90-96; Ex. 24 at 26-29.)

319.    The Exceptions further explain how Mr. Walker improperly found that Gospel Light failed to meet its burden of showing OSI's animus, and overcoming the presumption of impartiality, because Mr. Walker wrongly quashed Gospel Light's subpoena for Superintendent Toal to testify at the cease-and-desist hearing and thereby deprived Gospel Light of its due process opportunity to examine him on questions of bias, prejudice, prejudgment, and animus. (Ex. 23 at 90-96; Ex. 24 at 26-29.)

320.    Gospel Light's Exceptions note that Mr. Walker wrongly found that the OSI has the authority to order Gospel Light to cease and desist operating its HCSM in New Mexico unless it complies with the insurance code's requirements for insurers, because Gospel Light has not violated the insurance code. (Ex. 23 at 96-97; Ex. 24 at 29.)

321.    In its Exceptions, Gospel Light also explained how Mr. Walker's suggested fine of $10,040,000 is arbitrary and capricious because: (1) for years, the OSI publicly stated that HCSMs were not insurance subject to OSI oversight, and the legality of HCSM entities should not turn on the whims of whichever Superintendent of Insurance happens to be in power; (2) Gospel Light had no reasonable notice that the OSI could consider Gospel Light to be unauthorized insurance until at least March 26, 2020, when the OSI publicly changed its stance as to whether HCSMs are insurance, so fines should not accrue until after that date; (3) Gospel Light did not receive fair notice that the OSI viewed its conduct as prohibited in New Mexico before instituting fines against it, thus violating due process principles; (4) the fine is excessive, especially given that Gospel Light is not a recidivist violator of the insurance code or a criminal enterprise, and the excessive nature of the fine is reflective of the bias created within the OSI by Superintendent Toal's crusade against HCSMs; and (5) Mr. Walker suggested the maximum fine without explaining how he determined that the maximum fine was appropriate and while failing to conduct an analysis of the required factors in determining the fine amount. (Ex. 23 at 97-98; Ex. 24 at 29-36.)

322.    On February 22, 2023, Interim Superintendent of Insurance Jennifer A. Catechis (now known as Jennifer Conn) issued a final order against Gospel Light, summarily overruling all of Gospel Light's Exceptions; adopting Hearing Officer Walker's findings of fact, conclusions of law, and recommendations as the Superintendent's own; ordering Gospel Light to stop operating in New Mexico unless it complies with the requirements of the New Mexico Insurance Code, and ordering Gospel Light to pay a fine of $2,510,000. (Ex. 26; Ex. 39 at 6:10-12.)

323.    In her deposition for this lawsuit, Superintendent Catechis testified that she did not draft the final decision against Gospel Light, because she felt "it was the hearing officer's final decision." (Ex. 39 at 218:18-22.) Rather, she merely asked the hearing officer to make sure the final decision was edited to have the fine reduced by "whoever does it"—noting that she did not know who wrote or edited the draft final decision, but she did sign it. (*Id.* at 218:18-219:21.)

324.    In her deposition, Superintendent Catechis noted that it could have been Hearing Officer Walker who drafted the final decision against Gospel Light—effectively just summarily affirming his own recommendation that he'd recently issued. (*Id.* at 220:1-3.)

325.    Superintendent Catechis testified that, before signing off on the final order against Gospel Light, she had not reviewed any of the exhibits to the hearing itself, and she had not reviewed Gospel Light's written exceptions and objections to the hearing officer's recommended decision. (*Id.* at 222:14-23, 224:16-23, 224:24-225:25.) Moreover, she could not even confirm that anyone from the OSI had actually reviewed Gospel Light's exceptions and objections to the hearing officer's recommended decision. (*Id.* at 224:24-225:3, 227:6-9.)

326.    Superintendent Catechis testified that, before signing off on the final order against Gospel Light affirming the hearing officer's recommended decision, she only spent as much time "that was allowable" reviewing the 100-page recommendation, and she reviewed it in segments "[i]n between times [that she] was doing other things" like speaking with trial attorneys, attending

legislative hearings, and reviewing new bills during the hectic legislative session (*Id.* at 228:8-21.) She could not provide even an estimate of how long she spent reviewing the recommended decision. (*Id.*)

327.    In her deposition testimony, Superintendent Catechis admitted that she did not read the entire 100-page recommended decision against Gospel Light—she skipped "some of the more generic things" and read what she determined to be "the meat." (*Id.* at 229:5-7.)

328.    Superintendent Catechis affirmed that "because [she] had a decision [from] people [she] trusted, [she] gave [the final order] the rubber-stamp of approval at the end." (*Id.* at 259:2-16.)

329.    Superintendent Catechis could not recall making "any edits or modifications to the substance of the recommended decision . . . other than reducing the recommended fine." (*Id.* at 217:3-8.) According to her testimony, she decided to reduce the fine because "it felt like this was kind of a first hearing" which, in her mind, did not warrant "throwing the complete $10 million book at [Gospel Light]," so she "just thought 2.5 seemed adequate." (*Id.* at 217:9-15.)

330.    In her deposition, Superintendent Catechis admitted that there was no balancing or consideration of any legal factors in determining that the fine against Gospel Light should be $2.5 million—she merely came up with that number by dividing the recommended $10 million fine by four, because "[t]his seemed like a first violation" and the lower fine "just seemed more appropriate." (*Id.* at 245:21-246:7.)

331.    When asked to further explain the basis of the fine amount, Superintendent Catechis said that she was told by some OSI staff that she did not have to apply a formula to determine the fine amount, so she just came up with $2.5 million on her own. (*Id.* at 245:21-246:13.)

332.    At the deposition, Superintendent Catechis was asked: "Well, during the hearing, Mr. Glassman admitted that he knew [Gospel Light] wasn't insurance. And that is on page 12 of this decision, which we will just skip to here. Here's the little quote. And then also, Ms. Knollenberg, on

page 15 of the recommended decision, admitted that she knew that she was not signing up for insurance and that there was no promises that her medical expenses would be paid. And then finally, on page 21—and I will get to a question, I promise—Dr. Panzeter stated that she knew that she did not have a contract with [Gospel Light], as pursuant to this recommendation. How, then, was the decision reached in your office that the—these members of [Gospel Light] had contracted for insurance with [Gospel Light]?" (*Id.* at 229:15-230:4.)

333.    In response to this central question of the OSI's actions against Gospel Light, Superintendent Catechis merely responded: "You would have to ask the hearing officer." (*Id.* at 230:2-5.)

334.    Afterward, Superintendent Catechis tried to explain that, because some of Gospel Light's members allegedly expected Gospel Light to pay their medical expenses, the OSI determined that Gospel Light had contracted with all of its members to unlawfully provide insurance." (*Id.* at 231:10-14.)

335.    Superintendent Catechis admitted in a deposition that she "had a very limited interaction with the health division as a whole" and was not part of many conversations regarding HCSMs, so she did not have a deep understanding or definition of HCSMs. (Ex. 39 at 13:21-14:6.)

336.    In her deposition, Superintendent Catechis admitted that she was not aware of the names of any entities that identified as HCSMs and that she was not even aware, at any point, that Gospel Light identified as an HCSM. (*Id.* at 124:9-24.)

337.    Superintendent Catechis issued the final order against Gospel Light just one month after beginning her tenure as superintendent, which only lasted from approximately January 20, 2023 to June 8, 2023—less than six months. (*Id.* at 26:7-15.) Prior to her time as superintendent, Ms. Catechis acted as the OSI's Deputy Superintendent, beginning in December of 2020 or January 2021. (*Id.* at 26:3-10.)

338.    During her deposition, Superintendent Catechis admitted that she was not aware of the OSI's standard of proof related to its enforcement allegations, conclusions, and orders, as she did not know whether the applicable standard was probable cause, good cause, or something else. (*Id.* at 208:4-21.) She said that she would not have looked up the OSI's burden of proof at the time that she was reviewing the hearing officer's recommended decision against Gospel Light, because she made the assumption that "these things" were properly taken into consideration at the hearing. (*Id.* at 208:17-209:13.)

339.    Similarly, Superintendent Catechis admitted that she had "no idea" as to whether she was "bound by the factual findings in the recommended decision" or whether she could have "done a separate inquiry into the facts in order to make [her] final decision." (*Id.* at 216:3-7.)

340.    During her deposition, OSI attorney Rebecca Branch testified that, during her tenure with OSI, the OSI merged the General Counsel and Staff Counsel office roles within a single office, which caused some concern among OSI staff about retaining the independence of the bureaus and concern that the hearing officers would now be colleagues working within the same office as the attorneys pursuing enforcement actions and prosecuting administrative actions in front of those hearing officers. (Ex. 34 at 162:11-163:7.)

341.    These same independence concerns were echoed by OSI investigator Phyllis Christy, who testified during her deposition that, at certain times, Superintendent Toal would start becoming too immersed and directly involved in the investigations to the point where those potential enforcement actions had to be dropped because Superintendent Toal was no longer an impartial entity due to his interference with the investigations processes. (Ex. 36 at 53:1-55:5.)

**E. OSI agents' actions were, and are, undertaken under color of state law.**

342.    During the OSI's cease-and-desist hearing against Gospel Light, the OSI stipulated that the cease-and-desist order against Gospel Light was "issued by the New Mexico Superintendent of Insurance." (Ex. 22 at 1-2.)

343.    Superintendent Franchini, in his official capacity as the New Mexico Superintendent of Insurance, issued the December 3, 2019 press release against HCSMs on official OSI letterhead. (Ex. 11.)

344.    Superintendent Toal, in his official capacity as the New Mexico Superintendent of Insurance, issued the March 26, 2020 press release against HCSMs on official OSI letterhead. (Ex. 12.)

345.    The Consumer Advisory March Insurance Tip of the Month was published on OSI letterhead by Superintendent Russell Toal and Deputy Superintendent Jennifer A. Catechis in their capacities as agents of the State of New Mexico. (Ex. 13.)

346.    OSI Hearing Officer R. Alfred Walker's Recommended Decision and Order against Gospel Light was filed within the New Mexico Office of Superintendent of Insurance, and he signed the recommendation in his official capacity as the OSI hearing officer for the matter. (Ex. 23 at 1, 99.)

347.    The OSI's Final Order against Gospel Light was signed by Interim Superintendent of Insurance Jennifer A. Catechis in her official capacity as the OSI Superintendent, and it was filed within the New Mexico Office of Superintendent of Insurance. (Ex. 26.)

**F. OSI's definition of insurance is inconsistent, contradictory, and has a disparate impact on religion, treating comparable secular activities more favorably than the religious activities of HCSM members.**

348.    At his deposition, Superintendent Toal noted that it is not inconsistent for the OSI to hold the following, facially contradictory, understandings of HCSMs as they relate to insurance:

HCSMs are not insurance under the federal NAIC framework or for federal tax purposes, yet they *are* considered insurance under New Mexico insurance laws, but they are simultaneously *not* insurance under New Mexico state tax laws. (Ex. 38 at 286:12-291:19.) Superintendent Toal did admit that such a stance probably appears "pretty convoluted and confusing to the average person." (*Id.* at 292:4-9.)

349.    Superintendent Toal further testified: "We go out of our way in this country to make insurance situations as complex and as difficult as possible." (Ex. 37 at 111:2-4.)

350.    Despite acknowledging the confusing and convoluted stance of the OSI regarding whether HCSMs are insurance (Ex. 38 at 292:4-9), Superintendent Toal confirmed that he "of course" "think[s] predictability in the law is important," "[b]ecause enforcement of the law can't just be willy-nilly or random" (*id.* at 306:2-11).

351.    In his deposition, Superintendent Toal further confirmed: "[I]t's important for the members of society who are potentially subject to a law to be able to predict whether or not they're going to be violating that law." (*Id.* at 306:13-17.)

352.    Then, when attempting to reconcile his beliefs in the importance of predictability in the law (*id.* at 306:13-17) with the irreconcilable OSI press releases from December 2019 and March 2020 (Ex. 37 at 174:14-17, 175:4-8), Superintendent Toal merely stated: "the December one never should have been issued" (Ex. 38 at 306:18-25). Bewilderingly, he admitted that the conflicting nature of the press releases "does go to predictability," but then immediately contradicted himself, denying that the conflicting press releases "undermine[d] the predictability of the OSI's regulations and who will be subject to them." (*Id.* at 307:2-19.)

353.    Similarly, when Superintendent Catechis attempted to reconcile conflicting statements about whether Gospel Light should or should not be considered insurance, she sidestepped the issue by calling the "insurance" vs. "non-insurance" distinction mere "semantics." (Ex. 39 at 255:21-256:9.)

354.    In her deposition, Superintendent Catechis was asked how HCSM members could reasonably predict New Mexico's response to their fellowship when different state agencies come to different conclusions as to whether or not HCSMs are insurance, and she unreasonably placed the burden on the HCSMs to try to sort out the state's conflicting positions itself, stating: "As an entity, it's their due diligence to look at both [government entities' guidance] and then review the state laws to see which had the true authority." (*Id.* at 257:10-258:3.)

355.    Despite admitting that, if an HCSM member has signed a document with a HCSM, and "those documents clearly give the HCSM the ability to decide whether they're going to pay for, and what they're not going to pay for, there really was very little [the OSI] could do," Superintendent Toal issued a cease-and-desist against HCSMs, which included huge fines. (Ex. 17; Ex. 37 at 109:17-24.)

356.    Again, despite its enforcement actions against HCSMs (Ex. 17), Superintendent Toal testified in his deposition: "We aren't responsible for regulating health care sharing ministry per se" (Ex. 38 at 193:24-25).

357.    In her deposition testimony for this case, Paige Duhamel—longtime OSI employee and OSI health insurance policy expert witness (Ex. 35 at 24:3-25:1, 71:10-15)—admitted that, when OSI staff were speaking together, or with other insurance regulators across the country or NAIC staff, about HCSMs, there was no collective understanding of how to define the term HCSM, as it was never "something that [they] delved into particularly deeply" past a "general understanding that they were there to sort of share expenses somehow across some, you know, affinity group." (*Id.* at 128:13-129:10.)

358.    OSI investigator Phyllis Christy expressed similar sentiments, explaining in her deposition that no one from OSI ever attempted to come up with a collective definition of HCSM

"other than saying that, 'Well, they're'—'they look like—they run it like an insurance company, therefore it must be an insurance company.'" (Ex. 36 at 105:9-106:3.)

359.    Additionally, Ms. Christy testified that she never received any training on HCSMs and only learned about them through doing her own research. (*Id.* at 107:15-108:1.)

360.    During office meetings, Ms. Christy testified that if the ACA religious exemption was brought up, certain OSI attorneys would simply respond: "If it looks like a duck and walks like a duck, it must be a duck." (*Id.* at 108:14-21, 121:20-122:21.) No one attempted to reconcile state and federal law in this regard. (*Id.* at 109:3-8.) When Ms. Christy attempted to insert some nuance from her NAIC trainings into the discussions, she learned pretty quickly not to argue with certain OSI attorneys in that regard. (*Id.* at 122:22-123:17.)

361.    During his deposition, Superintendent Toal recalled the "duck argument," remembering that Hearing Officer Walker introduced the duck analogy within OSI but that both men talked about how this duck argument "can't be [the OSI's] only basis for taking this action" against HCSMs. (Ex. 37 at 140:21-141:2.)

362.    When describing his own understanding of the definition of an HCSM, Superintendent Toal deviated from the ACA's definition and disavowed any religious component to HCSMs, stating that these entities could be either religious-based or not religious-based, and regardless, he would refer to them all as HCSMs. (*Id.* at 168:4-17.)

363.    Paige Duhamel, OSI's expert witness on how insurance applies to HCSMs, had a contrary stance to Superintendent Toal regarding the significance of the variety of religious activities provided by an HCSM: Ms. Duhamel testified that, if an HCSM operated for purposes outside of providing medical cost coverage, that would be a green flag indicating that it was more likely that the HCSM was legitimate and not subject to OSI oversight (Ex. 35 at 175:2-17), whereas Superintendent

Toal testified that it was immaterial and not "a consideration" as to whether the HCSMs had other facets in addition to health care sharing (Ex. 38 at 302:24-303:3).

364.    Based on Ms. Christy's understanding, the OSI attorneys' refusal to consider nuance or the applicability of the ACA religious exemptions stemmed from these attorneys' desires not to upset Superintendent Toal, their boss, so they could keep their jobs, because the communication that flowed back from the supervisors was that: "This is what Superintendent Toal wants and so we're going to do it." (Ex. 36 at 124:2-125:6.)

365.    In her written testimony, entered into evidence at the cease-and-desist hearing (Ex. 19 at 56:4-13), expert witness Julie Weinberg, the OSI director of life and health (*id.* at 46:20-25), acknowledged that insurance is characterized by "the reallocation or shifting of risk of loss [] from one person to another, or many others" (Ex. 20 at 1-2); yet, she contradictorily concluded that Gospel Light "constitutes a health benefits plan" and "insurance" (*id.* at 3) despite knowing that the risk of loss is never shifted from Gospel Light members to Gospel Light (Ex. 19 at 61:21-62:3).

366.    During the cease-and-desist hearing, Julie Weinberg (Ex. 19 at 46:20-25), admitted that the OSI does not "deal with any fully exempt entities" that are exempt from insurance regulation in New Mexico, despite the fact that the OSI continually attempts to regulate Gospel Light—an exempt entity. (*Id.* at 77:12-18.)

367.    In an August 10, 2020 letter to then U.S. Department of the Treasury Secretary Steven Mnuchin, the New Mexico Attorney General, along with other states' Attorneys General, urged the federal government not to consider HCSMs to be insurance for tax purposes, writing: "Indeed, the federal government has taxed insurance companies for nearly a century, and during that time has never held that H[C]SMs are subject to insurance tax regulations. . . . That practice—and Congress's acquiescence in it—strongly supports the conclusion that H[C]SMs should not be considered insurance for tax purposes." (Ex. 14 at 8.)

368.    When attempting to reconcile the New Mexico Attorney General's conclusion that HCSMs are not insurance with the OSI's conclusion that HCSMs are insurance, Superintendent Catechis said that the OSI and AG do not operate in conjunction and are completely separate entities with separate powers. (Ex. 39 at 256:1-257:1.)

369.    OSI staff take conflicting positions on whether HCSMs are insurance or not, and they nearly published a press release stating that one purported HCSM was not insurance at the same time that they issued a cease and desist against this entity declaring that the entity was insurance, a contradiction noted by one of OSI's lawyers when he emailed the larger OSI team, saying: "Please give me time to review. My first concern is that we are saying these are not insurance, when we are about to launch a C&D that says they are insurance, but not authorized." (Ex. 30 at 52-53.)

370.    Similarly, in or around January 2022, OSI staff edited its website to post the following warning against HCSMs: "The OSI does not recognize health care sharing ministries (HCSM) as a legitimate source of assistance in paying for health care and discourages New Mexicans from signing up for HCSMs." (Ex. 30 at 1.)

371.    However, in his deposition testimony, Superintendent Toal denied using the term "illegitimate" to describe HCSMs and stated that, if the OSI had used that term, it would have been incorrect. (Ex. 38 at 189:15-190:4.)

372.    During her deposition related to this case, Margaret Peña—longtime OSI employee and current overseer of civil investigations and consumer complaints with the OSI's Managed Health Care Bureau (Ex. 33 at 6:3-16)—testified that "it is very minimal that [OSI goes] after an insurance company based on a consumer complaint," and that it probably only occurs as a result of one to two percent of the complaints about insurance companies. (*Id.* at 45:1-18.) Ms. Peña attributed the low frequency of OSI's insurance company investigations to the OSI's presumption that, just because a

member submits a complaint or a grievance against an insurance company, "[t]hat doesn't necessarily mean that the insurance company . . . is a bad actor in the State of New Mexico." (*Id.* at 45:1-10.)

373.    In contrast to the OSI's presumption that consumer complaints against insurance companies do not necessarily indicate that the company is a bad actor, the OSI adopts the opposite presumption when it receives a complaint against an HCSM like Gospel Light, presuming instead that the HCSM is a bad actor meriting investigation and anticipated enforcement action, as Ms. Peña admitted that, when she received the Gospel Light consumer complaint, she was "under the mindset that this would be a complaint that would be investigated . . . [a]fter doing some very basic research." (*Id.* at 62:1-14, 92:25-93:10.)

374.    OSI decided to investigate Gospel Light after merely verifying that it did not have a certificate of authority to operate insurance and one of its members called it insurance. (*Id.* at 92:25-93:10.)

375.    Contrary to other OSI staff opinions (Ex. 30 at 52-53), Ms. Peña testified that she has not received many consumer complaints "[m]aybe because it's not insurance." (Ex. 33 at 76:21-77:4.)

376.    OSI investigators concluded that Gospel Light was likely acting as an unlicensed insurer, requiring enforcement action, merely based on the following: (1) Gospel Light's website included medical terms, also used in the insurance code, like "telehealth visits," "specialists," "primary doctor," "provider," "medical testing," "vaccinations," "surgery," and "medical costs" (*id.* at 95:17-97:5, 99:9-101:8); and (2) Gospel Light's website mentioned "cost-sharing features," "health sharing," and there appeared to be a "network used" (*id.* at 95:17-96:13, 101:5-103:5). (*Id.* at 127:5-14.)

377.    In her deposition testimony, OSI healthcare insurance policy expert Paige Duhamel noted that OSI investigators would elevate a complaint against an HCSM for enforcement action simply "if the investigators seem to think that these HCSMs looked like they were operating like

insurance companies without a license, like they were walking like a duck, talking like a duck, you know, singing a song like a duck, you know, like health insurance sufficiently enough to be misleading to be a consumer." (Ex. 35 at 71:10-72:6.)

378.    However, outside the context of HCSM investigations, secular entities that include these same traits and general medical references do not trigger OSI investigation and oversight, as Ms. Duhamel testified in her deposition that a labor organization could offer healthcare sharing in New Mexico and not be subject to any OSI enforcement action. (*Id.* at 146:5-13.)

379.    Likewise, Superintendent Catechis understood that labor organizations could provide insurance to their members without being subject to OSI regulation. (Ex. 39 at 192:25-193:13, 194:7-12, 195:23-197:3.)

380.    Superintendent Toal also testified that, according to New Mexico statute, labor organizations can operate health care sharing plans in New Mexico without being subject to an enforcement action by the OSI and that some labor organizations did, in fact, do so. (Ex. 38 at 195:22-196:7.)

381.    When asked why secular labor organizations should be exempt from the insurance code for their health care sharing but not religious HCSMs, Superintendent Toal responded: "You have to ask the legislators that enacted this provision" and claimed not to have any thoughts on the matter. (*Id.* at 197:17-198:3.)

382.    Likewise, Superintendent Toal testified that certain New Mexico statutes permitted fraternal benefit societies to operate health care sharing plans without being subject to enforcement action by the OSI. (*Id.* at 201:23-202:2.) He further testified that he did not know why secular fraternal benefit societies should be exempt from the insurance code but not HCSMs. (*Id.* at 202:7-16.)

383.    During her deposition in this matter, Ms. Peña confirmed that no Gospel Light representative was interviewed as part of the OSI's investigation of Gospel Light. (Ex. 33 at 112:1-5.)

384.    In contrast, when the OSI receives grievances or complaints against insurance companies, the OSI routinely resolves these disputes by working with the insurance companies and without elevating the complaints for enforcement action against these insurance companies. (*Id.* at 129:24-130:25, 133:4-135:19.)

385.    In Ms. Peña's deposition testimony, she admitted that, of the 2,255 complaints against insurance companies received by the OSI from 2019 through October 2024, none of them resulted in the OSI taking corrective action, none of them were elevated for enforcement action, and none of them resulted in any fines against the insurance companies. (*Id.* at 133:4-135:13.) In fact, none of these 2,255 complaints against insurance companies even resulted in any OSI investigation of the insurance companies. (*Id.* at 135:13-19.)

386.    In contrast, of the nine consumer complaints against various purported HCSMs, five were elevated for enforcement action. (*Id.* at 146:7-14, 147:16-19.)

387.    Rather than characterize insurance companies as "bad actors" due to the consumer complaints against them, OSI investigators like Ms. Peña declare that these secular insurance companies are "absolutely not" bad actors, despite admitting that the insurance companies should have "probably" paid the disputed medical costs. (*Id.* at 137:11-138:10.)

388.    During her deposition, OSI investigator Phyllis Christy testified that she was instructed to elevate the Glassman consumer complaint against Gospel Light, even though her OSI supervisors knew that the complaint had already been resolved; in contrast, out of hundreds of complaints against insurance companies of which Ms. Christy is aware, none have moved forward for further

enforcement action when a consumer complaint is settled with the insurance company. (Ex. 36 at 91:3-92:1.)

389.    In her deposition for this matter, OSI attorney Rebecca Branch admitted that the OSI does not have its own definition of what an HCSM is, nor does it have policies or training on enforcing or effectuating the religious exemptions in the ACA, which include the HCSM exemption. (Ex. 34 at 122:20-123:21.)

390.    OSI health insurance policy analyst Paige Duhamel echoed the same sentiments in her deposition for this matter, confirming that the OSI did not have any formal or informal policies or procedures or training concerning the ACA religious exemptions, and it did not have a written or standardized understanding of the definition of an HCSM. (Ex. 35 at 128:13-129:10, 131:18-132:3.)

391.    Likewise, OSI investigator Phyllis Christy confirmed that she never received any training or materials about the ACA's religious exemption as part of her employment with the OSI. (Ex. 36 at 106:22-107:8.)

392.    In his deposition, Superintendent Toal admitted that the OSI had no formal or informal policies or procedures or training concerning the ACA religious exemptions. (Ex. 38 at 191:21-192:23.)

393.    Attorney Branch acknowledged that there is a legal exemption from the New Mexico insurance code for labor organizations that "exempts labor organizations that . . . provide services to their members that would, otherwise, be considered insurance from—effectively coverage under the Insurance Code." (Ex. 34 at 126:18-127:10.)

394.    Likewise, Attorney Branch recognized that there is a legal exemption from the New Mexico insurance code for fraternal societies, which "exempts certain fraternal societies from coverage, under the Insurance Code, and thus the jurisdiction of the OSI, even when they're doing activities that would otherwise qualify as the business of insurance." (*Id.* at 128:19-129:5.)

395.    Similarly, during her deposition related to this case, OSI employee and healthcare policy analyst Paige Duhamel confirmed that a labor organization could operate an HCSM plan in New Mexico without being subject to enforcement by the OSI. (Ex. 35 at 145:5-146:13.)

396.    Ms. Duhamel also testified that there were alternatives to standard medical insurance other than just HCSMs, such as fixed indemnity plans and accident and sickness plans, which cause the same concerns about the insurance risk pool as do HCSMs, and whose contract terms equally confuse some of their members—yet, Ms. Duhamel does not know of any instance where the OSI pursued enforcement action against any of these secular alternatives to standard medical insurance. (*Id.* at 38:1-40:1.)

397.    During her deposition testimony, OSI investigator Phyllis Christy noted that, with HCSMs and with secular insurance companies alike, part of the responsibility goes to the consumer to understand what they are signing, because insurance policies also have disclaimers that the consumer is expected to read and abide by as part of the contract terms. (Ex. 36 at 88:15-89:5.)

398.    At her deposition, Attorney Branch also conceded that the OSI had probably never attempted to initiate a dialogue with Trinity prior to the issuance of the cease and desist order against it and that, probably the first thing that Trinity saw from the OSI was the cease and desist order. (Ex. 34 at 95:12-25.)

399.    Likewise, Superintendent Toal stated in his deposition that he has never interacted with any HCSM member or representative, including related to the OSI's actions against HCSMs. (Ex. 37 at 84:5-25, 85:7-11.)

400.    In contrast, in regards to complaints of denials from secular insurance companies, Superintendent Toal testified that he would "take them [the insurance companies] to mediation" or "send them an order to correct their action," and "[m]ore often than not, all it took was usually a

phone call or a letter" to resolve any issues—a negotiation process to which all HCSMs were denied. (*Id.* at 87:12-19; Ex. 34 at 95:12-25.)

401.    At his deposition, Superintendent Toal acknowledged that, while he could call the insurance companies to get them to pay, he never attempted to call an HCSM to get them to pay, and he never directed any OSI staff to call an HCSM to get them to pay. (*Id.* at 107:15-23.)

**G.  OSI's interpretation of insurance conflicts with federal law, making HCSMs' simultaneous compliance with both federal and state regulations impossible and posing obstacles to the accomplishment of federal goals.**

402.    During a hearing related to Gospel Light's federal civil rights claims against the OSI, Gospel Light explained that it cannot legally continue operating as a non-profit organization under federal law while simultaneously complying with the OSI's order that it comply with the requirements of the New Mexico Insurance Code, stating: "Gospel Light operates and is required to operate as a 501(c)(3), which just simply cannot happen if you're in the business of insurance. So the dichotomy that that creates is that if the State of New Mexico is going to insist that healthcare sharing is a business of insurance, then Gospel Light would no longer be able to engage in healthcare sharing across the country with its other members because engaging in the business of insurance automatically takes away your 501(c)(3) status, which is a prerequisite for healthcare sharing under federal law." (Ex. 27 at 61:25-62:12.)

403.    Notably, during this hearing, federal judge Matthew L. Garcia asked the OSI how Gospel Light and its members could engage in their healthcare sharing ministry "if there is a conflict between their obligations under the Affordable Care Act and the state statute," and the OSI attempted to respond but never answered the judge's question or attempted to resolve the conflict of laws issue. (*Id.* at 67:4-68:12.)

404.    At the hearing, Kevin McCarty—former Florida insurance commission and longtime member of the National Association of Insurance Commissioners—provided expert testimony (*id.* at

159:10-167:4) that, for example, an insurance company would not be permitted to have a provision limiting members to Catholics and providing that medical expenses would be shared only in accordance with Catholic doctrine and the Bible, because those restrictions "would run afoul of various state and federal constitutional provisions," as insurance companies are not "permitted to discriminate based upon ethical or religious standard." (*Id.* at 174:21-175:3.) However, HCSMs are not only allowed to discriminate in their membership based upon ethical or religious standards, they are required to do so in accordance with the law in order to meet the exemption of the Affordable Care Act. (*Id.* at 175:8-16.)

405.    During the hearing, Mr. McCarty also testified that the definition of HCSM has always been "unique and distinct from insurance" under federal law. (*Id.* at 175:24-176:7.)

406.    At the hearing, Mr. McCarty provided expert testimony that one of the criteria for HCSMs in the Affordable Care Act is that they have to be 501(c)(3) nonprofits, and no insurer or entity doing business as insurance could be qualified by the IRS as a 501(c)(3), making it impossible for Gospel Light to be an HCSM that also complies with, and is subject to, the New Mexico Insurance Code. (*Id.* at 184:16-185:16.)

407.    Mr. McCarty's expert testimony at the hearing further concluded that, after reviewing Gospel Light's materials, he found no transfer of risk, no health insurance policy, and no promise by Gospel Light to cover its members medical costs." (*Id.* at 188:4-18.) Instead, Gospel Light "act[s] as a conduit to get to facilitate the sharing [of medical expenses] among the members of the group." (*Id.*)

408.    During his deposition, Superintendent Toal admitted that, for him, there was no functional significance or consequence concerning whether or not a purported HCSM met the ACA exemption requirements or whether it did not qualify under the ACA. (Ex. 37 at 153:16-24.)

409.    Superintendent Toal concluded even "legitimate HCSMs were in violation of state law." (Ex. 38 at 222:9-14.)

### H. OSI has no rational basis or compelling state interest in dismantling Gospel Light and other HCSMs in New Mexico.

410.    When asked why he was so focused on enforcement of the insurance code against HCSMs before there was any evidence that HCSMs had harmed New Mexican consumers, Superintendent Toal's only justification was to explain that his "overall focus was on enforcement of state law," regardless of the absence or presence of harms stemming from those alleged legal violations. (Ex. 38 at 224:19-225:4.)

411.    In her deposition testimony related to this litigation, Paige Duhamel—OSI's healthcare policy analyst and insurance policy expert witness—explained that the OSI began pursuing enforcement action against HCSMs "when regulators started having concerns about the impact on their risk pools in their state," because, if too many people opted out of insurance coverage in favor of HCSMs and other alternative forms of medical aid planning, the individual market in New Mexico could become so unaffordable that the ACA program would sink before it could take off. (Ex. 35 at 25:14-25, 30:3-13, 71:10-15.)

412.    Expert Duhamel further explained that the OSI viewed HCSMs as "a significant issue based on the potential market destabilizing effect that some of these healthcare sharing ministries might have on the individual market, which in New Mexico, is fairly small." (*Id.* at 31:18-32:6.) Expert Duhamel continued to outline how, "when you, potentially, have people joining—finding some alternative . . . to what they think is expensive major medical coverage. It undermines the risk pool and makes insurance coverage more expensive. . . . [and] if people can't afford to get health insurance in the first place because the market is destabilized, because you have these other entities siphoning off health risks, that's a problem." (*Id.* at 32:6-19, 38:1-7.)

413.    Expert Duhamel also noted that the OSI's enforcement against HCSMs was motivated by "a trend especially around that time of people looking for alternatives because they couldn't afford their health insurance coverage that was creating this sort of bad feedback loop of lack of affordability

of coverage," which caused "those other entities" to become "a regulatory concern" for the OSI. (*Id.* at 33:8-22.)

414.    Additionally, Expert Duhamel testified that she views HCSMs as causing diminished publicly-sponsored funding for New Mexicans' medical costs, as she believes that these public funds are used to pay HCSM members' medical costs when those costs are not completely shared through the members' HCSMs. (*Id.* at 48:12-24.)

415.    During her deposition concerning this litigation, Plaintiff Smith stated that she felt that OSI's actions against Gospel Light were trying to "force [her and New Mexico Gospel Light members] to go to conventional insurance," probably so that conventional insurance companies will make more money. (Ex. 32 at 18:14-19:7.)

416.    In his deposition, Superintendent Toal admitted that he served as a board member of the New Mexico Health Insurance Exchange while he was superintendent, and he, "of course," had an interest in the success of beWell New Mexico. (Ex. 37 at 45:2-5.)

417.    In his testimony, Superintendent Toal also acknowledged that "the success of beWell New Mexico was dependent on more people participating in the exchange." (*Id.* at 45:6-9.)

418.    Superintendent Toal acknowledged that, as a board member of the New Mexico Health Insurance Exchange, he "had an interest in seeing the numbers of beWell New Mexico participants increase." (*Id.* at 45:10-13.)

## I.    The state has less restrictive means of accomplishing its interest in protecting New Mexicans from malfeasance by HCSMs and fraudulent HCSMs.

419.    During the cease-and-desist hearing, Kevin McCarty—a former Florida insurance commissioner of 12 years and the 2012 president, and longtime member, of the National Association of Insurance Commissioners—testified that, should any HCSM behave unlawfully, every state is able to address these wrongs through state laws concerning "crimes or other civil wrongs," like consumer

protection laws and laws concerning deceptive statements, embezzlement, and the breach of fiduciary duty. (Ex. 19 at 223:13-21.)

420.   During a hearing related to Gospel Light's federal civil rights lawsuit against the OSI, Mr. McCarty provided expert testimony verifying that states like Washington, California, and Vermont replicated the federal definitions of HCSM and insurance, keeping them distinct. (Ex. 27 at 175:24-176:7.)

421.   At the hearing, expert witness Mr. McCarty explained: "[M]any states have created a carve-out [from their insurance codes] for shared ministries, based upon the fundamental principle of classic Christian values of sharing and not participating in insurance products that predates the Affordable Care Act. And so it's fundamental, you know, to their values, their Christian faith, as we heard testimony earlier today from one of the members, that it is essential to her faith to be able to do that." (*Id.* at 177:11-19.) Mr. McCarty clarified that between 33 and 35 states have created these carve-outs for HCSMs within their own state laws. (*Id.* at 178:1-4, 204:10-17.)

422.   Mr. McCarty testified that it would be permissible and consistent with the Affordable Care Act for states to bring Consumer Protection Act claims against HCSMs, emphasizing that, even though HCSMs are not insurance, states can certainly regulate them, and New Mexico could create laws concerning HCSMs if it chose to do so, but it has not. (*Id.* at 194:1-18, 211:16-212:1.)

423.   Mr. McCarty also testified that Colorado, Massachusetts, and Alaska have all implemented HCSM reporting bills requiring HCSMs to report certain information to the states. (*Id.* at 194:13-195:8.)

424.   In his federal expert testimony, Mr. McCarty concluded that the states that have implemented reporting requirements and other restrictions on HCSMs are able to oversee HCSMs within the permissible confines of the Affordable Care Act and through a "much less intrusive" means than simply preventing HCSMs to operate at all within the state. (*Id.* at 195:9-22.)

425.     When questioned by federal Judge Matthew L. Garcia, expert Mr. McCarty confirmed that he is not aware of any state that has prohibited or banned HCSMs from operating. (*Id.* at 198:22-199:6.)

426.     During the deposition of OSI attorney Rebecca Branch, she admitted that, in certain instances, the OSI uses less restrictive means of overseeing entities through its attempts to mediate conflicts rather than pursue enforcement action. (Ex. 34 at 16:8-20, 29:11-23.)

427.     At her deposition, Attorney Branch further testified that "the lower-level stuff, about, say, a particular claim, could usually be worked out" and that she was able to settle a lot of the issues without administrative prosecutions when these issues involved insurance companies. (*Id.* at 38:9-16.)

428.     Additionally, Attorney Branch admitted that, before issuing a cease-and-desist order against the purported HCSM Trinity, she never inquired as to whether there was a less severe option available to her in order to initiate an OSI prosecution. (*Id.* at 93:17-94:17.)

429.     During her deposition testimony, OSI investigator Phyllis Christy provided examples of forms of OSI enforcement that are less severe than the cease-and-desist order against Gospel Light, including simply fining an entity or negotiating with the company. (Ex. 36 at 132:15-22.)

430.     In his deposition Testimony, Superintendent Toal wrongly claimed that the OSI staff "don't really have a choice," and are compelled to issue cease-and-desist orders where there is a clear violation of the State insurance law. (*Id.*; Ex. 37 at 117:10-17.)

431.     When states other than New Mexico have made inquiries into Gospel Light's operations, these states have resolved their concerns through immensely less restrictive means than New Mexico; for example: (1) in 2017, both Florida and Alaska contacted Gospel Light to seek documents concerning its business operations, and after learning details about Gospel Light, concluded their investigations by requiring no further action (Ex. 40 at 8); (2) also in 2017, Maryland

requested extensive discovery from Gospel Light during an investigation, which was resolved through a stipulated consent order requiring Gospel Light to adopt certain operational changes but permitting it to continue to operate as an HCSM in Maryland (*id.* at 9); (3) in 2019, Texas reached out to Gospel Light to request details of its operations, and Texas concluded that no further action was required (*id.* at 9); (4) also in 2019, Ohio requested disclosures from Gospel Light and resolved its investigation through an agreement whereby Gospel Light made certain commitments regarding its operations, and Ohio permitted it to continue to operate as an HCSM in Ohio (*id.* at 9-10); (5) in 2021, Oregon requested information about Gospel Light's operations, making several follow up requests, and refraining from taking any action against Gospel Light (*id.* at 9); and (6) in 2022, Utah reviewed whether Gospel Light was following its consumer protection laws, subpoenaing documents from Gospel Light and closing its investigation after learning that two consumer complaints had been resolved (*id.* at 10).

432.    In stark contrast to the above states' dealings with Gospel Light, the New Mexico OSI persists in its efforts to terminate Gospel Light's operation as an HCSM in New Mexico despite conceding that Gospel Light is a legitimate HCSM under federal law and knowing that it completely resolved its two New Mexico consumer complaints. (*Id.* at 10.)

433.    Moreover, during the pendency of this matter, "no one from the New Mexico OSI has contacted Gospel Light in an attempt to resolve this matter through any means other than Gospel Light registering as an insurer in the State of New Mexico or leaving the state altogether." (*Id.*) "If Gospel Light were to register as an insurer in the State of New Mexico, Gospel Light would lose its tax-exempt status with the Internal Revenue Service and its status as a HCSM under the ACA and in 49 other states, effectively meaning that the only resolution of the matter offered by OSI is for Gospel Light to leave the state of New Mexico and pay a $2,510,000 fine." (*Id.* at 10-11.)

**J. OSI's actions against members of HCSMs, including Plaintiffs, have harmed, and will continue to harm, HCSM members, including by affecting the ways that HCSM members engage in religious expression, associate, define themselves, and carry out their mission.**

434.    During the cease-and-desist hearing, Plaintiff Breanna Renteria testified that "it would be very inconvenient" and "a pretty big problem" for her family to obtain health insurance through the New Mexico exchange, rather than through Gospel Light or another HCSM, because she lives four minutes from the Texas border, so all of her family's doctors are in El Paso, Texas, and these medical expenses are shareable through her Gospel Light membership but would not be covered by insurance plans available to her in New Mexico. (Ex. 19 at 157:16-158:18, 160:12-161:8, 163:5-22.) Mrs. Renteria emphasized these factors again during a federal hearing related to Gospel Light's civil rights lawsuit against the OSI. (Ex. 27 at 87:13-88:6.)

435.    At the cease-and-desist hearing, Mrs. Renteria stated that she decided to become a Gospel Light member, in part, because it works with her family's traveling, as they frequently go out of state, including to Mexico, and have lived in a lot of different places, so it is important to her that Gospel Light facilitates sharing for medical expenses for doctors anywhere in the world. (Ex. 19 at 160:12-161:8.)

436.    During the hearing, Mrs. Renteria affirmed that she does not believe that it would be in her family's best interest or in the best interest of New Mexicans if Gospel Light were not allowed to operate in New Mexico. (*Id*. at 165:17-25.)

437.    During a hearing related to Gospel Light's federal civil rights claims against the OSI, Mrs. Renteria testified that, with Gospel Light—unlike with insurance companies in New Mexico—she "knew that there weren't going to be any issues of [her family] being transferred away from the hospital just because [they] weren't going to be covered" by insurance at that hospital. (Ex. 27 at 87:22-88:6.) This gave Mrs. Renteria peace of mind that she had support in case of an emergency

where her family needed to use a medical provider outside of New Mexico. (*Id.* at 87:22-88:6, 100:2-101:6.)

438.    During the federal hearing, Mrs. Renteria testified that her husband and children had previously been Gospel Light members through a family sharing program, but that her husband and children had moved to a different HCSM because of the uncertainty caused by the OSI's actions against Gospel Light and its members, so Mrs. Renteria had to change to a singles Gospel Light sharing program rather than her previous family-based sharing program. (*Id.* at 93:3-24, 97:6-7.)

439.    At the hearing, when asked to explain how the OSI's order against Gospel Light affected her, Mrs. Renteria explained: "We set aside our own funds in case of an emergency, however, everything is up in the air right now with [Gospel Light] HealthShare," so she is unsure how the order is affecting her and how it will affect Gospel Light members sharing in her family's expenses concerning the recent medical expenses she submitted to Gospel Light. (*Id.* at 109:1-110:2.)

440.    Mrs. Renteria emphasized at the hearing: "I am genuinely wanting [Gospel Light] to continue. It would be extremely helpful for myself, my family, and other members in New Mexico." (*Id.* at 109:6-8.)

441.    During the hearing, Mrs. Renteria noted the big difference for her that exists between the choices of using health insurance compared to an HCSM, declaring: "My options of other health insurance through New Mexico versus a healthshare ministry route, besides being able to financially support things I believe, it makes more financial sense to us. The amount of money that we can contribute towards something we believe versus the amount of money we're paying into something we don't agree with, it's a big difference." (*Id.* at 112:6-15.)

442.    During her deposition for this litigation, Plaintiff Renteria explained that, due to the OSI's enforcement actions against Gospel Light, she felt compelled to move her husband and children to another HCSM and terminate their membership with Gospel Light, but she and her family "would

love to reconnect" through Gospel Light and are being prevented from doing so because of the OSI's actions against Gospel Light. (Ex. 31 at 12:24-13:9.)

443.    In her deposition testimony, Mrs. Renteria testified that the OSI's final order against Gospel Light "interfered with her religious activity" because it took her choice away to remain a member of Gospel Light and deprived her of the Gospel Light community, her global religious connections through Gospel Light, and the Gospel Light prayer network. (*Id.* at 44:16-45:12.)

444.    Mrs. Renteria further stated that, "because everything is in limbo" regarding Gospel Light membership in New Mexico, she feels personally that the OSI's order cuts her off from the Gospel Light community and from the established commitment Gospel Light members made to one another. (*Id.* at 45:20-46:5.)

445.    At her deposition, Mrs. Renteria confirmed that she felt that the OSI's actions against Gospel Light have negatively impacted her ability to "walk out [her] faith within the networks of [Gospel Light] HealthShare, which is much broader than [her] neighborhood." (*Id.* at 47:1-11.)

446.    Additionally, Mrs. Renteria testified that she felt the OSI's actions against Gospel Light members to be "a little bit hostile, because it feels like something is being taken, and that is an invasion, in [her] sense," and because of this, she feels that the OSI has "violated [her] religious beliefs." (*Id.* at 47:20-48:11.)

447.    Mrs. Renteria also testified that she perceives all HCSMs and their members in New Mexico as being attacked by the OSI, because she has become aware of the OSI's actions against other purported HCSMs. (*Id.* at 49:11-22.)

448.    In her declaration related to this matter, Mrs. Renteria affirmed that the OSI's actions against Gospel Light and its members has made her "feel that the OSI—and through them, the State of New Mexico—is attacking [her] faith, and [her] religious beliefs and practices." (Ex. 9 at 1.)

449.    Mrs. Renteria's declaration further explained: "When I was being questioned by the OSI's attorneys at various hearings related to OSI's actions against Gospel Light, I felt that OSI was trying to go after my Church and local community, and they seemed to be belittling the way that Christians try to take care of other people in my community. It seemed like the OSI simply wanted us to take care of each other using the methods that the OSI preferred, rather than the ways that we believe are biblical and the[] ways that connect us to the larger Christian community." (*Id.* at 1-2.)

450.    Mrs. Renteria further declared: "The OSI has mocked and made teasing remarks about my religious practice and fellowship, especially as it relates to my Gospel Light membership, and it has questioned the sincerity of my religious beliefs through the hearings related to this matter and the parallel state actions involving Gospel Light and the OSI." (*Id.* at 2.)

451.    Additionally, Mrs. Renteria declared: "I feel that, through the OSI's questioning, the OSI was trying to portray me as being fraudulent in my religious beliefs, just like they portray Gospel Light as fraudulent. . . . It feel[s] that they were trying to make it seem like I was not truly religious, and so that meant that I should not be entitled to the religious freedoms associated with my membership with Gospel Light." (*Id.* at 2.)

452.    Mrs. Renteria also declared: "Because of the OSI's actions against Gospel Light members, I have been compelled to testify and to bring this lawsuit so that I can fight to continue my religious fellowship through Gospel Light." (*Id.* at 2.)

453.    Mrs. Renteria emphasized the fear that the OSI's actions have caused her, stating: "Because the OSI outlawed Gospel Light in New Mexico, I am fearful of the risk of backlash against me from the OSI. Because of my role in this lawsuit and others, I feel concerned that I may be subject to hostilities or adverse action perpetuated by the OSI. . . . I've contemplated the ways that the OSI could try to hurt me and my family, and I don't know what they could do and what powers they might

have, so that is a concern. I worry about what it might mean for me and my entire family, because my husband and kids depend on me." (*Id.* at 2.)

454.    In her declaration, Mrs. Renteria further explained: "Because of the OSI's actions, I have lost the peace of mind that I once had through my Gospel Light membership, because things are all so uncertain and combative now regarding Gospel Light's status in New Mexico. . . . Because of the OSI's final order against Gospel Light, I became nervous about Gospel Light's future in New Mexico, so I refrained from re-enrolling my husband and children in their Gospel Light membership, and I moved them to another healthcare sharing ministry. Since that time, I've wanted my entire family to be back as members of Gospel Light." (*Id.* at 2-3.)

455.    Mrs. Renteria also declared: "Because I was concerned about Gospel Light's status in New Mexico, my family was compelled to begin membership with a different healthcare sharing ministry that was not as personable as Gospel Light, and my family did not feel as connected to that community as they did with Gospel Light. . . . Due to our family's changes in healthcare sharing ministry membership, me and my family endured a lot of stress, and sacrificed a lot of time, in the transition to membership with the other healthcare sharing ministry. During this transition, my family all felt like our life was on hold. We would not have had to endure any of this if the OSI had not issued its final order against Gospel Light." (*Id.* at 3.)

456.    Finally, Mrs. Renteria declared: "Because of the OSI's actions, I feel like New Mexico has intruded on my liberties to such a large extent that me and my family are seriously contemplating moving out of state." (*Id.* at 3.)

457.    During the cease-and-desist hearing, Plaintiff Laura Smith testified that she believes that it is "in the best interest of New Mexicans for [Gospel Light] Healthshare to be able to continue in New Mexico," emphasizing that she values it a lot and would be very upset if it was taken from her family. (Ex. 19 at 147:19-25.)

458.    While being deposed for this litigation, Plaintiff Smith testified that she felt that the OSI was interfering with her religious beliefs by trying to take away her choice to use whatever she wants for support with her medical expenses, and she likes that Gospel Light is a religious institution that will "just stick to what the Bible says" and "won't be investing in things that [Gospel Light members] don't believe in . . . like paying for transgender operations."  (Ex. 32 at 19:8-20:1.)

459.    At the deposition, Mrs. Smith explained that she believes health insurance through the normal commercial market pays for medical procedures that go against her religious beliefs and "we just don't know what they're investing in," which she finds religiously problematic. (*Id.* at 19:10-20:8.)

460.    Mrs. Smith further explained that she feels that she is "being treated differently by the Office of the Superintendent because of [her] membership in Gospel Light" because the OSI is trying to take Gospel Light away from its New Mexico members, to which Mrs. Smith commented: "I don't think it's right." (*Id.* at 20:19-25.)

461.    Additionally, Mrs. Smith testified that she feels the OSI's decisions violated her religious beliefs, stating: "I think we should be able to use whatever healthshare or insurance we choose and I don't think they [OSI] should be able to tell us who we can and can't use." (*Id.* at 21:17-22.)

462.    Mrs. Smith also testified that the OSI's actions exhibit hostility toward Gospel Light members, because they appear to be attempting to "make a law that we can't be a part of [Gospel Light]." (*Id.* at 22:3-8.) Mrs. Smith feels threatened by OSI's actions against Gospel Light because she anticipates that "a lot of times we don't even know what's in the works until it's done, and then it's too late to reverse it." (*Id.* at 22:3-18.)

463.    In her deposition, Mrs. Smith confirmed that she believes the OSI's actions "amount to a public campaign against Gospel Light and other healthcare sharing ministries," because they are

trying to restrict her community by "[n]ot letting [them] be members of [Gospel Light] in this state." (*Id.* at 22:19-23:4.)

464.    Based on the OSI's actions, Mrs. Smith testified that she feels that the OSI does not "want us to be affiliated with any of the Christian ministries" in New Mexico. (*Id.* at 23:2-9.)

465.    As part of this litigation, Mrs. Smith submitted a declaration, stating that the OSI "has been attacking my healthcare sharing ministry, [Gospel Light], which has made me feel like the OSI and State of New Mexico are attacking my religion and my faith." (Ex. 10 at 1.)

466.    In her declaration, Mrs. Smith further explained: "After the OSI issued its final order against Gospel Light, I was troubled by the thought that I might lose my Gospel Light membership. When we started Gospel Light, my husband had just been laid off, and Gospel Light provided the support we needed for our medical healthcare sharing. . . . I hate the thought of possibly having to purchase insurance, because I'm so comfortable with Gospel Light, and I would hate to lose that." (*Id.* at 1-2.)

467.    Notably, Mrs. Smith declared: "Because of the OSI's enforcement action, I feel like New Mexico has intruded on my religious liberties and is trying to tell me how I can and cannot worship, which I find offensive and harassing." (*Id.* at 2.)

468.    During the cease-and-desist hearing, Valentine E. Miller, one of Gospel Light's members since 1995, testified that, for members of his church who are against insurance altogether, and/or for those who are not comfortable paying an insurance company that pays for abortions, there is no other option for medical expense support except HCSMs. (Ex. 19 at 195:10-196:7.)

469.    At the hearing, Mr. Miller testified that, for certain members of his church who are over 65 and may opt into Medicare, it is very important to them that they retain their membership with Gospel Light so that they can continue their religious practice of helping bear the burdens of other members' medical expenses. (*Id.* at 189:21-24, 190:5-16, 194:14-195:4.)

470.    During a hearing related to Gospel Light's federal civil rights claims against the OSI, Gospel Light explained how its members were injured by the OSI's final order against Gospel Light, stating: "There is a real injury in that the Office of the Superintendent of Insurance has made a decision that the only way one can share their healthcare burdens is by engaging and purchasing healthcare insurance. And that is not what these individuals would like to do. It's not merely an objection to the type of coverage, they're sincerely-held religious beliefs that they only want to cover certain types of services and only want to engage in sharing with those individuals that share the same belief systems that they do. So the actual practice itself is the sharing, right? And the sharing practice comes out of their sincerely-held religious beliefs to carry each other's burdens and from that they are now being prevented from doing that absent purchasing health insurance." (Ex. 27 at 50:5-22.)

471.    At the hearing, Wendy Kuhl, Gospel Light's project manager (*id.* 139:22-140:2), explained that Gospel Light's New Mexico membership has been affected by the OSI's actions against Gospel Light because it caused Gospel Light to lose some of its members, which causes Gospel Light members "financial distress," as Gospel Light's members are their "lifeline" (*id.* at 140:19-23, 156:8-11).

472.    During the hearing, Ms. Kuhl further testified that the OSI's order against Gospel Light affects Gospel Light's members nationwide, because Gospel Light will struggle to facilitate sharing into the balance of members' medical expense contribution requests while simultaneously not receiving any more sharing contributions from New Mexico members. (*Id.* at 156:19-157:12.)

473.    As part of the hearing, Ms. Kuhl submitted an affidavit explaining how Gospel Light would lose 490 New Mexico members if the OSI's final order goes into effect, and New Mexico members would be deprived of the opportunity to have their approximately 1,433 outstanding requests for sharing approved and to receive a potential sharing value of $1,482,352. (Ex. 28 at 2-3.)

474.    In Ms. Kuhl's affidavit, she further outlined how Gospel Light would be unlikely to regain the 490 members forced by the OSI to lose their Gospel Light membership "because they are likely to find other health care sharing options," and it would minimally take years for Gospel Light to regain the 490 members lost due to the OSI's final order. (*Id.*)

475.    In her affidavit, Ms. Kuhl further testified that, since the OSI issued its final order against Gospel Light, Gospel Light had, by the time of filing her affidavit, "lost dozens of members who were nervous about the uncertainty about whether they will be able to continue as part of [Gospel Light's] ministry." (*Id.* at 3.) According to Ms. Kuhl's experience: "The longer this uncertainty remains, the more members that [Gospel Light] HealthShare will lose, and the more difficult it will be for its members to share one another's health care costs." (*Id.*)

476.    OSI staff acknowledge that the OSI's actions against purported HCSMs are injuring their members in New Mexico, as the OSI's enforcement actions prevent these New Mexicans from continuing their membership with the purported HCSMs while simultaneously rendering these individuals ineligible for open enrollment with an insurance company—thereby eliminating any protection for these New Mexicans concerning their medical costs, as they transition from being HCSM members to having no support for their medical expenses due to the OSI's actions against purported HCSMs. (Ex. 30 at 15.)

477.    When confronted in a deposition about this harm to HCSM members, caused by the OSI enforcement against HCSMs, Superintendent Toal acknowledged that he does not know how this issue was resolved or whether these individuals were able to enroll in medical insurance coverage. (Ex. 38 at 233:21-234:12.)

478.    In his deposition, Superintendent Toal admitted that, if these former HCSM members were prevented from obtaining medical insurance at the time that their HCSM agreed to stop operating in New Mexico, he would have a problem with that resolution. (*Id.* at 236:4-7.)

479.    During his deposition testimony, Superintendent Toal acknowledged that, in order to comply with New Mexico's insurance code, in accordance with the OSI's final order and to be permitted to continue operating in New Mexico, Gospel Light members would have to cover birth control, which violates Plaintiff Smith's and other members' religious beliefs. (Ex. 19 at 148:14-22; Ex. 37 at 82:14-25.)

480.    Superintendent Catechis agreed with Superintendent Toal that, if Gospel Light became licensed as an insurance company, it would be required to cover contraception. (Ex. 39 at 242:2-23.)

481.    In her deposition, Superintendent Catechis also acknowledged that, if Gospel Light became insurance, it would be required to open its membership to those who do not share their members' religious beliefs. (*Id.* at 243:5-13.) Alarmingly, Superintendent Catechis found nothing problematic about this religious restriction, reasoning: "And I would think that they would want more people to share things with them. Otherwise, if they only wanted people of their religious beliefs, and if this was a generous 'out of the goodness of my heart' donation campaign, that it would be that. . . [But t]his isn't about a volunteer donation 'goodness of your heart' kind of organization, as—as I see it." (*Id.* at 242:15-244:1.)

482.    Through these statements, Superintendent Catechis disregards all of Gospel Light's religious practices and sincerely held religious beliefs, attempts to impose her own morals and ideal religious practices onto Gospel Light members, and indicates that she judges Gospel Light members as not being sincere in their religious and charitable pursuits because these pursuits may differ from the superintendent's ideas of what they should be. (*Id.*)

483.    Superintendent Toal also testified that, in regard to the purported HCSMs against which the OSI pursued enforcement action, the OSI effectively took the option of being an HCSM member away from the New Mexico public and resulted in members of certain HCSMs being prevented from continuing their HCSM memberships. (Ex. 38 at 303:15-304:3.)

484.    Finally, the OSI's actions against Gospel Light and its members harm Plaintiffs by preventing them from exercising their sincerely held religious beliefs in all of the specific ways outlined in Section B of the Statement of Facts, *supra*, and deprives Plaintiffs of the benefits of associating with Gospel Light and its membership community, as also outlined in Section B within the Statement of Facts. (Ex. 9 at 3; Ex. 10 at 2.)

## LEGAL STANDARD

"Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to secure the just, speedy and inexpensive determination of every action." *U.S. v. Walker*, No. 97-CV-00641, 1998 WL 36030934, at *1 (D.N.M. Jan. 7, 1998) (internal cite omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question." *Dentsply Sirona Inc. v. Edge Endo, LLC*, No. 17-CV-01041, 2020 WL 3429473, at *1 (D.N.M. June 23, 2020) (internal quote omitted). "The burden then shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Id.* (internal cites and quotes omitted).

"A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "It is not enough for the party opposing a properly supported motion for summary judgment to rest on mere allegations or denials of his pleadings." *Warner Bros. Ent. Inc. v. Loyd*, No. 20-CV-00062, 2023 WL 5727468, at *56 (D.N.M. Sept. 5, 2023) (Browning, J.) (internal cites and quotes omitted) (granting plaintiffs' summary judgment motion). "A party cannot avoid summary judgment by repeating

conclusory opinions, allegations unsupported by specific facts, or speculation." *Id.* "In responding to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Id.* "If the issue is one of which the movant does not bear the burden of proof, and an adequate time for discovery has passed, summary judgment is warranted if the non-movant does not make a showing sufficient to establish the existence of each element essential to its cause of action." *Dentsply*, 2020 WL 3429473, at *1 (D.N.M. June 23, 2020) (internal cites and quotes omitted).

"To deny a motion for summary judgment, genuine factual issues must exist that can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Warner Bros.*, 2023 WL 5727468, at *56 (internal cite and quotes omitted). "A mere 'scintilla' of evidence will not avoid summary judgment." *Id.* (internal cites omitted). "Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party." *Id.* "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (internal cites and quotes omitted). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.*

While "the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party," there are "limited circumstances in which the court may disregard a party's version of the facts." *Id.* at 57. Notably, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Id.* (internal cite and quotes omitted). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

When ruling on a plaintiff's summary judgment motion, the "Court must first determine whether there are any genuine issues of material fact, and, to do so, the Court will examine the factual record." *Herrera v. City of Albuquerque*, 673 F. Supp. 2d 1307, 1311 (D.N.M. 2008), *aff'd*, 589 F.3d 1064 (10th Cir. 2009). The "Court must next determine whether [p]laintiff is entitled to judgment as a matter of law" by "determin[ing] whether the undisputed facts and circumstances . . . are sufficient" to establish the plaintiff's claims. *Id.* at 1312-13.

Notably, summary judgment motions implicating First Amendment issues merit special attention. "When [First Amendment] rights are burdened or, in this case, wholly extinguished by an action of government, this Court has an obligation to scrutinize the facts and the law closely, carefully, and objectively to ensure that, whatever the end result, it is just." *Doe v. City of Albuquerque*, No. 09-CV-01041, 2010 WL 11505938, at *18 (D.N.M. Mar. 31, 2010) (granting plaintiff's motion for summary judgment and holding that Albuquerque's administrative instruction banning certain civilians' access to public spaces violated plaintiff's First Amendment rights); *see also Jotunbane v. Sedillo*, No. 06-CV-00809, 2008 WL 11450465, at *6 (D.N.M. Nov. 6, 2008), *report and recommendation adopted*, No. 06-CV-00809, 2009 WL 10708113 (D.N.M. Mar. 4, 2009) (granting plaintiff's summary judgment motion, holding that New Mexico state actors violated plaintiff's religious liberties, and finding that "a blanket denial of [p]laintiff's religious requests was not the least restrictive means of furthering [compelling governmental] interests"); *Rue v. City of Albuquerque*, No. 01-CV-01036, 2002 WL 35649612, at *2 (D.N.M. Oct. 11, 2002) (granting plaintiff's summary judgment motion, holding that Albuquerque's city charter violated the First Amendment, and issuing

a permanent injunction enjoining Albuquerque from enforcing unconstitutional provisions in the charter); *Westbrook v. Teton Cnty. Sch. Dist. No. 1*, 918 F. Supp. 1475, 1482, 1497-98 (D. Wyo. 1996) (granting partial summary judgment to plaintiff on her First Amendment claim, noting the "exacting test" regarding free speech infringements, emphasizing that "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," and finding that the government policy was "unconstitutional on its face" (internal cites and quotes omitted)).

Consequently, when reviewing a summary judgment order that "implicates First Amendment concerns, [the Circuit Court has] an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Homans v. City of Albuquerque*, 366 F.3d 900, 904, 914 (10th Cir. 2004) (internal cite and quotes omitted) (affirming two plaintiffs' summary judgment motions and holding that Albuquerque "failed to justify" its infringements on First Amendment freedom of speech).

## ARGUMENT

As an initial matter, Defendants acted under color of state law when violating Plaintiffs' constitutional rights. "The provisions of § 1983 only apply to persons who both deprive others of a right secured by the Constitution or laws of the United States and act under color of a state statute, ordinance, regulation, custom or usage." *Janny v. Gamez*, 8 F.4th 883, 918 (10th Cir. 2021) (internal cite and quotes omitted). As such, "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State," which requires both that (1) "the deprivation [] be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and (2) "the party charged with the deprivation [] be a person who may fairly be said to be a state actor . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Both

elements of the "fair attribution" test—a state policy and a state actor—are present here. *See Janny*, 8 F.4th at 918 (internal cite and quotes omitted).

**First,** Plaintiffs were deprived of their constitutional rights by the exercise of a privilege created by the State and by a rule of conduct imposed by the state. *See id.* at 918-19. The State of New Mexico granted Defendants the privilege of regulating "insurance companies and others engaged in risk assumption" by creating the "office of 'superintendent of insurance' . . . as of July 1, 2023." N.M. Const. art. XI, § 20(A). The State codified these privileges in N.M. Stat. Ann. § 59A-2-1 by declaring the OSI to be "an adjunct agency pursuant to Section 9-1-6 NMSA 1978" and providing that "[a]ll powers relating to state supervision of insurance, insurance rates and rate practices, together with collection of insurance licenses, taxes or fees, and all records pertaining to such supervision are under control of the office of superintendent of insurance." Defendants invoked these privileges to pursue their campaign against HCSMs and their enforcement actions against Gospel Light and its members, including Plaintiffs. For example, the December 3, 2019 press release, warning consumers against HCSMs, was published by Superintendent Franchini in his official capacity as the New Mexico Superintendent of Insurance, and it was issued on official OSI letterhead. *See* Ex. 11. Likewise, the March 26, 2020 press release, warning consumers against HCSMs, was published by Superintendent Toal in his official capacity as the New Mexico Superintendent of Insurance, and it was issued on official OSI letterhead. *See* Ex. 12. Similarly, the Consumer Advisory March Insurance Tip of the Month was published on OSI letterhead by Superintendent Russell Toal and Deputy Superintendent Jennifer A. Catechis in their capacities as agents of the State of New Mexico. *See* Ex. 13. Moreover, the OSI agents' emails, through which the OSI pursued a biased campaign against HCSMs, were sent through the OSI's email server and using the OSI's domain name as official actions of the OSI. *See* Ex. 30.

Defendants' enforcement actions targeting Gospel Light were also completed through these same privileges granted to Defendants by the State. Notably, during the OSI's cease-and-desist hearing against Gospel Light, the OSI stipulated that the cease-and-desist order against Gospel Light was "issued by the New Mexico Superintendent of Insurance." *See* Ex. 22 at 1-2. In addition, OSI Hearing Officer R. Alfred Walker's Recommended Decision and Order against Gospel Light was filed within the New Mexico Office of Superintendent of Insurance, and he signed the recommendation in his official capacity as the OSI hearing officer for the matter. *See* Ex. 23 at 1, 99. The OSI's Final Order against Gospel Light was signed by Interim Superintendent of Insurance Jennifer A. Catechis in her official capacity as the OSI Superintendent, and it was also filed within the New Mexico Office of Superintendent of Insurance. *See* Ex. 26. Through their official nature, each of these actions against Gospel Light and its members constitutes "a rule of conduct imposed by the state." *See Janny*, 8 F.4th at 918-19. Defendants were only able to advance their campaign against HCSMs and Gospel Light members through the authority granted to them by the State of New Mexico.

**Second,** Defendants are state actors, as each is "a party whose official character is such as to lend the weight of the State to his decisions," and Defendants' conduct is chargeable to the State. *See Janny*, 8 F.4th at 918-19. It is beyond dispute that Defendants were acting through their authority granted by the State, as OSI agents invoked their status as OSI representatives to pursue Defendants' biased campaign against HCSMs and unlawful enforcement actions against Gospel Light. *See* Ex. 11-13; Ex. 22 at 1-2; Ex. 23; Ex. 26; Ex. 30. Importantly, "misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken under color of state law." *Lugar*, 457 U.S. at 929 (further affirming that "the actions of a state officer who exceeds the limits of his authority constitute state action" in regard to actions brought under 42 U.S.C. § 1983) (internal cites and quotes omitted). Accordingly, Defendants violated Plaintiffs' constitutional rights by acting under color of state law to adversely target Plaintiffs' HCSM

membership, particularly in regard to Gospel Light, and Plaintiffs are therefore entitled to seek relief under 42 U.S.C. § 1983.

## I.    DEFENDANTS VIOLATED PLAINTIFFS' RELIGIOUS LIBERTY RIGHTS UNDER THE BOTH THE FREE EXERCISE AND ESTABLISHMENT CLAUSES OF THE UNITED STATES CONSTITUTION.

Plaintiffs are entitled to summary judgment on Claims 1 through 3 of their Complaint, as there is no genuine dispute that Defendants violated Plaintiffs' constitutional rights under both the Free Exercise and Establishment Clauses through Defendants' non-neutral treatment (Claim 1) and non-generally applicable treatment (Claim 2) in violation of the Free Exercise Clause, and through their discrimination against and among religions in violation of the Establishment Clause (Claim 3). *See* Complaint at 46-53.

### A.    Legal background.

#### 1.    The (Mostly Recent) Case Law

The Free Exercise Clause has been on an absolute tear under the current Supreme Court, with a win rate for religious claimants that was already higher under the Roberts Court (83% since 2005) than ever before ("the religious side prevailed about half the time" under the Warren, Burger, and Rehnquist Courts) accelerating into a 15-for-16 record since 2012 (with the loss being the Muslim travel-ban case).[3] Marcia Coyle, *The Justices' Faith and Their Religion Clause Decisions*, Nat'l Const. Ctr. (July 15, 2022), https://constitutioncenter.org/blog/the-justices-faith-and-their-religion-

---

[3] There has since been a non-precedential 4-4 split (based on the recusal of Justice Barrett) on the question whether to reverse the Oklahoma Supreme Court's ruling that the Establishment Clause *prohibits* religious charter schools and instead rule that the Free Exercise Clause *mandates* them.  *See Okla. Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. ___, 2025 WL 1459364 (May 22, 2025). While it may not be for this Court to prognosticate about what the Supreme Court will do once its full complement of justices hears this issue — the nearly universal view among commentators is that the charter schools' loss will be short-lived— the oral argument in *Drummond* is instructive in getting a flavor of the type and level of scrutiny that the Supreme Court wants the judiciary to apply to failures to accommodate religious entities. *See Drummond*, Oral Argument Audio,  https://www.supremecourt.gov/oral_arguments/audio/2024/24-394 (last visited May 29, 2025). There have also been a few more religious-liberty wins, including *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 2025 WL 1583299 (U.S. June 5, 2025).

clause-decisions (last visited May 28, 2025) ("The top five most pro-religion justices since at least World War II are Chief Justice John Roberts Jr. and Justices Clarence Thomas, Samuel Alito Jr., Brett Kavanaugh and Neil Gorsuch." (citing Lee Epstein & Eric A. Posner, *The Roberts Court and the Transformation of Constitutional Protections for Religion: A Statistical Portrait*, 2021 Sup. Ct. Rev. 315 (2021))); Adam Liptak, *Will Religion's Remarkable Winning Streak at the Supreme Court Continue?*, N.Y. Times (Mar. 30, 2025), https://www.nytimes.com/2025/03/30/us/politics/supreme-court-religion.html (last visited May 28, 2025). The treatises and even the law reviews have not fully kept up, and so the summary below is tilted heavily in favor of the most recent decisions.

Since *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) ("*Smith*"), swapped out the Supreme Court's previous "compelling interest" analysis with a rule that neutral and generally applicable laws need only be supported by rational basis, the Free Exercise Clause has expanded in a couple different dimensions. "The[] bundles of circumstances that continue [after *Smith*] to receive searching scrutiny include the following: (1) where the challenged law includes secularly driven but not religiously driven exemptions; (2) where the challenged law includes an 'individualized' exemption that government applies in a manner so as to disadvantage religion; (3) where the challenged law targets a particular religious practice; and (4) where the challenged law—though by its terms generally applicable and facially neutral—gets applied by government in a manner discriminatory toward religion." Peter K. Rofes, *The Religion Guarantees* 163 (2005).

Taking the last of these first, the Supreme Court has, even in its appellate, non-factfinding capacity, undertaken searching and rigorous review of statements and other indicia of animus on the part of officials who promulgated or administered the law or policy in question. The seminal case on this front is *Lukumi*, in which the Hialeah, Florida city council passed an ordinance forbidding the killing of "animal[s] in a public or private ritual or ceremony not for the primary purpose of food

consumption," after holding a meeting at which countless disparaging statements were made about the impending opening of a Santeria religious facility in the city. 508 U.S. at 527. Although the Court was unanimous in striking down the ordinance, the justices were split on whether the statements themselves—which included expressions of outright hostility, like that the religion was "in violation of everything this country stands for," that in Cuba "people were put in jail for practicing this religion," and that "this community will not tolerate religious practices abhorrent to its citizens"— rendered the ordinances unconstitutional, with all justices agreeing that the multiple explicit ("not for the primary purpose of food") and implicit (exempting all non-"ceremony[ial]" killings) secular exceptions to the ban were sufficient to warrant its invalidation. *Id.* at 541-42.

In the ensuing years, it became clear that animus was a sufficient but not necessary condition for rendering a law non-neutral, *see*, *e.g.*, *Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1145 (10th Cir. 2006) ("Proof of hostility or discriminatory motivation may be sufficient to prove that a challenged governmental action is not neutral, but the Free Exercise Clause is not confined to actions based on animus." (citations omitted)), and that such evidence is particularly relevant when assessing the motives of executive or adjudicatory officials charged with applying the law, versus those who passed the law in the first place, *see Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018) ("Members of the Court have disagreed on the question whether statements made by lawmakers may properly be taken into account in determining whether a law intentionally discriminates on the basis of religion. In this case, however, the remarks were made in a very different context — by an adjudicatory body deciding a particular case."). In *Masterpiece Cakeshop*, the Court found anti-religious animus based on statements evincing far less targeted hostility than those in *Lukumi*, in the context of a baker who refused to create a wedding cake (apparently any cake,

including potentially one with no specifically same-sex-marriage features)[4] for use at a same-sex wedding, in violation of Colorado's nondiscrimination laws:

> [H]ostility [to religion] surfaced at the Commission's formal, public hearings . . . . [C]ommissioners endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain, implying that religious beliefs and persons are less than fully welcome in Colorado's business community.  One commissioner suggested that Phillips can believe "what he wants to believe," but cannot act on his religious beliefs "if he decides to do business in the state."  A few moments later, the commissioner restated the same position: "[I]f a businessman wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, he needs to look at being able to compromise." . . . . [Another commissioner said:]

>> "I would also like to reiterate what we said in the hearing or the last meeting.  Freedom of religion and religion has been used to justify all kinds of discrimination throughout history, whether it be slavery, whether it be the holocaust, whether it be— I mean, we— we can list hundreds of situations where freedom of religion has been used to justify discrimination.  And to me it is one of the most despicable pieces of rhetoric that people can use to—to use their religion to hurt others."

> To describe a man's faith as "one of the most despicable pieces of rhetoric that people can use" is to disparage his religion in at least two distinct ways: by describing it as despicable, and also by characterizing it as merely rhetorical—something insubstantial and even insincere.

584 U.S. at 634-35. "Views of th[e] sort [expressed by the Colorado Commission] are very widespread, and some commentators have publicly defended the[m]," Douglas Laycock, *The Broader Implications of* Masterpiece Cakeshop, 2019 B.Y.U. L. Rev. 167, 183 (2019) (footnote omitted), but

---

[4] At least this is how the Supreme Court treated the case.  Factual uncertainty on this front—the baker had "offered to make other baked goods for the couple, including cakes celebrating other occasions," and the prospective cake-buyers walked out without discussing the details of the wedding cake they wanted—seems to have prevented the Court from making what was widely expected to be a free-speech holding. *See Masterpiece Cakeshop*, 584 U.S. at 624 ("If a baker refused to design a special cake with words or images celebrating the marriage—for instance, a cake showing words with religious meaning—that might be different from a refusal to sell any cake at all. In defining whether a baker's creation can be protected, these details might make a difference.").

the Court nonetheless found them unacceptable, despite the fact that the baker had "not mention[ed] them at any point in the litigation below," Leslie Kendrick & Micah Schwartzman, *The Etiquette of Animus*, 132 Harv. L. Rev. 133, 139 n.38 (2018) (citations omitted). This has led some commentators to conclude that the courts now apply "a kind of 'strict scrutiny' of the foundational question of whether or not the law in question was in fact a neutral law of general applicability motivated by secular considerations." Howard Gillman & Erwin Chemerinsky, *The Religion Clauses: The Case for Separating Church and State* 123 (Oxford Univ. 2020).

In addition to policing animus, the courts have become increasingly militant about laws containing secular exemptions without corresponding religious exemptions. "When government creates exemptions from the constraints of statutory schemes for secular reasons, it generally cannot refuse to carve out an analogous exemption for those burdened by the scheme on account of religion." Rofes, *supra* at 165. Today, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise. It is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis in original) (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) (per curiam)). *Tandon* "resolved a decades-long debate about the Free Exercise Clause of the First Amendment," and represented the formal adoption of what is commonly called in the scholarly literature (by both its proponents and detractors) the "most-favored-nation" model of Free Exercise. William T. Sharon, *Religious and Secular Comparators*, 30 G.M. L. Rev. 763, 764 (2023).

Secular and religious exemptions are "analogous" when they cover "comparable" activity, and comparability is judged exclusively in relation to the asserted government interest—*i.e.*, the aspects (such as health or safety risks, damage to property, etc.) of the activity that prompted the government

to ban the activity as a general matter—without any consideration whatsoever for the countervailing value, or even necessity, of the activities being compared, as doing so would require a court to weigh the 'value' of, or justification for, religious activity against that of secular activity. *See Tandon*, 593 U.S. at 62 ("[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue. Comparability is concerned with the risks various activities pose, not the reasons why people gather."). The only other similarity required between the excepted secular activity and the non-excepted religious activity is the threshold requirement that both be *prima facie* proscribed by the statute—this is normally an easy inquiry, but it can become complex in the (admittedly common) context of anti-discrimination laws, where the level of generality at which a given religiously based act or course of discriminatory conduct is defined may have an effect on the conceptualization of its secular analogue. *See Masterpiece Cakeshop*, 584 U.S. at 650-53 (Gorsuch, J., joined by Alito, J., concurring) ("Neither the Commission nor this Court may apply a more specific level of generality in Mr. Jack's case (a cake that conveys a message regarding same-sex marriage) while applying a higher level of generality in Mr. Phillips's case (a cake that conveys no message regarding same-sex marriage). . . . There is another problem with sliding up the generality scale: It risks denying constitutional protection to religious beliefs that draw distinctions more specific than the government's preferred level of description.").[5] And importantly, *Tandon* established that it is the government—who has always borne the burden of proof once the strict-scrutiny phase is reached[6]—that bears the burden of proving

---

[5] Justice Gorsuch's discussion related to another aspect of the Colorado Commission's conduct aside from the discriminatory statements discussed above: the disparity in treatment between the complaints made against the religious baker by the same-sex-couple cake-buyers in *Masterpiece Cakeshop* itself, and other complaints made by a religious cake-*buyer* against secular bakers who refused to make cakes displaying (putatively) anti-gay Bible verses.

[6] *Catholic Charities Bureau, Inc. v. Wisc. Labor & Indus. Rev. Comm'n*, 2025 WL 1583299 (U.S. June 5, 2025) ("The government bears the burden to show that the relevant law, or application thereof, is "closely fitted to further a compelling governmental interest." (citation and internal quotation marks omitted)).

incomparability. *See* Sharon, *supra* at 804-05 ("The Ninth Circuit had held that the religious claimants bore the 'burden of showing that the regulation *trigger*[*ed*] strict scrutiny by regulating religious activities more strictly than comparable secular activities,'" but the "Supreme Court . . . place[d] the burden on the government, criticizing the Ninth Circuit for failing to 'requir[e] *the State* to explain why it could not safely permit at-home worshipers to gather in larger numbers while using precautions used in secular activities.'" (alterations and emphases in original) (quoting *Tanden*, 992 F.3d 916, 927 (9th Cir. 2021); *Tanden*, 593 U.S. at 64)).

Perhaps the high-water mark to date of the Court's religious-exception case law came in *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), where a unanimous Court made clear that "*any* amount of discretion regarding *any* potential exemption for *any* category of persons renders *any* law without religious exemptions presumptively unconstitutional." Zalman Rothschild, *Individualized Exemptions, Vaccine Mandates, and the New Free Exercise Clause*, 131 Yale L.J. F. 1106, 1130 (2022) (emphases in original). In that case, Philadelphia had refused to renew Catholic Social Services' foster-home contract on the ground that it "would not certify same-sex couples to be foster parents due to its religious beliefs about marriage," which violated the non-discrimination clause of the city's standard foster-care contract. 593 U.S. at 527. The clause allowed for "an exception [to be] granted by the Commissioner or the Commissioner's designee, in his/her sole discretion," however, which the Court considered to be a secular exception requiring an analogous religious counterpart—and, because the secular exception was fully individualized and discretionary, any religious exception would have to either **(a)** cover any and all sincere religious objections (which would render the law generally applicable), or **(b)** cover only a subset of sincere religious objections, whether defined

categorically or on an *ad hoc*/discretionary basis,[7] and then pass strict scrutiny on a case-by-case basis. *Id.* at 535.

The city objected that the reference to an exception in the contractual text was "irrelevant because the Commissioner ha[d] never granted one" to any entity, ever, *id.* at 537, but that its understanding of the contract—which had a separate provision with an independent anti-discrimination clause that on its face admitted of no exceptions—was that in fact no such exception existed at all, *see id.* In a somewhat counterintuitive move to those familiar both with federal-court deference to state interpretation of state law and with constitutional-avoidance principles—the Supreme Court effectively overruled the city's interpretation of its own contract to read *in* the disputed exception, which the Court then found unconstitutional. *See id.* ("[Pennsylvania] state law makes clear that 'one part of a contract cannot be so interpreted as to annul another part,'" meaning that "an exception from section 3.21 also must govern the prohibition in section 15.1, lest the City's reservation of the authority to grant such an exception be a nullity." (citations omitted)).

At the time, *Fulton* was viewed by many, including several concurring justices, as anti-climatic, as the case was expected to generate a reexamination (read: overruling)[8] of *Smith*. But the

---

[7] This includes exceptions based on open-ended standards like "good cause." *Fulton* relied heavily upon the pre-*Smith* case of *Sherbert v. Verner*, 374 U.S. 398 (1963)—and, in doing so, revitalized it, as its implicit overruling by *Smith* had been widely assumed—which had found a state unemployment provision granting benefits to anyone unemployed "for good cause" to be non-generally applicable. (The *Sherbert* test had been previously used in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), but *Burwell* was a Religious Freedom Restoration Act of 1993 ("RFRA") case, not a First Amendment case, and the whole point of RFRA was to statutorily overrule *Smith* (which ended up being effective only as to federal law, *see City of Boerne v. Flores*, 521 U.S. 507 (1997)).) Courts have subsequently confirmed that good-cause exceptions are indistinguishable from "sole discretion" exceptions under the post-*Fulton* Free Exercise analysis. *See, e.g.*, *Foothill Church v. Watanabe*, 623 F. Supp. 3d 1079, 1093 (E.D. Cal. 2022).

[8] Three justices concurred and said expressly that *Smith* should be overruled and that they would have done so in *Fulton*, *see* 593 U.S. at 544 (Alito, J., joined by Thomas & Gorsuch, JJ., concurring), and two others acknowledged "serious arguments that *Smith* ought to be overruled," as "the textual and structural arguments against *Smith* are more compelling," because "it is difficult to see why the Free Exercise Clause—lone among the First Amendment freedoms—offers nothing more than protection from discrimination," 593 U.S. at 543 (Barrett, J., joined by Kavanaugh, J.).

decision has proven unexpectedly powerful for its institution of a hardline rule that *every* secular exception must be accompanied by a religious counterpart, "even if the purported secular exemption is only a hypothetical possibility, and the law currently applies to all other secular activities." Frederick Mark Gedicks, *The Myth of Second-Class Free Exercise*, 70 Vill. L. Rev. 1, (2025) ("[I]t now appears that even a *single* secular exemption renders a law not generally applicable and triggers strict scrutiny of its failure to provide comparable religious exemptions." (emphasis in original) (footnote omitted)); Mark Rienzi, *Re-Evaluating* Fulton v. City of Philadelphia*: A "Narrow" "Wisp" of a Decision or Free Exercise "Bedrock"?*, 74 Cath. U. L. Rev. 384, 393-94 (2025) (collecting cases turning on *Fulton*) ("Both supporters and opponents of the result in *Fulton* . . . publicly touted the decision's narrowness and (seeming) avoidability. Yet four years in, *Fulton* seems to be far stronger, more durable, and more broadly applicable than originally predicted.").

### 2.      The Law of the (This) Case

The single precedent that should probably matter most to the Court is the Tenth Circuit's opinion in this very case, *Renteria v. New Mexico Office of Superintendent of Insurance*, No. 23-2123, 2025 WL 635754 (10th Cir. Feb. 27, 2025) (unpublished) ("*Renteria I*"),[9] in which a divided panel affirmed this Court's denial of a preliminary injunction. The majority opinion was based heavily on **(a)** the procedural posture of the appeal as one challenging denial of a preliminary injunction, *see*, *e.g.*, *id.* at 31 ("[T]he problem with the dissent's view is as much procedural as substantive."); *id.* at

---

[9] Pincites to *Renteria I* will be to the CM/ECF (top-right of the page) pagination on the official slip (PDF) opinion, which is filed in this Court as Document No. 155-1. As an unpublished opinion, *Renteria I* "is not binding precedent" in other cases, but it has lasting application in *this* case, "under the doctrine[] of law of the case." *Renteria I*, at 1 n.* (citing Fed. R. App. P. 32.1 & 10th Cir. R. 32.1). In practice, *Renteria I* should probably be treated as strong and on-point dicta from a directly superior court, as **(1)** the procedural posture of the appeal means that it is not strictly binding on anything other than the application of the preliminary-injunction prongs; and **(2)** more generally, law-of-the-case doctrine "is a flexible one that allows courts to depart from erroneous prior rulings, as the underlying policy of the rule is one of efficiency, not restraint of judicial power," as *stare decisis* is. *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 823 (10th Cir. 2007) (citations omitted).

32 ("'A preliminary injunction is an extraordinary remedy, the exception rather than the rule.' Here, Plaintiffs have not shown that the district court abused its discretion when it determined Plaintiffs did not merit such an extraordinary remedy." (citation omitted)), including the attendant abuse-of-discretion standard of review, *see id.* at 9, 32 & 33, and the as-yet-undeveloped factual record, *see*, *e.g.*, *id.* at 24 n.9 ("The extent to which other organizations are getting 'a better deal' for activity that may or may not be occurring was not developed by Gospel Light below and is not part of the record in this appeal."); and **(b)** the majority's conclusion that several of the linchpin arguments and facts relied upon by the dissent had not been properly preserved for appellate review, *see*, *e.g.. id.* at 32 ("[U]nlike the dissent, we cannot conclude the district court abused its discretion by declining to resolve arguments not made, inadequately developed, and subject to abstention."); *id.* at 24 n.10 ("Plaintiffs list other organizations that receive exemptions under the NMIC in the section of their Opening Brief pertaining to weighing the opposing party's and the public's interests. . . . Plaintiffs did not raise these exemptions in the relevant briefing before the district court . . . ."); *id.* at 28 n.11 ("Plaintiffs also argue on appeal that because the NMIC forbids discrimination based on religion, compliance with the NMIC would cause Gospel Light to lose its status as an HCSM . . . . Plaintiffs did not present this argument in the relevant briefing before the district court, and as such, we will not consider it on appeal."); *id.* at 32 ("[T]he dissent constructs an argument that was not made by Plaintiffs and relies upon cases not cited or discussed by Plaintiffs.").[10] The dissent, for its part, would

---

[10] It is irrelevant at this point—the Plaintiffs can obviously raise arguments and present evidence *now* that were deemed unpreserved during the appeal of the preliminary-injunction motion—but the majority rather aggressively deployed the forfeiture/waiver scalpel in its preservation rulings. This Court almost certainly recognizes the vast majority of the arguments (relied upon by the dissent in reaching its outcome) that the majority deemed to have been forfeited.  Some of the broad swath of non-preservation found by the majority appears to stem from a rather technical jurisdictional issue arising from the fact that the Plaintiffs noticed an appeal of this Court's initial denial of the preliminary-injunction motion (Dkt. No. 38), while also moving this Court to reconsider, but then, when the Court issued a new order reconsidering but ultimately sustaining the prior denial (Dkt. No. 54), the Plaintiffs did not amend their notice of appeal to appeal that subsequent order, *see Renteria I*, at 10-12.

have ruled in the Plaintiffs' favor on both First Amendment and federal-preemption grounds—and, on the First Amendment claim, would have ruled that the Defendants' conduct was both non-neutral and non-generally applicable.

This Court should of course review both the majority and dissenting opinions, but what is most instructive is the *dialogue* between the majority and the dissent—especially the portions of the majority opinion (since that, of course, is the controlling opinion) that directly address and refute the conclusions of the dissent.  Because for the most part, the majority does not actually disagree with the dissent at all on substance, but merely chastises the dissent for drawing factual inferences not yet supportable by the record, *see*, *e.g.*, *id.* at 24 n.9 ("The dissent finds error with this reasoning[, but] . . . there are not *facts* or *evidence* in the record before us as to whether the non-comparable benefit societies or labor unions are engaged in helping members pay medical bills."  (emphases in original)), and considering arguments not yet fully developed, *see id.* at 24 n.10, 28 n.11, 32 & 32. Thus, while the dissent is a substantive First Amendment and federal-preemption opinion, the majority is ultimately a procedural opinion that hinges on preservation, standard of review, and the underdevelopment of the record.

**B.  Analysis: The New Mexico Insurance Code is neither neutral nor generally applicable, and its application to HCSMs is animated by demonstrable animus.**

The New Mexico Insurance Code sets out a non-neutral, non-generally applicable regulatory scheme that exempts huge categories of comparable secular activity—most notably healthcare-sharing by labor unions and fraternal organizations—from regulation, while providing no religious exemptions, and is thus non-neutral and non-generally applicable 'on paper.'  Second, it vests the OSI with plenary discretion not only to investigate complaints and initiate enforcement actions, but to decide whether to pursue a complaint-specific resolution or a full-scale shutdown of the entity—effectively an individualized exception administered at the OSI's discretion. And third, whether this

discretion is itself problematic or not, the OSI has in fact exercised that discretion with unmistakable animus to religious entities. *See generally,* SOF(C), *supra.*

Before discussing these three constitutional infirmities, some preliminaries: it is undisputed that the Plaintiffs' beliefs vis-à-vis healthcare-sharing are both religious in nature[11] and sincerely held.[12]  *See generally*, SOF(B), *supra*; Ex. 23, *In re Gospel Light*, No. 2021-0085, OSI Recommended Decision & Order Setting Deadline for Exceptions at 87 (filed Jan. 20, 2023) ("The Hearing Officer accepts as indisputable that the beliefs of Respondent and its members are religious and sincere . . . ."). And, should the case proceed to a strict-scrutiny analysis, there has been absolutely no evidence adduced by the OSI either that Gospel Light's members have experienced any confusion (at all, let alone more confusion than one faces when confronting a normal insurance contract) or even

---

[11] Although the distinction between "religious" beliefs and other closely held (philosophical, political, moral, etc.) beliefs is a part of the threshold inquiry in the Free Exercise analysis, *see*, *e.g.*, *Frazee v. Ill. Dep't of Empl. Sec.*, 489 U.S. 829, 833 (1989) ("There is no doubt that '[o]nly beliefs rooted in religion are protected by the Free Exercise Clause.' Purely secular views do not suffice." (quoting *Thomas v. Rev. Bd. of Ind. Empl. Sec. Div.*, 450 U.S. 707, 713 (1981))), "[n]o Supreme Court decision has attempted to define the meaning of 'religion' in the First Amendment," and it appears that a belief does not necessarily have to be theistic (predicated on the dictates of a god) to qualify, Gillman & Chemerinsky, *supra* at 129. The Court has instead defined the term by analogy to well-established religions, stating that the test is "whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the exemption." *United States v. Seeger*, 380 U.S. 163, 166 (1965); *see also Welsh v. United States*, 398 U.S. 333, 339 (1970) ("[T]he central consideration in determining whether [a draft] registrant's beliefs are religious is whether these beliefs play the role of a religion and function as a religion in the registrant's life.").

[12] While "a court c[an] never inquire into the [substantive truth or] falsity of a religious belief," it can (and, when it is disputed by a governmental defendant, must) "requir[e] those seeking a religious exemption from secular regulatory statutes to demonstrate their sincerity in the asserted religious belief."  6 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure*, § 21.11, at 227-232 (4th ed. 2008) (citing *United States v. Ballard*, 322 U.S. 78 (1944) (reversing the fraud convictions of putative divine messengers who claimed to be able to cure medically incurable diseases), for the proposition that courts may not inquire into truth of beliefs, and *Thomas v. Rev. Bd. of Ind. Empl. Sec. Div.*, 450 U.S. at 716 (1981) ("The narrow function of a reviewing court in this context is to determine whether there was an appropriate finding that petitioner terminated his work because of an honest conviction that such work was forbidden by his religion."), and *Frazee v. Ill. Dep't of Empl. Sec.*, 450 U.S. at 833 ("Nor do we underestimate the difficulty of . . . determining whether a professed belief is sincerely held.  States are clearly entitled to assure themselves that there is an ample predicate for invoking the Free Exercise Clause."), for the proposition that courts can inquire into a Free Exercise plaintiff's sincerity of belief).

that their removal from the private insurance market[13] actually undermines the risk pool, leaving the OSI with, as far as the Plaintiffs can tell, nothing to argue. *See* Ex. 7 at 4; Ex. 35 at 38:1-40:1.

> **1. The Code's "slew of exceptions" for comparable secular conduct necessitates an analogous exception for comparable religious activity.**

The New Mexico Insurance Code provides wholesale exemptions[14] to labor unions and risk management divisions, *see* NMSA 1978, § 59A-1-16(A) & (C), fraternal benefit societies, nonprofit healthcare plans, health maintenance organizations, prepaid dental plans, motor clubs, *see id.* § 59A-1-15(A)-(E), and charitable gift annuities, *see* NMSA 1978, § 59A-1-16.1. The *Renteria I* dissent "place[d] the greatest weight on the fact that the NMIC as implemented by the OSI provides a veritable 'slew of exceptions' for secular organizations that do not extend to Gospel Light." *Renteria I*, at 40.

The majority sidestepped this issue, first ruling that arguments regarding all but two members of the "slew" had been waived by the "Plaintiffs list[ing them] . . . in the [wrong] section of their

---

[13] The OSI has not even shown evidence that Gospel Light members *are* removed from the risk pool—one can be a Gospel Light member and still purchase insurance. Also, relevant to the narrow-tailoring analysis, New Mexico could theoretically mandate the purchase of insurance by all New Mexicans—although it would have to eliminate all exceptions to that mandate, otherwise it would end up right back in the same position it is in now.

[14] To be clear, "[n]o provision of the Insurance Code [] appl[ies] to" any of the listed entities, NMSA 1978, § 59A-1-15; *id.* § 59A-1-16 ("[T]he Insurance Code shall not apply to . . . ."); *id.* § 59A-1-16.1(B)-(E) (providing that the operations of charitable gift annuities "do[] not constitute engaging in the business of insurance in this state" and that such an annuity "is not subject to regulation by the insurance division"), but the Insurance Code provisions that are centrally relevant in this case are those that are outright incompatible with the federal requirements for being an HCSM: the anti-discrimination provision (specifically its inclusion of religion), NMSA 1978, § 59A-16-12(A)-(B), which contradicts the ACA's requirement that HCSM members "share a common set of ethical or religious beliefs," 26 U.S.C. § 5000A(d)(2)(B); and any requirement that would cause Gospel Light to be deemed to be (or have to certify that it is) "providing commercial-type insurance," which is incompatible with § 501(c)(3) tax-exempt status, 26 U.S.C. § 501(m), which in turn is a requirement to remain an HCSM under the ACA, *see* 26 U.S.C. § 5000A(d)(2)(B)(ii)(I). Gospel Light's argument has never been that there could not *conceivably* be some lawful regulation of its activities—the Plaintiffs have the right to have Gospel Light *exist*, not that it be entirely unregulated—but New Mexico does not currently regulate HCSMs, which is why the OSI is having to strain to fit them into the definition of insurance (so that it can regulate them, although in fact this simply drives them out of the state altogether). Such theoretical regulation (which would require new legislation) could even be located in the Insurance Code, and even be administered by the OSI, provided that HCSMs are not regulated *as insurance*.

Opening Brief . . . [and] not rais[ing] the[m ] in the relevant briefing before the district court." *Id.* at

24 n.10.  As to the two proposed comparable activities it did consider, it deemed that "there [we]re

not *facts* or *evidence* in the record before us as to whether the [fraternal] benefit societies or labor

unions are engaged in helping members pay medical bills." *Id.* at 24 n.9.

There are now such facts and evidence, as the OSI has acknowledged the existence and non-

regulation of these exempted healthcare-sharing entities.[15] *See* Ex. 35 at 146:5-13; Ex. 39 at 192:25-

193:13, 194:7-12, 195:23-197:3; Ex. 38 at 195:22-196:7; Ex. 34 at 128:19-129:5; Ex. 35 at 38:1-40:1,

145:5-146:13. These entities' activities—being, as they are, exempted from the Insurance Code purely

by virtue of who's doing them—are comparable to HCSMs', *see generally*, SOF(F), *supra*,[16] and,

under the most-favored-nation approach, strict scrutiny applies if *any one* of them is comparable, *see*

*Tandon*, 593 U.S. at 62.  "[W]hether two activities are comparable for purposes of the Free Exercise

Clause must be judged against the asserted government interest that justifies the regulation at issue,"

*id.*, which here means that the OSI must show that either **(a)** the risk of member/consumer loss

resulting from confusion about whether the HCSM/excepted entity with which they are affiliating is

subject to the consumer-protection provisions of the Insurance Code; and/or **(b)** the undermining of

the risk pool from the loss of members/consumers, is substantially greater ("[dis]similar") vis-à-vis

HCSMs than any of the excepted entities. *See id.*; *Fulton*, 593 U.S. at 534 ("A law also lacks general

---

[15] Although, to be clear, *Fulton* stands for the proposition—it is expressly stated in the opinion, positively integral to the holding, and has been remarked upon uniformly in the scholarly literature—that a secular exception need not be actually 'in use' in order to render a law non-generally applicable.  *See* Part I.A.1, *supra*.  The *Renteria I* majority opinion should probably be read so as to not directly conflict with controlling Supreme Court precedent; *e.g.*, the Court should conclude that the "facts or evidence" needed on this point are just that the OSI does in fact exempt the other entities from regulation *even if* (either hypothetically or actually) they engage in healthcare-sharing activities that would otherwise, but for their statutory exemption, subject them to regulation.

[16] The Plaintiffs also contend that it is the OSI's burden to show incomparability. *See Tandon*, 593 U.S. at 64 ("[I]nstead of *requiring the State* to explain why it could not safely permit at-home worshipers to gather in larger numbers while using precautions used in secular activities, the Ninth Circuit erroneously declared that such measures might not 'translate readily' to the home.  The State cannot 'assume the worst when people go to worship but assume the best when people go to work.'" (emphasis added) (citation omitted)).

applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."). There is not a whit of evidence that there is any difference, let alone enough of a difference to render the activities non-comparable. *See* Ex. 38 at 197:17-198:3, 201:23-202:2, 202:7-16.

Analogizing to the facts of *Tandon*, which, like *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020), before it, struck down mass-gathering restrictions on religious exercise after finding that gatherings at "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants" were comparable, the activities clearly do not have to pose *identical* risks: churchgoers are older than the average American (and, presumably, the average hair-salon or restaurant patron), *see* Aaron Earls, *Average U.S. Pastor and Churchgoer Grow Older*, Lifeway Research (Nov. 1, 2021), https://research.lifeway.com/2021/11/01/americas-pastors-and-churchgoers-are-getting-older/ (last visited May 30, 2025); and people engage in collective song and close fellowship in religious settings that is usually absent at movie theaters and the like—and yet, the Supreme Court found all of these activities comparable. And even if the OSI could show that the excepted entities' activities do not undermine the government's asserted interests in a similar way to HCSMs, if that disparity were based on other legal protections/requirements attendant to those entities—*e.g.*, if fraternal-benefit organizations turned out to have highly informed and unlikely to be confused members due to extensive member-training and/or disclosure requirements elsewhere in the New Mexico Statutes—then HCSMs would still be entitled to an exemption *subject to those same protections/requirements*, unless it could further be shown that the protections/requirements that are effective at further government interests for the excepted entity do not work for HCSMs. *See Tandon*, 593 U.S. at 63 ("Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are

applied. Otherwise, precautions that suffice for other activities suffice for religious exercise too." (citations omitted)).

Finally, the *Renteria I* majority made a somewhat strange comment about "Gospel Light's sole purpose [being] to act as an HCSM," *Renteria I*, at 23, while labor unions and fraternal-benefit societies engage in healthcare-sharing "ancillary to their other, primary purposes for being," *id.* at 23-24, apparently suggesting that this might interfere with a finding of comparability. As strange as the suggestion that secular and religious *entities* (and/or their *other*, non-statute-violating activities) must be comparable, rather than their statutorily violative/exempted activities, is—the concept of comparability and analogous exceptions is not a new one, and the majority's test has not only never been used, but almost never works when substituted in for that facts of an actual case—is the fact that, when called out on it by the dissent, *see id.* at 18-19 ("The majority's 'ancillary conduct' distinction rests on a misinterpretation of the *Tandon* rule. *Tandon* does not instruct us to ask about an organization's *purpose*. *Tandon* says a law is not neutral when it treats more favorably any comparable secular *activity*." (emphasis in original)), the majority appear to back down and change the subject in a footnote, *see id.* at 24 n.9 (noting the dissent's objection, not responding to it, and instead focusing on the (also unusual) lack-of-facts-and-evidence point, *see* note 15, *supra*).[17] In any

---

[17] In the battling footnotes (note 9 of the majority and note 10 of the dissent), the dissent notes that, while it's irrelevant to the proper analysis, it is probably not even true that the healthcare-sharing function of these other entities is "ancillary" to their other operations, citing a 1937 case that says exactly that about New Mexico fraternal-benefit organizations. (This is probably even truer for labor unions. As Warren Buffett once said, General Motors is "a health and benefits company with an auto company attached." Dave Chase, *You Run a Health-Care Business Whether You Like it or Not*, CFO.com (Nov. 7, 2017), https://www.cfo.com/news/you-run-a-health-care-business-whether-you-like-it-or-not/659705/ (last visited May 30, 2025).) The majority then responds that it views one old case as inadequate to establish the factual basis that exempted organizations in New Mexico "are getting 'a better deal' for activity that may or may not be occurring"—where the better-deal quote is just from an off-hand characterization of the dissent. *Renteria I*, at 24 n.9 (quoting *Renteria I*, at 51). Lest this 'better deal' analysis grow legs, it should be noted that, as far as the Plaintiffs are aware, applying the Insurance Code to a labor union, fraternal-benefit organization, or any other exempted group would not result in its *destruction*, the way it would with an ACA-qualified HCSM—so these other organizations are definitely getting a better deal. *See* note 14, *supra*. The fact that the OSI's approach targets Gospel Light and other

event, although it really is not relevant to the analysis, it is not true that all Gospel Light does is coordinate the transfer of member sharing contributions to other members who have medical expenses. Gospel Light is a robust ministry that has a faith relationship with its members and that facilitates its members' fellowship and prayer with each other through things like its weekly devotionals and quarterly newsletters, full-time pastor and pastoral care team, and online (and physical) prayer boxes. *See* SOF ¶ 112; Ex. 27 at 115:1-116:6, 116:7-23-117:9, 117:20-23, 117:25-119:14, 119:15-120:6, 120:12-121:6, 121:10-18, 121:21-122:1, 129:9-130:1, 135:14-19, 136:22-137:5.

> **2.    The OSI's plenary discretion to choose who to leave alone and who to literally expel from the state constitutes an individualized exception.**

Consider the following statute, which grants the OSI unchecked discretion to seek to impose any sanction on any healthcare-sharing entity, from non-prosecution up to effective expulsion from the state, not subject to any substantive guidelines:

> The superintendent may, ***at his discretion***, suspend, limit or revoke an insurer's certificate of authority if he finds after a hearing thereon, or upon waiver of hearing by the insurer, that the insurer has:
>
> (1)    violated or failed to comply with any lawful order of the superintendent;
>
> (2)    willfully violated or willfully failed to comply with any lawful regulation of the superintendent; [or]
>
> (3)    violated any provision of the Insurance Code other than those for violation of which suspension or revocation is mandatory . . .

---

HCSMs, alone, for outright destruction is itself sufficient to render it non-neutral, *i.e.*, as a law whose object is to target religion.

NMSA 1978, § 59A-5-26(A) (emphasis added). Testimony confirmed that the OSI almost never—one employee estimated it happens one to two percent of the time—seeks to shut down an entity's operations upon receiving a consumer complaint, *see* Ex. 33 at 45:1-18, and instead focuses on voluntarily dispute resolution or, at most, complaint-specific corrective action, *see* Ex. 33 at 129:24-130:25, 133:4-135:19; Ex. 34 at 38:9-16.

This discretion may potentially be considered "enforcement" or "prosecutorial" discretion, and, if it is, that may or may not count as an individualized exception under *Fulton*. It is conceded that almost every statutory and regulatory scheme gives enforcement discretion to its administrator, and so it is often assumed that such discretion does not constitute an individualized exception. But while the *Fulton* majority spoke of "a formal system of entirely discretionary exceptions" and "[t]he creation of a formal mechanism for granting exceptions," 593 U.S. at 536-37, three concurring justices suggested that there is no reason why such discretion would not qualify, *see* 593 U.S. at 598 (Alito, J., joined by Thomas & Gorsuch, JJ.) ("[In *Smith*, t]he State had the discretion to decline prosecution based on the facts of particular cases, and that is presumably what it did regarding Smith and Black. Why this was not sufficient to bring the case within *Smith*'s rule about individualized exemptions is unclear."). One commentator has both made a persuasive case for the classifying of enforcement prosecution as an individual exception and, apparently presuming that no such classification is recognized, argued that this undermined the entire logic of the individualized-exception framework:

> The purported distinction between generally applicable criminal laws and systems of individualized exemptions is incoherent. This is illustrated in *Smith* in an additional way: the lack of a criminal prosecution of the respondents for their admitted peyote use. This illustrates the well-known fact that criminal prosecution is inherently discretionary and thus riddled with individualized exceptions. Indeed, "[u]nder American law, government prosecuting attorneys have nearly absolute and unreviewable power to choose whether or not to bring criminal charges and what charges to bring" — a power that can clearly be used in destructive and discriminatory

ways.  Further, police discretion operates at "every level" of policing and enforcement
of the law — a discretion that can lead to controversies such as occurred through the
"broken windows" model of policing.  The application of the criminal law at the levels
of law enforcement and prosecutorial decisions is inherently individualized and
involves the government providing individualized exemptions. Is this really
fundamentally different from the individualized adjudication of
unemployment compensation claims? To the degree it is somewhat different, is that a
difference with any non-arbitrary relevance to religious liberty claims? Indeed,
prosecutorial and police discretion are even more discretionary, and less limited by
law, than are the "good cause" or "misconduct" standards in unemployment
compensation cases. If the metric that allows strict scrutiny is that of executive branch
discretion in the application of the law, which creates risks of discriminatory
application, that discretion is even less bridled in criminal prosecutions since there is
no legal standard limiting that discretion and no real possibility of judicial review as
to the use of prosecutorial and police discretion.

David M. Smolin, *Kids Are Not Cakes: A Children's Rights Perspective on* Fulton v. City of
Philadelphia, 52 Cumb. L. Rev. 79, 91-92 (2022) (footnotes omitted). While, again, most enforcement
schemes do vest some discretion in their administrators, the breadth of the OSI's discretion here—its
unilateral and standardless choice, upon receipt of a complaint, to do anything from nothing at all to
issuing a cease-and-desist letter barring all operations in the state—presents a more compelling case
for scrutiny than most.

And even if this discretion is not in and of itself problematic, it illustrates the need for a
searching and rigorous review of the Plaintiffs' final Free Exercise argument: that the OSI's unfettered
enforcement discretion was in fact marshalled against HCSMs, and Gospel Light specifically, based
on a campaign undergirded by anti-religious animus.

> **3.    The OSI exercised its enforcement discretion with unvarnished animus
> toward the religious practices of HCSMs.**

The discovery in this case has laid out surprisingly clearly how the OSI's campaign against
HCSMs came to be: under Superintendent Russell Toal, the OSI went from not really being familiar
with HCSMs; to conducting an enforcement action against the notorious scam-HCSM Aliera/Trinity;

to conducting a search for bad-actor HCSMs while acknowledging the existence of 'legitimate' HCSMs; to adopting the categorical view that 'if it walks and quacks like a duck,' it must be insurance; to waiting for consumer complaints in order to launch pretextual and preordained-result investigations and enforcement actions so that it could expel any and all HCSMs from the state. Even before conducting discovery, there was already a track record of evolving, public, "overtly hostile statements," *Renteria I*, at 39, that "support[ed] a religious gerrymander's existence," *id.* at 41. That evidence, of course, is still valid today.

But discovery has now revealed the non-public, internal communications of OSI during this period (at least those that they were unwise enough to memorialize), and they illustrate a level of animus—led by Mr. Toal personally, and joined in on by most everyone else in the office called upon to touch the HCSM project in any way—that may not be quite as bad as that in *Lukumi*, but is comfortably worse than that in *Masterpiece Cakeshop*. One employee wrote that the Legislature should "just outlaw health ministries"—in other words, rather than the normal Free Exercise analytical inquiry of whether the creation of a secular exception to an otherwise generally applicable law converts the scheme at-large into a religious gerrymander, OSI considered asking (and may have asked) the Legislature for an exception that *exclusively targeted religious entities*. *See* Ex. 30 at 59. (It's hard to even find a case like that.) When the Legislature did not pass a law outlawing health ministries as the OSI employee had wanted, the OSI instead attempted to outlaw health ministries through executive action.

OSI staff referred, in writing, to HCSMs as "form[s] of garbage," "Ponzi scheme[s] rather than insurance,"[18] swindlers, and fraudsters, and presumed that they were all bad actors. Ex. 30 at 8, 15, 20, 36, 39, 47, 76; Ex. 33 at 62:1-14, 92:25-93:10. Mr. Toal and the OSI's lead HCSM expert,

---

[18] This is a correct usage of neither the actual nor the tongue-in-cheek pejorative usage of the term Ponzi scheme.

Paige Duhamel, demeaned Gospel Light in particular, comparing it to "pet insurance" and criticizing it for the short list of medical care it determined was ineligible for sharing, on religious-conscience grounds. *See* Ex. 30 at 29. Mr. Toal has opined that his general "problem" with Christianity was that "there were lots of southerners, including members of the church, who were full of disdain, if not outright hatred, for people who were different than them, and [he] found that intolerance not acceptable." Ex. 37 at 61:4-15, 61:24-62:9, 67:6-10. He expressed his frustration with Christians, "who were die-hard racists, but they certainly felt strongly in their faith." *Id.* at 67:11-24, 68:12-15. Compare this language with that which a 7-2 majority of the Supreme Court found to exhibit "hostility" in *Masterpiece Cakeshop*, about how "religion has been used to justify all kinds of discrimination throughout history." 584 U.S. at 634-35. Like those statements, these statements are "neither tolerant nor respectful of [the Plaintiffs'] religious beliefs." *Id.* at 639.

The OSI aggressively searched first its own archives for consumer complaints against HCSMs and then, finding none, asked the Attorney General's Office if it had ever gotten a complaint. *See* Ex. 30 at 72, 84-85. OSI staff admitted that, despite not having real complaints to work from, they were "actively looking at different avenues to stop" HCSMs, specifically, and began holding meetings and formulating strategies to go after them. Ex. 30 at 48-49. Multiple OSI staffers testified that Mr. Toal was personally interested in shutting down all HCSMs, which had become his pet project in office. *See* Ex. 35 at 94:15-96:7, 95:22-96:1; Ex. 36 at 51:12-52:19, 55:15-20, 56:9-20. Investigations into actually fraudulent insurance company actors like the 'Florida Four' were languishing, to the dismay of investigators, because "the focus was all on the Healthcare Sharing Ministries," and "the only thing that Superintendent Toal wants the attorneys to work on is the Healthcare Sharing Ministr[ies]." Ex. 36 at 58:10-59:13, 59:14-60:1, 61:2-62:6, 63:3-20. OSI attorneys demanded that investigators dig up evidence of New Mexicans harmed by HCSMs, but no evidence could be found, which frustrated the attorneys, who answered to Mr. Toal. *See id.* at 75:6-16, 76:14-19. For his part, Mr. Toal has admitted

that his interest in regulating HCSMs was not based on a non-result-motivated view that they qualified for regulation under existing law, but on his dissatisfaction with the status quo of their being, under this erroneous view, subject to no in-state regulation. *See* Ex. 30 at 11.

When a complaint finally came in the door against Gospel Light, OSI used the opportunity as a pretext to begin working up a case to shut it down entirely—despite the fact that Gospel Light had all five of the "green flag" factors and only one of the 11 "red flag" factors identified by OSI's insurance expert, Ms. Duhamel, to sort bad-actor HCSMs from legitimate HCSMs not subject to OSI oversight, before the OSI began just viewing all HCSMs as bad actors. *See* SOF ¶¶ 200-206, *supra*. The Gospel Light complainants, whose complaints were all routine delayed-payment issues that were ultimately satisfactorily resolved, all declined to cooperate with OSI's attempts to build a larger case against Gospel Light, *see* SOF ¶¶ 213, 230-32, *supra*, but complaints were elevated despite already being resolved, which OSI staff stated they had never seen happen before, *see* SOF ¶¶ 384-85, 388, 427, *supra*. Those who investigated the case viewed an enforcement action as inevitable, *see* SOF ¶¶ 226, 372, *supra*, and the understanding of some OSI staff was that the Gospel Light case was built around a complaint filed by Ms. Duhamel, not an outsider to the office, *see* Ex. 30 at 38-40; Ex. 36 at 64:18-65:6. All of this illustrates a clear fact pattern of non-neutrality: the OSI, in the ordinary and normal sense of the word, deliberately "targeted" Gospel Light, because it is an HCSM.

Finally, both Mr. Toal and his successor, Jennifer Catechis, testified that they felt it was perfectly fair for those whose religious beliefs barred them from paying into a system that pays for abortions or contraceptives to be given an ultimatum between violating their beliefs and going without any insurance (other than self-pay) at all. *See* Ex. 37 at 71:15-24, 75:5-76:6; Ex. 38 at 74:4-21, 301:5-16; Ex. 39 at 86:11-87:2. This is in direct contravention to the long-established rule that the "[g]overnment may not constitutionally apply the eligibility provisions of a public benefit program so as to force a person to choose between following the precepts of her religion and forfeiting benefits,

on the one hand, and abandoning her religious precepts in order to accept work, on the other." *Sherbert*, 374 U.S. at 404. It is indistinguishable from the remaining comments (aside from the ones quoted a few paragraphs above) in *Masterpiece Cakeshop*, "that Phillips can believe 'what he wants to believe,' but cannot act on his religious beliefs 'if he decides to do business in the state.'" 584 U.S. at 634-35 ("'[I]f a businessman wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, he needs to look at being able to compromise.'").

In sum, New Mexico's handling of HCSMs, and its treatment of Gospel Light in particular, do not pass muster under today's Free Exercise jurisprudence.  Both the enacted/legislative law and its administrative application to Gospel Light would each, on its own, violate the First Amendment: the "slew of secular exemptions," Renteria I, which are in established actual usage in New Mexico, go far beyond the one never-used-and-argued-to-be-nonexistent secular exemption that invalidated the law in Fulton; and the undisputable pattern of targeted aggression toward HCSMs, punctuated by regular statements of animus, far exceed the general, obnoxious platitudes about religion being no excuse for bad conduct that were found unacceptable in Masterpiece Cakeshop. Taken together, however, the cumulative impact on Gospel Light exceeds anything the U.S. Supreme Court has dealt with in many years now.

## II.  PLAINTIFFS' EQUAL PROTECTION RIGHTS HAVE BEEN VIOLATED THROUGH DEFENDANTS' DISCRIMINATION OF THEIR FUNDAMENTAL RIGHT TO FREE EXERCISE OF RELIGION AND DISCRIMINATION BASED ON PLAINTIFFS' RELIGION, A SUSPECT CLASS.

Plaintiffs are entitled to summary judgment on Claims 6 and 7 of their Complaint, as there is no genuine dispute that Defendants violated Plaintiffs' constitutional rights under the Equal Protection Clause. *See* Complaint at 58-61.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "This is essentially a direction that all persons similarly situated should be treated alike."

*Ashaheed v. Currington*, 7 F.4th 1236, 1249 (10th Cir. 2021) (internal cite and quote omitted). "An equal protection claim may challenge legislation or the conduct of individual state actors." *Id.* at 1250 (internal cites omitted). In order to succeed on an equal protection claim, a plaintiff must prove "the existence of purposeful discrimination causing an adverse effect." *Id.* (internal cites and quotes omitted). Discriminatory intent can be proved by either (1) direct evidence showing that "a distinction between groups of persons appears on the face of a state law or action" or (2) circumstantial evidence showing that a "plaintiff was treated differently from similarly situated persons who are alike in all relevant respects." *Id.* (internal cites and quotes omitted). Notably, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Id.* (citing and quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976).

After a plaintiff provides sufficient evidence that (1) he was intentionally discriminated against by defendants and (2) defendants' discrimination caused him an adverse effect, the court must review the state action under the appropriate level of scrutiny. *Ashaheed,* 7 F.4ᵗʰ at 1250. In cases involving the deprivation of a fundamental right or where a plaintiff represents a suspect class, the court must apply strict scrutiny to the state action. *Id.* Where strict scrutiny applies, the state actors bear the burden of demonstrating that the challenged state action was "narrowly tailored to achieve a compelling state interest." *Id.* at 1251 (internal cite and quote omitted). Notably, although religious-based discrimination claims are typically analyzed under the strict scrutiny framework, "where governmental bodies discriminate out of 'animus' against particular religions, such decisions are plainly unconstitutional." *Id.* at 1244 (internal cite and quotes omitted). This is because "government action motivated by religious animus cannot be narrowly tailored to advance a compelling governmental interest." *Id.* (internal cite and quotes omitted).

Plaintiffs are entitled to summary judgment on both Claims 6 and 7 of their Complaint, as there is no genuine dispute that Defendants violated Plaintiffs' equal protection rights on two separate grounds—deprivation of a fundamental right and discrimination of a suspect class.

### A.  Defendants violated Plaintiffs' equal protection rights by purposefully depriving them of their fundamental right to free exercise of religion.

Plaintiffs are entitled to summary judgment on Claim 6 of their Complaint, alleging violation of the Equal Protection Clause for discrimination involving a fundamental right under 42 U.S.C. § 1983, as there is no genuine dispute that Defendants discriminated against Plaintiffs' fundamental right to free exercise of religion. *See* Complaint at 58-60.

**First,** Plaintiffs and other Gospel Light members undeniably possess the fundamental right to the free exercise of religion, which they enacted through their memberships with Gospel Light. "Unquestionably, the free exercise of religion is a fundamental constitutional right." *Johnson v. Robison*, 415 U.S. 361, 375 (1974); *see also Ashaheed*, 7 F.4th at 1250 (noting that the "free exercise of religion" is "a fundamental right"); *Brown v. Borough of Mahaffey, Pa*., 35 F.3d 846, 850 (3d Cir. 1994) (recognizing plaintiffs' "fundament right to free exercise of religion").

Through their fellowship with other members of Gospel Light, a religious organization, Plaintiffs were engaging in the free exercise of religion. *See, e.g., Roberts v. U.S. Jaycees*, 468 U.S. 609, 622, 104 S. Ct. 3244, 3252, 82 L. Ed. 2d 462 (1984) (declaring that "we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends" (internal cites omitted)); 42 U.S.C.A. § 2000cc-5(7) (defining the term "religious exercise" as including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief"). As Defendants acknowledge, Gospel Light is a religious non-profit and certified HCSM through which its members practice their sincerely held religious beliefs. *See* Ex. 4;

Ex. 5 at 2; Ex. 7 at 2; Ex. 22 at 2-3; Ex. 27 at 63:7-11; *see generally*, SOF(A) & (B), *supra*. Gospel Light's bylaws state that its purpose "is to enable followers of Christ to bear one another's burdens" as the Apostle Paul instructs, in Galatians 6:2 of the Bible, to "[b]ear one another's burdens, and so fulfill the law of Christ." Ex. 2 at 1. Its bylaws further explain that Gospel Light was formed so that followers of Christ can "associate within the community of the Christian faith for discipleship, medical-sharing, physical needs-sharing, financial stewardship, and evangelical purposes." *Id.* Gospel Light membership is limited to "members of Gospel Light Mennonite Church and those who prescribe to the Statement of Faith." *Id.* at 2.

Plaintiffs became Gospel Light members to engage in the religious practices that Gospel Light facilitates and to benefit from the religious resources it provides. *See, e.g.,* Ex. 19 at 159:6-9, 160:12-17; Ex. 32 at 11:9-14. Among others, Gospel Light provides Plaintiffs with the following collective resources: (1) a community through which to share medical expense burdens with fellow Christians (*see* Ex. 19 at 189:21-24; Ex. 21 at 2; Ex. 27); (2) an online prayer box for members to share prayer requests with other members and receive messages of encouragement in return (Ex. 27 at 119:15-120:6); (3) the support of a pastoral care team to assist Gospel Light's pastor in praying for those who have submitted prayer requests (*id.* at 119:22-120:2); (4) monthly newsletters containing devotionals (*id.* at 121:21-23, 136:22-137:5); (5) scripturally based videos recorded and sent by a pastor to Gospel Light members containing religious messages and hymns (*id.* at 117:25-119:14, 121:10-18); (6) pastoral support concerning grief for a member's family when they die and support through sudden and unexpected bad news (*id.* at 120:12-121:6); and (7) spiritual care for members in their final moments of life through phone calls with Gospel Light's pastor (*id.* at 135:14-19); *see generally* SOF(A) & (B). Through their Gospel Light membership, Plaintiffs exercise their religious beliefs and are enriched by the religious resources and support that the Gospel Light community provides.

**Second,** Defendants' actions constitute an intentional deprivation of Plaintiffs' fundamental right to the free exercise of religion. By ordering Gospel Light members to disband in the State of New Mexico, and through their campaign to discredit and outlaw HCSMs in New Mexico, Defendants' intent to deprive Plaintiffs of their right to exercise their religion through Gospel Light membership could not be more apparent. *See generally* SOF(C) & (D). Notably, on November 23, 2021, Defendants issued a cease-and-desist order against Gospel Light, ordering that Gospel Light "cease and desist from any and all offerings, marketing, sales, and business related to its activities within the State." Ex. 17 at 2. The cease-and-desist order further ordered Gospel Light to "cancel[] all New Mexico membership plans" or pay a substantial fine. *Id.* at 9. Then, on February 22, 2023, Defendants issued a final order against Gospel Light, forbidding it from "servicing HCSMs in New Mexico until it complies with the requirements of the New Mexico Insurance Code"—a literal impossibility for Gospel Light given its 501(c)(3) non-profit status. *See* Ex. 26 at 7; Ex. 27 at 61:25-62:12, 184:16-185:16. Because Plaintiffs are Gospel Light members based in New Mexico, the Defendants' final order strips them of their ability to remain Gospel Light members without violating the law and without being afraid of facing prosecution and/or adverse administrative action related to their Gospel Light membership. *See* Ex. 19 at 149:6-10; Ex. 27 at 81:19-21. Defendants' blatantly antagonistic actions demonstrate its intent to prevent Plaintiffs from exercising their religion through Gospel Light membership. *See, e.g., Holt v. Hobbs*, 574 U.S. 352, 362 (2015) (confirming that First Amendment religious protections are "not limited to beliefs which are shared by all of the members of a religious sect" (internal cite and quotes omitted)); *Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 831 (1989) (rejecting position that a religious objection "must be found in a tenet or dogma of an established religious sect" in order to receive First Amendment protection).

**B.** **Separately, Defendants violated Plaintiffs' equal protection rights by intentionally discriminating against Plaintiffs' religion, a suspect class.**

Likewise, Plaintiffs are entitled to summary judgment on Claim 7 of their Complaint, alleging violation of the Equal Protection Clause for discrimination involving a suspect class under 42 U.S.C. § 1983, as there is no genuine dispute that Defendants discriminated against Plaintiffs' religious practices, which are a suspect class. *See* Complaint at 60-61.

**First,** it is undeniable that Plaintiffs have a right to be protected from unlawful religious-based discrimination. *See, e.g., Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found*., 586 U.S. 1213, 1214 (2019) ("As this Court has repeatedly held, governmental discrimination against religion—in particular, discrimination against religious persons, religious organizations, and religious speech—violates the Free Exercise Clause and the Equal Protection Clause."); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*., 508 U.S. 520, 532-33 (1993) (holding that state action cannot discriminate against "some or all religious beliefs" and that "targeting religious beliefs as such is never permissible"). As explained previously, Gospel Light is a religious-based organization through which Plaintiffs engage in religious worship. *See* Argument, (II)(A), *supra*; *see also* SOF (A) & (B), *supra*. As such, Plaintiffs' activities with, and through, Gospel Light are protected from unlawful religious discrimination perpetuated by state actors, including Defendants.

**Second,** Defendants' actions constitute intentional religious discrimination against Plaintiffs and other Gospel Light members. Notably, "[t]he intent to discriminate forbidden under the Equal Protection Clause is merely the intent to treat differently." *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008) (internal cites and quotes omitted). The U.S. Supreme Court "has never required proof of discriminatory animus, hatred, or bigotry" in order to find intentional discrimination. *Id*. Religious discrimination has been found to violate the First Amendment where laws have "the object of suppressing a religious practice, [and] also [where] official action [] targets

religious conduct for distinctive treatment." *Id.* (internal cites and quotes omitted). Discriminatory intent is proved where (1) "a distinction between groups of persons appears on the face of a state law or action" or (2) evidence shows that a "plaintiff was treated differently from similarly situated persons who are alike in all relevant respects." *Ashaheed*, 7 F.4th at 1250 (internal cites and quotes omitted). Here, there is both direct evidence of a distinction between groups on the face of Defendants' state action and circumstantial evidence showing disparate treatment of Gospel Light members, including Plaintiffs, compared to other similarly-situated groups.

Facial discrimination against HCSM members is evident in many of Defendants' state actions. *See generally* SOF(C). For example, on March 26, 2020, Defendants issued a press release calling all HCSMs "unauthorized insurance product[s]" that "do NOT comply with the ACA"—even though the ACA explicitly defines HCSMs and explicitly provides that membership in HCSMs exempts members from the ACA's health insurance mandate—and indicating that New Mexicans required "protect[ion]" from HCSMs. Ex. 12. Under oath, former OSI Superintendent Russell Toal admitted that it was "problematic" and "inaccurate" of him to publish this message. *See* Ex. 38 at 294:17-295:9. He also admitted that it was "improper to discourage New Mexicans from doing things like signing up for HCSMs" because that is not the OSI's role. *Id.* at 284:20-285:11. Likewise, Defendants' cease-and-desist order against Gospel Light also facially discriminated against Gospel Light members, as it wrongly alleged that, through its HCSM practices, Gospel Light "has falsely claimed to be exempt from the ACA" and Gospel Light's "claims to be exempt from the ACA and that its plans are not insurance are both deceptive." Ex. 17 at 7-8; Ex. 22 at 2-3. However, Defendants have formally admitted that it was incorrect to accuse Gospel Light of falsely and deceptively claiming to be exempt from the ACA. *See* Ex. 22 at 2-3. By then, the damage had been done, as the State had already misinformed the masses that Plaintiffs' religious practice of HCSM membership was unlawful and that Plaintiffs were part of a deceptive religious community from which New Mexicans at large should

seek protection. *See* Ex. 17. Additionally, Defendants facially discriminated against Plaintiffs through their February 22, 2023 final order against Gospel Light, in which they disbanded Gospel Light members in New Mexico, specifically targeting Gospel Light and wrongly finding that its HCSM practices violated New Mexico law. *See* Ex. 26. Finally, Defendants' website warned consumers against HCSMs, stating: "The OSI does not recognize health care sharing ministries (HCSM) as a legitimate source of assistance in paying for health care and discourages New Mexicans from signing up for HCSMs." Ex. 30 at 1. Notably, in his deposition testimony, Superintendent Toal denied using the term "illegitimate" to describe HCSMs and stated that, if the OSI had used that term, it would have been incorrect. Ex. 38 at 189:15-190:4.

In the present case, there is also compelling circumstantial evidence of Defendants' religious discrimination against Plaintiffs. Defendants' actions unquestionably target the religious conduct of Plaintiffs' HCSM membership for distinctive treatment, and Defendants suppress Plaintiffs' religious practice of fellowship through Gospel Light. The press releases, cease-and-desists, and final order against Gospel Light are only a small part of Defendants' larger campaign against HCSMs in New Mexico, where they ultimately seek to outlaw all HCSM fellowship. *See generally* SOF(C). Defendants' plan to effectively outlaw HCSMs is revealed most bluntly through an internal email in which an OSI employee asked: "Can't we just outlaw health ministries in the next session?" (Ex. 30 at 59.) In response, an OSI policy analyst wrote: "New Mexico has laws protecting with 'freedom of religion' that would probably interfere. There'd be so many lawsuits. There's ways to weed out the worst of actors, though. We're working on it." (*Id.*) OSI staff internally circulated a list of HCSMs to target for enforcement action and aggressively searched for consumer complaints against HCSMs, going back years, and finally admitting that they could not find any. *See* Ex. 30 at 69-70, 72. OSI staff even went so far as to contact other state agencies, like the New Mexico Attorney General's Office, searching for evidence that HCSMs were causing harm. *See id.* at 84-85. Superintendent Toal testified

that it was "inappropriate" for the OSI staff to have done so, "[b]ecause contact between constitutional officers happens at [the highest] level, not [the] lower level." Ex. 38 at 246:14-25. In her deposition, former OSI investigator Phyllis Christy revealed that Superintendent Toal placed a lot of pressure on his staff to find evidence that HCSMs had harmed New Mexicans, even where there was none. *See* Ex. 36 at 56:21-25, 57:1-3. Ms. Christy testified that the OSI's focus on HCSMs harmed New Mexicans, because fraudsters injuring citizens were not being prosecuted due to the lack of resources available for non-HCSM enforcement action. *See id.* 58:10-59:13, 61:2-62:6, 63:3-20. Even federal Judge Matthew L. Garcia noted Defendants' "unnecessarily aggressive" behavior toward Plaintiffs. Ex. 27 at 32:1-7.

In contrast, Defendants did not treat similarly situated secular entities with any of the antagonism characteristic of Defendants' actions toward HCSM members like Plaintiffs. *See generally* SOF(F). Longtime OSI employee Margaret Peña testified that consumer complaints against insurance companies would only lead to investigations about 1-2% of the time, because the OSI does not interpret the complaint as evidence that the insurance company is a "bad actor." Ex. 33 at 6:3-16, 45:1-18. However, Ms. Peña noted the OSI's opposite presumption when it receives a consumer complaint against an HCSM, which triggers "the mindset that this would be a complaint that would be investigated." *Id.* at 62:1-14, 92:25-93:10. Similarly, Defendants make no effort to enforce the insurance code against labor organizations or fraternal benefit societies that provide insurance or health care sharing, as former OSI superintendents and attorneys alike acknowledge that these membership entities are exempt from OSI oversight. *See* Ex. 34 at 126:18-127:10, 128:19-129:5; Ex. 35 at 145:5-146:13; Ex. 38 at 195:22-196:7, 201:23-202:2; Ex. 39 at 192:25-193:13, 194:7-12, 195:23-197:3. When asked why New Mexico allowed labor organizations or fraternal benefit societies to provide for health care sharing but not HCSMs, Superintendent Toal could provide no justification, said he did not know, and told Plaintiffs to "ask the legislators." Ex. 38 at 197:17-198:3,

202:7-16. Additionally, while Defendants routinely resolve consumer disputes with insurance companies by contacting them to reach an agreement (Ex. 33 at 129:24-130:25, 133:4-135:19), membership disputes involving HCSMs are viewed as necessitating a cease-and-desist order, according to Superintendent Toal, who testified that OSI personnel "don't really have a choice" in the matter. Ex. 37 at 117:10-17. However, OSI staff have acknowledged that they can utilize less severe enforcement actions than cease-and-desist orders, including fines and negotiations. *See* Ex. 36 at 132:15-22. **Notably, of the 2,255 complaints against insurance companies received by Defendants from 2019 through October 2024, none of them even resulted in an OSI investigation, enforcement action, corrective action, or any fines.** *See* Ex. 33 at 133:4-135:13, 135:13-19. In comparison, of the nine consumer complaints against various HCSMs, five were elevated for enforcement action. *See* 146:7-14, 147:16-19. Finally, former OSI policy analyst Paige Duhamel testified that there were alternatives to standard medical insurance other than just HCSMs, such as fixed indemnity plans and accident and sickness plans, which cause the OSI the same concerns as HCSMs—yet, Ms. Duhamel does not know of any instance where the OSI pursued enforcement action against any of these secular alternatives to standard medical insurance. *See* Ex. 35 at 38:1-40:1.

The stark distinction between Defendants' treatment of the HCSM community and the secular entities with which it interacts provides compelling evidence of Defendants' unlawful religious discrimination against Plaintiffs. *Cf. Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1040, n.37 (D.N.M. 2020) (Browning, J.), *aff'd sub nom. Legacy Church, Inc. v. Collins*, 853 F. App'x 316 (10th Cir. 2021) (noting that "a lack of neutrality may be evident in a law's disparate enforcement, if the executive's intent is to discriminate").

C. **In depriving Plaintiffs of their fundamental right to free exercise of religion and subjecting them to religious-based discrimination, Defendants' actions were not narrowly tailored to achieve a compelling state interest and cannot survive strict scrutiny.**

Under the Equal Protection Clause, in order to prove that their state actions were narrowly tailored, Defendants need not prove that their actions were the "least restrictive approach to address [their] concern," but they "must show that [their actions are] not substantially more restrictive than necessary to meet the [OSI's] objectives." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1134 (10th Cir. 2012). Defendants have not done so here, as there is compelling evidence that Defendants' actions were, indeed, substantially more restrictive than necessary to achieve the state's interest in guarding against fraudulent insurance alternatives and HCSM malfeasance. *See generally* SOF(I). During the OSI's cease-and-desist hearing against Gospel Light, expert witness Kevin McCarty—a former Florida insurance commissioner of 12 years and the 2012 president, and longtime member, of the National Association of Insurance Commissioners—testified that, should any HCSM behave unlawfully, every state is able to address these wrongs through state laws concerning "crimes or other civil wrongs," like consumer protection laws and laws concerning deceptive statements, embezzlement, and the breach of fiduciary duty. Ex. 19 at 223:13-21. In a subsequent hearing, Expert McCarty provided testimony that Colorado, Massachusetts, and Alaska have all implemented HCSM reporting laws requiring HCSMs to report certain information to the states and that these laws are "much less intrusive" than simply preventing HCSMs from operating. Ex. 27 at 194:13-195:8, 195:9-22. In fact, Expert McCarty is not aware of any state that has prohibited or banned HCSMs from operating. *See id.* at 198:22-199:6. Finally, during her deposition, former OSI attorney Rebecca Branch testified that "the lower-level stuff, about, say, a particular claim, could usually be worked out" and that she was able to settle a lot of the issues without resorting to administrative prosecutions for disputes involving insurance companies. Ex. 34 at 38:9-16.

Significantly, state action "that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*., 508 U.S. 520, 546 (1993). As previously discussed, there is a stark contrast between Defendants' treatment of HCSMs compared to its treatment of secular entities, and Defendants admit to targeting religious HCSMs for adverse action. *See* Argument (II)(B), *supra*. As such, Defendants' actions should not survive strict scrutiny here. One telling example of Defendants' distinctive treatment targeting religious conduct is evident in Superintendent Toal's testimony that, in response to complaints of denials from insurance companies, he would "take them to mediation," and "[m]ore often than not, all it took was usually a phone call or a letter" to resolve any issue. Ex. 37 at 87:12-19; Ex. 34 at 95:12-25. Conversely, Superintendent Toal testified that he never even attempted to call an HCSM to resolve consumer complaints, and he never directed any OSI staff to call an HCSM either. *See id.* at 107:15-23. Instead, he adopted the mentality that cease-and-desist letters against HCSMs were unavoidable, saying: "[W]e don't really have a choice." Ex. 37 at 117:10-17.

Moreover, Defendants have not identified a compelling state interest sufficient to justify the outright prohibition of Gospel Light membership in the state. *See generally* SOF(H). Significantly, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). Not only have Defendants failed to propose a high-order interest to justify outlawing HCSMs, Defendants have not even presented *any* concrete state interest that would be served through outlawing HCSMs. In his deposition, when Superintendent Toal was asked why he was so focused on enforcement actions against HCSMs before he had any evidence that HCSMs had harmed New Mexicans, his only justification was to explain that his "overall focus was on enforcement of state law," regardless of the absence or presence of harms stemming from those alleged legal violations. Ex. 38 at 224:19-225:4.

141

In one instance, a consumer who had complained about Gospel Light informed the OSI that Gospel Light had facilitated sharing for his medical expenses, that he was happy with his Gospel Light membership, and that he no longer wished to pursue an enforcement action against Gospel Light. Ex. 36 at 92:2-93:2, 97:18-98:7, 100:10-17. However, Superintendent Toal testified that the consumer's desire to withdraw his complaint "wouldn't be material to whether [OSI] did an enforcement action," because "[t]he enforcement action would have been driven by the results of the investigation [r]egardless of what the consumer wanted." Ex. 38 at 316:7-15.

Based on the testimony of Superintendent Toal and OSI's health insurance policy expert, Paige Duhamel, it appears that Defendants' true interest in its campaign against HCSMs is to eradicate entities providing alternatives to health insurance and thereby increase participants in beWell New Mexico. In his deposition, Superintendent Toal admitted that, as a board member of the New Mexico Health Insurance Exchange while he was superintendent, he, "of course," had an interest in the success of beWell New Mexico. Ex. 37 at 45:2-5. In his testimony, he acknowledged that "the success of beWell New Mexico was dependent on more people participating in the exchange." *Id.* at 45:6-9. Similarly, Expert Duhamel testified that, when too many individuals decide to choose alternatives to health insurance because it is too expensive, that fact "undermines the risk pool and makes insurance coverage more expensive." Ex. 35 at 25:14-25, 30:3-13, 32:6-19, 33:8-22, 38:1-7, 71:10-15. In short, Defendants attempt to outlaw HCSM members' religious practices to advance the state's interest in increasing consumers of health insurance so that the profits of insurance companies increase, thereby making insurance somewhat less expensive. Expert Duhamel testified that the OSI views HCSMs as a threat to this goal, because they present an alternative to medical insurance that is more financially manageable and "siphon off health risks." *Id.* at 32:6-19, 38:1-7.

Advancing the profit margins of private insurance companies so that a marginal portion of those profits can be passed down to New Mexico consumers of insurance—*i.e.,* trickle-down

economics—comes nowhere near to satisfying the compelling state interest standard. *Cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 576–77 (2011) (holding that the state's interest in reducing healthcare costs by imposing pharmaceutical marketing restrictions was not sufficiently compelling to justify content-based restrictions on speech protected by the First Amendment).

**D.    Regardless of any alleged state interest, Defendants' discriminatory acts against Plaintiffs are *per se* violations of the Equal Protection Clause, as these actions were motivated by religious animus, which is not a permissible governmental interest under the Equal Protection Clause.**

"[W]here governmental bodies discriminate out of 'animus' against particular religions, such decisions are plainly unconstitutional," because "government action motivated by religious animus cannot be narrowly tailored to advance a compelling governmental interest." *Ashaheed,* 7 F.4th at 1250 (internal cites and quotes omitted); *see also Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1268 (10th Cir. 2024) (emphasizing that, "[i]f a government policy is motivated by religious animus, the policy is categorically unconstitutional" (internal cite omitted)).

Here, there is substantial evidence of Defendants' animus toward Gospel Light members, including Plaintiffs. *See generally* SOF(C). Defendants refer to HCSMs as "red flag[s]" (Ex. 30 at 8), a "form of garbage" (*id.* at 20), "Ponzi scheme[s] rather than insurance" (*id.* at 36, 76), swindlers (*id.* at 39), and "Frankenstein plans" (*id.* at 47). Defendants compare HCSMs to fraudsters (*id.* at 15) and warn New Mexicans that they may need "protect[ion] from HCSMs" (Ex. 12 at 1). OSI staff member, Paige Duhamel, called HCSM membership "heart-breaking." Ex. 35 at 37:9-15. An OSI attorney compared Gospel Light members being prevented from associating with their chosen religious community to nude dancers being forced to wear G-string thongs when they dance. *See* Ex. 27 at 246:7-16. In Defendants' April 25, 2023 motion to dismiss, Defendants recommended that Gospel Light members substitute their religious ministry with Gospel Light by, instead, "donating to GoFundMe pages." 4/25/23 Motion to Dismiss, ECF No. 8, at 14.

Superintendent Toal, who oversaw the OSI's actions against Gospel Light, admitted to having a strong personal bias against Christians, like Plaintiffs, and testified that he had converted from Christianity to Judaism because he believes that many Christians are "racist," "sexist," display "intolerance," and are "full of disdain, if not outright hatred, for people who were different than them," which he finds unacceptable. Ex. 37 at 61:4-62:9, 67:6-24. He also refused to acknowledge any "religious component" in the way that HCSMs, including Gospel Light, "function." *Id.* at 9:5-7.

Similarly, Paige Duhamel had personal bias against Gospel Light, as her hairdresser was a frustrated Gospel Light member whom Ms. Duhamel was trying to assist. *See* Ex. 35 at 74:4-75:23, 87:9-88:3. Ms. Duhamel even admitted: "I think it [the Gospel Light investigation] might have been triggered by me telling somebody that I knew [Gospel Light] was operating in New Mexico because my hairdresser had had difficulties with [Gospel Light]. So, I think that was a part of the start of this investigation." *Id.* at 72:24-73:5. OSI investigator Phyllis Christy confirmed this fact and testified that the investigation against Gospel Light was the only instance she knew of where the OSI issued a cease-and-desist order against an entity before an investigation had been completed. *See* Ex. 36 at 64:18-65:6, 80:16-81:2. In email correspondence, Superintendent Toal and Ms. Duhamel mock HCSM members by comparing Plaintiffs' religious practices to pet insurance, ridiculing both for not covering behavioral health. *See* Ex. 30 at 29. When reviewing this correspondence during his deposition, Superintendent Toal affirmed that he found nothing wrong with "comparing a crazy pet health care sharing [plan] to a religious health care sharing ministry." Ex. 38 at 279:2-10.

Such blatant evidence of Defendants' animus toward Plaintiffs and their religious practice indisputably proves that Defendants violated Plaintiffs' equal protection rights, particularly when considering the aggressive campaign Defendants mounted against HCSMs and their singular focus on HCSMs to the detriment of New Mexicans at large. *See, e.g., Masterpiece Cakeshop v. Colorado C.R. Comm'n,* 584 U.S. 617, 635 (2018) (finding religious animus where state actors disparaged

plaintiff's religion by calling it "despicable" and characterizing it as insubstantial and insincere); *see also Does 1-11*, 100 F.4th at 1269 (finding religious animus where state action "passe[d] judgment upon and presuppose[d] the illegitimacy of certain religious beliefs").

### E.  Plaintiffs suffered adverse effects due to Defendants' equal protection violations.

"The 'injury in fact' in an equal protection case . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (internal cite omitted). "[D]iscriminatory classification is itself a penalty" and thus qualifies as an actual injury for standing purposes. *Saenz v. Roe*, 526 U.S. 489, 490 (1999); *see also Hassan v. City of New York*, 804 F.3d 277, 289-90 (3d Cir. 2015), as amended (Feb. 2, 2016) (same). Notably, "stigmatizing members of the disfavored group as 'innately inferior' and therefore less worthy participants in the political community, can cause serious noneconomic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 729 (1984). Moreover, a plaintiff suffers "an ongoing injury resulting from the [state action's] chilling effect on his desire to exercise his First Amendment rights." *Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987).

In the present case, Plaintiffs suffer from discriminatory classifications that stigmatize them as inferior, thereby revealing sufficient adverse effects to make out a claim under the Equal Protection Clause. For instance, Defendants' March 26, 2020 press release labeled HCSM members as individuals who "deliberately misle[a]d" and violate the law, further stating that, as HCSM members, Plaintiffs were part of a deceptive religious community from which New Mexicans at large should seek protection. *See* Ex. 17. Then, on Defendants' website, they label HCSM members as engaged in illegitimate health care sharing and discourage New Mexicans from associating with HCSM communities. *See* Ex. 30 at 1. These widely-dispersed, disparaging comments unquestionably made

Plaintiffs feel that they were being depicted as inferior, disfavored, and stigmatized in their community solely due to their membership in a group disfavored by Defendants.

Plaintiffs admit as much. Mrs. Renteria testified that she feels that Defendants "interfered with her religious activity" because they are working to deprive her of her religious community through Gospel Light membership. Ex. 31 at 44:16-45:12. "[B]ecause everything is in limbo" regarding her Gospel Light membership, Mrs. Renteria feels cut off from the Gospel Light community and from the commitments that she made to other members. *Id.* at 45:20-46:5. Defendants' hostility toward her religious community has made her feel invaded, violated, and attacked. *Id.* at 47:20-48:11, 49:11-22. Likewise, Mrs. Smith feels like she is "being treated differently" by Defendants because of her religious affiliations, and she feels that Defendants are wrongly trying to take Gospel Light away from her. Ex. 32 at 20:19-25. Mrs. Smith testified that she feels that Defendants are violating her religious beliefs by telling her who she can and cannot associate with. *Id.* at 21:17-22. Mrs. Smith explained: "they're trying to restrict us . . . [by] [n]ot letting us be members of [Gospel Light] in this state" because "they just don't want us to be affiliated with any of the Christian ministries." *Id.* at 22:19-23:9.

Additionally, Plaintiffs have suffered other, more concrete injuries. For example, Mrs. Renteria testified that she felt compelled to end her husband's and children's Gospel Light memberships because of the uncertainty caused by Defendants' actions against Gospel Light, so Mrs. Renteria was forced to switch from the family sharing program to the singles sharing program with Gospel Light, while her husband and children participate in a different HCSM. Ex. 27 at 93:3-24, 97:6-7. Mrs. Renteria stated that she "would love to reconnect" with her family through Gospel Light membership, but she is afraid to do so because of the OSI's actions against Gospel Light. Ex. 31 at 12:24-13:9. She has become so upset by Defendants' religious discrimination against her that she is seriously considering moving her and her family out of New Mexico to another state. Ex. 9 at 3.

Additionally, because of Defendants' public warnings and enforcement actions against Gospel Light, Gospel Light is losing New Mexico members, thereby making it more difficult for Gospel Light members, including Plaintiffs, to share one another's medical costs and diminishing the amount of funds available for sharing. Ex. 28 at 2.

Finally, because Plaintiffs are Gospel Light members based in New Mexico, the Defendants' final order strips them of their ability to remain Gospel Light members without violating the law and without being afraid of facing prosecution and/or adverse administrative action related to their Gospel Light membership. *See* Ex. 19 at 149:6-10; Ex. 27 at 81:19-21; *Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011) (holding that "[a] plaintiff who challenges a statute on First Amendment grounds may satisfy the injury-in-fact requirement by showing a credible threat of prosecution or other consequences following from the statute's enforcement" (internal cites and quotes omitted)); *Wilson*, 819 F.2d at  946 (holding that a plaintiff suffers "an ongoing injury resulting from the [state action's] chilling effect on his desire to exercise his First Amendment rights"); *281 Care Comm. v. Arneson*, 638 F.3d 621, 630 (8th Cir. 2011) (finding that the threat of prosecution is present where plaintiffs have "grounds to reasonably fear that, unless they modify their speech [or expression], they will be subject to the hassle and expense of administrative proceedings"); *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) (explaining that, "[a]s to whether a First Amendment plaintiff faces a credible threat of prosecution, the evidentiary bar that must be met is extremely low"); *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000) (noting that "[t]he fear of civil penalties can be as inhibiting of speech as can trepidation in the face of threatened criminal prosecution" (internal cites and quotes omitted)); *see also Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) ("We think that the prospect of issuance of an administrative cease-and-desist order . . . or a court-ordered injunction . . . against such prohibited conduct provides substantial additional support for the conclusion that appellees' challenge to the publicity provision is justiciable.").

### III.  DEFENDANTS VIOLATED FEDERAL PREEMPTION LAWS BY APPLYING THE NEW MEXICO INSURANCE CODE TO GOSPEL LIGHT AND ITS MEMBERS, INCLUDING PLAINTIFFS.

Plaintiffs are entitled to summary judgment on Claim 9 of their Complaint, as there is no genuine dispute that Defendants violated federal preemption laws in applying the insurance code to Gospel Light and its members. *See* Complaint at 65-70.

### A.  Conflict preemption prevents the application of the New Mexico Insurance Code to HCSMs.

The Supreme "Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020). "Put simply, federal law preempts contrary state law." *United States v. Supreme Court of N.M.*, 839 F.3d 888, 917-18 (10th Cir. 2016). Relevant here is conflict preemption, which will preempt a state law when "(1) compliance with both federal and state regulations is a physical impossibility, or because the provision (2) stands as an obstacle to the accomplishment and exception of the full purpose and objective of federal law." *Id.* at 917-18 (citations and internal punctuation omitted). *Accord Club Madonna v. Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022).

The Affordable Care Act provides health care sharing ministry members with a conscious-based exemption from the individual mandate. Under that law, a health care sharing ministry is defined as a nonprofit, tax exempt organization whose "members . . . share a common set of ethical or religious beliefs and share medical expenses . . . in accordance with those beliefs." 26 U.S.C. § 5000A(d)(2)(B)(ii)(I) & (II). The Affordable Care Act also requires that this be done "without regard to the State in which a member resides or is employed." *Id.* Subjecting Gospel Light to the Insurance Code violates conflict-preemption principles on both impossibility and obstacle grounds.

148

Unlike federal authorities and insurance regulators in every other state, the Superintendent has interpreted "insurance" contrary to federal law. Using that interpretation to subject Gospel Light to the Insurance Code, the Superintendent would disqualify Gospel Light from qualifying as a healthcare sharing ministry under the Affordable Care Act in four ways.

First, it would cost Gospel Light its nonprofit status because the Internal Revenue Code strictly prohibits nonprofit status for any entity that "substantially" provides any kind of "commercial insurance." 26 U.S.C. § 501(m)(1). "Congress intended a broad definition of the term 'commercial-type insurance.'" *Paratransit Ins. Corp. v. Commissioner of Internal Revenue,* 102 T.C. 745, 752 (1994); *Florida Hosp. Tr. Fund v. Commissioner of Internal Revenue,* 103 T.C. 140, 158 (1994), aff'd, 71 F.3d 808 (11th Cir. 1996); *see also Florida Independent Colleges and Universities Risk Mgmt. Association, Inc. v. United States,* 850 F. Supp.2d 125, 132 (D.D.C. 2012). This federal definition was intended to capture anything even like insurance. But Gospel Light, as a health care sharing ministry, is required by federal law to be a nonprofit corporation. Requiring Gospel Light to comply with the Insurance Code, including the Code's requirement for indemnification, minimum standards of coverage, and reserve requirements, would transform Gospel Light from a healthcare sharing ministry into commercial insurance. That would result in Gospel Light losing its nonprofit status, which would automatically destroy Gospel Light's status as a health care sharing ministry under federal law. 26 U.S.C. § 5000A(d)(2)(B)(ii)(I).

The Tenth Circuit, during the appeal of the preliminary injunction decision, rejected this argument by concluding that "any nonprofit could flout state law by arguing that compliance would cause their organization to land outside of the IRC's definition of a nonprofit," and because the regulations only make health care sharing ministries "choose between functioning as a nonprofit or selling commercial insurance." *Renteria v. N.M. Office of the Superintendent of Ins.*, 2025 WL 635754, at *11 (10th Cir. Feb. 27, 2025) (unpublished). But as the dissent noted, Plaintiffs do not

argue that Gospel Light merely wants to operate as a nonprofit. Rather, the issue is that if Gospel Light was to comply with the New Mexico Insurance Code, and took the step of relinquishing its nonprofit status so it can engage in the business of insurance, then it would no longer be a health care sharing ministry under federal law. This dichotomy—that a health care sharing ministry cannot be both even if they tried—is the conflict that results in preemption.

Second, the New Mexico Insurance Code is preempted because it would prevent Gospel Light's membership from sharing medical expenses (uniformly, nationwide) in accordance with their common religious beliefs. This is because the New Mexico Insurance Code requires that "[n]o insurer, on the basis of . . . religion . . . A. refuse to make insurance available to any application for insurance; or B. treat any such application or insured differently than any other application or insured with respect to the terms, conditions, rates, benefits or requirements of any such insurance contract." N.M. Stat. § 59A-16-12(A)-(B). Yet, federal law requires that a health care sharing ministry only allow membership, to the exclusion of others, for those who "share a common set of ethical or religious beliefs." 26 U.S.C. § 5000A(d)(2)(B)(ii)(II). A second dichotomy therefore exists—if Gospel Light allowed any individual to join regardless of whether they agreed with Gospel Light's Statement of Shared Christian Beliefs, then it could no longer operate as a health care sharing ministry. That results in an irreconcilable conflict.

Third, it would prevent Gospel Light's membership from sharing medical expenses (uniformly, nationwide) "without regard to the State in which a member resides." 26 U.S.C. § 5000A(d)(2)(B)(ii)(II). Gospel Light currently operates freely in every other state, and the District of Columbia, as non-insurance. If Gospel Light is forced to comply with the many requirements of the New Mexico Insurance that conflict with Gospel Light's core beliefs and practices, such as providing minimum essential coverage for contraception and abortion, it would have to gerrymander its sharing program for New Mexico, adopting policies and practices solely for New Mexico. This would prevent

the uniform sharing required by the Affordable Care Act and again destroy Gospel Light's status under federal law. 26 U.S.C. § 5000A(D)(2)(B)(ii)(II).

And fourth, Gospel Light's "option" of simply exiting New Mexico would also violate the Affordable Care Act's uniformity requirement, which requires health care sharing ministries to serve members equally, nationwide, "without regard to the State in which a member resides or is employed." 26 U.S.C. § 5000A(d)(2)(B)(ii)(II). The Superintendent's actions, therefore, would deprive members of Gospel Light in the other 49 states of equal treatment by preventing Gospel Light from serving any member who moves to New Mexico, violating the uniformity requirement. And the Superintendent's exclusion of all health care sharing ministries would also deprive the Plaintiffs, who are New Mexicans that are individual members of Gospel Light and beneficiaries of the conscious-based exemption to the Affordable Care Act's individual mandate, of the benefits of that exemption to which they are entitled by federal law, again violating uniformity.

In enacting the Affordable Care Act, Congress necessarily defined health care sharing as non-insurance that qualifies an individual for a conscious-based exemption to the individual mandate. 26 U.S.C. § 5000A(d)(2)(B). In other words, if Congress believed that health care sharing was insurance, then a conscious-based exemption from the individual mandate would not have been necessary. In such a reading, the federal exemption would be meaningless.

Viewed in any of the above ways, state law, as interpreted by the Superintendent, would make "compliance with both federal and state regulations" impossible, requiring preemption. *Johnson v. American Towers, LLC*, 781 F.3d 693, 707 (4th Cir. 2015). Subjecting Gospel Light to the New Mexico Insurance Code creates irreconcilable conflicts with the Affordable Care Act and the Internal Revenue Code, not only making it "impossible" for Gospel Light to comply with both federal and state law but also standing as an "obstacle to the accomplishment [of] the full purposes and objections" of Congress. *Supreme Court of New Mexico*, 839 F.3d at 917-18.

**B.  The Superintendent's arguments against preemption are untenable.**

The Superintendent's primary argument against preemption has been that the individual mandate, and by extension the ACA's conscious-based exemption, has been revoked. That, however, is not true; Congress has only reduced the penalty for failing to comply with the individual mandate to $0. *See, e.g., Texas v. United States*, 352 F. Supp. 3d 665, 668 (N.D. Tex. 2018). "And because the courts are better positioned to interpret written law than pick policy, Congress must be the one to repeal the individual mandate if that is what it intends to do." *Id.* But it has not. *Id. See also DeOtte v. State*, 393 F. Supp. 3d 490, 509-10 (N.D. Tex. 2019), *vacated on other grounds in DeOtte v. State*, 20 F.4th 1055 (5th Cir. 2021) ("But if the text of a law communicates what it requires—and it does— the Individual Plaintiffs *are required by law* to purchase ACA-compliant health insurance because the 2017 Congress did not repeal the Individual Mandate.") (emphasis in original). The reduction in the penalty cannot be used to sidestep conflict preemption. If the Superintendent were to prevail, Mrs. Renteria and Mrs. Smith would each be forced to make a morally impossible decision between (1) violating their conscience and religious beliefs by purchasing health insurance, or (2) violating federal law by foregoing the purchase of health insurance. Federal law recognized the Constitutional impropriety of forcing such a decision on individuals and offered a conscience-based exception to this conundrum. By removing this exception, the Superintendent has created the Constitutional violation and Congress sought to avoid.

The Superintendent has also contended that Plaintiffs seek a regulation-free environment for health care sharing ministries. That is also incorrect. Thirty-four states have safe harbor regulations for health care sharing ministries; Plaintiffs believe those regulations would pass muster under Plaintiffs claims because they do not seek to prevent individuals from engaging in health care sharing. And health care sharing ministries, as nonprofit corporations, are subject to a complex patchwork of regulations such as the portions of the New Mexico Nonprofit Corporation Act that apply to foreign

nonprofit corporations, N.M. Stat. § 53-8-3(B); and the New Mexico Unfair Practices Act, N.M. Stat. § 57-12-2(A) (including corporations in the definition of person). Such laws would continue to apply even if Plaintiffs succeed in this lawsuit.

### C.  HCSMs do not offer insurance, so the McCarran Ferguson Act does not apply.

Finally, the Superintendent has asserted that her regulation of health care sharing ministries is not preempted because of the McCarran Ferguson Act. Under the McCarran Ferguson Act, federal law reserves "insurance regulation" to the states by protecting such state regulation from "federal preemption." *SEC v. Variable Annuity Life Ins.*, 359 U.S. 65, 67 (1959). But only state regulations of "insurance" as defined under federal law qualify for this protection. To qualify, therefore, states must define insurance consistently with federal law.

In *Air Evac EMC, Inv. v. Dodrill*, the court held that an insurance commissioner's "enforcement threat against" a "Membership Program" similar to Gospel Light's did not "involve regulation of the business of insurance" because the program did not include indemnification. 523 F. Supp. 3d 859, 872 (S.D. W. Va. 2021). Without indemnification, the membership program did not meet the federal definition of insurance and was thus not subject to the McCarran Ferguson Act. *Id.* at 873. This conclusion makes sense. Insurance always requires assumption of "true risk." *Variable Annuity*, 359 U.S. at 71. This assumption of risk "involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts" and that "[t]he companies that issue these annuities [do] take the risk of failure. *Id.* at 71-73. But here, Gospel Light guarantees nothing. Nor does Gospel Light underwrite any risks of its members. The legal hallmarks of insurance are thus not present in the religious practice of health care sharing., *Id.* at 71-73 (quotations and citations omitted). *See also Jordan v. Group Health*, 107 F.2d 239, 245 (D.C. Cir. 1939) (explaining that if risk "is not shifted [to] others, there can be neither insurance nor indemnity," because insurance "involves distribution of the risk," and distribution without is not insurance).

Insurance always requires a legally enforceable promise or "ultimate obligation to indemnify the insured." *Marathan Ashland Pipe Line, LLC v. Md. Cas. Co.*, 243 F.3d 1232, 1244 (10th Cir. 2001). Only one "compelled to pay another party due to a legal obligation [fulfills] indemnification," *Stewart v. EMJ Corp.*, 2005 WL 300430, at *5 (10th Cir. 2005) (unpublished), since an "obligation to indemnify [arises from a] legal obligation to pay, *In re Wallace & Gale*, 385 F.3d 820, 831 (4th Cir. 2004). To "shift [the] entire responsibility" "is exactly what indemnity means." *ERC v. Archstone Smith*, 603 F. Supp. 2d 814, 824 (D. Md. 2009). But Gospel Light does not promise to pay anything; it merely facilitates the sharing of health expenses amongst its members. The McCarran Ferguson Act cannot be relied on to sidestep the conflict between the New Mexico Insurance Code and federal law.

*     *     *

The Superintendent's policy and practice of subjecting health care sharing ministries, like Gospel Light, to the Insurance Code is "an obstacle to the accomplishment and execution of the full purposes and objections of Congress," including its intent to treat health care sharing ministries as "not insurance"—requiring preemption by the Affordable Care Act, *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829 (4th Cir. 2010) ("Obstacle preemption . . . applies 'where state law standards as an obstacle [to] accomplishment and execution of the full purposes and objectives of Congress.'")—and its intent to prohibit nonprofit organization from engaging in any kind of commercial insurance activity—requirement preemption by the Internal Revenue Code. By interpreting state insurance law to create an irreconcilable conflict with the Affordable Care Act and the Internal Revenue Code, the Superintendent also contradicts the proper federal authorities in their own determinations under those laws, which "impede[s federal] authority, again ensuring preemption." *Johnson*, 781 F.3d at 706. In addition, by interpreting state law to "interfere[] with the

methods by which [§ 5000A and § 501 were] designed to reach [their] goal," the Superintendent's interpretation must be preempted by those sections of the Internal Revenue Code.

The Superintendent's unlawful targeting of health care sharing ministries, including Gospel Light, ruptures the otherwise reasonably uniform national regulatory environment—led by the Affordable Care Act's exemption—that allows health care sharing to operate freely as non-insurance nationwide and prevents Plaintiffs from having to choose between violating their religious beliefs or violating federal law. It renders New Mexico the lone, hostile outlier, a sharp departure from its own longstanding regulatory interpretation prior to 2020. Thus, the Superintendent's application of the Insurance Code to Gospel Light is "conflict preempted" under the Supremacy Clause of the United States Constitution. And the Superintendent should be enjoined from enforcing its order against Gospel Light because doing so causes harm to Plaintiffs by preventing them from practicing their religious beliefs.

## IV. THE OSI'S PROHIBITION ON THE PLAINTIFFS' ASSOCIATION WITH EACH OTHER AND WITH OTHER GOSPEL LIGHT MEMBERS—AND ITS ONGOING AND IN-EFFECT BAN ON ADMITTING NEW MEMBERS, IN PARTICULAR— VIOLATES THE FIRST AMENDMENT RIGHT TO FREE SPEECH AND ASSOCIATION.

Plaintiffs are entitled to summary judgment on Claims 4 and 5 of their Complaint, as there is no genuine dispute that Defendants violated Plaintiffs' constitutional rights under the Free Speech and Assembly Clauses through Defendants' content discrimination (Claim 4) and improper interference with Plaintiffs' expressive association (Claim 5). *See* Complaint at 54-58.

The OSI's actions violate the Plaintiffs' right to freedom of association, which is a long-recognized correlative right of the rights of free speech and assembly. "An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. . . . Consequently, we have long understood as implicit in the

right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (citation omitted); *see also Valdez v. New Mexico*, 109 F. App'x 257, 263 (10th Cir. 2004) ("The First Amendment protects the right to associate for the purpose of engaging in . . . the exercise of religion. 'When the State interferes with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association may be implicated.'" (alterations and citation omitted)). The Supreme "Court has rigorously reviewed laws and regulations that constrain associational freedom. In the context of public accommodations, [it] ha[s] subjected restrictions on that freedom to close scrutiny; such restrictions are permitted only if they serve compelling state interests that are unrelated to the suppression of ideas—interests that cannot be advanced through significantly less restrictive means." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 680 (2010) (cleaned up).

Under the free-association analysis, the first question is whether the plaintiff-association "is an expressive association and [whether] the forced inclusion [or exclusion of members] would significantly affect its expression," *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 656 (2000), and the second question is whether "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms," *Roberts*, 468 U.S. at 623 (citations omitted). Somewhat surprisingly to those familiar with these types of analyses, governmental restrictions on membership, when upheld, are normally upheld at the second step of the analysis (contrast this to, say, the Free Exercise analysis, *supra*, where, if and when strict scrutiny is reached, the law rarely survives).

The first step of the analysis is relatively easy for groups to satisfy, as "associations do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the

protections of the First Amendment. An association must merely engage in expressive activity that could be impaired [by governmental interference in an association's desire to admit or exclude certain members] in order to be entitled to protection." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 654 (2000). Courts must both "give deference to an association's assertions regarding the nature of its expression [and] must also give deference to an association's view of what would impair its expression." *Id.* Here, there is no doubt that Gospel Light engages in expressive (namely, religious) activity, *see, e.g.*, Decl. of Plf. Breanna Renteria ¶ 4, at 1-2 ("OSI simply wanted us to take care of each other using the methods that the OSI preferred, rather than the ways that we believe are biblical and they ways that connect us to the larger Christian community."), nor that this activity is being actively impaired both by the OSI's order that Gospel Light stop doing business in New Mexico and specifically that it stop recruiting new members, *see id.* ¶ 13, at 3 ("Because I was concerned about Gospel Light's status in New Mexico, my family was compelled to begin membership with a different healthcare sharing ministry that was not as personable as Gospel Light, and my family did not feel as connected to that community as they did with Gospel Light."); *Church on the Rock v. City of ABQ*, 84 F.3d 1273, 1278 (10th Cir. 1996) ("The City argues that the proselytizing religious speech . . . enjoys a lesser degree of First Amendment protection than does religious speech that is not intended to recruit new believers. The Supreme Court, however, has rejected the notion that speech about religion, religious speech designed to win converts, and religious worship by persons already converted should be treated differently under the First Amendment." (citing *Widmar v. Vincent*, 454 U.S. 263, 269 n.6 (1981)).

The second step of the analysis has sometimes (apparently roughly half the time at the Supreme Court level) been held to justify associational restrictions, but almost exclusively in the context of anti-discrimination laws—which the Supreme Court has viewed as furthering a compelling state interest, and which are obviously not the basis of the OSI's associational interference here. *See generally* SOF(H), *supra*.

To illustrate how the analysis works in practice, one can rather quickly go through the major Supreme Court[19] cases on the freedom of association. In *Roberts*, which is often considered the seminal freedom-of-association case,[20] the Supreme Court held that the Jaycees—a civic organization whose "regular membership [wa]s limited to young men between the ages of 18 and 35, while associate [(non-voting and non-officeholding)] membership [wa]s available to individuals or groups ineligible for regular membership, principally women and older men"—did have a *prima facie* associational right to exclude women, despite a state law requiring their acceptance as regular members. 468 U.S. at 613; *see id.* at 623 ("By requiring the Jaycees to admit women as full voting members, the Minnesota Act works an infringement of the last type. There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire."). The Court upheld the law's application to the Jaycees, however, reasoning that the state's "compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms," *id.* at 623, in light of the fact that the law "requires no change in the Jaycees' creed of promoting the interests of young men, and [] imposes no restrictions on the organization's ability to exclude individuals with ideologies or philosophies different from those of its existing members," *id.* at 627, and that "the Jaycees already invites women" to serve as associate members, *id.* The Court concluded that, "[a]ccordingly, any claim that admission of women as full

___

[19] Interestingly, the Tenth Circuit has no binding freedom-of-association case law post-*Dale*, as every case even citing *Dale* has been either reversed by the U.S. Supreme Court, as is the situation with the two most significant analyses conducted by the Tenth Circuit, *see 303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021), *rev'd*, 600 U.S. 570 (2023); *Beaver v. Clingman*, 363 F.3d 1048 (10th Cir. 2004), *rev'd*, 544 U.S. 581 (2005), or is a relatively perfunctory and/or tangential analysis in an unpublished opinion, *see Valdez*, 109 F. App'x at 263; *McCook v. Spriner Sch. Dist.*, 44 F. App'x 896, 910-11 (10th Cir. 2002).

[20] There are freedom-of-association cases that predate *Roberts*—and they actually have a very pro-plaintiff track record—but they employ analyses that do not closely resemble the modern *Roberts-Hurley-Dale* analysis. *See*, *e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) (striking down Alabama's requirement that the NAACP disclose the names and addresses of all its Alabama members to the state attorney general).

voting members w[ould] impair a symbolic message conveyed by the very fact that women are not permitted to vote [wa]s attenuated at best," *id.* and was outweighed by the significant evidentiary showing made by the state that the Jaycees' gender discrimination constituted a "barrier[] to economic advancement and political and social integration," *id.* at 626.

In *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) (Souter, J.) (unanimous), the Supreme Court struck down the application of a non-discrimination statute to the South Boston Allied War Veterans Council—a group that conducted an annual parade celebrating the anniversary of the evacuation of British troops from Boston, and honoring Boston veterans more generally—when it tried to exclude the participation of the Gay, Lesbian, and Bisexual Group ("GLIB") in the parade. The Supreme Court ruled, unsurprisingly, that parades are expressive as a general matter, and it also ruled, more controversially (though not among the Members of the Court), that the fact that the Council's parade expressed (by way of the vast number of float applications it granted) a broad spectrum of only loosely connected views, none of which had anything to do with sexuality, that the forced inclusion of GLIB would nonetheless significantly affect the Council's expressive activity.

> [A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a particularized message would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll.
> . . . .
>
> Since *all* speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say.
>
> . . . .
>
> . . . Rather like a composer, the Council selects the expressive units of the parade from potential participants, and though the score may not produce a particularized message, each contingent's expression in the Council's eyes comports with what merits

celebration on that day. Even if this view gives the Council credit for a more considered judgment than it actively made, the Council clearly decided to exclude a message it did not like from the communication it chose to make, and that is enough to invoke its right as a private speaker to shape its expression by speaking on one subject while remaining silent on another. The message it disfavored is not difficult to identify. Although GLIB's point (like the Council's) is not wholly articulate, a contingent marching behind the organization's banner would at least bear witness to the fact that some Irish are gay, lesbian, or bisexual, and the presence of the organized marchers would suggest their view that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals and indeed as members of parade units organized around other identifying characteristics. The parade's organizers may not believe these facts about Irish sexuality to be so, or they may object to unqualified social acceptance of gays and lesbians or have some other reason for wishing to keep GLIB's message out of the parade. But whatever the reason, it boils down to the choice of a speaker not to propound a particular point of view, and that choice is presumed to lie beyond the government's power to control.

*Hurley*, 515 U.S. at 569, 573 & 574 (citations and internal quotation marks omitted). *Hurley* is thus a powerful case illustrating the laxness of step one of the analysis: if a desire to merely remain silent on a given issue is deemed to be unconstitutionally interfered with by forced association with that issue, then the test largely boils down to one of sincerity (this would become even more clear after *Dale*'s articulation of the 'deference' courts should give associations). On the second step of the analysis, the opinion is not a paragon of clarity (it is consciously ambiguous on the question of whether strict or intermediate scrutiny applies), *see*, *e.g.*, *id.* at 575 (noting that in a past case "on the general subject of compelled access for expressive purposes," the Court "applied only intermediate scrutiny"), but the Court found it significant that "no individual member of GLIB claims to have been excluded from parading as a member of any group that the Council has approved to march," with the "the disagreement go[ing] to the admission of GLIB as its own parade unit carrying its own banner," which the Court determined did not implicate a compelling or important governmental interest at all, thus obviating the need for a tailoring analysis, *id.* at 572; *see id.* at 577 (holding that, "whatever the

ultimate level of scrutiny, [] a challenged restriction on speech serve a compelling, or at least important, governmental object").

Five years later, in *Dale*, the Court delivered another free-association victory by striking down the application of a New Jersey law to the Boy Scouts of America, which wished to exclude openly gay scoutmasters. *Dale* basically extended the *Hurley* rationale beyond the specifically-expressive (even if the ultimate message was non-specific) context of parades and into the broader context of the expressive aspects of general operations, including the general moral beliefs of an association. The Boy Scouts did have an avowed policy of opposing homosexuality, and the Court ultimately found that the "presence [of a gay] . . . scoutmaster would significantly burden the Boy Scouts' desire to not 'promote homosexual conduct as a legitimate form of behavior.'" 530 U.S. at 653. The Court noted that "an expressive association can[not always] erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message," but that the scoutmaster's "presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior," which the Court found to be an unacceptable incursion into the Boy Scouts' freedom of expressive association. *Id.* The Court arrived at this far-from-indisputable conclusion by applying an equally controversial conception of "deference" to the Boys Scouts itself, which the four dissenting justices—while vehemently disagreeing with the concept—describe quite accurately:

> [T]he majority insists that we must "give deference to an association's assertions regarding the nature of its expression" and "we must also give deference to an association's view of what would impair its expression." So long as the record "contains written evidence" to support a group's bare assertion, "[w]e need not inquire further." Once the organization "asserts" that it engages in particular expression, "[w]e cannot doubt" the truth of that assertion.

> This is an astounding view of the law.

161

*Dale*, 530 U.S. at 685-86 (Stevens, J., dissenting) (citations omitted). At the second step, the Court made clear that strict scrutiny applied, *see id.* at 659, but largely handled that analysis by way of contradistinction from *Roberts* and another case, *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537 (1987), in which the Court had upheld the application of anti-gender-discrimination laws on civic organizations. *See Dale*, 530 U.S. at 657 ("[I]n each of these cases we went on to conclude that the enforcement of these statutes would not materially interfere with the ideas that the organization sought to express.").

While it is not quite true/fair to say that the varying outcomes in *Roberts*/*Duarte* and *Dale* stem from a prioritization of the problem of gender discrimination over that of discrimination on the basis of sexual orientation,[21] a close reading of *Dale* renders the conclusion inescapable that the Court views the inclusion or exclusion of homosexuals by an association to be more fundamentally *expressive* than the inclusion or exclusion of women—a conclusion that one may reasonably think might have changed in the ensuing years, as LGBT identities have become accepted and (more importantly for this analysis) less remarked-upon. *Cf. Dale*, 530 U.S. at 699 (Stevens, J., dissenting) (outlining the ways in which, even by the year 2000, "traditional ways of thinking about members of unfamiliar classes[] have [been] modified"). As the instant case does not involve the application of anti-discrimination laws,[22] the issue is not centrally relevant.

---

[21] Although, when undertaken by the government, gender discrimination does in fact receive greater scrutiny under the Equal Protection Clause than discrimination on the basis of sexual orientation. *Compare Craig v. Boren*, 429 U.S. 190, 197-98 (1976) (applying intermediate scrutiny to gender-based classifications), *with Romer v. Evans*, 517 U.S. 620, 635 (1996) (applying rational-basis scrutiny in the context of a putatively anti-gay law).

[22] To clarify, because there *are* anti-discrimination laws at the periphery of this case (mostly anti-religious-discrimination laws), what is meant by this statement is that this is not a case where Gospel Light is being forced to include members that it wishes to exclude (for whatever reason). Rather, the argument being made here is that the OSI's prohibition on Gospel Light recruiting *any* new members in New Mexico is a violation of its (and the Plaintiffs') right to *include*.

Neither the Supreme Court,[23] nor the Tenth Circuit, *see* note 199, *supra*, appear to have returned to the *Roberts-Hurley-Dale* analysis since *Dale*, although it remains the applicable standard for assessing the constitutionality of governmental restrictions on private associations' ability to determine their own membership.[24]   The OSI's effective prohibition on the Plaintiffs' right to associate with other Gospel Light members—and, specifically, its prohibition on the recruitment of new members—clearly violates this test.

To first explain why this argument—and the distinction between the OSI's prohibition on Gospel Light existing in New Mexico, versus the (lesser-included) prohibition on the recruitment of new members, is potentially significant—matters in a practical sense, the Court should recall that the OSI is in the process of arguing that the Plaintiffs lack standing because, as of right now, they are continuing to both share into, and reap the benefits of sharing from, Gospel Light's ministry. *See generally* Defs' MSJ at 6-7 (Doc. No. 127) (filed Jan. 3, 2025) ("The inability to exercise their religious belief by making a monthly share payment is the injury in fact claimed by the Plaintiffs to satisfy the requirements of standing. Yet, as both Plaintiffs testified, they continue to make their

---

[23] Although a free-association claim was raised in *CLS v. Martinez*, which concerned a student organization's requirement that all members sign a "statement of faith" that in effect "exclude[d] from affiliation anyone who engage[d] in 'unrepentant homosexual conduct,'" or "who h[e]ld religious convictions different from those in the statement," 561 U.S. at 672, the Supreme Court circumvented, while expressly leaving intact, the two-step *Roberts-Hurley-Dale* analysis by instead analyzing the school's non-discrimination rules under its limited-public-forum line of cases, *see id.* at 681 ("[T]he strict scrutiny we have applied in some settings to laws that burden expressive association would, in practical effect, invalidate a defining characteristic of limited public forums—the State may reserve them for certain groups. . . . The same ground rules must govern both speech and association challenges in the limited-public-forum context, lest strict scrutiny trump a public university's ability to confine a speech forum to the limited and legitimate purposes for which it was created." (alterations, internal quotation marks, and citations omitted)).

[24] Given the paucity of case law, some commentators have read an additional axis into the analysis in a preemptive attempt to reconcile the freedom-of-association cases with the Supreme Court's commercial-speech cases. *See, e.g.*, 5 Rotunda & Nowak, *supra* § 20.41(e), at 389 ("It is best to think of associational rights as proceeding on a continuum.  This continuum ranges from the least protected form of association (for example, the associational rights related to commercial activities) to the most protected forms of association (for example, the associational rights related to political or religious speech or associations . . . )."). This is irrelevant (or even helpful) to the Plaintiffs' case, as their expressive association is explicitly religious in nature.

monthly contributions the very act they claim the Final Order prohibits them from doing."). The Plaintiffs of course contend that this in no way constitutes a lack of standing: if a government official issues an order shutting down the First Baptist Church and declaring all of its weekly masses and other gatherings to be criminal acts, the fact that some congregants defy the order and go to mass anyway does not deprive them of standing to challenge the order—quite the opposite, it increases the reasonableness of their fear of enforcement. *See* Plfs' Response to Defs' MSJ (Doc. No. 143) (filed Jan. 30, 2025).

Still, because the OSI has raised the issue, the Plaintiffs are obliged to counter that, while Gospel Light is indeed continuing to share with its pre-existing members in New Mexico, it has—in compliance with and submission to the OSI's order—ceased proselytizing, recruiting, or accepting new members. Ex. 26 at 7. What this means is that the one aspect of the Plaintiffs' religious-ministry activities that has been indisputably—meaning, even under the OSI's wrongheaded logic—shut down by the OSI also happens to be the aspect of the ministry that most clearly gives rise to a freedom-of-association claim.[25]

How the freedom-of-association analysis applies here is clear. As explained above, Gospel Light is very obviously an expressive association, and the OSI's bar on new members clearly "significantly affect[s] its expression." *Dale*, 530 U.S. at 656. So the question, then, is whether the "[i]nfringement[] on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623 (citations omitted). Here, the answer is no: New Mexico has countless ways it can effectuate its stated interests of protecting

---

[25] To be clear: the OSI's prohibition on proselytization/recruitment *also* violates the Free Exercise Clause, but the Free Exercise analysis unfolds identically for the ongoing-operation/sharing aspect of the ministry and the recruitment/proselytization aspect, so the two aspects were not discussed separately when undertaking that analysis.

consumers from misunderstandings about the non-insurance nature of HCSMs—including, most obviously, disclosure requirements—and the OSI has in fact not adduced any evidence of member confusion in this case; and as for protecting the state risk pool, it could do that by any number of methods, including—most bluntly from a policy perspective, but also with absolutely *perfect* effectuation of the government interest—by simply requiring that all New Mexicans carry insurance.

## V.    DEFENDANTS VIOLATED PLAINTIFFS' DUE PROCESS RIGHTS THROUGH THE OSI'S UNCONSTITUTIONALLY INADEQUATE ADJUDICATORY PROCESS.

Plaintiffs are entitled to summary judgment on Claim 8 of their Complaint, as there is no genuine dispute that Defendants violated Plaintiffs' constitutional rights under the Due Process Clause through Defendants' denial of a fair hearing process to Gospel Light and its members, including Plaintiffs. *See* Complaint at 61-64.

Due Process prohibits the State from taking away someone's life, liberty, or property. *Beckles v. United States,* 580 U.S. 256, 262 (2017). Here, Plaintiffs were deprived of due process for each of the factors and reasons outlined in Section D of the Statement of Facts, *supra.* Most importantly, Plaintiffs' due process protections were violated through the actions of the Superintendent, carried out by two decisionmakers: (1) the OSI Hearing Officer who rendered a Recommended Decision following an evidentiary hearing; and (2) the Superintendent, who adopted all of the Hearing Officer's findings of fact and conclusions of law as her own. Neither was impartial.

> The essential elements of the adversary process, some or all of which may be required as part of the due process afforded an individual when the government deprives him of life, liberty, or property through the action of a state agency, are: (1) adequate notice of the charges or basis for government action; (2) a neutral decision-maker; (3) an opportunity to make an oral presentation to the decision-maker; (4) an opportunity to present evidence or witnesses to the decision-maker; (5) a chance to confront and cross-examine witnesses or evidence to be used against the individual; (6) the right to have an attorney present the individual's case to the decision-maker; (7) a decision based on the record with a statement of reasons for the decision.

*Bd. Of Educ. of Carlsbad Mun. Schs. v. Harrell*, 882 P.2d 511, 520 (N.M. 1994). The requirements can be further condensed into the three requirements of notice, opportunity to be heard, and an impartial decision maker. *See* Rhonda Wasserman, *Procedural Due Process* 79 (2004) (endnote omitted). *See also Goldberg v. Kelly*, 397 U.S. 254, 271 (1970) ("And, of course, an impartial decision maker is essential.").

Indeed, "[i]t is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal*, 556 U.S. 868, 876 (2009); *accord William Jefferson & Co. v. Bd. of Ass'mt*, 685 F.3d 960, 963-64 (9th Cir. 2012) (applying *Caperton* to local agency process). "This applies to administrative agencies which adjudicate as well as to courts. Not only is a biased decisionmaker constitutionally unacceptable but our system of laws has always endeavored to prevent even the probability of unfairness." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (citation and quotations omitted).

A due process compliant hearing process requires a decisionmaker who is impartial and free from any form of bias or predisposition regarding the outcome of the case. *See Reid v. New Mexico Bd. of Examiners of Optometry*, 589 P.2d 198, 200 (N.M. 1979) (recognizing that "[a]t minimum, a fair and impartial tribunal requires that the trier of fact be disinterested and free from any form of bias or predisposition regarding the outcome of the case[]" and that "[t]he inquiry is not whether the [triers of fact] are actually biased or prejudiced, but whether, in the natural course of events, there is an indication of a possible temptation to an average man sitting as a judge to try the case with bias for or against any issue presented to him"); *City of Albuquerque v. Chavez*, 941 P.2d 509, 514 (N.M. Ct. App. 1997) (applying an "objective appearance of fairness test" to determine bias by looking at whether "a reasonable person would have serious doubt about whether the hearing officer could be fair").

"The rigidity of the requirement that the trier be impartial and unconcerned in the result applies more strictly to an administrative adjudication where many of the customary safeguards affiliated with court proceedings have, in the interest of expedition and a supposed administrative efficiency, been relaxed." *Reid*, 589 P.2d at 200. The "test for disqualification" is "whether a disinterested observer may conclude that the agency has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Fast Food Workers Comm. v. NLRB*, 31 F.4th 807, 815 (D.C. Cir. 2022). And with respect to this case, where there is a claim that the Superintendent's actions violated the Plaintiffs' religious freedom, those Plaintiffs were entitled to have those rights only stripped by "a neutral decisionmaker who would give full and fair consideration to [Plaintiffs' religious freedom claim] as [they] sought to assert it in all of the circumstances in which this case was presented, considered, and decided." *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 640 (2018).

Applying these criteria to Superintendent Toal, it is clear that he was not disinterested in the outcome of this case and that he was prejudiced as to the facts and law of the case. First, Superintendent Toal testified that he has hostility towards Christians as a general class. *See* Ex. 37 at 61:4-15. 61:24-62:9, 67:6-10, 68:12-15. Second, the evidence is clear that Superintendent Toal sought out complaints so that he could end health care sharing, going so far as reaching out to other administrative agencies to see if there were any complaints against health care sharing ministries— an action that even Superintendent Toal admitted was improper overreach by the OSI. *See* Ex. 30 at 69-70, 72, 84-85; Ex. 38 at 246:14-25. This made good on the Superintendent's promise to "tak[e] action" against health care sharing. Ex. 12 at 2. Third, the Superintendent took actions prior to the administrative action in this case that eliminated the firewalls between the investigators, prosecuting attorneys, and hearing officers at the Office of the Superintendent of Insurance, consolidating all of those individuals into a single office and giving himself the final say in each step of the investigative,

prosecutorial, adjudicatory, and appellate processes. *See* Ex. 34 at 162:11-163:7; Ex. 36 at 53:1-55:5; Ex. 37 at 101:10-103:1, 117:21-118:2, 134:15-20, 137:6-18, 145:1-13, 147:24-149:22; Ex. 38 at 213:13-214:5, 215:4-21, 292:17-25, 293:1-13, 295:14-297:8. Fourth, the hearing officer in this case did not issue a neutral decision that was then approved by the Superintendent; the hearing officer instead sought review and approval prior to making his own decision. *See, e.g.,* Ex. 37 at 147:24-149:22; Ex. 39 at 229:2-16. Superintendents Toal and Catechis described their own "final decisions" as merely "rubber stamps" and "pro forma" recitations of the hearing officers' recommended decisions. Ex. 37 at 149:2-22; Ex. 39 at 259:2-16. And fifth, Superintendent Toal admitted to further bias against HCSMs, and in favor of insurance companies operating through beWell New Mexico, when he testified that, as a board member of the New Mexico Health Insurance Exchange during his tenure as superintendent, he "of course" had an interest in the success of beWell New Mexico, which was "dependent on more people participating in the exchange" rather than becoming HCSM members. Ex. 37 at 45:2-13. As such, he had a direct conflict of interest in fairly adjudicating whether HCSMs are insurance due to his fiduciary duty to increase enrollment on the beWell New Mexico exchange.

Superintendent Toal also showed that he was interested in the outcome of this case through his public statements, which prejudiced the facts and law prior to the proceedings being initiated. On March 26, 2020, the Superintendent made a public statement that "a HCSM plan is an unauthorized insurance product"—a statement that he later admitted under oath was "problematic" and "inaccurate" of him to publish. Ex. 12 at 1; Ex. 38 at 294:17-295:9. He also admitted that it was "improper to discourage New Mexicans from doing things like signing up for HCSMs" because that is not the OSI's role; yet, that is the very message he did, in fact, relay to the public. *See* Ex. 38 at 284:20-285:11. The Superintendent's Consumer Advisory March Insurance Tip of the Month referred to HCSMs as "bad plans" and "scammers trying to lure people into purchasing low-quality health

insurance or health insurance-like products" and described a representation made by a valid, ACA-compliant HCSM as a "red flag" that means "someone is trying to sell you a bad" health plan. Ex. 13. On March 26, 2020, a news article quoted the Office of the Superintendent of Insurance urging consumers not to engage in health care sharing, which it describe as an "unauthorized insurance product," and which included a photograph accompanying the news story prominently displaying the word "SCAM" spelled out in large, red, uppercase letters that are placed atop a fanned-out pile of large-denomination bills of U.S. currency.

It is hard to imagine a set of statements that more clearly prejudices a decision maker. Certainly, the Superintendent "ha[d] demonstrably made up his mind about important and specific factual questions and [was] impervious to contrary evidence." *Fast Food Workers Committee v. NLRB*, 31 F.4th 807, 817 (D.C. Cir. 2022) (Rogers, J. concurring in part and dissenting in part). With those statements made, in what world could individuals that engage in health care sharing get a fair hearing? Would it matter if the health care sharing occurs through a legitimate, certified sharing ministry in the eyes of the federal government? Or is this a crusade against all who engage in health care sharing in which the ultimate decisionmaker is pushing his office—including the Hearing Officer—to take action against entities he believes are a scam because they carry out a religion he abhors? The Hearing Officer was not immune from these statements; he recognized that Gospel Light had "presented evidence of the Superintendent's views on policy, even strong views, and even views that are pertinent to the case before the tribunal." That deprived Plaintiffs of an impartial decisionmaker.

Plaintiffs were also deprived of an impartial decisionmaker because a single person within OSI served as the initiator, prosecutor, and decisionmaker as the hearing officer, R. Alfred Walker, directly represented the Superintendent in litigation and worked in the same office as Stephen Thies, who was prosecuting the action. *See* Ex. 34 at 162:11-163:7; Ex. 36 at 53:1-55:5; Ex. 37 at 101:10-

103:1, 117:21-118:2, 134:15-20, 137:6-18, 145:1-13, 147:24-149:22; Ex. 38 at 213:13-214:5, 215:4-21, 292:17-25, 293:1-13, 295:14-297:8. These points are salient because they bear on structural issues particular to this administrative hearing that raise "the possibilities of bias that may lurk in the way particular procedures actually work in practice." *Withrow*, 421 U.S. at 54. Here, an attorney employed by the Superintendent—who provides attorney-client advice and representation to the Superintendent—was appointed by the Superintendent to act as a hearing officer in a matter that the Superintendent not only initiated, but in no uncertain terms indicated his intractable determination that health care sharing is a "scam." The case was then administratively prosecuted by an attorney from the same office that was a colleague of the Hearing Officer, and nearly all of the evidence presented during the hearing came from OSI employees. See Ex. 18-19. Even taking *Withrow*'s strict view of bias into account, in what world were Plaintiffs going to get a fair hearing? The answer is none—not where the Superintendent served as grand jury, prosecutor, and judge.

   To be clear, there are processes that exist to eliminate this type of bias. For example, New Mexico has passed the Administrative Hearing Office Act, which creates independent hearing officers to hear tax protests, adjudicate hearings under the Motor Vehicle Code, and adjudicate revocation allegations under the Implied Consent Act. N.M. Stat. Ann. §§ 7-1B-1 through -10. Additionally, the City of Albuquerque has a general, all-purposes Office of Administrative Hearings that hears appeals of everything from abandoned-inoperable-vehicle designations, to suspensions of security-alarm permits, to body art permits, to towed vehicles, to rulings about the height of news racks. *See* Independent Office of Hearings Ordinance § 2-7-8-4(a). While no statute exists under the Insurance Code, the juxtaposition of a scheme of independent hearing officers against the Superintendent's scheme of part-time hearing officers that serve as the Superintendent's lawyers at other times is enlightening. The risk of institutional bias (not to mention the attorneys just trying to keep their jobs or innocently hoping to make their boss happy) is astounding. This is particularly vexing when one

considers how much higher the stakes are in a case like this one—involving the prohibition of a religious practice based on sincerely held religious beliefs as well as the imposition of $2.51 million fine on Gospel Light—compared to revocation of a driver's license or the height of a newspaper rack.

Due Process demands more. Plaintiffs are entitled to summary judgment on their due process claims.

## VI.  PLAINTIFFS ARE ENTITLED TO DECLARATORY JUDGMENT THAT DEFENDANTS' ACTIONS VIOLATED THE U.S. CONSTITUTION AND THAT GOSPEL LIGHT IS AN HCSM UNDER FEDERAL LAW, WHICH CANNOT BE CONSIDERED AN "INSURANCE PROVIDER" IN NEW MEXICO.

Plaintiffs are entitled to summary judgment on Claim 10 of their Complaint, as there is no genuine dispute that declaratory judgment is appropriate relief here. *See* Complaint at 71-72, 77-78.

"In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Whether the exercise of discretion is appropriate is determined by considering five factors:

> (1) whether a declaratory action would settle the controversy; (2) whether it would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of procedural fencing or to prove an arena for a race to *res judicata*; (4) whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*State Farm Fire & Casualty Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994) (internal cite and quote omitted). Here, all five factors counsel in favor of issuing a declaratory judgment.

First, the declaratory claim would settle the controversy between the Superintendent of Insurance and the Plaintiffs. Plaintiffs are like-minded Christians that seek to carry out their faith together through the religious practice of health care sharing; the Superintendent seeks to prohibit them from doing so. Declaring that Plaintiffs may practice their religion, whether it be because the

Superintendent's action violated their First Amendment rights or deprived them of due process, would resolve that conflict.

Second, a declaratory judgment would serve a useful purpose in clarifying the legal relations at issue here. Plaintiffs are individual members of Gospel Light. Many of the actions taken by the Superintendent have been against Gospel Light, which undoubtedly affects Gospel Light members. But clarifying the legal relations at issue—in other words, resolving the extent to which the Superintendent may take action against Gospel Light before unconstitutionally depriving its members of their religious beliefs and practices—would serve a useful purpose in outlining the parameters of the litigation, Plaintiffs' claims, and the Superintendent's authority.

Third, the declaratory remedy is not being sought merely for procedural fencing or to engage in a race to *res judicata*. There are parallel state proceedings. But this action would not necessarily preclude claims or issues in those actions. For example, Gospel Light's state court appeal of the Superintendent's administrative action does not include the individual Plaintiffs that have sued here. Similarly, the parallel state litigation in the Fifth Judicial District Court includes only those claims (claims brought under the New Mexico Civil Rights Act and New Mexico Religious Freedom Restoration Act) which Gospel Light and Plaintiffs could not bring here because of the Superintendent's sovereign immunity. The declaratory judgment claim is a legitimate attempt to define the legality of the Superintendent's actions, not a procedural ploy to gain a litigation advantage.

Fourth, issuing a declaratory judgment would not cause friction between the federal and state courts. This action originally included Gospel Light. But the Court abstained from hearing Gospel Light's claims because Gospel Light was appealing the administrative order through the state courts. The only remaining claims are those claims brought by two individual members. Deciding whether the Superintendent's actions violate those two individuals' constitutional rights will not cause friction with the state courts, because this Court has already abstained to avoid such friction.

And fifth, there is not necessarily an alternative remedy that is better or more effective. Plaintiffs bring this declaratory judgment claim alongside several § 1983 claims. Under § 1983, Plaintiffs seek injunctive relief. But a declaration that Plaintiffs constitutional rights were violated provides a remedy that § 1983 does not.

Taken together, the Court should exercise its discretion and enter a declaratory judgment that Plaintiffs' constitutional rights were violated.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for Summary Judgment.

Respectfully submitted,

*/s/ Elise C. Funke*
Carter B. Harrison IV
Nicholas T. Hart
Elise C. Funke
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 295-3261
carter@harrisonhartlaw.com
nick@harrisonhartlaw.com
elise@harrisonhartlaw.com

*-and-*

J. Michael Sharman
**Commonwealth Law Offices, P.C.**
246 E. Davis Street, Suite 200
Culpeper, VA 22701
(540) 727-1007
mikesharman@verizon.net
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on June 9, 2025, I electronically filed the foregoing with the United States District Court for the District of New Mexico's CM/ECF system, causing a copy of it to be served on all counsel of record.

HARRISON & HART, LLC

By: _/s/ Elise C. Funke_